78,165-03

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 16 2015

Abel Acosta, Clerk

Sept. 14, 2015

Abel Acosta
Clerk of the Texas Court of
Criminal Appeals
201 West 14th Street
Austin, Texas 78701

Chadrick Pate # 1563340
3060 FM 3514
Beaumont Texas 77705

Re: Emergency Motion for Permission to File Writ of Mandamus from a Void Final Felony Conviction with Emergency Writ of Mandamus from a Void Final Felony Judgment and Conviction included.

Dear Clerk,

Enclosed you will find the original documents referenced above.

As my address indicates I am a inmate pro se filer.

I respectfully request that these proceedings be filed and submitted under emergency considerations under the Emergency Titles or which I have labeled them.

I also respectfully request that the Court consider the pleadings liberally and if need be consider the pleadings as an Original Ex Parte Habeas Corpus Proceeding only if the Court cannot provide expedious decision pursuant to my Writ of Mandamus.

**Suspension of Rule:** On a party's motion or on its own initiative an appellate court may — to expedite a decision or for other good cause —suspend a rule's operation in a particular case and order a different procedure; but a court must not construe this rule

suspend any provision in the Code of Criminal Procedure or to alter the time for

perfecting an appeal in a civil case.

Thank you for your kind consideration in this matter.

Respectfully,

Chadrick Pate # 1563340
3060 FM 3514
Beaumont, Texas 77705

# IN THE TEXAS COURT OF CRIMINAL APPEALS, AUSTIN TEXAS

In Re: CHADRICK B. PATE # 01563340
     REALTOR

          V.
                                    CAUSE NO. A-08-5080-4CR

THE 36TH DISTRICT COURT
ARANSAS COUNTY, TEXAS

HONORABLE JANNA K. WHATLEY
     STATE OF TEXAS
     RESPONDENT

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 1 6 2015

Abel Acosta, Clerk

EMERGENCY
## MOTION FOR LEAVE TO FILE WRIT OF MANDAMUS FROM A VOID FINAL FELONY JUDGMENT AND CONVICTION AND  EMERGENCY MOTION FOR  RELIEF PURSUANT TO WRIT OF MANDAMUS FROM A VOID FINAL FELONY JUDGMENT AND CONVICTION

Respectfully Submitted,

Chadrick Pate pro se  # 1563340
3060 FM 3514
Beaumont, Texas 77705

This document contains some
pages that are of poor quality
at the time of imaging.

# IN THE TEXAS COURT OF CRIMINAL APPEALS AUSTIN TEXAS

**In Re: CHADRICK PATE**
        **REALTOR**

                    **V.**                                          **CAUSE NO. A-08-5080-4CR**

**THE 36TH DISTRICT COURT**
**ARANSAS COUNTY, TEXAS**

**HONORABLE JANNA K. WHATLEY**
        **STATE OF TEXAS**
            **RESPONDENTS**

## EMERGENCY MOTION FOR LEAVE TO FILE ORIGINAL WRIT OF MANDAMUS PURSUANT TO A VOID FINAL FELONY CONVICTION

**To The Honorable Texas Court of Criminal Appeals,**

Comes Now, Realtor Chadrick B, Pate hereinafter referred to as Pate, proceeding

pro se and respectfully request Emergency Relief for Motion For Leave To File Original

Writ of Mandamus Pursuant To A Void Final Felony Conviction, filed with this Motion.

## JURISDICTION

This Court has jurisdiction of this proceeding pursuant to Texas Constitution

Article 5 Section 5 of The Texas Constitution.

1.

Under exceptional circumstances, the court may deny the right to file a response and act on the motion any time after it is filed; Petition Practice before Texas Supreme Court 2008 Douglas W. Alexander and Lori Ellis Ploger.

Pate would show good cause and exceptional circumstances for emergency relief as follows: (1) Pate is entitled to the relief sought as a matter of law.

Pate filed the Writ of Mandamus pursuant to a Void Judgment and Conviction. The void statute calls for no discretion and no judicial decision , it mandates acquittal.

Mandamus will lie when a district court fails to observe a mandatory statutory provision conferring a right or forbidding a particular action. In these instances the trial court's discretion is not invoked, and it's failure to comply with the mandatory provision renders it's order or judgment void. **See: State Bar of Tex. v. Heard 603 SW 2d 829 Tx. Sup. Ct. 1980; Cline v. Niblo 117 Tex; 474 8 SW 2d 633.368.66 A.L.R. 916 Freeman on Judgments. 5th Ed. 354.**

Pate has set out in his Writ of Mandamus a non exhaustive list of each of the violations of due process, abuses of discretion, and fraud upon the court by the court and it's officers used to illegally proceed to a trial and to render a void and illegal judgment and conviction and supported the abuses with an adequate record to establish the mandamus relief requested. **See Walker v. Packer 827 S W 2d 833 837 (Tex. 1992); In Re Mata, No. 14-12-00460- CV Tx. App. 2012 and TRAP 52.3(k)(1) 52.7(a).**

Therefore it is with respect and trust that Realtor Pate relies upon the judicial system to terminate the last more than Seven Years of the abuse of his liberty rights. Pate has

2.

professed his innocence from the very beginning of this ordeal and though not effectively due to his lack of knowledge of the law and financial resources he has never stopped looking to the judiciary to acquit him.

To force Pate to await a response from the same parties that are responsible for his illegal Judgment and Conviction and to await the response from this Honorable Court serves only to continue the abuse of Pate's substantial rights to his liberty and freedom from the State having brought an illegal indictment with no evidence to support the indictment, his illegal incarceration, illegal trial and illegal Judgment and Conviction. If the Honorable Court cannot make a decision for immediate Mandamus relief based upon the evidence supplied by Pate contained within his Writ of Mandamus, then Pate respectfully requests that if the court sees fit to allow a response from the Respondent and Interested Party then it would order an immediate response and that both the trial Judge Janna K. Whately and the District Attorney Michael Wellborn be recused from serving any such response and that a Special Judge be appointed to insure a fair and impartial response based only on the facts of the trial court record and any supporting facts offered by Pate. Not withstanding the serious conflict of interest that exists from any response from Judge Whatley or District Attorney Michael Wellborn, **Judicial Cannon 2** prohibits the current District Attorney Michael Wellborn from any participation in the Mandamus Proceedings as he was one of the presiding Pre Trial Judges over Pates trial, who had ex parte communications with the Prosecuting Attorney regarding Pate's trial defense and trial dates, and also

3.

failed to provide a decision on Pate's properly filed Motion for Severance when a decision was requested. Judge Janna K. Whatley should be recused in accordance with **Judical Cannon 2** as well as she was the presiding judge who among other abuses had ex parte communications and rendered and certified a fraudulent Judgment and Conviction into this Honorable Court. **Canon 2 states: (A)** A judge should respect and comply with the law and should conduct himself or herself in a manner that promotes public confidence in the integrity and impartiality of the judiciary. **(B).** A judge should not allow family, social, or other relationships to influence his or her judicial conduct or judgment. A judge should not lend the prestige of his or her office to advance the private interests of himself or herself or others; nor should he or she convey or permit others to convey the impression that they are in a special position to influence him or her. A judge should not testify voluntarily in an adjudicative proceeding as a character witness.

The Record provided by Pate in his Writ of Mandamus will reflect that Judge Janna K. Whately was aware that the indictment was fatally defective rendering incomplete jurisdiction or authority over the matter of the offense of Murder charged and the personal authority over Pate and yet she allowed the State to bring Pate to trial and failed to excuse the jury and Pate upon that awareness. She further held ex parte communication in a pretrial hearing for the co defendant Christopher Hall and allowed the District Clerk to enter upon Pate's Criminal Docket Sheet that he had announced

4.

Ready for trial when in fact he was not before the Court at that proceeding was not aware of the proceeding at the time and did not announce Ready.

Judge Whately was also aware that Pate had a pending Motion for Severance before the pre trial court when she allowed the trial to go forward . She was also aware that at a pretrial hearing for the co defendant Christopher Hall that Judge Joel Johnson had separated the trials of Pate and Hall and yet proceeded to a joint trial with Pate and Hall. This same kind of abuse and violation of Pate's due process was continued throughout Pate's jury trial and the Record will reflect same. Once the Jury returned a Guilty verdict against Pate for which there was no evidence presented by the state for conviction, Judge Whately did not order the jury to acquit Pate and instead rendered the illegally obtained Judgment and Conviction and certified and filed same fraudulent Judgment into both this Court, and the 13th Court of Appeals.

It will become evident upon the reading of the Writ of Mandamus that under the facts and law applicable to Pate's Jury Trial Case # A-08-5080-4CR presided over by the Respondent Janna K. Whately that she lost jurisdiction to proceed to trial and had no authority to enter a Judgment and Conviction but rather her only authorization was to order the jury to acquit and or order the dismissal of the indictment and the jury. Judge Whately had no discretion to continue to a trial, or a Judgment and Conviction or to enter a Fraudulent Judgment of Proceedings and certify them to the Courts of Appeals.

Because Judge Whately and Officer's of the Court violated Pate's Constitutional Due

5.

Process rights under both the U. S. and Texas Constitutions and because She and Officer's of the Court participated in a fraudulent scheme to illegally convict Pate her only authorization was a ministerial act and not discretionary to Order an Acquittal, Dismiss the Indictment , Pate and the Jury.

Because the Judgment rendered and entered by Judge Janna Whately is Void, it is a ministerial act of this court to issue the relief sought in this Motion and The Writ of Mandamus. **See Void Judgment Bill of Review and Procedural Due Process in Texas, 40 Baylor L. Rev. 367, 378-79 (1988) See Thomas, 906 S W 2d at 262** (holding that trial court has not only power but duty to vacate a void judgment) A judgment is void only when it is clear that the court rendering judgment had no jurisdiction to render judgment or no capacity to act as a court. When appeal is taken from a void judgment, the appellate court must declare the judgment void. Pate's right to be heard, notice and a fair and impartial trial are demanded by **Johnson v. Zerbst 304 U.S. 458 Supreme Court 1938** showing: If the constitutional rights of the defendant are not complied with the court no longer has jurisdiction to proceed and one imprisoned thereunder may obtain release. See also: **15 Tex. Jur 2d 50 pp 475-477** showing: judicial action without jurisdiction is void; where the court is without jurisdiction it has no authority to render any judgment other than one of dismissal.

**Garcia v. Dial 596 S W 2d 524 Tex. Court of Criminal Appeals.**

This Court found the following in **Garcia v. Dial 596 S W 2d 524 Tex. Court of Criminal Appeals;** The only proper order that the trial court judge could enter was

6.

that of dismissing the indictment because the judge had issued a Void Order reinstating the indictment after he had lost jurisdiction. This Court granted the Motion for Mandamus and issued an order to the Judge to Set Aside the void order and to dismiss the cause.

Pate's circumstances are similar but the violations by his Trial Court are extensive, it is not simply an Order that is void. It is a Judgment of Conviction that is void. A Judgment under which Pate has been illegally imprisoned for over 7 years. A void and fraudulent judgment of the proceedings. Not only did the trial court violate Pate's due process rights at his jury trial, Judge Whately submitted a Fraudulent Judgment with fraudulent proceedings and failed to include legitimate proceedings upon which The 13th Court of Appeals relied to determine and deny his appeal. It was that same record that this court would rely when denying Pate's Writ of Habeas Corpus.

The Supreme Court, speaking through Folley, Commissioner, in Bridgman v. Moore, 143 Tex. 250, 183 S.W.2d 705, at page 707, said: "The court has not only the power but the duty to vacate the inadvertent entry of a void judgment at any time, either during the term or after the term, with or without a motion therefore." We will not extend this discussion further than to state that we here reaffirm the holding on the point involved as announced by Justice Hightower in the former appeal (301 S.W.2d 181). While this holding was premature in view of the action of the Supreme Court (304 S.W.2d 265) reversing our holding, it was not upon the points discussed in Justice Hightower's opinion, but was on the point that since the judgment appealed from was an interlocutory one and not final, the appeal should be dismissed. However, we think our holding then is now appropriate. A void judgment has been termed mere waste paper, an absolute nullity; and all acts performed under it are also nullities

Because the Trial **Court** Judgment is void both The 13th Court of Appeals Judgment and this Courts Judgments are also void.

Pate has supported all of the complaints of the violations of his due process rights, the

7.

trial court's fraud on the court and on Pate, the illegal proceedings and concealment of them and the Fraudulent Certified Proceedings to the Courts of Appeals by competent evidence from the Record of the trial Court. It is readily apparent upon the face of the Record that the Judgment in cause no. A-08-5080-4CR for which Pate is illegally convicted and imprisoned is Void. **See** Where a void judgment has been rendered and the record in the cause, or judgment roll, reflects the vice then the court has not only the power but the duty and even after the expiration of the term to set aside such judgment. **Harrison v. Whiteley, Tex./com App. 6 S W 2d 89.**

Any delay in deciding this Motion for Leave To File Emergency Motion for Mandamus continues the violation of Pate's due process to his liberty.

# PRAYER

Wherefore premises considered, Realtor Chadrick B. Pate prays for Emergency Mandamus Relief from each and singular of all issues presented in this Emergency Motion for Relief and the simultaneously filed Writ of Mandamus.

Those issues include immediate decision on Pate's Writ of Mandamus, recusal of Judge Janna K. Whately and District Attorney Michael Wellborn from filing a Response and if this Honorable Court is unable to provide the relief requested based on the competent evidence supplied by Pate in The Writ of Mandamus that a Special Magistrate be appointed for a proper impartial response.

Also that this Honorable Court issue Immediate Orders Reversing The Trial Courts illegal Judgment of Conviction, Dismiss Indictment , Issue Immediate Order of Acquittal and an Order to immediately Discharge Pate from his illegal incarceration in the custody of The Texas Department of Criminal Justice, and any other relief that this Honorable Court finds that is legally due and available to Pate.

Respectfully Submitted,

**Realtor Chadrick Pate pro se #1563340**
**3060 F M 3514**
**Beaumont, Texas 77705**

# CERTIFICATE OF SERVICE

I. Chadrick Pate  hereby certify and swear under penalty of perjury  that a true and correct copy of the foregoing Realtor's Writ of Mandamus from A Void  Final Felony Judgment and  Conviction  and Emergency Motion was mailed to The District Attorney for Aransas County, Texas and to Honorable Janna K. Whatley , Judge 36th District Court Aransas County,  on the ₁₆ᵗʰday of  Sept , 2015. The Original Writ of Mandamus from a Void Final Felony Judgment and Conviction  and Emergency Motion will be hand delivered by Nema Bardin who is my Power of Attorney on ~~or about~~ the ₁₆ᵗʰday of Sept.  2015.



**Realtor  Chadrick Pate #1563340**
**3060 F M 3514**
**Beaumont,Texas 77705**

## CERTIFICATION  Trap 52.3

I, Chadrick Pate do hereby certify under penalty of perjury  that the foregoing Writ of Mandamus  from a Void Judgment and Conviction and Emergency Motion  that each and every factual statement in this petition is supported by competent evidence in the appendix or the record.

**Realtor  Chadrick Pate pro se #1566340**
**3060 FM 3514**
**Beaumont, Texas 77705**

## NOTARIZED CERTIFICATION

**State of Texas**
County of  Jefferson
Chadrick Pate #1563340, personally appeared before me, and being first duly sworn declared that, he/she signed this application in the capacity designated, if any, and further states that he/she has read the above application and the statements there in contained are true.


Notary Public

STEPHANIE LUTE
Notary Public, State of Texas
My Commission Expires
03/03/2018

Notary without Bond



# IN THE COURT OF CRIMINAL APPEALS AUSTIN, TEXAS

REALTOR PRO SE
CHADRICK PATE #1563340
3060 FM 3514
BEAUMONT, TEXAS 77705

In Re:                                    FROM CAUSE NO. A-08-5080-4CR4CR
CHADRICK B PATE  #01563340        THE DISTRICT COURT 36TH JUDICAL
    REALTOR                              DISTRICT ARANSAS COUNTY, TEXAS

      VS.
JANNA K. WHATELY TRIAL JUDGE
STATE OF TEXAS

## REALTOR'S OATH
## MOTION FOR LEAVE TO FILE WRIT OF MANDAMUS FROM A VOID FINAL FELONY JUDGMENT AND CONVICTION AND EMERGENCY MOTION FOR RELIEF PURSUANT TO WRIT OF MANDAMUS FROM A VOID FINAL FELONY JUDGMENT AND CONVICTION

STATE OF TEXAS
COUNTY OF JEFFERSON

I CHADRICK PATE # 1563340, being duly sworn, under oath says" I am the REALTOR in this matter and I know the contents of the above "MOTION FOR LEAVE TO FILE WRIT OF MANDAMUS FROM A VOID FINAL FELONY JUDGMENT AND CONVICTION AND EMERGENCY MOTION FOR RELIEF PURSUANT TO WIRT OF MANDAMUS FROM A VOID FINAL FELONY JUDGMENT AND CONVICTION. , and according to my belief, the facts stated in these documents are true.

                                 Chadrick Pate #1563340

Subscribed and Sworn To Before me on the 4th day of Sept., 2015.

                                     NOTARY PUBLIC

STEPHANIE LUTE
Notary Public, State of Texas
My Commission Expires
03/03/2018

Notary without Bond

11.

# IN THE TEXAS COURT OF CRIMINAL APPEALS, AUSTIN TEXAS

In Re: CHADRICK B. PATE #1563340
      REALTOR

                    V.                          CAUSE NO. A-08-5080-4CR

THE 36TH DISTRICT COURT
ARANSAS COUNTY, TEXAS

HONORABLE JANNA K. WHATLEY
      STATE OF TEXAS
        RESPONDENT

## EMERGENCY
## WRIT OF MANDAMUS FROM A VOID FINAL FELONY JUDGMENT AND CONVICTION

Respectfully Submitted,

Chadrick Pate pro se #1563340
3060 F M 3514
Beaumont, Texas 77705

# IN THE TEXAS COURT OF CRIMINAL APPEALS AUSTIN, TEXAS

## TRAP RULE 52.3 IDENITY OF PARTIES AND COUNSEL

## EMERGENCY WRIT OF MANDAMUS

**REALTOR:**                                    Chadrick Pate pro se #1563340
                                                3060 FM 3514
                                                Beaumont, Texas 77705

**ATTORNEY FOR THE STATE**                       Aransas County District Attorney
                                                P O Box 1393
                                                Sinton, Texas 78387
                                                361-364-6220

**TRIAL COURT**                                  Honorable Janna K. Whately
                                                Judge Presiding
                                                36th District Court Aransas County
                                                361-3646220

# TABLE OF CONTENTS

Identity of Parties and Counsel........................................................................... ii

Table of Contents ...............................................................................................iii-xvi

Index of Authorities.................................................................................iv,v,vii

Statement of The Case .................................................................................viii-viiiii

Jurisdiction..................................................................................................x

Issues Presented .................................................................................xi

Statement of Facts..................................................................................1-11

Argument and Authorities..................................................................................11-42

Conclusion...........................................................................................42

Prayer.................................................................................................43

Certificate of Service...........................................................................xii

Certification..........................................................................................xiii

Certificate of Compliance...........................................................................xiv

Appendix.............-.........................................................................xv-xvi

Record With 1-9 Certified Exhibits..................................................................xvi

# IN THE TEXAS COURT OF CRIMINAL APPEALS AUSTIN, TEXAS

## INDEX OF AUTHORITIES

*Adderley v. Florida*, 385 U. S.39................................................................................29

Almanza v. State 645 S W 2d 885 Tex. App.-Ft. Worth 1983,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,22

Aoude v. Mobil Oil Corporation 892 F 2d 1115,1118 (1st Cir. 1989) ..........................44

Aguilar v. State, 26 S.W 3d 901, 909 (Tex.Crim.App.2000)...........................,,,31

*Boddie v. Connecticut*, 401 U. S. 371, 377379,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,21

Browning v. Prostock, 165 S.W. 3D 336 (Tex 2005).......................................43,46

Bulloch v. United States, 763 F.2d 1115, 1118 (10th Cir. 1985)(enbanc),,,,,,,,,,,,,,,,,,,,,41

Burks v. State 876 S W 2d 877 Tex Cr. App94,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,...15

Cantu v. State 939 S W 2d 627,633 Tx. Crim. App

Carter v. Fenner 136 F 3d 1000, 1005 (5th Cir.1998).......................................11

Caraway v. State v. State 550 S W 2d 699 Tx Crim App.1977......................................29

*Cole v. Arkansas, 333  U. S. 196, 201*................................26

Ex rel. Curry v. Gray 726 S W 2d 125 Tex Court Crim(1987) ..........................13

Davis v. Boone 786 S W 2d 85,87 (Tx. App.1990)........................................12

Deck v. Missouri 544 U.S.622          ..........................................37

Dikeman v. Snell 490 S W 2d 183 186  Tex 1973.......................................12

*Douglas v. Buder*, 412 U. S.43...........................................................27

iv.

In re EP 185 S. W. 3d 908 (Tex. App.-Austin 2006)..............................32,33,36,37,40,42

Fay v. Noia 372 U S 391 Supreme Ct. 1963.................................................................11

*Gregorgy v. Chicago* 394.U.S.111.................................................................................21

Glunz v Hernandez 908 S W 2d 255............................................................................12

Haley 113 S W 3d 810.................................................................................................21

Hall v. State 225 3d 524 (2007) ................................................................................ 27
Hovey v. Elliot 167 U. S.409 ,416 -420 ........................................................................12
Hughes v. State, 673 SW 2d 654 Tex: Court of Appeals, 3rd Dist.1984.......................27
Irving v. State 879 S W 2d 20.......................................................................................42
Jackson v. Virginia, 443 US 307 - Supreme Court1979 ...................,,,,,,,,,,,,,,,,...21,26,35
Johnson v. Zerbst 304 U. S. 458 SupremeCourt......................................31,34,35,37,38,40
King Ranch v; Chapman, 118 S W 3d 742,752(Tex.003) ........................................31.38
Louis v. State 825 S W 2d 752, 757 Tex. App Houston 14th Dist. 1992
Malik v. State 953 S.W. 2D 234, 240Tex.Crim.97........................................22,23.24
Messenger v. State 638 S.W.2d 883 (Tex. Cr. App.1982)...........................................22
Montgomery, 669 S. W. 2d at 313 Browning 165 S.W. 3D at 348..............................42
Morales v. State 466 S W 2d 293 296 Tex. Crim. App 1971......................................31
In Re Padilla v. McDaniel 122 S W 3d 805 807 Tx Crim. 2003 .................................5

Planter v 9 S W 3d156................................................................................16,23,24

Presnell v. Georgia, 439 U. S. 14..............................................................................26

*Qualley v. State 151 S W 3d 655 Tx. Ct. Appth.Dist* .................................................*31*

In Re Roger Keeling 227 S W 3d 391 Tex2007...........................................................11
Robinson v. Audi Aktiengesellschaft, 56 F.3d 1259, 1267
(10th Cir. 1995), cert. denied, 516 U.S. 1045 (1996) ..................................... . .................41
Smith v. Flack 728 S W 2d 788-789.............................................................................12
Southwestern Bell Telephone Company 355 SW 3d @ 605..........................................12
Seidel 2 S W 3d 524 (1999) 39 S W 3d 221 Tx. Crim. App. (2001)............................28
Silva v. State 933 S W 2d 715 718-19 Tex App San Antonio1996...............................31
Thompson v. Louisville..................................................................................................27
Vachon v. New Hampshire, 414 U S 47........................................................................27
Vela v. Maryland 17 S W 3d 750.................................................32,33,36,37,40
Wesbrook v. State 29 S W 3d 750.................................................................32,37
In Re: Winship, 397 U.S.35...........................................................................................21

## TEXAS AND UNITED STATES CONSTITUTION

Texas Constitution Article v,6..................................................................................vii

Texas Constitutional Rights Article 1 and 10................................................................vii,x

U.S. Constitutional Rights Amendments 1,5,6 and ..............................................viii,x,4,41

## AMERICAN BAR ASSOCIATION CRIMINAL JUSTICE STANDARDS

ABA Criminal Justice Standard3.5,3....................................................................31,38
ABA  Criminal Justice Standard  6.1.3...............................................................27,32,38
ABA  Criminal Justice Standard 6.1.1................................................................27,32

## GOVERNMENT CODES

Government Code 22.221(b)(1)..........................................................................vii.
Government Code Sec. 51.303.............................................................................29

## TEXAS PENAL  CODES
Texas Penal Code 6.02.....................................................................................20,21
Texas Penal Code7.01.......................................................................................20,42
Texas Penal Code 7.02...................................................................................... 20,42
Texas Penal Code 19.02....................................................................................viii, 19
Texas Penal Code 22.02....................................................................................viii.
Texas Penal Code 37.10...................................................................................33,38, 40
Texas Penal Code 71.02....................................................................................viiii

## TEXAS  CODE CIVIL  PROCEDURE

TCCP  1.05....................................................................................................,34,41
TCCP 1.24.....................................................................................................
TCCP 2.01.....................................................................................................28
TCCP 247......................................................................................................34

## TEXAS CODE CRIMINAL PROCEDURE

TCCP.21.15...................................................................................................28
TCCP 21.03...................................................................................................28
TCCP 28.01 ..................................................................................................34,41
TCCP 32.02...................................................................................................
TCCP 36.03..................................................................................................35
TCCP 36.09..................................................................................................30,31,36

## TEXAS RULES APPELLATE PROCEDURE

TRAP 52.3(a)ii
       (b)iii-xvi
      .(c)iv,v,viii
       (d)viii-viiii
       (e)x
       (f)xi
       (g)1-11
       (h)11-42
       (i)43
       (j)xiii
       (k)( 2) xiv-xvi

TRAP 52.7(1)(2) xvi

## TEXAS RULES OF EVIDENCE

36.03................................................................................................39

## JUDICIAL CODES

Canon 1................................................................................................34
Canon 2................................................................................................34

# STATEMENT OF THE CASE

Pate was charged by an Aransas County, Texas Grand Jury with 4 others in a joint two count indictment returned on 6/24/08 with Murder pursuant to **Texas Penal Code 19.02** (Count 1) Aggravated Assault Texas **Penal Code 22.02 & 71.02** Engaging in Organized Criminal Activity (Count 11). In a 4 day Joint Jury trial that started on February 9th 2009 in Cause No. A-08-5080-4CR a Jury found Pate Guilty of the offense of Murder as charged in the indictment on February12[th] 2009. On February 13th 2009 the jury returned a punishment of 99 years or life and a $10,000 fine.

The Jury Trial was presided over by the Respondent Judge Janna K. Whately in the 36th District Court of Aransas County Texas.

Judge Janna K. Whately abused her discretion and authority when she violated Pate's U. S. and Texas Constitutional rights to due process of law, right to be heard, notice and a fair and impartial trial and because these constitutional mandates were not complied with, the trial court lost jurisdiction to proceed to a conviction and sentence. Pate's Judgment, Conviction and Sentence are Void for violation of his First, Fifth Sixth and Fourteenth U. S. Constitutional Amendment Rights and for the violation of his Texas Constitutional Article 1 and 10 rights.

Among other things that will be offered as evidence from the Court Record in this proceeding, Judge Whately did not instruct the Jury to Acquit when the State did not prove that Pate committed Murder as alleged in the indictment. She proceeded to trial

while Pate's timely pre trial Motion for Severance was still pending and Pate was not before the Court or the Jury for adjudication. She suppressed the status of the Motion for Severance from the jury and Pate. She failed to hold a hearing with Pate's presence and provide an opportunity for him to be heard on his timely and properly filed Motion for Severance , and provide findings of fact, and failed to provide a court order denying or granting his Motion for Severance. She Suppressed Pate's Court Ordered Separate Jury Trial Date of 11/03/08. She suppressed ex parte hearings without Pate's presence, knowledge or permission and discussed his case. She told the trial court jury that the Defense had to disprove the conduct of knowingly and intentionally in the alleged offense. She failed to admonish and correct the State for telling the Jury that the indictment alleged that Pate acted alone "or together and not alone "and together," She suppressed the fact that there was no Motion, Court Order,Hearing or Findings of Fact for forcing Pate to wear "leg restraints'. She suppressed the fact that fraudulent entries of proceedings were entered by the Clerk of the Court onto Pate's Criminal Docket Sheet and that the Clerk did not enter legitimate proceedings.

She suppressed the fact that there was no Motion or Order for not permitting Pate's Mother to be present at Pate's public trial.

She filed a Fraudulent Certified Record of the Proceedings and Judgment into the Courts of Appeals. It is from each of these violations that the Judgment, Conviction and Sentence are Void and from which Pate seeks and is entitled to Mandamus relief.

## STATEMENT OF JURISDICTION

Pate Invokes this Honorable Courts Jurisdiction pursuant to the **Texas Constitution Article V.5**

and **Government Code 22.221(b)(1)**, and pursuant to this Court's inherent power.

# ISSUES PRESENTED

Pate's Judgment, Conviction and Sentence are Void and any proceeding or court order pursuant to said Judgment Conviction and Sentence are also Void.

Not only is Pate Actually Innocent of the offense for which the Jury found him guilty. The Trial Court Lost Jurisdiction to Proceed and to continue to Trial for Violations of Pate's Texas Constitutional Rights Article 1 and 10 and U. S. Constitutional Rights Amendments 1,5,6, and 14.

Judge Whately's actions by Negligent Misrepresentation, Concealment and Participation in a fraudulent scheme of extrinsic fraud with The State and other officers of the Court her Bias toward Pate, and structural errors violated Pate's U. S. 1st 5th 6th and 14th Constitutional Amendment Rights and his Texas Constitutional Rights pursuant to Article 1 and 10 causing the Trial Court to lose Jurisdiction leaving her with no authority to proceed or to continue a trial,.enter a Judgment, Sentence and Conviction and then to enter a Certified Fraudulent Record of Proceedings to the Courts of Appeals. The Judgment Conviction and Sentence are Void as a Matter of Law.

# STATEMENT OF THE FACTS

The following facts are all contained in the Record Exhibits and the Appendix.

## A.

Judge Whately participated with The State, Pate's Defense Attorney, Judge Well born, Stan Trupin and the District Clerk all Officer's of the court in a scheme of extrinsic fraud to illegally convict Pate for an offense he did not commit and once she entered the Judgment Sentence and Conviction she then entered a fraudulent certified record to the Court's of Appeals, that denied Pate once again to be properly heard on his Appellant issues.

Judge Whately did not instruct the Jury to Acquit when the State did not prove that Pate committed Murder as alleged in the indictment and she did not dismiss the indictment when there was no evidence to bring the indictment.. **See Record Exhibits 1-9.**

Pate is actually innocent of the offense for which he was found guilty and the indictment did not support the jury charge. When the accomplice witness testimony is removed from the evidence that the State brought against Pate, and only the evidence from the testimony of non accomplice is considered, there is not even evidence of an offense.

## B.

Judge Whately, with the full knowledge of The State, Pate's Defense Attorney, Judge Well born and the District Clerk knowing that Pate's pre trial properly filed Motion for Severance was still pending proceeded to trial , and each of them knowing that Pate

1.

was not jurisdictionaly before the Court or the Jury for adjudication.

**See Record Exhibit # 1 Clerk's Record vol 1 of 1 page 1** listing Pate's Motion and **page 36 Written Motion. Also See Exhibit Record # 1 page 1** listing Order on Motion for Severance and **see page 45** a document that purports to be a proceeding and document that Grants Pate's Severance Motion, then **see Appendix Exhibit # 6 Judge Well born's Post Conviction Letter** indicating that he signed the Order by Mistake, and **See Appendix Record # 8** Investigator Stacey Deville's certified Affidavit that Pam Heard the District Clerk, called the Motion for Severance just a piece of paper in the file. Then see **Record Exhibits 1-9 Trial Court** that demonstrates the joint trial of Pate with the Co Defendant and no record reflecting a hearing, order, or factual findings, but **see Record Exhibit # 3 RR vol 2 of 9** where the defense attorney requests an answer on the motion and Judge Wellborn continues the Motion for Severance to 10/03/08 and then see the trial court **Record Exhibit# 1 Clerk"s Record vol 1 of 1 pages 1,2, and 3 showing** no certified Judgment Proceeding where Pate never receives a hearing on his Motion either that date or any date.

She did not admonish Pate's Defense Attorney when he lied and told the Jury veniremen that he was being forced to have the joint trial with the co defendant. **See Record Exhibit #5 vol 4 of 9 page 102 lines 6-25.** Pate's attorney also lied to him and told him that the Motion had been denied **See Appendix Exhibit #9 Nema Bardin's affidavit.**

2.

The Trial Court Record file is available to all Pre Trial and Trial Court Judges and Judge Janna Whately and Judge Wellborn both knew that or should have known that the Motion for Severance was still pending and that Judge Johnson had separated Pates trial from the co defendant and there is nothing in the record that indicates that she took notice and advised Pate or his Defense Attorney that the Motion had received no Decision thus she concealed the Status of Pates Motion from him and the Trial Jury and proceeded to trial without authority to do so. She failed to hold a hearing with Pate's presence and provide an opportunity for him to be heard on his timely and properly filed Motion for Severance , and provide findings of fact, and failed to provide a court order denying or granting his Motion for Severance.

## C.

She, The State , Pate's 'Defense Attorney and the District Clerk Suppressed Pate's Court Ordered Separate Jury Trial Date of 11/03/08. **See Record Exhibit # 3 RR vol 2 of 9 pages 1&3** where Judge Wellborn ordered Pates trial date to 11/03/08 and see **Appendix Exhibit # 1 RR vol 4 of 11 pages 3-6** where Judge Johnson separated the co defendant"s trial date from that of Pate, denied the State's Oral Motion to keep the trials joined and told the Defense and State that he would be back in November to preside over Pate's Jury Trial.

## D.

She , Judge Well born, The State and other Officer's of the Court suppressed and held and had knowledge of both Judge Whately and Judge Wellborn 's ex parte hearings without Pate's presence, knowledge or permission and discussed his case. **See**

3.

**Appendix Exhibit # 3 RR vol 5A of 11 pages 1-11,**showing that Pate was not present . Pate's name or cause number was not called at the proceeding, that the State did not announce READY on Pate and Pate's Defense Attorney did not announce ready on Pate, and where the only question asked of Pate's Defense Attorney was " who will do punishment". Then See Judge Wellborn's ex parte hearing **Appendix Exhibit # 2 RR vol 5 of 11 pages** 3-7 showing that Pate was not present, not before the court, and had no opportunity to be heard and where the State, the Co defendant's attorney and Judge Wellborn discussed at length Pate's pre trial defense motion, his defense attorney's status and opinions and Pate's trial dates. Then **See Record Exhibit # 3 vol.** 2 of 9 showing Pate was not present, had no opportunity to be heard or notice that his Motion for Severance was discussed or that his new trial date had been set to 11/03/08 and Pate's attorney did not inform him of any such actions of the court or orders.

### E.

She told the trial court jury that the Defense had to disprove the conduct of knowingly and intentionally in the alleged offense and both the State and Pate's Defense attorney stayed silent. **See Record Exhibit # 5 RR vol 4 of 9 page 28 lines 5-19 .**

### F.

She told the jury that the reason the defendants were being tried together was because the State had the right because they were the one's bringing the case and both The State and Pate's defense attorney stayed silent. **See Record Exhibit # 6 RR vol 5 of 9 page 3 lines 16-20**

### G.

She failed to admonish and correct the State for telling the Jury that the

4.

indictment alleged that Pate acted alone "or together and not alone "and together," **See Record Exhibit # 6 RR vol 5 of 9 pages 11&12 lines 8,9 and 15 on page 12 .**

**H.**

She, The State, and Pate's defense attorney suppressed the fact that there was no Motion, Court Order,Hearing or Findings of Fact for forcing Pate to wear "leg restraints'.**See Record Exhibit # 1 Clerk's Record pages 1-3** showing no Motion Order or Proceeding with factual findings listed there or included in the Certified Proceedings. **See Also Appendix Exhibit # 10 Pate's Affidavit** regarding the leg restraints, and **See Record Exhibit # 9 RR vol 6 of 9 page 259-261** showing someone in the Arena announcing that Pate was in jail because she could see his leg restraints.

**I.**

She suppressed the fact that fraudulent entries of proceedings were entered by the Clerk of the Court onto Pate's Criminal Docket Sheet and that the Clerk did not enter legitimate proceedings. **See Record Exhibit # 1 Clerk's Record vol 1 of 1 pages 94.95,** Pate's Criminal Docket Sheet showing fraudulent entries on the dates of 9/25/08 States Motion for Continuance Granted, 10/30/08 DX Motion for Cont Reset, JT set to 1/5/09 Ann. To 12/22/08. Then 12/22/08 Reset to Jt/ Feb. 9, 2009, Ann. To 2/5/09, Then 2/5/09 All R. Then **See Record Exhibit #1 Clerk's Record Vol.1 of 1 pages 1-3** where there is No Order Granting the State's Motion listed for 9/25/08, No Defendant's Motion for Continuance or any Order for Reset of Trial Date to 1/5/09 or announcement for 12/22/09 or Reset Trial Date of 2/9/09 or Reset Announcement date of 2/5/09 listed or contained in the Certified Record of Proceeding.

5.

**J.**

Regarding the legitimate proceedings that the clerk did not enter onto Pate's Criminal Docket sheet or into the Certified Judgment Record of Proceedings. Pate's Motion for Severance was not entered onto his Criminal Docket Sheet **See Record Exhibit # 1 Clerk's Record vol 1 of 1 pages 94, 95, and 96,** however the proceeding was entered into the certified record of proceedings. **See Record Exhibit # 3 RR vol 2 of 9 page 3 lines 9-25 and page 4 lines1-4** Judge Well born's Oral Order to Continue the Matter of the Severance to 10/3/08 was not properly turned into a Written Order nor entered onto Pates Criminal Docket Sheet and was not listed as a proceeding/Order in the Certified Proceedings Judgment Record, **See Record Exhibit # 1 Clerk's Record vol 1 of 1 pages 1.2, and 3. See Record Exhibit # 4 RR vol 3 of 9 page 33 line 6** Judge Johnson's Oral Order Denying Pate's Motion to Dismiss was not entered onto Pate's Criminal Docket Sheet not properly turned into a Written Order or entered into the certified Judgment Proceedings. **See Record Exhibit # 1 Clerk's Record vol. 1 of 1 pages 1.2, and 3 and pages 94, 95, and 96. See Appendix Exhibit # 4 RR vol 4 of 11 page 5 lines 16-25** Judge Johnson's Oral Orders Separating Pate's Trial from the Co defendant's Trial The State's Oral Motion to keep the Trials Joined and Judge Johnson's Oral Order Denying the State's Motion to keep the Trials Joined were not entered onto Pate's Criminal Docket Sheet , and were not properly turned into Written Orders and were not certified in the Certified Judgment Proceedings **See Record Exhibit # 1 Clerk's Record vol. 1 of 1 pages 1,2, and 3. See Appendix Exhibit # 3 RR vol 5A of**

6.

**11** this proceeding a pre trial hearing on 2/5/09 for co defendant Hall was suppressed and concealed, not entered onto Hall's Criminal Docket Sheet and not entered into the Certified Judgment Proceedings in Hall's Cause. **See Appendix Exhibit # 4 Hall's Criminal Docket Sheet, and Appendix Exhibit # 5 Hall's Judgment Index Sheet of the Certified Proceedings** no such proceeding is listed there. This proceeding also under the Reporter's Record shows an out of sequence Record Number and a different Cause Number 5A of 11 and S-08-5080-2. This proceeding was held 4 days prior to the trial date. This is the same purported proceeding where the District Clerk entered a fraudulent entry onto Pate's Criminal Docket Sheet purporting that he had announced Ready for Trial.

## K.

She suppressed the fact that there was no Motion by any Party or Court Order for not permitting Pate's Mother to be present at Pate's public trial and the State and Pate's defense attorney stayed silent about it.. The Trial Court Record reflects no Motion or Order of any such proceeding, however **See Record Exhibit # 6 RR vol 5 of 9 page 9 line 24-25 page 60 lines 1-25 and page 61 lines 1 -25 and page 62 lines 1-6** where Pate's Mom is admonished first by the Assistant District Attorney Retha Cable (who Pate's Mom did not know was a Prosecutor) and then by Judge Whately that she is not to be in the court room or talk to anyone regarding the trial.

## L.

She, with the cooperation of the District Clerk filed a Fraudulent Certified Record of the Proceedings and Judgment into the Courts of Appeals. The following are those

7.

proceedings that she certified that were fraudulent **(1)  See Record Exhibit # 1 Clerk's Record vol 1 of 1 page 91** showing that the State in  the interest of Justice determined not to proceed with Count Two of the indictment and said count was hereby dismissed.  A simple review of the trial court record reveals this  not to be true. **(2)  See Exhibit # 1 Clerk's Record vol 1 of 1 pages 1, 2, and 3** showing no  such proceeding was had, and **see pages 62-71 excerpts of the Jury Charge** describing  Count Two and **see page 73 the Verdict Form** describing Count Two and see Record **Exhibit # 5 RR vol 4 of 9 page 7 lines 24-25 page 8 lines 1-25 and page 8 lines 1-25  page 9 lines 1-4,** where Retha Cable reads the Indictment to Pate and  the Jury. **(3) See Record Exhibit # 1 Clerk's Record vol 1 of 1 page 91** where the court finds that  the defendant used or exhibited a deadly weapon. The Certified Judgment Proceedings  show no Hearing or Order for any such proceeding and if there was any such  proceeding it was not held in the presence of Pate, and the Jury found no such Special Findings  **(4) See Record Exhibit # 1  Clerk's Record vol 1 of 1 page 1** showing  **Order on Motion for Severance** then see  Written Order **page 45** Order signed by Judge Wellborn, then see **Appendix Exhibit # 6  Judge Wellborn's letter** stating that he signed the Order by mistake.  **(5) See  Record Exhibit # 1  Clerks Record vol 1 of 1 page  2 listing Court's Docket Sheet  then see pages 94, 95 and 96 showing** proceedings listed under the dates **of 9/25/08  10/30/08, 12/22/08, and 2/05/09** The Criminal Docket Sheet itself is fraudulent for  listing the fraudulent proceedings under those dates and

8.

there are no proceedings for those dates on the Clerk's Record or listed on **SEE Record Exhibit # 2 Master Index** listing no such proceedings.

The Judgment is also fraudulent for Judge Whately's concealment of and failure to include in the judgment the following legitimate proceedings. # **(1) See Record Exhibit #1 Clerks Record vol. 1 of 1 pages 94, 95 and 96** showing no entry for Pate's **Motion for Severance page 36 of the Clerk's Record.** # **(2) See Record Exhibit # 3 RR vol 2 of 9 page 3 lines 9-25 and page 4 lines 1-5** showing Pate's Defense Attorney's Oral Motion for a Decision on Pate's Motion for Severance and where Judge Well born issues an Oral Order to Continue Pate's Motion for Severance to 10/03/08 then **See Record Exhibit #1 Clerk's Record vol. 1 of 9 pages 1, 2, and 3** where there is No listing of the Oral Motion for Severance or the Judge's Oral Order to Continue the Severance issue and **See pages 94, 95, and 96** where the District Clerk did not enter the Motion or the Order onto Pate's Criminal Docket Sheet. # **(3) See Appendix Exhibit # 1 RR vol 4 of 11 page 5 lines 16-25 and page 6 lines 1-3** where The State does an Oral Motion to keep Pate's trial joined to the co defendant's Hall's trial after Judge Johnson provided an Oral Order Granting the co defendant's Motion for a Continuance to 1/5/09, Judge Johnson provides and Oral Order denying the State's Oral Order to keep Pate's trial joined to the co defendant's . Then **See Record Exhibit # 1 Clerk's Record vol 1 of 9 pages 1,2, and 3** showing no listing of the Oral Motion or the Judge's Oral Order and see also **pages 94,95, and 96 Pate's Criminal Docket Sheet** showing the District Clerk did

9.

not enter them there either.

And # **(4) See Appendix Exhibit # 3  RR vol 5A of 11** this is the proceeding where the Court purports that Pate announced ready when in fact he did not and this proceeding was a  Pre Trial Hearing for Christoper Hall the co defendant and Judge Whately did not  certify this proceeding into the record proceedings of Hall's Judgment, **See Appendix  Exhibit # 8 Halls Mater Index RR vol 1 of 11** showing no such proceeding listed  and  see that the Reporter's volume number is out of sequence in **Exhibit # 3 RR vol 5A of  11 and that** it reveals a different Cause No. other than the one used in every other  Reporter's Record and  the Criminal Docket Sheet at **Appendix Exhibit # 4 Hall's  Criminal Docket Sheet.** Hall's Criminal Docket Sheet also lists the proceeding as  an Announcement when clearly it was a Pre Trial Hearing and is listed as such in  the Report's Record but it is the proceeding where Hall's Attorney announced  Ready and the State announced Ready on Hall. Pate was not there and did not  announce ready.

## M.

She, The State, and Pate's Defense Attorney concealed  and stayed quite  that Pate did not waive his right to be present at pre trial hearings and announcement and that he was not notified by the Court or his attorney of the pre trial hearings and announcements and was not told about any  Court Orders that flowed from them.

For all of the violations listed  above, that include the violations of Pate's Constitutional Due Process of Law, for the fraud on the court by the court and for Pate's Actual

10.

Innocence of the offense of Murder charged in the indictment, Pate's Judgment, Conviction and Sentence are Void and he seeks Mandamus Relief for each of the reasons.

## ARGUMENT AND AUTHORITIES
## VOID JUDGMENTS
## ISSUE PRESENTED

Since the constitutional amendments entitle one charged with a crime to due process of law, right to be heard, notice,and a fair and impartial trial, compliance with these constitutional mandates are essential jurisdictional prerequisites to a trial courts jurisdiction to proceed to conviction and sentence. A courts jurisdiction at the beginning of the trial may be lost in the course of the proceedings due to failure to complete the court. If the constitutional rights of the defendant are not complied with the court no longer has jurisdiction to proceed and one imprisoned thereunder may obtain release. **Johnson v. Zerbst 304 U. S. 458 Supreme Court 1938, Fay v. Noia 372U S 391 Sup. Ct. 1963.** In Texas when a Order is Void even after final conviction relief is available through mandamus **See In re Roger L. Keeling 227 S W 3d 391 2007. Because** Pate's due process rights to to be heard, notice,and a fair and impartial trial, were violated mandamus relief is appropriate, as his conviction is final and he was illegally convicted for the trial court's violation of constitutional mandates that include fraud on the court by the court.

## MANDATORY RELIEF

Relief under void judgment Statute is Mandatory, **Carter v. Fenner 136 F 3d 1000,**

11.

**1005 (5th Cir) 1998.** a void judgment decree or order may be vacated at any time on motion of a party or any person affected thereby. **Johnson v, Zerbst 304 U.S,.458 Supreme Court 1938** showing when court violates Constitutional Rights they lose jurisdiction to proceed to trial and the conviction is void. A collateral attack is any proceeding to avoid the effect of a judgment which does not meet all the requirements of a valid direct attack. There is neither a set procedure for a collateral attack nor a statute of limitations. **See Glunz, 908 S W 2d at 255: Davis v. Boone, 786 S. W.2d 85,87 (Tex. App- San Antonio 1990, no writ). A judgment is void if it is shown that the court lacked jurisdiction (1) over the party or property; (2) over the subject matter; (3) to enter a particular judgment; (4) to act as a court. Glunz v. Hernandez 908 SW 2d 253 - Tex: Court of Appeals, 4th Dist. 1995**

## NO ADEQUATE REMEDY

When a judgment is void it is not necessary to show there is no adequate remedy. **Southwestern Bell Telephone Company 355 SW 3d @ 605, also Dikeman v. Snell 490 S W 2d 183,186 (Tex 1973)** showing relief through mandamus available even after final conviction. However even if there is technically an adequate remedy, any other remedy would be time consuming and extend the time of the violation of Pate's constitutional due process rights. **See Smith v. Flack 728 S W 2d @ 788-89.**

## MINISTERAL ACT

The act of Acquittal for a Void Judgment acquired by a trial court who has lost jurisdiction to proceed to trial for violation of Compulsory Due Process and through No

12.

Evidence to support the indictment or verdict and for fraud on the court by the court is a ministerial Act. The question is not whether the trial court made an incorrect decision regarding the Judgment. The question is did trial court have the authority to rule in any way he believed proper. In the underlying proceedings,the trial court had already lost jurisdiction to proceed to the trial and thus had no authority to render/enter the Judgment and Conviction, and should have acquitted Pate before and after the Jury brought back a finding of guilt when number one Pate was not properly before the court or jury for adjudication and number two when there was no evidence supporting the jury's findings or the indictment. **Ex rel..Curry v. Gray 726 S W 2d 125 Tex. Court Crim. App. (1987).** The trial court lost jurisdiction to try Pate, when it violated Pate's Constitutional Rights to notice, to be heard, and to a fair and impartial trial. This argument is developed in every issue presented.

## A.

Because the State could not prove the elements of the offenses plead in the indictment, or the jury charge a scheme was developed to assure the conviction of Pate. The State used their unlimited resources and knowledge of the Judiciary to manipulate Pate, The Court, and The Jury to secret the invalid indictment, Pate's Defense Motion for Severance of Defendant's and Offenses, Judge Johnson's Order separating the trial of Pate and co defendant Hall, Pates Court Ordered Separate Jury Trial Date of 11/03/08, and among other things, Pates Court Ordered Separate Jury Trial Date of 11/03/08, and among other things, ignored pre trial court orders, had ex parte communication

13.

with Judge Well born and Judge Whately regarding Pate's defense motion, trial dates and or announcements. The State lied repeatedly to the tier of fact regarding the conduct charged in the indictment and the conduct and law applicable stated in the Jury Charge and violated Pate's Mother's right to access of the public trial. Each of these actions were in concert with the Trial Court Judge Janna Whately, The Pre Trial Judge Michael Wellborn, Pate's Defense Attorney John Gilmore, The District Clerk's Office and in some instances Stan Turpin the co defendant's attorney.

This is a case in which Pate's constitutional rights were abused from the very beginning. The State brought **no** witness evidence to the Grand Jury or the trial jury that

Pate was criminally responsible as a party to Aaron Watson's Murder by conduct of acting with intent to promote or assist the commission of the offense, by soliciting, encouraging, directing, aiding, or attempting to aid the shooter to commit the offense other than that of the accomplice witness whose testimony was not corroborated as to any such conduct.

The State brought **no** evidence to the Grand Jury or the trial jury that Pate intentionally or knowingly shot Aaron Watson with a firearm, knew about a firearm, or was present at the scene of the murder before during or after the commission of the murder.

Even the accomplices all testified that they were asked to run the guy off not murder him. **See Record Exhibit #8RR vol 7 pg 95 lns. 15-18,** Every accomplice witness testified that Pate was not at the scene when they committed the murder and that he did not know about a firearm. **See Record Ex #8 vol 7 pg. 96-97 lns 13-15 & 1-9.**

14.

There is no witness testimony outside that of the accomplices that Pate acted with intent to promote or assist the commission of the offense, by soliciting, encouraging, directing, aiding, or attempting to aid the shooter to commit the offense. When the accomplice witness testimony is removed from the other testimony, there is no evidence that Pate performed any of the above acts, or had intent or knowledge of the offense , or knew about a gun or was at the murder scene.

**See Article 38.14, V.A.C.C.P, provides,** "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense. " The test for sufficient corroboration is to eliminate from consideration the accomplice testimony and then examine the other inculpatory evidence to ascertain whether the remaining evidence tends to connect the defendant with the offense. **Burks v. State. 876 S W 2d 877 (Tex. Cr. App 1994. cert. Denied, 513 U.S 114 115S. Ct. 909, 130 L. Ed 2d 791 (1995)** In order to determine whether the accomplice witness testimony is corroborated, we eliminate all accomplice evidence and determine whether the other inculpatory facts and circumstances in evidence tend to connect appellant to the offense. Pate's offense would have been that of being a party to the offense of murder by acting with intent to promote or assist the commission of the offense, by soliciting, encouraging, directing, aiding, or attempting to aid the shooter to commit the offense and that he intentionally or knowingly shot Aaron Watson with a hand gun first when he was alone then again when he was together

15.

with the accomplices, Hall, Underwood, Tanton and Ray. Therefore after removing the accomplice testimony there must be witness evidence or some other evidence that Pate was a party/ accomplice to the offense by by acting with intent to promote or assist the commission of the offense, by soliciting, encouraging, directing, aiding, or attempting to aid the shooter to commit the offense and that he intentionally or knowingly shot Aaron Watson with a hand gun first when he was alone then again when he was together with the 4 accomplices. A review of the Record of the Trial Court will reveal that there was no other testimony or evidence introduced by the State that Pate was responsible for any of the above conduct. Texas Law does not permit but rather prohibits a conviction based upon accomplice testimony alone. **See Planter v. State 9 S W 3d 156 Texas Court of Criminal Appeals 1999.**There was no evidence introduced by the State other than that of the **accomplice witness's** (who took a plea bargain for testifying against Pate) that Pate was a party to the offense by exhibiting the conduct of (1.) calling someone on the phone and asking that someone send some people down to "run a guy off" not murder a guy, and **(2)** that once the accomplices arrived Pate **(3)** met the accomplices at a shack that had gang signs on the outside of the shack where there were three females present and **(4)** then Pate rode in a car with at least one of the gang members and directed them to the location of the crime scene, and once at the crime scene showed the accomplices how to get to the actual residence of the victim, but then Pate limped off and **(4)** then Pate rode in a car with at least one of the gang members and directed them to the location of the crime scene, and once at the

16.

crime scene showed the accomplices how to get to the actual residence of the victim, but then Pate limped off into the woods and was not seen again.

Because the State's theory was that Pate acted with intent to aid, assist, encourage, solicit, direct or attempt to aid the shooter or the other accomplices in the murder, and that he was responsible for the actions of the shooter and the other accomplices, **SEE RECORD # 6 RR VOL 5 OF 9 specificly pages 11 through 14** where the State lays out their theory of the offense committed. Although the State lies to the Jury about what the indictment charges, they yet described their theory of the offense.

The State must have proved beyond a reasonable doubt that Pate was at the scene, acted with intent to aid, assist, encourage, solicit, direct or attempt to aid the shooter or the accomplices in the murder, and that he was responsible for the action of the shooter and the other accomplices. The State did not prove any of it.

The State could have called the 3 girls where the accomplices said that they met up with Pate to discuss going to the victims house to run him off. **See Record Exhibit # 8 RR Vol 7 of 9 pgs 90-91 lines 1-25 & 1-6 & Rec Ex #9 vol 8 page190 lns 1-25.** They did not because Pate submits they would not have identified him as having been there with the accomplices.

The State could have produced the phone records that the Grand Jury subpoenaed to prove that Pate made phone calls to a Gang Leader and requested that he send the accomplices down to run the guy off. **See Appendix Exhibit # 7 Phone Records. And See Record Exhibit # 7 vol 6 of 9 page 244 and Exhibit 11 vol. 7**

17.

**of 9 page 30 43 and 44 t**hat Pate showed the co defendant's how to get to Aaron Watson's house (the evidence showed the co defendant's already knew how to get to Aaron Watson's home from a trip in December when they came down). **See Record Exhibit # 8 vol 7 of 9 page 58.**

Pate submits that the State did not introduce the records as evidence because the records would not reveal any calls from Pate to anyone. Also **See Record Exhibit # 8 RR Vol 7 of 9 specifically pages 194 through 247** which shows accomplice witness testimony of the supposed events of the evening of the offense, which includes testimony about the phone calls, the shack where the 3 females were, the car that Pate was supposed to have ridden in, and the direction from Pate to "run the guy off." The State could have produced the finger prints of Pate from the trailer where the accomplices all met up to discuss going to the victims house, or fingerprints from the accomplices car that Pate rode in to show them how to get to the victims house any one piece of evidence that was just mentioned would have supported and corroborated the accomplices testimony that Pate called the gang leader to send them down to run the guy off. Judge Whately had the authority to dismiss the indictment for the lack of evidence as to Pate's participation in the offense, but she chose not to. Pate's defense attorney could have asked that the indictment be dismissed for lack of evidence as to Pate's participation but he stayed silent. The State knew that they did not have any evidence as to Pate's participation in the offense but they asked the Grand Jury for an indictment anyway. The Grand Jury could not have had any evidence of the essential

18.

elements of Pate's participation as a party to the crime, as the State offered no proof of his participation as a party by acting with intent to aid, assist, encourage, solicit, direct or attempt to aid the shooter or the other accomplices in the murder, and that he was responsible for the actions of the shooter and the other accomplices.

Upon the reading of the indictment alleging Pate to be responsible for the murder of Aaron Watson by shooting him with a gun first alone, and then being responsible for the murder of Aaron Watson by shooting him again while together with the 4 co defendant's, Pate's Defense Counsel nor the Trial Judge Motioned for the Dismissal of the Indictment based on a lack of any evidence to support the offenses alleged in the indictment. Which is demanded under **Jackson v. Virginia 443 U.S 307 Supreme Ct. 1979., and Butler v. State 769 S.W.2d 234 (Texas Crim. App. 1989)**

The State was alleging that Pate was criminally responsible as a party to Aaron Watson's Murder by acting with intent to promote or assist the commission of the offense, by soliciting, encouraging, directing, aiding, or attempting to aid the shooter to commit the offense and that he was therefore responsible for the shooter's action of using a gun to murder Aaron Watson. However The Plain language of the Indictment See **Record Exhibit # 1 Clerks Record Vol. 1 of 1 page 4** indicts Pate under Count One for Murder pursuant to **Texas Penal Code 19.02** and authorizes the jury to convict Pate only for Murder pursuant to that code.

There is no language in Count One of the indictment that allows the Jury to convict Pate as a party/accomplice for any conduct that would make him responsible for the actions

19.

of others to the offense of Murder charged in the indictment . In addition the indictment charges Pate with both being the Principal and a Party.

The indictment under Count One for which the Jury found Pate guilty was Murder.

It reads: Comes now the Grand Jurors for the County of Aransas, State of Texas aforesaid, duly selected, organized, impaneled and sworn as such at the April Term, A.D. 2008 of the 36th Judicial District Court, in and for said County, a quorum thereof being present, upon their oaths present in and to said Court that Michael Jason Underwood, Christopher Joseph Hall, Anthony Lee Ray, Chadrick B. Pate, and Kevin Ray Tanton, acting alone **and** together, on or about the 4th day of January, A.D. 2008 and anterior to the presentment of this indictment, in the County and State aforesaid, did then and there intentionally or knowingly cause the death of an individual, namely Aaron Watson, by shooting the said Aaron Watson with a firearm.

The indictment does not set out or track the language of The Party Statute"**Texas Penal Code 7.02** or complicity under **Texas Penal Code 7.01** or **Texas Penal Code 6.02 The Statute for** the requirement for criminal responsibility as described above.

The Indictment does not authorize the Jury to Convict Pate as a party/accomplice or for being responsible for the actions of others to the Offense of Murder.

However even if the Indictment or The Jury Charge or a hypothetically correct Jury Charge had authorized a finding of Guilty as a party/accomplice and criminally responsible for the action of others, The State did not prove that Pate acted as a principal or party to the Murder of Aaron Watson. There was no evidence

20.

that Pate was at the scene when the murder occurred, or that he was the shooter. There was no testimony other than that of the accomplice witness's (which must be removed) that he acted intentionally, or with intent, with respect to a result of his conduct when it was his conscious objective or desire to cause the result of murder.

The State did not prove that Pate acted knowingly or with knowledge, with respect to a result of his conduct that he was aware that his conduct was reasonably certain to cause a murder.

The State did not prove that Pate possessed used or knew about any deadly weapon or that Pate shot Aaron Watson. Texas **Penal Code 6.02** describes what is and what is not culpability. Under section (b) a person does not commit any offense unless he intentionally or knowingly engages in conduct as the definition of the offense requires. The trial court record reveals that Pate had no knowledge of the deadly weapon, that he was not there when the Murder occurred, that he did not solicit, encourage, direct aid or attempt to aid another person or persons in committing the offense of murder and did not intend to promote or assist in a murder.

All accomplices testified that Pate wanted "the guy run off (not murdered) All accomplices testified that Pate was not aware that anyone had a deadly weapon, and all accomplices testified that Pate was not at the scene of the murder.

The elements laid out above are all substantive elements of the crime that **Jackson v. Virginia, 443 U. S. 307 319 998 CT 2781** demands must be proven beyond a reasonable doubt. Also see **Haley 113 S W 3d 810** the evidence must show that at the
21.

time of the offense (in this case murder the parties were acting together each doing some part of the common design.

Because the indictment alleged Pate to be both the principal and a party then the state was required to prove that he was both. The jury charge, **See Record Exhibit # 1 Clerk's Record pages 60-61** charges that Pate was the principal **OR** a party. **Almanza v. State 645 S W 2d 885 (Tex App-Ft. Worth 1983**: Although many recent opinions have off handedly dismissed the changing of `**and**' in the indictment to `**or**' in the court's charge, such approach is dangerous and usually fatal in matters where *aggravation* or *jurisdiction* is involved. In the instant cause of *aggravated rape* the indictment *joined* the allegation of threats of death to the standard form allegation of rape by the word *and.* In the court's charge, [however],the aggravation feature was *dis joined* from rape by the word *or.* Such constitutes fundamental error." <u>*Messenger v. State*, 638 S.W.2d 883 (Tex.Cr.App.1982)</u>.

In the instant case alleging Pate acted alone (as the Principal to the offense of Murder) the indictment joined the allegation that Pate acted together (was a Party to the Murder) by the word "and", however in the jury charge the allegation that Pate acted alone (as the Principal to the offense of Murder) was dis joined from the allegation that Pate acted together with Underwood, Hall, Ray and Tanton by the word "or". According to **Almanza and Messenger** this constitutes fundamental error and is a violation of due process. Thus making the indictment invalid and the Judgment and Conviction pursuant to the invalid indictment Void as a Matter of Law. In **Malik v. State 953 S W**

22.

**2d at 240 Tex. Court of Appeals 1997** the plain language states: sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case, Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. Both the indictment and the Jury charge describes the particular offense as Murder by intentionally or knowingly shooting Aaron Watson with a firearm, not Murder by acting with intent to promote or assist the commission of the offense by soliciting, encouraging directing aiding or attempting to aid the other person to commit the offense The charge did not accurately set out the law, the jury charge was not authorized by the indictment. A simple review of the Jury Charge will reflect these simple truths.

See :*Planter v. State,* **9 S.W.3d 156, 159 (Tex.Cr.App. , 1999)** ("[b]ecause the evidence presented at trial does not comport with the allegations in the indictment, and because the jury verdict cannot be supported logically by either the actual jury charge or the hypothetically correct jury charge formulated by the Court of Appeals, the Court of Appeals erred in its assessment of the sufficiency of the evidence"). Even when measured against the standard in **Malik, 953 W 2d at 240**, which sets out that evidentiary sufficiency clearly requires that evidentiary sufficiency be measured against the "elements of the Offense", when measured against the "elements of the offense, there is no evidence in the record to prove that Pate was guilty of the offense charged.

23.

Pate relies on **Malik** as he is entitled to Mandamus relief in this Court as to Acquittal just as **Planter** relied on **Malik** which recognizes the general rule that appellate affirmance of a conviction on the basis of a charge neither alleged in the indictment or presented to the jury is constitutionally prohibited. **See Planter, 9 S W 3d at 159 161 5; Malik, 953 S W 2d at 238 fn.3.**

Pate is Actually Innocent of the Offense for which he was indicted and for which the Jury found him Guilty. There is not only Insufficient Evidence to support a finding of guilty beyond a reasonable doubt, there is NO evidence that supports a finding of guilty beyond a reasonable doubt. **See RECORD Exhibit # 1 Clerk's Record vol 1 of 1 Indictment pg. 4** The indictment charges Pate with Murder by **acting alone AND together** did then and there intentionally or knowingly cause the death of an individual namely, Aaron Watson, by shooting the said Aaron Watson with a firearm. **See Record Exhibit # 1 Clerk's Record vol 1 of 1 Verdict Form page 72** signed by Presiding Juror Ronald Gore finding Pate Guilty of Murder as alleged in the indictment. Not as alleged by the State or the Jury Charge. The Jury Charge stated that if the jury found that Pate **acted alone OR together** with Michael Jason Underwood, Christopher Joseph Hall, Anthony Lee Ray, and Kevin Ray Tanton. did then and there intentionally or knowingly cause the death of an individual, namely Aaron Watson by shooting the said Aaron Watson with a firearm, then you will find the defendant guilty of Murder.

There is NO evidence that Pate caused the Murder of his Best Friend Aaron Watson by

24.

**acting alone** and intentionally or knowingly causing his murder by shooting him with a firearm, and then after **murdering him alone** he intentionally or knowingly caused his **murder again** with Michael Underwood, Christopher Joseph Hall, Anthony Lee Ray, and Kevin Ray Tanton by shooting him with a firearm. The evidence conclusively demonstrates that The State proved not one single element of the Offense charged in the indictment. Pate is entitled to Relief as there is upon the record evidence adduced at the trial no evidence to support the tier of fact's findings that Pate was guilty beyond a reasonable doubt of causing the offense alleged in the indictment.

The Evidence contained in The Record of the Trial Court reveals that Pate was not even at the scene of the offense **See Record Exhibit #7 RR vol 6 of 9 pages 246 and 248** and that the co defendant Christopher Hall shot Aaron Watson, **See Record Exhibit # 7 RR 6 of 9 page 251 lines 23-25 and page 252 lines 12-18** and that the other 3 co defendants who plead guilty and took deals to testify against Pate were at the scene of the offense with Christopher Hall and participated in assaulting Aaron Watson. **See Record Exhibit #7§ RR vol 6 of 9 page 247 and page 250** Testimony of co defendant's verifying that Pate was not there. (He limped off into the woods)

The Jury Charge **See Record Exhibit # 1 Clerk's Record vol 1 of 1 page 61-71** where the Jury is instructed. "Our laws provide that a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to

25.

promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one party to a crime." None of the conduct described in this paragraph was alleged in the application paragraph of the jury charge or in the indictment.

The indictment charged none of the conduct listed in that paragraph.

The State had to prove according to the Indictment, that Pate intentionally or knowingly murdered the victim while he was alone, by shooting him with a gun and then he murdered the victim again intentionally or knowingly when he was together with the other 4 co defendant's by shooting him again.

The State had to prove according to the Application Paragraph of the jury charge that Pate intentionally or knowingly murdered the victim while he was alone by shooting him with a gun Or that he intentionally or knowingly murdered the victim while he was with the other 4 co defendants by shooting him with a gun.

The State should not have brought the charge to the Grand Jury and Pate should not have been indicted. The State violated Pate's constitutional rights even by bringing an indictment against Pate for which they had no evidence to charge him. **See: Jackson v Virginia, 443 US 307 - Supreme Court 1979.**

The U. S. Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt *In re Winship, 397 U. S. 358*. It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process. *Cole v. Arkansas, 333 U. S. 196, 201*; *Presnell v. Georgia, 439 U. S. 14*. These

26.

standards no more than reflect a broader premise that has never been doubted in our constitutional system: that a person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend. *E. g.,* *Hovey v. Elliott,* 167 U. S. 409, 416-420. Cf. *Boddie v. Connecticut,* 401 U. S. 371, 377-379. A meaningful opportunity to defend, if not the right to a trial itself, presumes as well that a total want of evidence to support a charge will conclude the case in favor of the accused. Accordingly, we held in the *Thompson* case that a conviction based upon a record **wholly devoid of any relevant evidence of a crucial element of the offense** charged is constitutionally infirm. See also *Vachon v. New Hampshire,* 414 U. S. 478; *Adderle y v. Florida,* 385 U. S. 39; *Gregory v. Chicago,* 394 U. S. 111; *Douglas v. Buder,* 412 U. S. 430. The "no evidence" doctrine of *Thompson v. Louisville* thus secures to an accused the most elemental of due process rights: freedom from a wholly arbitrary deprivation of liberty. The Trial Court Judge, and the Defense Attorney had a responsibility to Motion for Acquittal once the Jury returned with a Verdict of Guilty.

**ABA Justice Standard 6-1.3. Adherence to standards** The trial judge should be familiar with and adhere to the canons and codes applicable to the judiciary, the ethical rules effective in the particular jurisdiction applicable to the legal profession, and standards concerning the proper administration of criminal justice.

**ABA Justice Standard 6-1.1. General responsibility of the trial judge** (a) The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. The adversary nature of

27.

the proceedings does not relieve the trial judge of the obligation of raising on his or judge of the obligation of raising on his or her initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial. The purpose of a criminal trial is to determine whether the prosecution has established the guilt of the accused as required by law, and the trial judge should not allow the proceedings to be used for any other purpose.

The trial court Judge allowed the State to use the Court to illegally convict Pate.

The trial court judge had the authority to acquit Pate based upon No Evidence.

The State knew that there was no evidence that Pate shot Aaron Watson, or that he was criminally responsible for the shooter's actions, and thus the indictment was illegal.

The State violated **TCCP Title 1 Chap. 2 Article 2.01** Duties of the District Attorney : The primary duty of all Prosecuting attorney's is not to convict but to see that Justice is done. They shall not suppress facts or secret witness' capable of establishing the innocence of the accused. The State had no jurisdiction/authority to try Pate under the law of `parties when no law of parties conduct consistent with criminal responsibility was charged in the indictment **See : State Seidel 2 S W 3d 524 (1999) 39 S W 3d 221 Tx. Crim App (2001) also see TCCP Article 21.03** showing: Everything should be stated in an indictment which is necessary to be proved, also **See: Hall v. State 225 3d 524 (2007).** Then **See TCCP 21.15 must allege acts "overt acts"** It was necessary that the State prove that Pate participated with the co defendant's in the murder by proving that he committed some affirmative act. **See**

**28.**

**Caraway v. State, 550 S. W. 2d 699 (Tx. Cr. App. 1977)**

B.

Concealing Pate's Motion for Severance and the fact that the Judge provided no hearing , no factual findings and no Court Order and making it appear that it had been legally disposed of was a part of the scheme to illegally convict Pate for a offense he did not commit. Judge Whately, The State, Pate's Defense Attorney, Co defendant's Defense Attorney and the District Clerk committed fraud on the court by the court by concealing Pate's properly filed pre trial Motion for Severance through falsifying the Trial Court Record and staying silent about it, and when Pate's attorney lied to him and said that the Motion had been denied and when he lied and told veniremen that he was being forced to have the joint trial with the co defendant.

See: Aoude v. Mobil Oil Corporation 892 F 2d 1115,1118 (1st Cir. 1989) showing: " the requisite fraud on the court occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme influencing the trier of fact or unfairly hampering the presentation of the opposing party's claim or defense" The State developed the scheme to illegally convict Pate by hampering his defense motion in order to keep the trial a joint trial with the co defendant so that they could use evidence pertinent only to the co defendant against Pate and convince the jury that Pate was guilty of a offense he did not commit.

Pate never had the opportunity to be herd on his timely and properly filed pre trial Motion for Severance because Judge Whately, Pate's defense

29.

attorney, The State, and Judge Michael Wellborn thwarted his opportunity to litigate his defense motion by falsifying Court Records. They concealed the fact that he did not have a hearing or a Court Order Denying or Granting the Motion. Pate relied on his defense attorney when he told Pate that the Motion had been denied. The trial court judge and the officer's of the court violated Pate's Due Process of Law right to be heard, notice and a fair and impartial trial when not providing a hearing on his Motion and then proceeded to trial while the Motion was still pending. Pate had the right to bring evidence of co defendant's previous convictions and to show that the joint trial would prejudice him. In other words he had the right to be heard, notice, and a fair and impartial trial. Without a hearing neither the trial court judge or the pre trial judge could have determined if the Severance would be mandatory based upon the evidence that Pate would have provided or discretionary. If Texas Code Crim. Proc. Ann. Article 36.09 mandates severance under certain conditions and it does, then the Trial Court Judge is responsible to see that Pate is heard on his

30.

properly filed motion. Because Judge Whatley did not follow statutory procedure, she violated Pate's due process and lost jurisdiction to proceed to trial. **See Johnson v. Zerbst 304 U.S. 458 Supreme Court 1938** showing: When a court violates due process they lose jurisdiction to proceed to trial and the conviction is void. Also **See Qualley v. State 151 S W 3d 655 Tx. Ct. App. 8th Dist. 2004.(quoting)** See Texas CODE **CRIM.** PROC. ANN. Art. 36.09 (Vernon 1981).

Article 36.09 mandates severance where a prior criminal conviction of one codefendant is admissible or where a joint trial would, as a matter of law, prejudice a codefendant; otherwise, the granting of a severance is within the sound discretion of the trial court. _Silva v. State_, 933 **S.W.**2d 715, 718-19 (Tex.**App.**-San Antonio 1996, no pet.). The denial of a motion to sever will constitute an abuse of discretion only when the movant satisfies the heavy burden of showing "clear prejudice." _King v. State_, 17 **S.W.**3d 7, 16 (Tex.**App.**-Houston [14th Dist.] **2000**, pet. ref'd); _Louis v. State_, 825 **S.W.**2d 752, 757 (Tex.**App.**-Houston [14th Dist.] 1992, pet. Ref'd).

When the defendant has filed a pretrial motion for severance based on prejudice that the court denies, the trial court has a continuing duty under the Federal Constitution to order a severance _sua sponte_ if sufficient prejudice becomes known during the course of the trial. 659*659 _Aguilar v. State_, 26 **S.W.**3d 901, 909 (Tex.**Crim.App.**2000). Different degrees of culpability of codefendants does not warrant severance. _See Morales v. State_, 466 **S.W.**2d 293, 296 (Tex.**Crim.App.**1971). In order to show clear prejudice, it must be shown that the respective defenses of the parties are mutually exclusive to the extent that the jury must believe the core of one defense and must necessarily disbelieve the core of the other. _Aguilar v. State_, 39 **S.W.**3d 700, 702 (Tex.**App.**-Corpus Christi 2001, pet. Ref'd). Pate asked for a Severance numerous times during the trial **See**

31.

**Record Exhibit #  vol of  pages    lines       .  and Judge Whately  continually denied** The severance motion and the  jury must  have relied on Judge Whately's  denial because she had told the Jury that The defendant's were being tried together because The State had the right to try them together because they were the one's bringing the case to the jury. The trial court Judge Whately and officer of the court committed fraud on the court by the court when they all remained silent and concealed the fact that Pate had no hearing  on his Motion for Severance. See   **In re  E.P. 185 S W 3d 908 Tex App.** **Austin-2006  showing**: " Fraud is defined as trickery or  deceit, intentional misrepresentation,  concealment of  what should have been disclosed  that deceives or is intended to  deceive  another so that  he shall act upon it to his legal   injury" emphasis added) also  **Vela v. Marywood 17 S W 3d 750** showing "Fraud may consist of both active  misrepresentation and passive silence."   See **ABA Justice  Standard  6** **-1.3. Adherence  to  standards** The trial judge  should be  familiar with and adhere to the canons and  codes applicable to the  judiciary, the ethical  rules effective in the particular jurisdiction  applicable to the legal profession,  and  standards concerning the proper administration  of criminal justice.

**ABA Justice Standard  6-1.1. General responsibility of the trial judge** (a) The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the  administration of criminal justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his or her initiative, at all appropriate times and in  an appropriate  manner, matters which

may promote a just determination of the trial.

The purpose of a criminal trial is to determine whether the prosecution has established the guilt of the accused as required by law, and the trial judge should not allow the proceedings to be used for any other purpose.

## C.
## Court Ordered Jury Trial Date

Concealing Pate's Court Ordered Separate Jury Trial Date was a part of the State's fraudulent scheme to illegally convict Pate for a crime that he did not commit.

The Trial Court Judge , Pate's Defense Attorney, The State and The District Clerk violated Pate's Due Process and committed fraud on the court by the court when they each concealed Pate's Court Ordered 11/03/08 Jury Trial Date by staying silent about the Court Ordered Trial Date, or falsifying Court documents to make it appear that the Court Order had been legally disposed of. See **In re E.P. 185 S W 3d 908 Tex App. Austin-2006 showing**: " Fraud is defined as trickery or deceit, intentional misrepresentation, concealment of what should have been disclosed that deceives or is intended to deceive another so that he shall act upon it to his legal injury" emphasis added) also **Vela v. Marywood 17 S W 3d 750** showing "Fraud may consist of both active misrepresentation and passive silence." Also See **See: Government Code Sec. 51.303 Duties of the Clerk showing:** The clerk of the Court has custody of and shall carefully maintain and arrange the records relating to all that are lawfully deposited in the clerk's office and the clerk shall record the acts and proceedings of the court and also See **See Texas Penal Code 37.10** showing: A person commits an offense

33.

if he knowingly makes a false entry in, or false alteration of , a governmental record: makes presents, or uses any record, document or intentionally destroys, conceals, removes or otherwise impairs the verity, legibility, or availability of a governmental record. **Also See Texas Rule Civil Procedure # 247** showing that No cause which has been set upon the trial docket of the court shall be taken form the trial docket for the date set except by agreement of the parties or for good cause upon motion and notice to the opposing party. Pate was notified of any Motion, Order , or Notice that the trial date was being taken from the docket and reset and there is no record of any of those kinds of proceedings. Pate's Constitutional Due Process rights were violated and the court lost jurisdiction to proceed to trial and the conviction is void. **Johnson v. Zerbst.**

## D.
### Ex Parte Hearings/Communications

With intent to influence the outcome of the proceedings on the basis of considerations other than those authorized by law, both Judge Whately and Judge Wellborn held exparte proceedings and allowed discussions of Pate's defense motion, and trial dates between themselves, The State, and The codefendant's attorney. These proceedings violated Pates, right to be present , be heard, notice and a fair and impartial trial See **TCCP Title 1 Chapter 1 Article 1.05 Rights of Accused** show Pate and his attorney has the right to appear and be heard **and see Article 28.01** requiring Pate's presence at all pre trial hearings. **Also See Judicial Codes 1 and 2 showing : A** judge shall uphold and promote the , independence, integrity, and impartiality of the judiciary, and

34

shall avoid impropriety and the appearance of Impropriety. A judge should perform the duties of his office impartiality, competently and diligently. The Judges and officers of the court committed fraud on the court by the court and violated Pate's due process rights to be heard, notice and a fair and impartial trial and lost jurisdiction to proceed to trial and the conviction is void. **Johnson v Zerbst**

E.

The Defense has to Disprove the conduct of Knowingly or Intentionally

Judge Whately's statement to the Jury that the Defense has to Disprove the conduct of Knowingly or Intentionally clearly were stated to shift the burden of prove to the Defense and not the State. Clearly it is the State that must prove the elements of the offense **See Jackson v. Virginia 44. U S 307 99 S Ct. 2787, 61 L. Ed. 2D 560 Supreme court 1979 .** Judge Whatley 's comment was intended to influence the tier of fact and the out come of the proceedings. She violated Pates due process right to a fair and impartial trial and clearly showed her bias against Pate. The conviction is void for the violation of Pate's right to a fair and impartial trial **Johnson v. Zerbst**

F.

Reason for Joint Trial

The Trial Court Judge misrepresented to the Jury that the State had the right to try the defendant's together because they were the one's bringing the case to them. This was not true, The trial court Judge knew that Pate still had a Motion for Severance pending in the court and that it was mandatory to hold a hearing to ascertain whether not she had the discretion to grant or deny a Severance or whether it was mandatory that she grant a

35.

motion for Severance. See Article 36.09 Severance on separate Indictments.

Judge Whately violated Pate's Constitutional right to due process for misrepresenting the law on Joinder to the Jury and lost jurisdiction to proceed to trial and conviction See Johnson v Zerbst.

## G.
## Failure to Admonish State

The State lied to the jurors and told them that the indictment alleged that Pate committed the offense by acting alone **or** together and not alone **and** together, violating Pate's due process rights to a fair and impartial trial and for committing fraud on the court, by the court. Judge Whately committed fraud for staying silent and for failing to admonish The State for lying. She also committed fraud by changing the word **and** to the Word **OR** in the Jury charge. The State's lie misrepresented the charge of the indictment and lessened their burden of proof as did Judge Whately's changing of the word and to the word or in the jury charge.

See **In re E.P. 185 S W 3d 908 Tex App. Austin-2006 showing**: " Fraud is defined as trickery or deceit, intentional misrepresentation, concealment of what should have been disclosed that deceives or is intended to deceive another so that he shall act upon it to his legal injury" emphasis added) also **Vela v. Marywood 17 S W 3d 750** showing "Fraud may consist of both active misrepresentation and passive silence."

## H.
## Leg Restraints
There was no motion, hearing, court order or factual findings for forcing Pate to wear

36.

leg restraints at his trial.

**See Deck v. Missouri 544 U.S. 622 (2007) showing:** The Court must make an independent determination that restraint is justified. When appellate court is left to guess at the reasons for shackling it has no choice but to find a due process violation and vacate the conviction. The trial court violated Pate's due process, right to be heard, notice and a fair and impartial trial when restraining him with restraints without the proper due process of a Motion, Order, Notice and factual findings for the reason for the restraints. **See Johnson v. Zerbst 304 U S 458 Supreme Court 1938** showing when court violates Constitutional Rights they lose jurisdiction to proceed to trial and the Conviction is Void. The Trial Court Judge and officer's of the court concealed the fact that there was no due process hearing factual findings or orders of the court on the reasons for restraints and committed fraud on the court by the court. **See In re E.P. 185 S W 3d 908 Tex App. Austin-2006 showing**: " Fraud is defined as trickery or deceit, intentional misrepresentation, concealment of what should have been disclosed that deceives or is intended to deceive another so that he shall act upon it to his legal injury" emphasis added) also **Vela v. Marywood 17 S W 3d 750** showing "Fraud may consist of both active misrepresentation and passive silence."

**I. and J.**
**Fraudulent Entry of Proceedings and Failure to Enter Legitimate Proceedings**

The Action of the Trial Court Judge, The State, The District Clerk and Defense Attorney's in either entering false proceedings or staying silent about the entry of false proceedings and of not entering legitimate proceedings or staying silent that they were

37.

not entered amount to fraud on the court by the court, tampering with a court/government instrument and filing a fraudulent court instruments. **See**

**Texas Penal Code 37.10** showing: A person commits an offense if he knowingly makes a false entry in, or false alteration of , a governmental record: make presents, or uses any record, document or intentionally destroys, conceals, removes or otherwise impairs the verity, legibility, or availability of a governmental record. Also See **See ABA Criminal Justice Standard 3.5,3** The State Prosecutor should document what happens at proceedings to insure any orders issued to the prosecution is transmitted to the appropriate persons necessary to effectuate the order. The Clerks actions and the States Actions by not turning the Oral Orders into written instruments and not recording them properly were a part of the fraudulent scheme perpetrated on the court and kept Pate from being heard , notice and a fair and impartial trial. Pate was kept from litigating his Defense Motion. **See King Ranch v; Chapman, 118 S W 3d 742, 752 (Tex. 2003) . See also ABA Justice Standard 6-1.3. Adherence to standards** The trial judge should be familiar with and adhere to the canons and codes applicable to the judiciary, the ethical rules effective in the particular jurisdiction applicable to the legal profession, and standards concerning the proper administration of criminal justice. The deliberate actions of these officer's of the court amount to fraud on the court and a violation of Pates due process right to be heard, notice and a fair and impartial trial and for these violations the conviction is void **Johnson v. Zerbst,**

38.

## K.
## Permitting Presence at the Public Trial

The trial court judge did not follow statutory procedures when invoking the rule and in cooperation with the State violated Pate's due process right to a public trial, and this action was a part of the fraudulent scheme to obtain an illegal conviction against Pate. Pate had the right to a public trial, and it is his contention that the State supenoed Pate's Mother to testify although they did not call her to testify, but the purpose was to keep Pate's Mother out of the trial, so that it would appear to the jury that Pate had no family there to support him, and to keep her from observing the due process violations by the trial court judge, the state, and other officer's of the court.

**See Article 36.03 Invocation of Rule** showing: **Texas Rules of Evidence**, a court at the Request of a party may order the exclusion of a witness who for the purposes of the prosecution is a victim, close relative of a deceased victim, or guardian of a victim only if the witness is to testify and the court determines that the testimony of the witness would be materially affected if the witness hears other testimony at the trial. (b) On the objection of the opposing party, the court may require the party requesting exclusion of a witness under subsection (a) to make an offer of proof to justify the exclusion etc. etc... The trial court followed none of the requirements of Article 36.03 and violated both Pate and his Mother's due process rights to a public trial.

## L.
## Fraudulent Filing of Certified Judgment Proceedings

The Trial Court Judge with intent to defraud, to keep Pate from Defending his

Innocence, and to conceal the Officer's of the Court's Fraud on the Court by the Court, filed a Fraudulent Certified Record of Proceedings Judgment into the 13th Court of Appeals and other Courts of Appeals and violated Pate's right to be heard, notice and a fair and impartial Appeals process. **See Texas Penal Code 37.10** showing: A person commits an offense if he knowingly makes a false entry in, or false alteration of , a governmental record: makes presents, or uses any record, document or intentionally destroys, conceals, removes or otherwise impairs the verity, legibility, or availability of a governmental record. Also Also **See In re E.P. 185 S W 3d 908 Tex App. Austin -2006 showing**: " Fraud is defined as trickery or deceit, intentional misrepresentation, concealment of what should have been disclosed that deceives or is intended to deceive another so that he shall act upon it to his legal injury" emphasis added) also **Vela v. Marywood 17 S W 3d 750** showing "Fraud may consist of both active misrepresentation and passive silence."

Because Judge Whately filed a Fraudulent Judgment into the Courts of Appeals any order of any Court of Appeals is Void as Pate's Judgment and Conviction are Void for all of the incidents of the Violation of his Constitutional Federal and State Rights and there fore any Orders that flow from the Judgment are also Void. **See Johnson v. Zerbst.**

## M.
### Pate did not waive his rights to Appearance

Pate did not waive his right to appear at pre trial hearings and announcements, and was not permitted to appear at any pre trial hearings. Pate had the right to appear and be

40

heard by both he and his attorney **See TCCP Title 1 Chapter 1 Article 1.05 Rights of Accused. And see Article 28.01 requiring Pate's presence at all pre trial hearings.**

Pate's defense attorney did not apprise Pate of pre trial hearings or of any orders of the court, violating his **6th Amendment** rights to Counsel, his right to be heard, notice and a fair and impartial trial. For the Court's violation of Pate's mandatory and statutory right to appear at every stage of his trial, his Judgment and Conviction are void. Johnson v. Zerbst.

## CONCLUSION

Each and every violation by the Trial Court and it's officer's described in this Application falls in the criteria mentioned in the following paragraphs and the violations support Pate's claims that the Judgment rendered/entered by the trial court judge in cause No. A-08-5080-4CR is VOID. The "fraud on the court" doctrine rests on two distinct features. First, as the Tenth Circuit has explained in **Robinson v. Audi Aktiengesellschaft, 56 F.3d 1259, 1267 (10th Cir. 1995), cert. denied, 516 U.S. 1045 (1996)**, "whatever else it embodies, [fraud on the court]requires a showing that one has acted with an intent to deceive or defraud the court." **Second,** as the Tenth Circuit explained in **Bulloch v. United States, 763 F.2d 1115, 1118 (10th Cir. 1985) (en banc)**, the deception must go to the heart of the judicial proceeding, creating an impression about the core, operative facts that is relied on by the court and is false. "Fraud on the court ... is fraud which is directed to the judicial machinery itself." fraud

41.

is defined as trickery or deceit, intentional misrepresentation, concealment, or nondisclosure for purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or a false representation of a matter of fact by words or conduct or by concealment of what should have been disclosed that deceives or is intended to deceive another so that he shall act upon it to his legal injury (emphasis added) **In re EP 185 S. W. 3d 908 (Tex. App.-Austin 2006).** Extrinsic fraud justifies an exception to the tenet of finality because it prevents a real trial upon the issues involved **Montgomery, 669 S. W. 2d at 313 Browning 165 S.W. 3D at 348.**

**Browning v. Prostock, 165 S.W. 3D 336 (Tex 2005) showing:**

Fraud upon the court "has been defined as that fraud committed by an officer of the court in any attempt to deceive, either by commission by omission, by speech, by any attorney or judge, it is a "fraud upon the court" The trial court tampered with Government/ Court Documents and committed fraud on the court to make it appear that Pate had a fair and impartial trial, that included Trial Court Orders Granting and Denying Motions, Resetting trial dates, announcement dates and pre trial dates for filing illegal proceedings in the trial court records and Courts of Appeal and for not filing legitimate proceedings into the record of the Trial Court and the Courts of Appeal.

42.

## PRAYER

Wherefore premises considered, Realtor Chadrick B. Pate prays for Mandamus Relief from each and singular of all issues presented in this Writ that the Judgment entered by the trial court be ordered reversed, order for indictment's dismissal and an order of Acquittal be entered along with an order for Realtor (Chadrick B. Pate"s) Immediate Discharge from his illegal imprisonment in the Texas Department of Criminal Justice Stiles, Unit where he is presently housed and detained from his liberty, and an Order of the Conviction to be Expunged from any and all Governmental Records and any other relief that is legally available to him.

Respectfully Submitted,

Realtor Chadrick Pate pro se #1563340
3060 FM 3514
Beaumont, Texas 77705

43.

# CERTIFICATE OF SERVICE

I. Chadrick Pate hereby certify and swear under penalty of perjury that a true and correct copy of the foregoing Realtor's Writ of Mandamus from A Void Final Felony Judgment and Conviction and Emergency Motion was mailed to The District Attorney for Aransas County, Texas and to Honorable Janna K. Whatley , Judge 36th District Court Aransas County, on the 16th day of Sept , 2015. The Original Writ of Mandamus from a Void Final Felony Judgment and Conviction and Emergency Motion will be hand delivered by Nema Bardin who is my Power of Attorney on or about the16th day of Sept. 2015.

**Realtor  Chadrick Pate #1563340**
**3060 F M 3514**
**Beaumont,Texas 77705**

## CERTIFICATION  Trap 52.3

I, Chadrick Pate do hereby certify under penalty of perjury that the foregoing Writ of Mandamus from a Void Judgment and Conviction and Emergency Motion that each and every factual statement in this petition is supported by competent evidence in the appendix or the record.

**Realtor  Chadrick Pate pro se #1566340**
**3060 FM 3514**
**Beaumont, Texas 77705**

## NOTARIZED CERTIFICATION

**State of Texas**
**County of** Jefferson
Chadrick Pate #1563340, personally appeared before me, and being first duly sworn declared that, he/she signed this application in the capacity designated, if any, and further states that he/she has read the above application and the statements there in contained are true.

Notary Public



STEPHANIE LUTE
Notary Public, State of Texas
My Commission Expires
03/03/2018

Notary without Bond



xii

# CERTIFICATION Trap 52.3 (3)

I, Chadrick Pate do hereby certify under penalty of perjury that each and every factual statement in each of the instruments listed herein is supported by competent evidence in the appendix or the record of each instrument filed.
**Motion for Permission to File Writ of Mandamus from a Void Final Felony Judgment and Conviction, Motion for Emergency Relief pursuant to Realtor's Writ of Mandamus from A Void Final Felony Judgment and Conviction and Realtor's Writ of Mandamus from a Void Final Felony Judgment and Conviction**

**Realtor Chadrick Pate pro se #1566340**
**-3060 FM 3514**
**Beaumont, Texas 77705**

## NOTARIZED CERTIFICATION

State of Texas
County of Jefferson
Chadrick Pate #1563340, personally appeared before me, and being first duly sworn declared that, he/she signed this application in the capacity designated, if any, and further states that he/she has read the above application and the statements there in contained are true.

Notary Public

STEPHANIE LUTE
Notary Public, State of Texas
My Commission Expires
03/03/2018

Notary without Bond

xiii

# CERTIFICATE OF COMPLIANCE Trap 9.4 (3)

I Chadrick Pate do hereby certify that the foregoing Writ of Mandamus from a Void Felony Judgment and Conviction according to this computer generated document in Open Office, the word count excluding: Identity of parties and counsel, table of contents. index of authorities, statement of the case, statement of issues presented statement of jurisdiction statement of procedural history. signed proof of service, certification. certificate of compliance and the appendix and record is 12,108 words, and 43 pages.

Realtor Chadrick Pate pro se  #1566340
3060 F M 3514
Beaumont, Texas 77705

# APPENDIX

The petition must include an appendix containing: (1) a certified or sworn copy of any order complained of, or any other document showing the matter complained of, and (2) unless voluminous or impracticable, the text of any rule, regulation, ordinance, statute or constitutional provision on which the argument is based. *Id.* R. 52.3(k)(1). If the petition is for a writ of habeas corpus, the appendix must include proof of restraint. *Id.* R. 52.3(k)(1)(D).

RR Vol 4 of 11 Hall.................................................................................................1

RR Vol 5 of 11 Hall.................................................................................................2

RR Vol 5A of 11 Hall..............................................................................................3

Hall's Criminal Docket Sheet .................................................................................4

Master Index RR Vol 1 of 11  Hall..........................................................................5

Judge Michael Well born's Post Conviction Letter.................................................6

Grand Jury Subpoena  Phone Records 2 pages........................................................7

Affidavit of Stacey Deville......................................................................................8

Affidavit of Nema Bardin........................................................................................9

Affidavit of Chadrick Pate.....................................................................................10

Clerk's Instrument Record 3 pages.........................................................................11

Proof of Restraint...................................................................................................12

Letter to Clerk of The Texas Court of Criminal Appeals......................................13

APPENDIX EXHIBIT # 1

RR VOL. 4 OF 11     HALL

10\23 HALL

Scanned Jan 26, 2012

EX #8

*Pretrial Hearing*
*10-23-08*

44,275-04

# REPORTER'S RECORD
VOLUME  4  OF  11  VOLUMES
TRIAL COURT CAUSE NO. A-08-5080-2CR

THE STATE OF TEXAS ) IN THE DISTRICT COURT
)
vs. ) ARANSAS COUNTY, TEXAS
)
CHRISTOPHER JOSEPH HALL )
) 36TH JUDICIAL DISTRICT

RECEIVED IN
COURT OF CRIMINAL APPEALS

AUG 10 2011

Louise Pearson, Clerk

## PRETRIAL HEARING

— Original produced on March 11, 2009 —

# COPY

On the **23rd day of October, 2008,** the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Joel B. Johnson, Judge Presiding, held in Rockport, Aransas County, Texas.

Proceedings reported by computerized stenotype machine.

LISA TUCKER RILEY, CSR, RPR

Scanned Jan 26, 2012

**APPEARANCES**

**MR. MARCELINO RODRIGUEZ**
SBOT NO. 00797336
Assistant District Attorney
P.O. Box 1393
Sinton, Texas   78387
Telephone:   361-364-6220
*Attorney for the State*

**MR. PATRICK L. FLANIGAN**
SBOT NO. 07109600
District Attorney
P.O. Box 1393
Sinton, Texas   78387
Telephone:   361-364-6220
*Attorney for the State*

**MR. STANLEY A. TURPEN**
SBOT NO. 20344300
Attorney at Law
P.O. Box 1209
Portland, Texas   78374
Telephone:   361-643-6422
*Attorney for the Defendant*

**MR. JOHN S. GILMORE, JR.**
SBOT NO. 07958500
Attorney at Law
622 S. Tancahua
Corpus Christi, Texas   78401
Telephone:   361-882-4378
*Attorney for the Co-Defendant Pate*

LISA TUCKER RILEY, CSR, RPR

Reset for Hall

Turpen could not be ready on next court date 12/3

Johnson set for 1/5/09

# PROCEEDINGS

*(Defendant present)*

THE COURT: Christopher Hall, Mr. Turpen.

Stan, you just got re-appointed as a result of Ms. Cochran-May's employment in the county attorney's office.

MR. TURPEN: That's correct, Judge.

THE COURT: You need a reset?

MR. TURPEN: Big time.

THE COURT: Okay.

MR. TURPEN: I have talked to him for about an hour-and-a-half and talked to Tamara a little bit; talked to Marcelino a little bit but that is about it.

THE COURT: Okay. The next round of jury trials after this --

DEPUTY CLERK: December the 3rd -- or December the 1st.

THE COURT: Will you be ready by December you think, or no?

MR. TURPEN: Judge, I'm -- or that week I'm going to tell you that to be honest with you I don't think I could be ready by then.

THE COURT: Okay. January the 5th will be the trial date.

MR. TURPEN: Thank you, Judge. That was more or less what I had mentioned to Marcelino. I figured January I

*Pretrial Hearing*
*10-23-08*

*annauncement*
*docket*
*12/30*

should be able to be up for it.

DEPUTY CLERK: Announcement?

THE COURT: At 9:00 o'clock -- hang on. That is going to be tricky. It looks like the announcement docket will be December the 30th.

Now, guys, I am remissed to tell you whether that would be an afternoon or a morning.

DEPUTY CLERK: So far our list says 1:30 still.

THE COURT: That is what your list says?

DEPUTY CLERK: So far.

THE COURT: Then that is what I'm going to tell you.

MR. TURPEN: Judge, can I fax in my announcement on that?

THE COURT: On a murder case?

MR. TURPEN: I'm off the week after Christmas.

THE COURT: You can't be off the week that I have got you. I want to set you for trial the first time and then be off the next week when you --

MR. TURPEN: Well, I have put my announcement in for vacation. I do it every year. And the week after Thanksgiving I go hunting. The week after Christmas I do what I can do.

THE COURT: This is not the week after Christmas -- well the 30th I guess is.

LISA TUCKER RILEY, CSR, RPR

*MR. TURPEN:* I think it is.

*THE COURT:* Okay. Can you have an announcement the week before Christmas on December the 22nd?

*MR. TURPEN:* Okay.

*DEPUTY CLERK:* At 1:30? The clerk is going to get the blame.

*MR. RODRIGUEZ:* 9:00 o'clock is good.

*THE COURT:* I mean one announcement docket on one case, it should be 9:00 o'clock. That is what I'm thinking.

*MR. FLANIGAN:* I would say for -- if we'll do stuff on the 30th, let's do it at 9:00 o'clock as well.

*THE COURT:* Well, you'll not do anything on the 30th. I'm not doing anything on the 30th right now.

*MR. FLANIGAN:* Okay.

*MR. GILMORE:* Judge, I have a codefendant in this case.

*MR. RODRIGUEZ:* We would like to carry his case as well.

*THE COURT:* I know, but we'll try your case in November when I come over here.

*MR. GILMORE:* We'll try me?

*THE COURT:* You're my number one priority in life, John.

*MR. GILMORE:* Well, I do appreciate that, Judge.

LISA TUCKER RILEY, CSR, RPR

MR. RODRIGUEZ: Got to be number one with somebody.

THE COURT: Somebody has got to be number one.

DEPUTY CLERK: Pretrial?

THE COURT: A pretrial. How many pretrials have already been conducted in this case?

DEPUTY CLERK: Everyone has been passed. We really haven't addressed anything yet.

MR. FLANIGAN: We have one pretrial, Judge, where, like, the discovery motions and all the non-evidentiary motions were agreed to, but there have been no evidentiary trial.

THE COURT: The 25th of November -- no, that is the week before Thanksgiving. That is when you leave off the week after.

MR. TURPEN: I'm leaving the week after Thanksgiving. This is the week before.

THE COURT: All right. The 25th at 9:00 o'clock.

MR. TURPEN: At 9:00 o'clock.

THE COURT: And what that does is it has you appearing before the trial judge for your pretrial, for your announcement and for your jury trial. You stay hooked up with where the case is set.

All right?

Set Terry
Need
pretrial
on 11/25/08

LISA TUCKER RILEY, CSR, RPR

Pretrial Hearing
10-23-08

MR. TURPEN:  Sounds good, Judge.

THE COURT:  Done.

(End of proceedings)

*    *    *    *

LISA TUCKER RILEY, CSR, RPR

STATE OF TEXAS

COUNTY OF ARANSAS

I, **LISA TUCKER RILEY**, Official Deputy Court Reporter in and for the 156th District Court of Aransas, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $44.00 and will be paid in full by Aransas County.

WITNESS MY OFFICIAL HAND on this, the 11th day of March, 2009.

**LISA TUCKER RILEY, CSR, RPR**
Texas CSR #3895
Official Deputy Court Reporter
P.O. Box 700
Sinton, Texas 78387
Telephone:  361-364-9320
Expiration:  12-31-2010

LISA TUCKER RILEY, CSR, RPR

APPENDIX EXHIBIT # 2

RR VOL. 5 OF 11    HALL

EX #13

44,275-04

# REPORTER'S RECORD
VOLUME 5 OF 11 VOLUMES
TRIAL COURT CAUSE NO. A-08-5080-2CR

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| vs. | ) ARANSAS COUNTY, TEXAS |
| CHRISTOPHER JOSEPH HALL | ) |
| | ) 36TH JUDICIAL DISTRICT |

RECEIVED IN
COURT OF CRIMINAL APPEALS

AUG 10 2011

Louise Pearson, Clerk

## PRETRIAL HEARING

— Original produced on March 11, 2009 —

# COPY

On the **25th day of November, 2008**, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Michael Welborn, Judge Presiding, held in Rockport, Aransas County, Texas.

Proceedings reported by computerized stenotype machine.

**APPEARANCES**

**MR. MARCELINO RODRIGUEZ**
SBOT NO. 00797336
Assistant District Attorney
P.O. Box 1393
Sinton, Texas 78387
Telephone: 361-364-6220
***Attorney for the State***

**MR. STANLEY A. TURPEN**
SBOT NO. 20344300
Attorney at Law
P.O. Box 1209
Portland, Texas 78374
Telephone: 361-643-6422
***Attorney for the Defendant***



LISA TUCKER RILEY, CSR, RPR

# PROCEEDINGS

*(Defendant present)*

THE COURT: Good morning, Mr. Turpen.

MR. RODRIGUEZ: I'll get the file, your Honor, if we can go through it.

THE COURT: Which file?

MR. RODRIGUEZ: Mr. Hall's.

MR. TURPEN: Judge, for the record, I have talked with the State, and I have also talked to Mr. Gilmore. Mr. Gilmore has the Codefendant Pate. I represent Mr. Hall.

THE COURT: Okay.

MR. TURPEN: And Tamara Cochran-May represented him before I was, and there was a motion to sever that was filed, and they were going to not go forward on that motion. I have talked to my client and he in agreement.

I have also checked with Mr. Gilmore, and it's my understanding he is in agreement with that, too, unless his client tells him something different. That was my understanding.

THE COURT: Who is the codefendant?

MR. TURPEN: Pate is the last name.

THE COURT: Pate.

MR. RODRIGUEZ: Chadwick.

MR. TURPEN: Chad --

MR. RODRIGUEZ: Chadrick.

THE COURT: When is that one scheduled for trial?

MR. TURPEN: Right now January the 5th

THE COURT: Okay. Well, both cases on the same trial docket at this time?

MR. RODRIGUEZ: Yes, your Honor.

THE COURT: Okay. Well, it's kind of hard to try them at the same time if it's not on the same docket.

MR. TURPEN: I understand, Judge.

THE COURT: Minor technicality.

DEPUTY CLERK: And also Mr. Gilmore is not supposed to be here on the 5th. He will be on vacation till the 9th.

THE COURT: Yeah, supposed to be.

MR. RODRIGUEZ: Your Honor, may we approach on --

THE COURT: On what, Hall? Did you bring my file back in? I was going to say, no, you can't, because I don't have a file.

MR. TURPEN: That's correct.

MR. RODRIGUEZ: We went ahead and marked the

that you have filed, Mr. Turpen?

MR. TURPEN: They are, Judge. I went ahead and just refiled all the pretrial motions. The only one I was going to carry over from Tamara's was the motion to sever. I don't think we're going to use them.

THE COURT: All right. Well, we have got the -- all right. You've got an order on discovery here?

MR. TURPEN: Yes.

THE COURT: It looks like it has got some pen-and-ink changes on it. This particular order, is that the one?

MR. TURPEN: Yes, sir.

THE COURT: Y'all are agreeing that this order should be entered; is that correct?

MR. RODRIGUEZ: Yes, your Honor.

MR. TURPEN: Thank you, Judge.

THE COURT: Motion in limine we'll take up I guess at time of hearing.

MR. RODRIGUEZ: Yes, Your Honor.

THE COURT: I'm looking at the different orders here that are contained. There is a motion for severance, and I believe that has been withdrawn; is that correct?

MR. RODRIGUEZ: That's correct, your Honor.

THE COURT: Is that correct?

MR. TURPEN: Judge, what I would like to do on that is leave it in the file just in case we need it because I did talk to Gilmore. Gilmore says he didn't see any reason to sever unless his client talks otherwise, but I haven't talked back with him to know that, and I don't think he has a motion in the file.

THE COURT: All right. Then no ruling on the motion to sever.

MR. TURPEN: Thank you, Judge.

THE COURT: Motion to inspect and examine and test physical evidence.

MR. RODRIGUEZ: Not a problem, your Honor.

THE COURT: Granted.

for him.

MR. TURPEN: At the sheriff's office.

THE COURT: You'll just need to make an appointment to go wherever the items are.

MR. TURPEN: Okay.

THE COURT: Motion to require State to reveal agreement. In other words, that is the deal. This is the agreement with whom?

MR. RODRIGUEZ: The codefendants, and that's

basically a public record now since they went ahead and entered their pleas.

MR. TURPEN: I have been told they have -- they have it in each one of their files. That is sufficient for me. He said it was the same deal for each codefendant; is that correct?

MR. RODRIGUEZ: Yes. Each one received the same plea offer.

THE COURT: So basically no objection to it. It's granted, and I would just simply indicate see codefendants' plea bargains.

MR. TURPEN: Yes, sir.

THE COURT: And they are a public record.

MR. RODRIGUEZ: Just awaiting sentencing at this point. SoNO

MR. TURPEN: I understand.

THE COURT: This is one of the group that I accepted the plea bargain on?

MR. RODRIGUEZ: That's correct, your Honor.

THE COURT: That we're waiting to get sentenced. Okay.

What is this motion to instruct State's attorney to refrain from racial discrimination in the exercise of peremptory strikes?

MR. RODRIGUEZ: It's kind of like that

Scanned Jan 26, 2012

preemptive *Batson*.

THE COURT: I don't think --

MR. RODRIGUEZ: I --

THE COURT: -- the Court needs to grant any motion in that regards. That is the law.

MR. TURPEN: I understand, Judge. I have talked to the State about it, but this case involves or at least the allegations are that Mr. Hall is involved with a gang that is probably known for racial epithets and things that I just wanted to preclude that from even coming up.

THE COURT: That's a *Batson*.

MR. TURPEN: Here in Rockport I don't think it will any way.

THE COURT: That is a *Batson* issue at time of trial.

MR. TURPEN: Yes, sir.

THE COURT: And the State will always be

THE COURT: Although I don't think it's necessary, and you'll be ordered not to do that.

MR. RODRIGUEZ: Yes, your Honor.

THE COURT: And they'll --

MR. RODRIGUEZ: And I'll refrain from doing that.

Scanned Jan 26, 2012

THE COURT: Motion for inspection of premises.

MR. TURPEN: It's a trailer and a yard in between.

MR. RODRIGUEZ: The only problem we have with that, your Honor, is I'm not sure who has the premises now. It was a trailer. I'm not even sure it's still there. At one time it belonged to the mother of the victim. Of course, the victim is now, of course, deceased. The mother that was living there is in custody, and the children are with CPS. So there are basically -- unless someone else moved in. I don't know who controls the premises. I told Mr. Turpen that I'll try to find out who has it and make it available to him if I can.

MR. TURPEN: I'm not asking that the defendant be present. I'm just for my personal viewpoint.

always remain is is the premises under the control of the State, and the answer is, no, it's not, is it?

MR. RODRIGUEZ: No.

THE COURT: I don't know how the State -- I can order the State to allow you to attend the premises when they don't have control of the premises.

MR. TURPEN: I understand. I guess we have an agreement I think between us to find out who has control and

try to set something up where I can go out there and look at it.

MR. RODRIGUEZ: I will make an effort to assist him to get the information.

THE COURT: That's exactly what I'm putting on the order. I'm denying it but State is to assist in viewing of premises and not to take any measures that would deprive him of the ability to examine it.

MR. RODRIGUEZ: If anything I can get a floor plan for him.

MR. TURPEN: That's fine.

MR. RODRIGUEZ: Tracy Watson who was living in the residence is still here. I can probably get a diagram --

MR. TURPEN: Get a diagram of the yard.

THE COURT: All right. Assist as best you can in that, and most importantly don't take any action that would deprive him of the ability to examine the premises noting that it's not controlled by the State.

The only other thing we have is a motion for voir dire of expert witnesses. What is this?

MR. TURPEN: Basically it's a Daubert challenge. I have talked to the State. What I'm going to do is ask the Court to hold it in abeyance until trial. I think I may be

able to resolve it without having to have that type of hearing.

I have been informed by the State, number one, I have got the expert's names. I can call them; review the stuff with them, but also it's my understanding one of these tests, the scent test.

MR. RODRIGUEZ: The scent lineup.

MR. TURPEN: They are going to have one of these supposedly in -- Ms. Cable is going to have one in Sinton on the 15th or something like that, so I may be able to come up there.

THE COURT: I have heard about those things.

MR. RODRIGUEZ: And I'll provide him with information, the curriculum vita of the expert that will do that.

THE COURT: Isn't the expert the dog?

MR. RODRIGUEZ: Well, the handler.

THE COURT: I mean, if you want to voir dire a dog, feel free.

MR. RODRIGUEZ: The dog did have training, so I guess there is a certification.

THE COURT: I mean, which one is the witness? Which one is the expert witness?

MR. TURPEN: The dog or the trainer?

THE COURT: The dog or the trainer? I think the

dog is the witness. I would be willing to grant that one to see him voir dire a dog. I would like to watch that.

Okay. Yeah. Well, just hold that off. I think I know where you're going on that.

MR. RODRIGUEZ: My understanding is the bloodhound is very truthful.

THE COURT: And I don't think that the defense has to file any specific motion and be granted a motion to voir dire an expert witness. I think they are just putting you on notice as far as I'm concerned as far as admissibility of any testimony regarding any type of expert areas. You're always entitled to take the witness on voir dire to determine the competency and ask the Court to make such a determination --

MR. TURPEN: understand.

THE COURT: -- even at the time of hearing.

MR. TURPEN: was going to try to do it outside the presence of the jury, but I think we can probably resolve it.

THE COURT: The Court would prefer that if it is an issue that is going to be in the trial of the case, it would be best to do this ahead of time if we know that it's going to be an issue --

MR. TURPEN: I will.

THE COURT: on a pretrial matter versus

THE COURT: Okay. Anything else on your pretrials?

MR. TURPEN: That's all I have, Judge.

THE COURT: All right. Well, very good. Those orders will enter as reflected.

MR. TURPEN: Thank you, Judge.

Also I think all the other -- I have asked that all the other motions that Ms. Tamara Cochran-May be filed, have those be struck at this time, too, so there is no confusion.

THE COURT: Okay.

MR. TURPEN: I'm not sure what she filed.

THE COURT: All right.

MR. TURPEN: I just think it's cleaner to go forward with what I have got.

THE COURT: You're going forward on your motions only?

MR. TURPEN: Right, except for the motion to sever in case Mr. Gilmore comes back and says his client wants to sever and needs to sever or something. We'll bring it back.

THE COURT: I think it's more than a want or a need. I think there has to be some purpose behind some specific reason the case needs to be severed such as prior criminal history or something of that nature.

MR. TURPEN: Yes, sir.

THE COURT: All right. Very good. Very good.

We'll see everybody on the next setting date, whenever that may be.

MR. RODRIGUEZ: December 22nd.

THE COURT: Well, we'll see everybody on that date. That's me.

*(End of proceedings)*

*      *      *      *

LISA TUCKER RILEY, CSR, RPR

STATE OF TEXAS

COUNTY OF ARANSAS

I, **LISA TUCKER RILEY**, Official Deputy Court Reporter in and for the 36th District Court of Aransas, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the

in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $78.00 and will be paid in full by Aransas County.

WITNESS MY OFFICIAL HAND on this, the 11th day of March, 2009.

**LISA TUCKER RILEY, CSR, RPR**
Texas CSR #3995
Official Deputy Court Reporter
P.O. Box 700
Sinton, Texas 78387
Telephone: 361-364-9320
Expiration: 12-31-2010

LISA TUCKER RILEY, CSR, RPR

APPENDIX EXHIBIT # 3

RR VOL. 5 A OF 11    HALL

**EXHIBIT # 8**

**RR VOL 5A OF 11**

**DATE 10/23/08**
**HALL PRE TRIAL**

Ex. #3
Vol 5A of 11

https://www.docusign.net/Member/DocuSign.aspx?ti=73853144d28323245b9c... 7/2/2014

EX # 14
X3

*Pretrial Hearing
2-5-09*

EX #X3

44,275-04

REPORTER'S RECORD
VOLUME 5-A OF 11 VOLUMES
TRIAL COURT CAUSE NO. S-08-5080-2

THE STATE OF TEXAS ) IN THE DISTRICT COURT
)
vs. ) ARANSAS COUNTY, TEXAS
)
CHRISTOPHER JOSEPH HALL )
) 36TH JUDICIAL DISTRICT



RECEIVED IN
COURT OF CRIMINAL APPEALS

AUG 10 2011

Louise Pearson, Clerk

PRETRIAL HEARING

ORIGINAL

On the 5th day of February, 2009, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Janna K. Whatley, Judge Presiding, held in Rockport, Aransas County, Texas.

Proceedings reported by computerized stenotype machine.

LISA TUCKER RILEY, CSR, RPR

DocuSign

Scanned Jan 26, 2012

**APPEARANCES**

**MR. PATRICK L. FLANIGAN**
SBOT NO. 07109600
District Attorney
P.O. Box 1393
Sinton, Texas   78387
Telephone:   361-364-9390
*Attorney for the State*

**MR. STANLEY A. TURPEN**
SBOT NO. 20344300
Attorney at Law
P.O. Box 1209
Portland, Texas   78374
Telephone:   361-643-6422
*Attorney for the Defendant Hall*

**MR. JOHN S. GILMORE, JR.**
SBOT NO. 07958500
Attorney at Law
622 S. Tancahua
Corpus Christi, Texas   78401
Telephone:   361-882-4378
*Attorney for the Defendant Pate*

**P R O C E E D I N G S**

*(Defendant present)*

MR. FLANIGAN: I'm ready on Hall. I'm not happy with a late-filed motion to suppress that we have in Mr. Hall's case.

THE COURT: It's not set for pretrial.

What is your motion, Mr. Turpen?

MR. TURPEN: Judge, well, first of all, I'm ready for trial subject to I have carried over, with Judge Welborn's permission, the Daubert challenge concerning the dog patch sniff test. I have talked to Mr. Gilmore. We feel it's probably a good idea to go ahead and go forward with that. I have also --

THE COURT: I don't know how Judge Welborn can carry over an evidentiary hearing without checking with everybody. Do you-all know about that?

MR. TURPEN: The State's attorney was present when he did that, Judge, at the last pretrial hearing. That's when we went through it. My understanding at that point the State wasn't ready to go forward with it that day; neither were we. That is why --

THE COURT: Carried to trial. It's not carried to pretrial; carried to trial.

MR. TURPEN: Exactly. Carried to trial.

THE COURT: Oh, okay.

Scanned Jan 26, 2012

MR. TURPEN: That's what I'm asking for is to carry it to trial. I don't think it will take that long. I just -- I have talked to David Cano. David Cano told me that you-all had one in Sinton, and evidently it was granted, so...

THE COURT: Are you talking about as far as a Daubert challenge?

MR. TURPEN: There was another Daubert challenge against the same witness and in Sinton.

THE COURT: Don't know nothing about it.

MR. TURPEN: Month and a half go.

MR. FLANIGAN: Judge Johnson heard that hearing and denied the defense challenge --

MR. TURPEN: Correct.

MR. FLANIGAN: -- to that evidence by the Court, not that it makes any difference in this trial, but --

THE COURT: I don't know anything about it. Okay.

MR. TURPEN: Then on this case I was brought in on this case when Tamara Cochran-May --

THE COURT: I know all of it. That is why we reset it this far down the road.

MR. TURPEN: I have talked with Tamara. What I have got is a motion to suppress on a photographic lineup. In the photographic lineup that I had from Tamara there was only one in there for Mr. Hall. Now, I filed my pretrial motions,

the Daubert challenge and all the stuff in there and went through it. At that point I didn't see any issues with photographic lineups based on what I had seen.

Later, and I can't give you the exact date but I believe it was the early part of January, that first week in January, I received some supplemental discovery from Mr. Rodriguez, one of those being a photographic lineup of Mr. Hall where he is identified as No. 5. I checked with Tamara. We did not have that in our discovery before.

After I went -- through the first week in January I had a trial that lasted most of the week in Kleberg. The second week I was sick. I got sick the first week. So I spent the second week trying to recover. The last two-and-a-half weeks I spent getting ready on this trial.

When I sat down with Mr. Hall, Mr. Hall who has been looking at these photographs for a long time before I even -- I got the case, he noticed something that I had not seen and what he has put in here I put in my motion to suppress photographic lineup. He is alleging, and I certainly can't answer his questions on it, that the two photo arrays that deal with him have been tampered with. The reason that he has brought this up is that when you look at the other photo arrays for all the other codefendants the location of the codefendant in the photo array is always the same and the people surrounding him have not changed.

In Mr. Hall's photographic lineup, the two lineups, for some reason his location changes from five to three and there is also different people that are surrounding him. So he is alleging that the photographic arrays were tampered with and that when the witnesses look at this, that there is a substantial likelihood of misidentification of the defendant in trial as a result of this procedure, specifically the tampered photo arrays of the defendant were different than the photo arrays of the codefendant.

The defendant's picture was rotated and submitted with each array having different people around the defendant, both acts --

THE COURT: I don't need you to read your motion, Mr. Turpen.

MR. TURPEN: I'm just explaining.

THE COURT: Explain in normal terms. You're reading.

MR. TURPEN: Okay. Explaining --

THE COURT: Your client thinks your photo array is messed up. Cool.

So, Mr. Flanigan?

MR. TURPEN: And I think it would take probably five or ten minutes, and I would ask that it be carried to trial along with the Daubert challenge. That's why I filed it today so there wouldn't be more of a surprise than what there

Scanned Jan 26, 2012

is, if there is a surprise, instead of waiting till the day of trial like I filed it today as soon as I found out there was some issue that I have not seen.

MR. FLANIGAN: Well --

THE COURT: Sorry, guys. I haven't touch the cases before. It's all new to me.

MR. FLANIGAN: Unfortunately the State is stuck. Either we have to deal with late filed motions or we have to deal with ineffective assistance of counsel. Because business doesn't get taken care of in a timely fashion and according to the rules and according to the Court's schedule, we're going to object. I'm not going to be surprised if the Court goes ahead and has a hearing however long it takes anyway, but, you know, we're just at the mercy of the Court or at the pleasure of the Court. Let me put it that way.

THE COURT: Who needs to be witnessed? I mean, who is supposed to be the witness on this? You're talking about five minutes. There is no way you can do it in one witness in five minutes.

MR. TURPEN: Well, you have got Officer Brooks and one of the officers, probably Matt Baird.

THE COURT: Is that right? Do you know?

MR. FLANIGAN: You know, Judge, I have no idea. I got this about three minutes before I walked into court to deal with the schedules of this matter.

**Scanned Jan 26, 2012**

THE COURT: Okay. All right.

MR. FLANIGAN: So --

THE COURT: You need to figure out who it is and I want to know how much time and when it is going to be done then. Okay? I need to know who the witnesses are so we can get them here to deal with it.

MR. FLANIGAN: I assume that they'll be here any way, Judge. They'll be available.

MR. TURPEN: They are on his witness list.

THE COURT: Okay. Just make sure they are. Okay.

MR. TURPEN: Judge, I think the Court needs me -- well, I usually try to file these things in a timely manner. This is one of those situations where I have got new information. Granted if I could have gotten on top of it the first week in January when it was handed to me, that would have probably been a better situation, but that's not the way it happened.

THE COURT: Okay. What else?

MR. TURPEN: Other than that I would ask that the Daubert challenge be taken up. Other than those two issues we're waiting to go to trial.

I have checked with my client he has also told me that his mother, who is present today, that they have brought him clothing to the jail. He has not been able to

even look at the clothing yet, and I'm sure there is some --

THE COURT: He won't. They'll put it on him. They have got it. I'm sure all -- like all the other jails, they have it.

THE OFFICER: They'll dress him out Monday morning.

MR. TURPEN: That is my request, Judge, is to at least have him try on the clothes before trial, because if they need to be altered --

THE COURT: I'm not in charge of the jail, Mr. Turpen. I'm sorry. You'll have to talk to somebody else about that. Okay? We're having a meeting at 3 o'clock, but you're asking things of me to do that I have no control over.

MR. TURPEN: I'll certainly address that with the sheriff.

THE COURT: What else?

MR. TURPEN: That's all I can think of, Judge.

THE COURT: Okay. Who is doing punishment?

MR. TURPEN: Ma'am?

THE COURT: Who is doing punishment?

MR. TURPEN: I have to talk to my client. He has still not decided yet.

THE COURT: Before 9 o'clock it must be filed.

MR. TURPEN: I understand, Judge.

THE COURT: Mr. Gilmore?

MR. GILMORE: I think we're going to jury for punishment.

THE COURT: File your election before 9 o'clock.

MR. GILMORE: Okay.

THE COURT: All right.

(Another case called for announcement)

MR. TURPEN: Yes. Judge, announcement on punishment, I'm pretty sure it will probably be the jury because we did discuss that at the jail yesterday evening, but --

THE COURT: Okay. If you-all don't tell me now otherwise it defaults to me. When I start at 9 o'clock Monday morning it goes to the judge. I have to stop it because I can't get anybody moving on this stuff, and I have one person that has done it today.

All right. Number one is Hall and Pate.

Number two is Barns, subject to Mr. Roger's availability, three is Ramirez, four is Moreno, five is Satterlee, six is Campos, and I have down seven and eight for Moreno, but I know we won't try both of them.

MR. FLANIGAN: Which Moreno are you speaking about?

THE COURT: Ramiro. I'm sorry. I'm looking at Moreno. Instead I wrote them down seven and eight. Then nine and ten, last two, Chupe and Soliz.

**Scanned Jan 26, 2012**

Pretrial Hearing
2-5-09

MP. FLANIGAN: Okay. Thank you, Judge.

THE COURT: Okay.

*(End of proceedings)*

\* \* \* \*

LISA TUCKER RILEY, CSR, RPR

**STATE OF TEXAS**

**COUNTY OF ARANSAS**

I, **LISA TUCKER RILEY**, Official Deputy Court Reporter in and for the 36th District Court of Aransas, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the

WITNESS MY OFFICIAL HAND on this, the 21st day of July, 2011.

**LISA TUCKER RILEY, CSR, RPR**
Texas CSR #3895
Official Deputy Court Reporter
P.O. Box 700
Sinton, Texas 78387

LISA TUCKER RILEY, CSR, RPR

APPENDIX EXHIBIT # 4

HALL'S CRIMINAL DOCKET SHEET

Haller Creminil
Dechel Sheel

# CRIMINAL DOCKET

CASE NO. A-5080-2...

Scanned Mar 30, 2011

Case 2:12-cv-00093   Document 10-5   Filed in TXSD on 06/12/12   Page 39 of 43

| NUMBER OF CASE | STYLE OF CASE | ATTORNEYS | | OFFENSE | DATE OF FILING | | |
|---|---|---|---|---|---|---|---|
| | | | | | Month | Day | Year |
| A-08-5080-2-CR | STATE OF TEXAS vs. | Patrick Flanigan | STATE | Murder 19.02 1st degree | 6 | 24 | 0 |
| | | Christopher Joseph Hall   Lonard Cochran May (appt) | | Agg Assault / Eng in Org Crim Activity | Information, Index or Indictment | | |
| | | Stan Turpin | | | Fee Book | | |
| | | | | | Vol. | | Page |
| | | Richard Rogers III | DEFENDENT | 22.02/71.02 1st degree | | | |

| DATE OF ORDERS | | | Was Stenographer Used | ORDERS OF COURT | Minute Book | | WITNESSES |
|---|---|---|---|---|---|---|---|
| Month | Day | Year | | | Vol. | Page | |
| 6 | 25 | 08 | | Capias issued; illegia custody | | | |
| 7 | 7 | 08 | | Waiver of Arraignment filed | | | |
| 7 | 10 | 08 | | Case Set PT 7-24-08, Arr 7-31-08, JT 8-4-08 | | | |
| 7 | 24 | 08 | | PH - Discov - M/Investigar appointed approved - $500 - granted | | | L Riley |
| 7 | 31 | 08 | | MFC Granted  Arr: 9/25/08 1:30pm  JT: 9/29/08 9a | | | |
| 9 | 25 | 2008 | | St's Motion for Cont - Granted  Reset JT to Nov 3, 2008 @ 9-, Arr to Oct 30 2008 @ 1:30pm  PT to Oct 23, 2008 @ 9- | | | (ST) |
| 10 | 23 | 08 | | Reset  1-5-08 @ 9:00  12-22-08 @ 9:00  11-25-08 @ 9:00 | | | L. Riley |

Turpin asked for reset

100

HALL Did not Get A
PreTrial on 11/25/08
Neither produced
12/22 shows cont granted rest to Feb trial
but there is no Con-Motion or Order on file
... Record
over

Scanned Mar 30, 2011

No. CR 5080-C

| DATE OF ORDERS | | | ORDERS OF COURT CONTINUED | Minute Book | | PROCESS |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Vol. | Page | |
| 11 | 25 | 2008 | Hearing on Pre-Trial — Matters ordered in this Hearing; | | LR | |
| | | | offered - Motion to Inspect Premises — Denied with Qualified - | | | |
| | | | Motion Package, Stricter Granted; Motion to Reveal Deal Granted | | | |
| | | | Motion to Inspect - Granted; Motion to Deliver Pre- | | | |
| | | | Expert - Counsel to Trial - Motion to Sever - Carried to | | | |
| | | | Trial | | | |
| 12 | 22 | 2008 | Cont. Granted - Reset to File Trial Brief w/ counsel (Stricter) | | LR | |
| 2 | 5 | 09 | R - #1 - have filed M/ Suppven — + M/ Expert Strike — | | LR | |
| 3 | 9 | 09 | AOR - Shuffle Requested by Deft. -V/Dsegie 12:15 -3:10 | | SD | |
| | | | Jury seated + Sworn 3:30 - Dx arraigned - Plead Not Guilty | | | |
| | | | Oct L-C12 - Opening DJ - Sx - Wi, A++ hoven — | | | |
| | | | Jury released 5pm preparing 9 | | | |
| 2 | 10 | 09 | Testimon resumed 9:15 Broke 10:30 - resumed 10:30 - | | | |
| | | | lunch Broke 12 - El pm M/ Sulivan Photographi Identification | | | |
| | | | h,s - outside jury presence - SX - 27, 28 - Denied | | | |
| | | | M/ HVD; Exhit (W) - Court finds this an expert - to trino's | | | |
| | | | relevant + probative value outweigh prejudicial potential - testimony will | | | |
| | | | be allowed - Jury brought in 2pm - Broke 3:11-3:28 - | | | |
| | | | recessed for day 3:30pm - Ct recalled - Criminal | | | |
| | | | histr | | | |

# CRIMINAL DOCKET

CASE NO. A 08-5080-2

| NUMBER OF CASE | STYLE OF CASE | ATTORNEYS | OFFENSE | DATE OF FILING | | |
|---|---|---|---|---|---|---|
| | | | | Month | Day | Year |
| A08 5080-2 | STATE OF TEXAS vs. | Patrick Flanigan   STATE | Murder | 6 | 24 | 08 |
| | Christopher Hill | Stan Turpen | | Information, Index or Indictment | | |
| | | | | Fee Book | | |
| | DEFENDENT | | | Vol. | Page | |

| DATE OF ORDERS | | | Was Stenographer Used | ORDERS OF COURT | Minute Book | | WITNESSES |
|---|---|---|---|---|---|---|---|
| Month | Day | Year | | | Vol. | Page | |
| 2 | 11 | 09 | | Hearing on admissibility of Leal's gang report - ruling made on record - Testimony begune 9:10 - 10:30 a - Bck 10:45 - lunch break, 12:25 - Ct review criminal testim - disclosed of forms to orally - testimony resume 1:30 - brek - 4:12 Testimony resumed - Concluded of Day e 5pm | | | 8A |
| 2 | 12 | 09 | | Testimony resumed 9:10 am - Brek 10:15 - 10:36 - 12:25 lunch - 1:53 testimony resum - Sx rests Defense + Dxy rest e 2:43 - jury recessed f a brek e 2:45 - retired to deliberate e 6:28 Verdict of Guilt as to ct - e 8:00pm - Jury buchin e 10am | | | |
| 2 | 13 | 09 | | Jury brought in e 10:00 - Sx made opening stm Jury retired to deliberate e 10:32am - Verdict e 12:46pm verdict 99 yrs IDTDCJ + $10,000 fine | | | 8D |

APPENDIX EXHIBIT # 5

HALL'S MASTER INDEX RR VOL 1 OF 11

εχ≠ 15

44,275-04

R E P O R T E R ' S    R E C O R D

VOLUME ⎯I⎯ OF ⎯II⎯ VOLUMES

Trial Court Cause Number A-08-5080-2-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT OF |
| VS. | * | ARANSAS COUNTY, TEXAS |
| CHRISTOPHER JOSEPH HALL | * | 36TH JUDICIAL DISTRICT |

MASTER INDEX

**ORIGINAL**

RECEIVED IN
COURT OF CRIMINAL APPEALS

AUG 10 2011

Louise Pearson, Clerk

_HALL MASTER INDEX_

# T A B L E   O F   C O N T E N T S

VOLUME 1: Master Index

VOLUME 2: Pretrial Motions (Hearing)  —Cochran May (Hall pleser

VOLUME 3: Announcement (9-25-08) STATE MTC granted by
Severance held over
Reset Trial date 11/3/08
Pretrial for 10/23

VOLUME 4: Pretrial Hearing (10-23-08)

VOLUME 5: Pretrial Hearing (11-25-08)
MISSING Pretrial Rev — 02/05/09

VOLUME 6: Jury Trial -- Voir Dire Proceedings (2-9-09)

VOLUME 7: Jury Trial -- Guilt/Innocence (2-9-09)

VOLUME 8: Jury Trial -- Guilt/Innocence (2-10-09)

VOLUME 9: Jury Trial -- Guilt/Innocence (2-11-09)

VOLUME 10: Jury Trial -- Guilt/Innocence (2-12-09)

VOLUME 11: Jury Trial -- Punishment-Sentencing (2-13-09)
Trial Exhibits

-oOo-

_Wheres There_

**Scanned Jan 26, 2012**

CAUSE NO. A-08-5080-2-CR(HC3)

| | | |
|---|---|---|
| EX PARTE: | ( | IN THE DISTRICT COURT |
| | ) | 36TH JUDICIAL DISTRICT |
| CHRISTOPHER JOSEPH HALL | ( | ARANSAS COUNTY |

## INDEX

Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Order from Court of Criminal Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Correspondence to Judge and District Attorney . . . . . . . . . . . . . . . . . . . . 4

Order Appointing Attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Order from District Court Judge Janna K. Whatley . . . . . . . . . . . . . . . . . . . 6

Indictment 4.23 ....... 6/24 . . . . . . . . . . . . . . . . . . . . . . . . . 8

Affidavit of Indigence with Order Appointing Counsel 8-10 3/13/08 . . . . . . . . . . 11

Fax Notification of Appointment ... Mr. order Cochran . . . . . . . . . . . . . . . . 17

Receipt for Capias and Precept from Sheriff Department . 6/25 . . . . . . . . . . 19

Correspondence to Attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Capias Returned Served . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Precept Returned Served . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Correspondence from Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Waiver of Arraignment . . . . 7/7/08 . . . . . . . . . . . . . . . . . . . . . . 25

Motion for Discovery with Order . . 7/7 ...... 7/21 granted 7/24 . . . . . 27

Motion for Authorization to Expend Funds for Investigator . . 7/21 granted 7/24 . . 39

Correspondence from Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Motion for Continuance . . . . . 7/31 Cochran granted on granted 7/3 . . . . 43

Order on Motion for Continuance . granted 7.3.1 . . . . . . . . . . . . . . . 44

Order on Motion for Authorization to Expend Funds for Investigator . . . . . . . . . . 46

Setting Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Motion to Sever . 8/5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

States Motion for cont 9/25

Defendant's Application for Subpoena . . . . . . . . . . . . . . . . . . . . . . . . . 50

cont pre endcrment Motion to withdrw to 15 Cochran
States — pend PT 10/23
Ann 10/30/08
Tira 11/3 order granten 10/15 whb

i

**Scanned  Jan 26, 2012**

State's Application for Subpoena .......................................... 185

Subpoena Returned Served
    Justin Padgett ................................................................. 161

Motion to Suppress Photographic Identification ............................ 162

State's Application for Subpoena ......................................... 165

Subpoena Returned Served
    Jennifer Leyva ............................................................. 167
    Roy Lytle ................................................................. 168
    Ernest Solis .............................................................. 169

Defendant's Election as to Punishment ................................... 170

Strike List - State ...................................................... 172

Strike List - Defense .................................................... 174

Jury Chosen .............................................................. 176

Jury Note 1 .............................................................. 178

Charge of the Court ..................................................... 179

Verdict ................................................................. 191

Jury Note 1 ............................................................. 193

Punishment Charge ....................................................... 194

Verdict ................................................................. 198

Trial Court's Certification of Defendant's Right of Appeal ............... 199

Order to Withhold ....................................................... 200

Notice of Appeal filed Pro Se ........................................... 201

Order Appointing Counsel ................................................ 202

Notice of Appeal to Court of Appeals .................................... 203

Notice of Appeal ........................................................ 204

Written Designation Specifying Matters for Inclusion in Clerk's Record ... 207

Request for Preparation of Reporter's Record and Designation of Matters
to be Included .......................................................... 210

Amended Notice of Appeal to Court of Appeals ............................ 212

Correspondence to Court of Appeals ...................................... 213

Correspondence from Court of Appeals .................................... 214

Correspondence from Defendant ........................................... 216

iv

**Scanned  Jan 26, 2012**

Correspondence to Defendant ............................................... 217

Judgment of Conviction by Jury; Sentence by Jury to Institutional Division, TDCJ ..... 218

Receipt for Pen Packet ...................................................... 223

Notice from Court of Appeals ............................................... 224

Claim for Felony/Juvenile Attorney Fees ..................................... 225

Correspondence from Defendant .............................................. 228

Cover Letter ............................................................... 229

Order from 13th Court of Appeals ........................................... 230

Notice of Setting .......................................................... 233

Correspondence from Defendant .............................................. 234

Order Allowing Withdrawal of Counsel and Appointing New Counsel ............... 236

Affidavit of Indigence with Order Appointing Counsel ......................... 238

Fax Notification of Appointment ............................................. 243

Cover Letter from Court of Appeals .......................................... 245

Judgment and Opinion from Court of Appeals (Withdrawn) ...................... 246

Cover Letter from Court of Appeals .......................................... 277

Judgment and Opinion from Court of Appeals ................................. 278

Claim for Felony/Juvenile Attorney Fees ..................................... 309

Correspondence from Defendant .............................................. 310

Correspondence to Defendant ................................................ 312

Correspondence from Court of Appeals ....................................... 313

Mandate ................................................................... 314

Court Docket Sheet ........................................................ 315

Certification .............................................................. 319

v

APPENDIX EXHIBIT #6

JUDGE MICHAEL WELL BORN'S POST CONVICTION LETTER



# MICHAEL E. WELBORN

*District Judge*
*36th Judicial District*
P.O. Box 700
Sinton, Texas 78387-1303
361/364-9310
Fax: (361) 364-9410

**COUNTIES:**
Aransas
Bee
Live Oak
McMullen
San Patricio

October 5, 2012

The Law Office of Carrie Crisp
109 E. Hopkins, Suite 206
San Marcos, Texas 78666

> RE: The State of Texas v. Chadrick B. Pate, Cause A-08-5080-4-CR. In the 36th Judicial
> District Court of Aransas County, Texas.

Dear Counsel,

First, I apologize for not getting you a response on a more timely basis. I did have to do some research to determine the correct answers to some of your questions.

The Judges for the 36th, 156th and 343rd District Courts have concurrent jurisdiction in five different counties and the jurisdiction to generally exchange benches. The three Judges rotate from county to county on a set schedule and all criminal matters are set on available days without regard to which presiding Judge will be setting. In the matter involving Mr. Pate, it was my scheduled date to handle all criminal pre-trial matters in Aransas County. (All criminal cases are scheduled for pre-trial, announcement and jury trial at the docket call of all new indictments according to the published calendar for the three district judges.)

Regarding Mr. Pates case, research shows that I did preside over the pretrial matters that involved multiple defendants in the same criminal indictment. The docket reflects that the Court was considering a motion to sever, however the issue became moot when it was announced that it appeared one or more of the defendant's were going to waive their right to a jury trial in the pending matter. Counsel for the State, did move for a continuance on the active trial setting. Both State and Defendant agreed that said matter should be continued. I granted the State's Motion to Continue at the hearing on September 25, 2008. There were multiple orders presented and in the clerk's file at that time. The order presented to me at the hearing on September 25, 2008 was incorrect, as they presented the order on the motion to sever and not the order on the motion to continue. The order on the severance was signed by me in error on that date. The Court and the Clerk's office discovered the error before the order was formally filed (that same day) in the paper's of this cause. This is why the Order in question had not been file stamped.

Mr. Gilmore attorney for Mr. Pate filed the Motion for Severance that was scheduled for hearing on September 25, 2008.

Normally, any order granting a motion is file stamped by the District Clerk's office after it is granted and signed by the Judge. This order was not file stamped because it was quickly determined that the wrong order was handed to the Judge for signing.

If you have additional questions, please do not hesitate to call or write. I do respond to appropriate email if time is of the essence. (Email: welbornme@aol.com.)

Respectfully,

Michael E. Welborn.
Judge Presiding
36th District Court.



**MICHAEL E. WELBORN**
*District Judge*
*36TH Judicial District*
P. O. Box 700
SINTON, TEXAS 78387-1303



CORPUS CHRISTI TX
RIO GRANDE DIST

U.S. POSTAGE PITNEY BOWES

ZIP 78387 $ 000.45⁰
02 1W
0001376079 OCT 05 2012

THE LAW OFFICE OF CARRIE CRISP
109 E. HOPKINS, SUITE 206
SAN MARCOS, TEXAS 78666

APPENDIX EXHIBIT # 7

GRAND JURY SUPOENA PHONE RECORDS 2 PAGES

# GRAND JURY SUBPOENA

## STATE OF TEXAS

To the Sheriff **Aransas County**, Texas or any Peace Officer of the State of Texas, *GREETING:*

**YOU ARE HEREBY COMMANDED** to summon, **Custodian of Records, AT&T, National Compliance Center, PO Box 24679, West Palm Beach, Florida 33416 Phone- 800-635-6840, Fax-888-938-4715**, to be and personally appear on the 25th day of *March, A.D., 2008*, at *9:30am* before the *Grand Jury of Aransas County, Texas* now in session at the Court House of Aransas County, in the City of Rockport, Texas, then and there to testify as witness in certain matters, (a felony), now pending and under investigation before the Grand Jury.

Said above named witness is further commanded to produce at said time and place above set forth the following records, and documents to-wit; Subscriber Information and Cellular telephone records, incoming and outgoing for **(469) 323-2372** from 12:01am on December 1, 2007 through 11:59pm on January 8, 2008;

**You may comply with this subpoena by delivering the above described documents before the appearance date to:**

**36th Judicial District Attorney**
**Investigator Russell Kirk**
**P.O. Box 1393 Sinton, Tx. 78387.**

**Office- (361) 364-9390**
**Fax-    (361) 364-9490**

YOU ARE NOT TO DISCLOSE THE EXISTENCE OF THIS REQUEST FOR A PERIOD OF 90 DAYS FROM THE DATE OF THIS REQUEST. ANY SUCH DISCLOSURE COULD IMPEDE THE INVESTIGATION BEING CONDUCTED AND THEREBY INTERFERE WITH ENFORCEMENT OF THE LAW.

You will deliver to said witness a true copy of this Subpoena.

**Herein Fail Not**, and have you then and there before said Grand Jury this writ with your return thereon endorsed, showing how you have executed the same.

Given under my hand and seal of said Court, this the ___12th___ day of ___March___, 2008.

_____
Patrick L. Flanigan
District Attorney
36th Judicial District

By _____ 3-12-08 _____ Deputy.

"A disobedience of this Subpoena is punishable by fine not exceeding five hundred dollars, to be collected as fines and costs as in other criminal cases." Art. 24.05 Texas Code of Criminal Procedure

# GRAND JURY SUBPOENA

## STATE OF TEXAS

To the Sheriff **Aransas County**, Texas or any Peace Officer of the State of Texas, *GREETING:*

**YOU ARE HEREBY COMMANDED** to summon, **Custodian of Records, AT&T, National Compliance Center, PO Box 24679, West Palm Beach, Florida 33416 Phone- 800-635-6840, Fax-888-938-4715**, to be and personally appear on the 25th day of *March, A.D., 2008*, at *9:30am* before the *Grand Jury of Aransas County, Texas* now in session at the Court House of Aransas County, in the City of Rockport, Texas, then and there to testify as witness in certain matters, (a felony), now pending and under investigation before the Grand Jury.

Said above named witness is further commanded to produce at said time and place above set forth the following records, and documents to-wit; Subscriber Information and Cellular telephone records, incoming and outgoing for **(361) 205-0105** from 12:01am on December 1, 2007 through 11:59pm on January 8, 2008;

**You may comply with this subpoena by delivering the above described documents before the appearance date to:**

**36th Judicial District Attorney**
**Investigator Russell Kirk**
**P.O. Box 1393 Sinton, Tx. 78387.**

**Office- (361) 364-9390**
**Fax- (361) 364-9490**

YOU ARE NOT TO DISCLOSE THE EXISTENCE OF THIS REQUEST FOR A PERIOD OF 90 DAYS FROM THE DATE OF THIS REQUEST. ANY SUCH DISCLOSURE COULD IMPEDE THE INVESTIGATION BEING CONDUCTED AND THEREBY INTERFERE WITH ENFORCEMENT OF THE LAW.

You will deliver to said witness a true copy of this Subpoena.

**Herein Fail Not**, and have you then and there before said Grand Jury this writ with your return thereon endorsed, showing how you have executed the same.

Given under my hand and seal of said Court, this the ___12th___ day of ___March___, 2008.

_____
Patrick L. Flanigan
District Attorney
36th Judicial District

By _____ Deputy.

"A disobedience of this Subpoena is punishable by fine not exceeding five hundred dollars, to be collected as fines and costs as in other criminal cases." Art. 24.05 Texas Code of Criminal Procedure

APPENDIX EXHIBIT #8

AAFFIDAVIT OF STACEY DEVILLE

STATE OF TEXAS

COUNTY OF TRAVIS                    §

### AFFIDAVIT

Before me, the undersigned authority, on this day personally appeared Stacey Deville, who, being by me duly sworn, stated:

"My name is Stacey Deville. I am over the age of eighteen, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I was hired by Nema Bardin to investigate the facts and circumstances associated with Chad Pate's conviction for the death of Aaron Watson. Below is the information I learned during the course of my investigation.

I called and spoke with Pam Heard, the district clerk for Aransas County (Ms. Heard was also the district clerk in 2008). While speaking with Ms. Heard she mentioned that there was no severance granted. I did not see or have a copy of the granted severance but had been informed by Attorney Carrie Crisp that a severance was in fact granted. I mentioned to Ms. Heard that there is reportedly paperwork from Judge Wellborn stating that the severance was granted. She said that she did not know of any severance, but if there was then it was "just a piece of paper" saying that it was granted but was not file stamped with their office, and thus was not granted.

I called and spoke with Juror Herlinda Maldonado. Ms. Maldonado repeatedly expressed that she did not understand why Chad Pate was tried with Christopher Hall, the co-defendant. Ms. Maldonado told me that she thought that it was harmful to Chad's case that the two were tried together. Ms. Maldonado stated that the jurors had trouble deciphering which evidence and what witness' testimony applied to which defendant. Ms. Maldonado stated that it was hard to hear what one did over the other and keep all of the evidence between them separate. According to Ms. Maldonado the jurors relied on the foreman of the jury to get "everything straightened out." She told me that she and the other jurors depended on the foreman to keep the evidence straight between the two defendants. Ms. Maldonado said that Pate should not have been tried with the co-defendant because it did not help Pate's case and was "guilt by association". She stated that Pate was prejudiced by the joint trial. It was the opinion of Ms. Maldonado that the Applicant's case was hurt by the fact that he was tried with the co-defendant. Juror Herlinda Maldonado also informed me that she (Ms. Maldonado) did observe applicant being brought into the court room in leg restraints.

_SD_ (initials)

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT,."

SIGNED this 21th day of Dec ,~~2011~~ 2012

X _____
Affiant, Stacey Deville

SUBSCRIBED AND SWORN TO BEFORE ME by the said Stacey Deville on this the 21th day of December 2012

X _____
Notary Public, State of Texas

PEDRO L ESCOBAR
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-11-15

APPENDIX EXHIBIT # 9

AFFIDAVIT OF NEMA BARDIN

STATE OF TEXAS

**COUNTY OF TRAVIS** §
§

## AFFIDAVIT

Before me, the undersigned authority, on this day personally appeared Nema Bardin, who, being by me duly sworn, stated:

"My name is Nema Bardin. I am over the age of eighteen, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the mother of Chadrick Pate, Applicant in this cause. My son, Chadrick Pate (Chad), is innocent of murdering his best friend, Aaron Watson. He did not conspire to kill Aaron Watson, nor did he aid in any way or have any part in his death.

Because Chad is innocent he demanded a jury trial. To my knowledge, at no point did Chad indicate on the record or off the record that he wished to waive his right to a jury trial. Chad and I consulted often about his case and he would have told me if he intended to waive his right to a jury trial.

It was clear to us from the outset that if Chad were to be tried with Christopher Hall, the shooter and co-defendant at trial, Chad would be prejudiced. Chad's defense attorney, John Gilmore, filed a severance timely. Chad told Mr. Gilmore that he did not want to be tried with Christopher Hall, the co-defendant. Mr. Gilmore told Chad and me that the court would not grant a severance. John Gilmore spoke with me about Chad's case on several occassions.

Mr. Gilmore and I exchanged emails wherein we discussed the possibility of being granted a severance. At the time of Chad's trial and at the time of his appeal, neither Chad nor I knew that an order granting a severance in Chad's case was signed on September 25, 2008, by Judge Welborn.

The first day of the trial the State gave Chad's attorney discovery related to the co-defendant making a statement in writing against Chad.. This was something that was requested months before the trial.

During Chad's four day trial in Aransas County, Texas, from February 9, 2009 to February 12, 2009, he was in leg restraints that limited his movement. He told me that two jailers, one with the first name Miguel, put the restraints on his legs. He told me that one day they put them on the wrong way and the judge stopped the court proceedings for the leg restraints to be re-adjusted. Chad informed me that in addition to being painful,

1

prosecution was in the trial and was heard saying loudly that he must be in jail becasue he is wearing shackles. This witness to the prosecution was sitting behind the prosecutors, and next to the impaneled jury.

I looked at Chad's case file a few months ago, and I found no order for "leg restraints" in the file nor docketed on the docket sheet. I also found no Motion to restrain Chad during the trial. I found no "factual findings" filed anywhere within the case file either on the Severance Motion, Motion to Dismiss, or for the Motions to Continue nor any findings to warrant leg restraints.

I found that some of the Motions and Orders in the file were file stamped and others were not file stamped. I found that some of each were on the docket sheet and others were not.

I also found that there was an order filed on the 31st of July 2008 to Appear at 9am for the 29th of Sept. 2008. However, on the 25th of Sept. 2008 Judge Wellborn signed the Order to Sever Chad's trial, and the Order for a Continuance. there was a Motion to Dismiss my son's case dated and filed on the 16th day of Oct .2008 before the next order to appear dated the 30th day of Oct.2008, there was no hearing scheduled to rule on that motion. There was no evidence that the judge ruled on The Motion to Dismiss. The orders and dates of motions and hearings do not make since to me nor my son however I am certainly not an attorney and have not been able to figure that all out but it sure seems "unusual".

I do know that orders of the court and motions filed especially in a criminal trial where my son was fighting for his freedom should be treated with careful importance, where procedures should be followed as Chad was required by law and is required by law to follow all procedures and laws concerning the trial and all the following motions pursuing his freedom.

These observations of mine were not known by Chad nor myself until in recent months at the Habeas phase of his case, and had we known we would have inquired of the Defense Attorney and the Appellant Attorney as to why these observatons should not have been addressed at trial or for Direct Appeal. Neither the Defense attorney nor the appellant attorney brought these observations to my son's attention. Both my son and I beleive that he had both Texas State and United States Constitutional Rights to take advantage of a Granted Court Order for Severance and have his own trial, and that all the other orders and motions should have all been ruled on and signed by a Judge.

My Son's defense attorney did not hire a investigator, and visited my son as far as I can remember only twice before his trial. My son requested visits from him on numerous occassions when I visited him in jail. I would call or email John immediately and tell him that Chad needed to see him. My son's appellant attorney did not order an investigation and as far as I remember only visited Chad twice before filing his appeal.

Because my son did not have benefit of his case being investigated before his trial, the present Habeas attorney Ms. Crisp told me how important that it would be to have an investigation done. I hired Ms. Stacey Wells at Ms. Crisp suggestion, and my son agreed

2

to the investigation. As a result of Ms. Well's investigation, we discovered numerous things (information) that was not known to us (Chad and I) before or even during or immediately after his trial.

Ms. Wells has not presented me with a formal summation in writing of her investigtation, however the following information was provided to me either through emails from her or personal conversation with her.

Ms. Wells interviewd one Ms. Maldanado who was a juror at Chad's trial.
Ms. Maldanado told Ms. Wells that she never understood why Chad was tried with the co defendant Chris Hall and that she made the other jurors aware of her feelings more than a few times. She told Stacey that the jurors did not understand most of the law that was being presented to them and that they all relied on the foreman to figure it all out. She also said that they were told that Chad would not do 99 years that he would only do 35 years but it was ok to give him the 99 years since he would only serve 35 years. Stacey found that Ms. Maldanado was very forthcoming with her information during the first phone call to her, but that when she called her back sometime later Ms. Maldanado really did not want to talk with her. Ms. Wells told me that she recorded the conversations with Ms. Maldanado but she had not yet taken the conversation from her notes and recordings and recorded them in writing , for the purposes of attaching to Chad's Habeas Corpus.

Ms. Wells also interviewed Tracy Watson who was brought from State Jail while serving a sentence for brgulary of a habitation  to testify  against Chad at the trial, and who had been in a relationship with Chad, and was married to Aaron Watson. I have personal knowledge that Tracy Watson received a shortened term of imprisonment for her crime because she testified against my son. I also have personal knowledge that Tracy Watson had served time in prison before, and was on medication when she testified.  In the telephone interview that Ms. Wells had with Tracy, she told her that she never beleived that Chad had  anything to do with Aaron's murder. She also said that after Aaron was killed she had a relationship with an individual with the last name Kefawfer. She said that Kefawfer said that he was involved with the murder. Tracy said that Kefawfer told her that one of them had to go, meaning that either Chad or Aaron had to go.  Ms. Wells said that Tracy was very cooperative with the initial phone interview.

I had asked Ms. Wells  to confirm with Tracy that she had received a shortened sentence for testifying against Chad, but she had forgotten to do so. When Ms. Wells called Tracy back, she indicated that she was busy and would call her back. When Ms. Wells did not get a return call, she called Tracy again. This time Tracy told her that she would call her back but for Ms. Wells not to call her at this number again, becasue it was not her phone, it was her father in laws.  Tracy never returned the second call to Ms. Wells.

In the course of Ms. Wells investigation she discovered that the prosecution had evidence of unknown DNA taken from the crime scene. Neither my son nor myself knew of any unknown DNA being revealed and the defense attorney never mentioned this to either of us. Ms. Wells investigation also discovered that the State investigation revealed no time stamps on items from their investigation. It appeared that the investigation of the house

3

.and area where Aaron was murdered was left unattended by the police and investigators for some time after they removed Aaron Watson from the property down a few miles where Halo flight was called to take him to the hospital. When officers came back to the scene they found Tracy Watson there. The investigators asked her what she was doing there and she said she was packing Chad's clothes in a trash pack to leave outside on the trunk of a car. Tracy and her Mom Jo Ann Budlong had been in jail during Aaron's murder, and they were released that same night after Aaron was murdered
Neither Chad nor I were aware that the investigation of the State into the murder had no time stamps on the evidence that they recovered.

In the course of the trial, my nephew Brian Brock called me and let me know that he was in jail where Chad was in jail but that they were not near each other. He said that Chad was in a cell by himself, but that he (Brian) was in a cell with some gang members that were talking about Chad. He said that he did not reveal to them that he was Chad's cousin. He told me that it was hard for him to talk on the phone but he wanted me to know that the gang was trying to set Chad up to take the fall for Aaron being killed. He said that they all talked freely in front of him because he was acting like he wanted to be a part of them. He said he even passed notes back and forth between them. I told him that when he got out of jail to call me so that we could talk, because he may be able to help with Chad's defense. I called Chad's defense attorney and told him about who Brian was and what all he had said. John said well do you think he will testify I said yes and John said to set up a meeting with him when he gets out of jail so that he could talk to him. When Brian got out of jail, I called John and we set up a meeting so that he could talk with Brian and see if what he had to say would be helpful. I am explaining what happened next with as much detail as I can, as I found out through Ms. Wells investigation that the defense attorney Mr. Gilmore, did not remember a meeting with Brian and me.(There were other things he did not remember as well) Brian and I met John in Rockport, Texas at a car wash on Hwy. 35 across from Sigwald's(a heating or ac business). That was the spot that John choice because it was just a couple of blocks from the couthouse where the trial would be held and John had some appointments there that day. I picked Brian up and brought him there with me, I was driving my Maroon Dodge Durango and John was in his Bmw sport coupe. Brian and I got to the car wash before John and parked right in front , so that John would see us when he arrived. He parked beside us and got out and got into the backseat of my car. He asked Brian to explain what all he had heard. Brian told him everything. John then asked Brian if he was willing to testify. Brian then said no not really. John asked him why, and he said that the gang was very dangerous and he did not want to die. He said that he would put it all in writing for us , but he was afraid to testify. John thanked Brian for the information and said he would see what he could do. The next day John and I talked and he told me that Brian was not a good witness because he would not testify.

When I told the present Habeas attorney Ms. Crisp about Brian and what he knew, she asked if we could get him to do an affidavit. At the time I did not know where he was, but I said that I would try and find him. I did finally and he was in jail again in Missouri Texas. I got a message to him, and he said that he would send me a letter with everything that he knew. He also talked with our investigator Stacey Wells.

4

Unfortunatley, Brian was in jail when he wrote the letter and because he can't spell well. he had another inmate transcribe what he said and he signed the letter. I later found out that this could not be used as an affidavit, however he had told me everything that he wrote in that letter in more than one conversation, and that letter I have re created below.

BRIAN'S LETTER TO ME

Dear Aunt Nema,
While I was sitting in Rockport Texas county jail, they had me in cell 3 and I overheard an anglo they called "Spooky" saying he was sent to Arrons to collect on a drug debt and six other members came with him.
From the way they spoke, I heard them say that they went to Arrons to collect a drug debt of $7,000 that he owed, from what I heard about he didn/t have the total amount and so he had offered a motorcyvle and some cash.
Before I heard about the debt, a Chris Hall had contacted a person called "Do Boy" to get in touch with Chad Pate to find out where and how they could get in touch with Arron. Thats when they had found out where arron lived. Chris Hall underwood Spooky Mathew Chips and two others whoms names I didnt hear clearly, all of them had went to visit Arron, things started to get out of hand, thats when Mathew Chips took Arrons daughters out of the room they were in.

Underwood and one other held Arron as Spooky held a knife to Arrons throat, then he heard his little girls scream for him, and that is when Arron began to try and fight back, they ended up on the floor towards the front door, that is when Chris Hall had pulled a handgun Im not sure what caliber it was but Hall then shot Arron in the stomach, then I overheard them say that after the shooting when they was leaving that someone appeared outside and that is when they shot off a couple of rounds at that person.
They said they could pitch the gun somewhere west of Houston Texas on I 35, thne when they were incarcerated a detective was at the jail questioning all of them about Arrons death. I overheard them plot to put the blame on Chad Pate I heard later they also killed Troy Arrons brother over the dope debt , thats how they found out where Arron lived from what I heard them say Troy was suppose to bring them back the methaphetimes or the money....This is what I heard them say. this alot of people know this will get me hurt or kill knowing this yes I am scared for my life cause they are in A/C gang.

It is my belief that my son did not receive a fair trial.

_____(Initial)

5

*Initial*

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT,."

SIGNED this 20th day of Dec. 2012

X_____

Affiant    Nema Bardin

SUBSCRIBED    AND    SWORN    TO    BEFORE    ME    by    the    said Nema Bardin            on this the 20th day of December 2012

ANJULI MARTINEZ
Notary Public, State of Texas
My Commission Expires
July 18, 2015

X_____

Notary Public, State of Texas

6

to the investigation. As a result of Ms. Well's investigation, we discovered numerous things (information) that was not known to us (Chad and I) before or even during or immediately after his trial.

Ms. Wells has not presented me with a formal summation in writing of her investigtation, however the following information was provided to me either through emails from her or personal conversation with her.

Ms. Wells interviewd one Ms. Maldanado who was a juror at Chad's trial.
Ms. Maldanado told Ms. Wells that she never understood why Chad was tried with the co defendant Chris Hall and that she made the other jurors aware of her feelings more than a few times. She told Stacey that the jurors did not understand most of the law that was being presented to them and that they all relied on the foreman to figure it all out. She also said that they were told that Chad would not do 99 years that he would only do 35 years but it was ok to give him the 99 years since he would only serve 35 years. Stacey found that Ms. Maldanado was very forthcoming with her information during the first phone call to her, but that when she called her back sometime later Ms. Maldanado really did not want to talk with her. Ms. Wells told me that she recorded the conversations with Ms. Maldanado but she had not yet taken the conversation from her notes and recordings and recorded them in writing , for the purposes of attaching to Chad's Habeas Corpus.

Ms. Wells also interviewed Tracy Watson who was brought from State Jail while serving a sentence for brgulary of a habitation to testify against Chad at the trial, and who had been in a relationship with Chad, and was married to Aaron Watson. I have personal knowledge that Tracy Watson received a shortened term of imprisonment for her crime because she testified against my son. I also have personal knowledge that Tracy Watson had served time in prison before, and was on medication when she testified. In the telephone interview that Ms. Wells had with Tracy, she told her that she never beleived that Chad had anything to do with Aaron's murder. She also said that after Aaron was killed she had a relationship with an individual with the last name Kefawfer. She said that Kefawfer said that he was involved with the murder. Tracy said that Kefawfer told her that one of them had to go, meaning that either Chad or Aaron had to go. Ms. Wells said that Tracy was very coopertative with the initial phone interview.

I had asked Ms. Wells to confirm with Tracy that she had received a shortened sentence for testifying against Chad, but she had forgotten to do so. When Ms. Wells called Tracy back, she indicated that she was busy and would call her back. When Ms. Wells did not get a return call, she called Tracy again. This time Tracy told her that she would call her back but for Ms. Wells not to call her at this number again, becasue it was not her phone, it was her father in laws. Tracy never returned the second call to Ms. Wells.

In the course of Ms. Wells investigation she discovered that the prosecution had evidence of unknown DNA taken from the crime scene. Neither my son nor myself knew of any unknown DNA being revealed and the defense attorney never mentioned this to either of us. Ms. Wells investigation also discovered that the State investigation revealed no time stamps on items from their investigation. It appeared that the investigation of the house

3

Unfortunatley, Brian was in jail when he wrote the letter and because he can't spell well. he had another inmate transcribe what he said and he signed the letter. I later found out that this could not be used as an affidavit, however he had told me everything that he wrote in that letter in more than one conversation, and that letter I have re created below.

BRIAN'S LETTER TO ME

Dear Aunt Nema,
While I was sitting in Rockport Texas county jail, they had me in cell 3 and I overheard an anglo they called "Spooky" saying he was sent to Arrons to collect on a drug debt and six other members came with him.
From the way they spoke, I heard them say that they went to Arrons to collect a drug debt of $7,000 that he owed, from what I heard about he didn/t have the total amount and so he had offered a motorcyvle and some cash.
Before I heard about the debt, a Chris Hall had contacted a person called "Do Boy" to get in touch with Chad Pate to find out where and how they could get in touch with Arron. Thats when they had found out where arron lived. Chris Hall underwood Spooky Mathew Chips and two others whoms names I didnt hear clearly, all of them had went to visit Arron, things started to get out of hand, thats when Mathew Chips took Arrons daughters out of the room they were in.

Underwood and one other held Arron as Spooky held a knife to Arrons throat, then he heard his little girls scream for him, and that is when Arron began to try and fight back, they ended up on the floor towards the front door, that is when Chris Hall had pulled a handgun Im not sure what caliber it was but Hall then shot Arron in the stomach, then I overheard them say that after the shooting when they was leaving that someone appeared outside and that is when they shot off a couple of rounds at that person.
They said they could pitch the gun somewhere west of Houston Texas on I 35, thne when they were incarcerated a detective was at the jail questioning all of them about Arrons death. I overheard them plot to put the blame on Chad Pate I heard later they also killed Troy Arrons brother over the dope debt , thats how they found out where Arron lived from what I heard them say Troy was suppose to bring them back the methaphetimes or the money....This is what I heard them say. this alot of people know this will get me hurt or kill knowing this yes I am scared for my life cause they are in A/C gang.

It is my belief that my son did not receive a fair trial.

_____(Initial)

APPENDIX EXHIBIT # 10


AFFIDAVIT OF CHADRICK PATE

**STATE OF TEXAS** §

**WICHITA COUNTY** §

## AFFIDAVIT OF CHADRICK B. PATE

Before me, the undersigned notary, on this day personally appeared CHADRICK PATE, the affiant, a person whose identity is known by me. After I administered an oath to affiant, affiant testified:

"My name is Chadrick B. Pate. I am over the age of 18, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

During my four day trial in Aransas County Texas from February 9, 2009 – February 12, 2009 I was in leg restraints that limited my movement. The limitation of my movement was visible to people in the courtroom. I was made to wear the leg restraints in the presense of the Jury. "

Chadrick B. Pate

SWORN TO AND SUBSCRIBED before me, the undersigned authority on this day 21 of May, 2012.

Notary Public, Wichita County, Texas



Hazelle M. Davis
Notary Public, State of Texas
My Commission Expires
08/09/2014
(Notary Commission Stamp)

APPENDIX EXHIBIT # 11

CLERKS INSTRUMENT RECORD

CAUSE NO. *A-08-5080-4-CR*

STATE OF TEXAS     VS *Chadrick D. Pate*

| INSTRUMENT | ATTORNEY | FILE |
|---|---|---|
| Indictment | | 6-24- |
| Receipt | | 6-25- |
| Corres | | ✓ |
| Capias + Precept to Sud | | 6-26-0 |
| Notice of Appearance - Letter Not in Record | | 6-27- |
| Waiver Arraignment | | ✓ |
| Mot Reduce Bond | | 7-9- |
| Setting notice NOT IN Record | | 7-10- |
| Cover Letter | | 7-22- |
| Mot Reveal Deal | | ✓ |
| Art 37.07 Request | | ✓ |
| Rule 404(b) Request | | ✓ |
| Mot to Prohibit | | ✓ |
| Mot Discovery/Prod/Inspection | | ✓ |
| Order Rule 404 Request | | 7-24- |
| Order for Discovery | | ✓ |
| Order to Reveal the Deal | | ✓ |
| Mtn for Severance | | 7-31- |
| Mtn & Order for Continuance NO ORDER IN Record | | ✓ |
| Setting notice NOT IN Record | | ✓ |
| Mtn & Order to Continue NO Order IN Record | | 9-25- |
| Setting notice NO NOTICE To chad only Hall | | ✓ |
| Mot. Dismiss filed No order in MTC | | 10-16-0 |
| Setting notice NONotice only Hall | FRAUD | 10-31- |
| NOT IN RECORD FRAUD | | 12-22 |
| Election as to Punishment FRAUD | | 2-9-0 |

CAUSE NO. A-08-5080-4-CR

STATE OF TEXAS          VS   Chadrick B. Pate

| INSTRUMENT | | ATTORNEY | FILED |
|---|---|---|---|
| Def's Mtn In Limine | FRAUD | | 2-9-0? |
| Strike List - State | FRAUD | | ✓ |
| Strike List | FRAUD | | ✓ |
| Jury Chosen | FRAUD | | ✓ |
| Jury Note | FRAUD | | 2-12-0 |
| Charge to the Jury | | | ✓ |
| Jury Note | | | 2-13-0 |
| Charge as to Punishment | | | ✓ |
| Def's Right of Appeal | | | ✓ |
| Order to Withhold | | | ✓ |
| Notice of Appeal | | | 2-25-0? |
| Notice of Appeal to COA | | | 2-26-0? |
| Aff Indigence | | | ✓ |
| Tax Notification | | | ✓ |
| Corres from COA | | | 3-2-09 |
| Corres | | | 2/21-25/0 |
| Inmate Corres | | | 3-2-09 |
| Judgment | | | 3-30-0? |
| Receipt | | | 3-31-0 |
| CR-43 + 44 | | | ✓ |
| Corres (copy) w/ encl. | | | 7-6-09 |
| Ct. atty Fee | | | 10-13-0? |
| ✓ ✓ ✓ | | | 11-17-0? |
| Cover Letter | | | 8-30-10 |
| Judgment/Opinion | | | ✓ |
| Atty Fee | | | 9-13-10 |

CAUSE NO. _A-08-5080-4-CC_

STATE OF TEXAS          VS _Chadrick D. Pate_

| INSTRUMENT | ATTORNEY | FILED |
|---|---|---|
| Cover Letter | | 10-18- |
| Judg/Opinion | | ✓ |
| Cover Letter | | 7-5- |
| Mandate | | ✓ |
| Fax Cover | | ✓ |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

APPENDIX EXHIBIT #12

PROOF OF RESTRAINT

  **TDCJ Home**  **New Offender Search**

# Offender Information Details

*T8,145-02*

| Return to Search list |
|---|

| | |
|---|---|
| **SID Number:** | 05581316 |
| **TDCJ Number:** | 01563340 |
| **Name:** | PATE,CHADRICK B |
| **Race:** | W |
| **Gender:** | M |
| **DOB:** | 1976-03-29 |
| **Maximum Sentence Date:** | 2107-05-04 |
| **Current Facility:** | STILES |
| **Projected Release Date:** | 2107-05-04 |
| **Parole Eligibility Date:** | 2038-05-04 |
| **Offender Visitation Eligible:** | YES |

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAY 2 1 2015

Abel Acosta, Clerk

*Information provided is updated once daily during weekdays and multiple times per day on visitation days.* **Because this information is subject to change, family members and friends are encouraged to call the unit prior to traveling for a visit.**

## SPECIAL INFORMATION FOR SCHEDULED RELEASE:

| | |
|---|---|
| **Scheduled Release Date:** | Offender is not scheduled for release at this time. |
| **Scheduled Release Type:** | Will be determined when release date is scheduled. |
| **Scheduled Release Location:** | Will be determined when release date is scheduled. |

| Parole Review Information |
|---|

## Offense History:

| Offense Date | Offense | Sentence Date | County | Case No. | Sentence (YY-MM-DD) |
|---|---|---|---|---|---|
| 2002-11-13 | THEFT FROM A PERSON | 2003-03-06 | TRAVIS | 3022467 | 1-00-00 |
| | | | | A-08-5080-4- | |

| 2008-01-04 | MURDER | 2009-02-13 | ARANSAS | CR | 99-00-00 |
|---|---|---|---|---|---|

Return to Search list

*The Texas Department of Criminal Justice updates this information regularly to ensure that it is complete and accurate, however this information can change quickly. Therefore, the information on this site may not reflect the true current location, status, scheduled termination date, or other information regarding an offender.*

*For questions and comments, you may contact the Texas Department of Criminal Justice, at (936) 295-6371 or webadmin@tdcj.texas.gov. This information is made available to the public and law enforcement in the interest of public safety. Any unauthorized use of this information is forbidden and subject to criminal prosecution.*

New Offender Search     TDCJ Home Page

APPENDIX EXHIBIT #12

PROOF OF RESTRAINT

**APPENDIX EXHIBIT # 13**

**LETTER TO CLERK OF THE TEXAS COURT OF CRIMINAL APPEALS**

Sept. 14, 2015

Abel Acosta
Clerk of the Texas Court of
Criminal Appeals
201 West 14th Street
Austin, Texas 78701

Chadrick Pate # 1563340
3060 FM 3514
Beaumont Texas 77705

Re: Emergency Motion for Permission to File Writ of Mandamus from a Void Final
Felony Conviction with Emergency Writ of Mandamus from a Void Final Felony
Judgment and Conviction included.


Dear Clerk,

Enclosed you will find the original documents referenced above.

As my address indicates I am a inmate pro se filer.

I respectfully request that these proceedings be filed and submitted under emergency

considerations under the Emergency Titles or which I have labeled them.

I also respectfully request that the Court consider the pleadings liberally and if need be

consider the pleadings as an Original Ex Parte Habeas Corpus Proceeding only if the

Court cannot provide expedious decision pursuant to my Writ of Mandamus.

**Suspension of Rule:** On a party's motion or on its own initiative an appellate court

may — to expedite a decision or for other good cause —suspend a rule's operation in

a particular case and order a different procedure; but a court must not construe this rule

suspend any provision in the Code of Criminal Procedure or to alter the time for

perfecting an appeal in a civil case.

Thank you for your kind consideration in this matter.

Respectfully,

Chadrick Pate # 1563340
3060 FM 3514
Beaumont, Texas 77705

RECORD EXHIBIT # 1

CLERKS'S RECORD VOL 1 OF 1

ment
# CLERKS RECORD

# VOLUME 1 OF 1

# THE STATE OF TEXAS
# VS.
# CHADRICK B PATE

## CAUSE NO. A-08-5080-4-CR

| THE STATE OF TEXAS | ( | IN THE DISTRICT COURT |
| VS | ) | 36TH JUDICIAL DISTRICT |
| CHADRICK B. PATE | ( | ARANSAS COUNTY |

## INDEX

Index ............................................................................................ 1

Caption ......................................................................................... 3

Indictment ...................................................................................... 4

Capias Returned Served ........................................................................... 7

Precept Returned Served .......................................................................... 8

Letter of Representation .......................................................................... 9

Waiver of Arraignment ........................................................................... 10

Motion to Reduce Bond ........................................................................... 11

Defendant's Motion to Reveal the Deal ............................................................ 13

Request Under Article 37.07 Section 3(g) for Notice from State ..................................... 16

Rule 404(b) Request for Notice of Intent to Offer Extraneous Conduct ............................... 18

Motion to Prohibit State from Attempting to Introduce Statements Allegedly
Made by the Defendant without Prior Hearing on Admissibility ...................................... 21

Motion for Discovery, Production and Inspection of Evidence ....................................... 23

Order on Rule 404(b) Request .................................................................... 33

Order on Motion for Discovery ................................................................... 34

Order on Motion to Reveal the Deal .............................................................. 35

Motion for Defendant Chadrick Pate for Severance of Defendants .................................... 36

Motion for Continuance .......................................................................... 38

Order on Motion for Continuance ................................................................. 42

State's Motion for Continuance ................................................................... 43

Order on Motion for Severance ................................................................... 45

Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Defendant's Motion to Elect the Jury to Assess Punishment . . . . . . . . . . . . . . . . . . . . . 49

Defendant's Motion in Limine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

State's Strike List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Defendant's Strike List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Jury Chosen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Jury Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Charge of the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Verdict (Guilt/Innocence) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Jury Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Punishment Charge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Verdict (Punishment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Trial Court's Certification of Defendant's Right of Appeal . . . . . . . . . . . . . . . . . . . . . . 80

Order to Withhold . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Affidavit of Indigence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Order Appointing Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Notice of Appeal to Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Judgment of Conviction by Jury; Sentence by Jury to Institutional Division, TDCJ . . . . . 89

Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

The State of Texas      (

County of Aransas      )

In the 36TH Judicial District Court of Aransas County, Texas, the Honorable JANNA WHATLEY, Judge Presiding, the following proceedings were held and the following instruments and other papers were filed in this cause, to wit:

Trial Court Cause No. A-08-5080-4-CR

| THE STATE OF TEXAS, Plaintiff | ( | IN THE DISTRICT COURT |
|---|---|---|
| VS | ) | 36TH  JUDICIAL DISTRICT |
| CHADRICK B. PATE, Defendant | ( | ARANSAS COUNTY, TEXAS |

_3_

## INDICTMENT

### THE STATE OF TEXAS vs. MICHAEL JASON UNDERWOOD, CHRISTOPHER JOSEPH HALL, ANTHONY LEE RAY, CHADRICK B. PATE, AND KEVIN RAY TANTON

**OFFENSE** Murder, Aggravated Assault /Engaging In Organized Criminal Activity
TPC Sec. 19.02 / First Degree Felony
TPC Sec. 22.02 / 71.02 // First Degree Felony

**WITNESS** Michael Brooks, Russell Kirk

CAUSE # *A-08-5080-4-CR* FILED ON _6/24/08_ BAIL $ _500,000_

---

### IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS

#### Count One

COMES NOW THE GRAND JURORS for the County of Aransas, State aforesaid, duly selected, organized, impaneled and sworn as such at the April Term, A.D. 2008, of the 36th Judicial District Court, in and for said County, a quorum thereof being present, upon their oaths present in and to said Court that MICHAEL JASON UNDERWOOD, CHRISTOPHER JOSEPH HALL, ANTHONY LEE RAY, CHADRICK B. PATE, and KEVIN RAY TANTON, acting alone and together, on or about the 4th day of January, A.D. 2008 and anterior to the presentment of this indictment, in the County and State aforesaid, did then and there intentionally or knowingly cause the death of an individual, namely, Aaron Watson, by shooting the said Aaron Watson with a firearm;

#### Count Two

AND THE GRAND JURORS AFORESAID, upon their oaths aforesaid, do further present in and to said Court that MICHAEL JASON UNDERWOOD, CHRISTOPHER JOSEPH HALL, ANTHONY LEE RAY, CHADRICK B. PATE, and KEVIN RAY TANTON, acting alone and together, on or about the 4th day of January, A.D. 2008 and anterior to the presentment of this

4

Indictment, in the County and State aforesaid, did then and there intentionally, knowingly or recklessly cause serious bodily injury to Aaron Watson by shooting the said Aaron Watson with a handgun, the same being a firearm;

And the defendants did then and there commit said offense with the intent to establish, maintain, or participate in a combination or in the profits of a combination who collaborated in carrying on said criminal activity;

against the peace and dignity of the State

_____
Foreman of the Grand Jury

Filed on the _2 4_ day of _June_, 20 _08_

_____PAM HEARD_____ Clerk of the District Court

_____*Aransas*_____ County, Texas

By _____*signature*_____ Deputy

## THE STATE OF TEXAS

County of _____

I, _____**PAM HEARD**_____, Clerk of the

_____ District Court of _____ County,

Texas, do hereby certify that the within and foregoing is a true
and correct copy of the **Original Bill of Indictment**, filed in said
Court on the _____ day of _____ A.D. 20 _____,
in Cause No. _____, styled The State of Texas vs

_____

Given under my hand and the seal of said Court at office in

_____, Texas, this _____ day of

_____ A.D. 20 _____.

_____PAM HEARD_____ Clerk

by _____ Deputy

# RETURN



| | |
|---|---|
| THE STATE OF TEXAS | 36TH DISTRICT COURT |
| VS | ARANSAS COUNTY, TEXAS |
| CHADRICK B. PATE | DOCKET NO. A-08-5080-4-CR |

## CAPIAS

SS: 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
DOB: 03/26/1976
DL#: 16716877
SEX/RACE: /
To any Peace Officer of the State of Texas, Greetings:

YOU ARE HEREBY COMMANDED to arrest CHADRICK B. PATE and safely keep, so that you have him/her before the Honorable 36TH DISTRICT COURT of Aransas County, Texas, at the Court House of said County, in the City of Rockport, TEXAS, INSTANTER, then and there to answer THE STATE OF TEXAS upon a charge by INDICTMENT pending in said court, charging CHADRICK B. PATE with the offense of MURDER INTENDS SBI CAUSING DEATH.

HEREIN FAIL NOT, but due make return hereof as the law directs.

WITNESS my signature and seal, on this the 25th day of June, 2008.

AMOUNT OF BOND:$500,000 SURETY

PAM HEARD, Clerk of the 36TH DISTRICT COURT

By_____, Deputy.

## OFFICER'S RETURN

Came to hand the _25_ day of _June_ A.D. _08_, at _145_ o'clock _P_ M, and executed on the _25_ day of _June_ A.D. _2008_ at _430p_ o'clock M. by arresting the within named _Chadrick B. Pate_ at _ACOC_ in _Rockport_, Texas, and taking bond, which is herewith returned, placing CHADRICK B. PATE in the County jail of _Aransas_ County, Texas.

_26_ day of _June_ _2008_
at _2:14_ o'clock _P_ M

FILED

MARK GILLIAM _____ Sheriff/Constable

Aransas _____ County, Texas

By: _____ Deputy
LILLIAN PENICK
CIVIL PROCESSOR

# RETURN

edoc Technologies, Inc. Austin, Tx

THE STATE OF TEXAS

VS

CHADRICK B. PATE



36TH DISTRICT COURT

ARANSAS COUNTY, TEXAS

DOCKET NO. A-08-5080-4-CR

SS: 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
DOB: 03/26/1976
L/K/A: ARANSAS COUNTY JAIL,
   , TX

## PRECEPT TO SERVE COPY OF INDICTMENT

YOU ARE HEREBY COMMANDED to deliver forthwith to CHADRICK B. PATE, the accompanying certified Copy of Indictment in Cause No. A-08-5080-4-CR, THE STATE OF TEXAS vs. CHADRICK B. PATE, now pending in the 36TH DISTRICT COURT of ARANSAS County, Texas, and to make due return of this writ without delay.

Issued and given under my hand and seal of Office, this 25th day of June, 2008.

PAM HEARD, Clerk of the 36TH DISTRICT COURT

By:_____,Deputy

### SHERIFF'S RETURN

Came to hand on the _25_ day of _June_, _08_ at _145_ o'clock _P_.M., and executed by delivering to the within named defendant, CHADRICK B. PATE, in person, a certified copy of the indictment mentioned within, and delivered to me with this writ, on the _25_ day of _June_, _2008_.

Returned on the _25_ day of _June_ _2008_.

_____MARK GILLIAM_____ Sheriff

_____Aransas_____ County

By:_____Deputy
LILLIAN PENICK
CIVIL PROCESSOR

crprecsv.rcr

FILED
_26_ day of _June_ 20 _08_
at _2:14_ o'clock _P_ M

crprecsv.rcr

# John Gilmore Attorney At Law

Deanna M. King
Legal Assistant

Patricia T. Gilmore
Business Manager



June 26, 2008

Mrs. Pam Heard
District Clerk
Aransas County Courthouse
300 N. Live Oak Street
Rockport, Texas 78382

Re:   The State of Texas vs. Chad Pate
      Cause No.: A-08-5080-4CR

Dear Mrs. Heard:

Please be advised that our office represents Chad Pate in the above-referenced cause. Also, please find enclosed a waiver of arraignment. Please file it in your official records and bring it to the attention of the Court.

If you need anything further, please do not hesitate to contact our office.

Thank you.

Sincerely,

Deanna M. King
*Legal Assistant to John Gilmore*

Enclosure

Cause No. A-08-5080-4CR

| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | 36th JUDICIAL DISTRICT |
| CHAD PATE | * | ARANSAS COUNTY, TEXAS |

## WAIVER OF ARRAIGNMENT

**NOW COMES** the Defendant, **Chad Pate,** by and through his attorney of record, **John Gilmore** and respectfully:

1. Enters a plea of not guilty to the information in the above-captioned case.

2. Requests a pretrial and jury trial in the above-captioned case.

3. Waives the right to be present at arraignment in this case.

4. States that **John Gilmore** has been retained to be his attorney of record in this case and that he has consulted with said attorney.

JOHN GILMORE
622 South Tancahua/P. O. Box 276
Corpus Christi, Texas 78401
(361) 882-4378   FAX (361) 882-4378
ATTORNEY FOR DEFENDANT
BAR NO. 07958500

Cause No.  A-08-5080-4CR

| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | 36th JUDICIAL DISTRICT |
| CHAD PATE | * | ARANSAS  COUNTY, TEXAS |

### WAIVER OF ARRAIGNMENT

**NOW COMES** the Defendant, **Chad Pate,** by and through his attorney of record, **John Gilmore**  and respectfully:

1. Enters a plea of not guilty to the information  in the above-captioned case.

2. Requests a pretrial and jury trial in the above-captioned case.

3. Waives the right to be present at arraignment in this case.

4. States that **John Gilmore**  has been retained to be his  attorney of record in this case

and that he has consulted with said attorney.

JOHN GILMORE
622 South Tancahua/P. O. Box 276
Corpus Christi, Texas 78401
(361) 882-4378   FAX (361) 882-4378
ATTORNEY FOR DEFENDANT
BAR NO. 07958500

27     June     2008
10:45

## CAUSE NO.   A-08-5080-4CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | 36TH JUDICIAL DISTRICT |
| CHAD PATE | * | ARANSAS COUNTY, TEXAS |

## MOTION TO REDUCE BOND

TO THE HONORABLE JUDGE OF SAID COURT:

**Chad Pate**, Defendant, moves the Court to reduce bond in the above-referenced case, and as grounds therefore shows the following:

1.

The defendant is being held in the Aransas County Jail for the offense of Murder.  The bond is set at $500,000.00.

This amount is unreasonable and Defendant is not able to make said bond.

2.

The Defendant has not failed to appear for any court setting and isn't a flight risk.

3.

Defendant has the ability to make a bond of  $25,000.00.

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays the Court grant this Motion to Reduce Bond and that the bail in this case be reduced to $25,000.00.

Respectfully submitted,

JOHN GILMORE
622 South Tancahua
Corpus Christi, Texas  78401
ATTORNEY FOR DEFENDANT
(361) 882-4378   Fax: (361) 882-3635
Bar # 07958500

FILED
9 day of July 20 08
at 8:15 o'clock a M
Pam Heard, District Clerk
Dist. Court, Aransas Co., Texas
Deputy

## CAUSE NO. A-08-5080-4CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | 36TH JUDICIAL DISTRICT |
| CHAD PATE | * | ARANSAS COUNTY, TEXAS |

## CERTIFICATE OF SERVICE

I, John Gilmore, do hereby certify that a true and correct copy of the foregoing Motion To Reduce Bond has been served on the Office of the District Attorney, Aransas County Courthouse, Rockport, Texas 78382 this the _____ day of , July 2008.

_____
JOHN GILMORE

CAUSE NO.   A-08-5080-4CR

| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
|---|---|---|
| VS. | * | 36TH JUDICIAL DISTRICT |
| CHAD  PATE | * | ARANSAS COUNTY, TEXAS |

## O R D E R

The Court, having considered Defendant's Motion to Reduce bond is of the opinion that said motion be **GRANTED/DENIED;**

The Court therefore **ORDERS** Defendant be released on the posting of a surety bond in the amount of $_____.

**SIGNED** this _____ day of _____, 2008.


_____
**JUDGE PRESIDING**

CAUSE NO. A-08-5058-4CR

*\* \* \* \* \* \* \* \* \* \**

THE STATE OF TEXAS VS. CHADRICK PATE

*\* \* \* \* \* \* \* \* \* \**

IN THE 36ᵗʰ DISTRICT COURT OF
ARANSAS COUNTY, TEXAS

---

## DEFENDANT'S MOTION TO REVEAL THE DEAL

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Chadrick Pate, Defendant in the above-entitled and-numbered

cause and moves the Court to require prosecution to reveal any agreement with any

witness in the nature of concession by the State to the witness which could influence the

witness' testimony, and in support of this Motion would show unto the Court the

following:

I.

The witness is a so-called confidential informant in the offense with which the

Defendant is charged. It is expected that the witness will testify on direct examination as

a key prosecution witness and his testimony seeks to inculpate and implicate the

Defendant as having engaged in the criminal conduct alleged herein.

II.

If the prosecution has either made, promised or implied that it will make

concessions to the witness in order to induce his testimony, the defense has the right to

know the nature of the concessions that have been made, promised or implied to the

witness in any discussions which the prosecution has had with the witness or his

FILED

22 day of July 2008
at 10:16 o'clock a M

Pam Heard, District Clerk
Dist. Court, Aransas Co., Texas
By _____ Deputy

13

representative in order to prove the witness' testimony was biased by such discussions. Without disclosure defense counsel only speculates that the concessions probably involved either pending or future charges against the witness. The disclosure is vital to prove on the issue of credibility.

WHEREFORE, PREMISES CONSIDERED, the Defendant prays that the Court issue an order requiring the prosecutor to reveal the exact nature of all negotiations and discussions with the witness or his representatives concerning any promises or expectations expressed or implied, of concessions which could or might be expected to occur in the event that the witness cooperated with the prosecution by testifying against the Defendant herein.

Respectfully submitted,

JOHN GILMORE
622 S. Tancahua/P.O. Box 276
Corpus Christi, Texas 78403
(512) 882-4378
ATTORNEY FOR DEFENDANT
BAR NO. 07958500

**CAUSE NO. A-08-5058-4CR**

\* \* \* \* \* \* \* \* \* \* \*

**THE STATE OF TEXAS VS. CHADRICK PATE**

\* \* \* \* \* \* \* \* \* \* \*

**IN THE 36th DISTRICT COURT OF**
**ARANSAS COUNTY, TEXAS**

---

**CERTIFICATE OF SERVICE**

I, John Gilmore, do hereby certify that a true and correct copy of the foregoing

Motion to Reveal the Deal has been served on the Office of the District Attorney, Aransas

County Courthouse, 301 North Live Oak Street, Rockport, Texas 78382 on this the 21st day of

July 2008.

_____
JOHN GILMORE

# CAUSE NO. A-08-5080-4CR

\* \* \* \* \* \* \* \* \* \* \*

## THE STATE OF TEXAS VS. CHADRICK PATE

\* \* \* \* \* \* \* \* \* \* \*

## IN THE 36th DISTRICT COURT OF
## ARANSAS COUNTY, TEXAS

### REQUEST UNDER ARTICLE 37.07 SECTION 3(g) FOR NOTICE FROM STATE

The defendant, Chadrick Pate, by his attorney, request from the State reasonable notice in advance of trial of the State's intent (if the State does so intend) to introduce any and all particular evidence at any hearing on punishment in this cause. This includes, but is not limited to, any and all evidence which the State intends to offer relating to the defendant's prior criminal record, his general reputation, his character, any opinion regarding his character, the circumstances of the offense for which he is being tried in this cause, and any and all other evidence of any extraneous crime or bad act asserted by the State to have been committed by the defendant or for which he could be criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act. This also includes, but is not limited to, any evidence to be offered by the State of any adjudication of delinquency or in any way relating to acts asserted by the State to have been committed by the defendant as a juvenile.

The defendant makes this timely request pursuant to Texas Code of Criminal Procedure Article 37.07, Section 3(g). This request is made by service upon the State of a copy or copies of this document in the manner or manners set forth below in the Certificate of Service.

Respectfully requested,

JOHN GILMORE
State Bar No. 07958500
622 S. Tancahua
Corpus Christi, TX 78401
(361) 882-4378/phone
(361) 882-3635/fax
gilmorelaw@msn.com (e-mail)

FILED
23 day of July 2008
at 10:16 o'clock a M
Pam Heard, District Clerk
Dist. Court, Aransas Co., Texas
By _____ Deputy

# CAUSE NO. A-08-5080-4CR

\* \* \* \* \* \* \* \* \* \* \*

## THE STATE OF TEXAS VS. CHADRICK PATE

\* \* \* \* \* \* \* \* \* \* \*

## IN THE 36th DISTRICT COURT OF
## ARANSAS COUNTY, TEXAS

### CERTIFICATE OF SERVICE

I, John Gilmore, Attorney at Law, certify that on this date I served a copy of the foregoing

motion has been served on the Office of the Aransas County District Attorney's Office on this

21st day of July, 2008.

JOHN GILMORE



## CAUSE NO. A-08-5080-4CR
\* \* \* \* \* \* \* \* \* \* \*
## THE STATE OF TEXAS VS. CHADRICK PATE
\* \* \* \* \* \* \* \* \* \* \*
## IN THE 36th DISTRICT COURT OF
## ARNANSAS COUNTY, TEXAS

### RULE 404(b) REQUEST FOR NOTICE OF INTENT
### TO OFFER EXTRANEOUS CONDUCT

To the Honorable Judge of Said Court:

**Now comes** Defendant, **Chadrick Pate**, herein, by and through Counsel, **John Gilmore**, and files this request pursuant to Article 37.07, Sec. 3(g) of the Texas Code of Criminal Procedure and Rule 404(b) of the Texas Rules of Criminal Evidence, and in support thereof would respectfully show unto the Court as follows:

Rule 404(b) provides in part as follows:

"(b) Other crimes, wrongs, or acts...provided, upon timely request by the accused, reasonable notice is given in advance of trial of intent to introduce in the State's case in chief such evidence other than that arising in the same transaction.

(c) Character relevant to punishment. In the penalty phase, evidence may be offered by an accused or by the prosecution as to the prior criminal record of the accused. Other evidence of this character may be offered by an accused or by the Prosecution."

Article 37.07, Sec. 3(a) provides in part as follows:

"(a) ...any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act...."

FILED
22 day of July 20 08
at 10:16 o'clock ___ M

Pam Heard, District Clerk
Dist. Court, Aransas Co., Texas
By _____ Deputy

Article 37.07, Sec. 3(g) provides in part as follows:

"(g) On timely request of the defendant, notice of intent to introduce evidence under this article shall be given in the same manner required by Rule 404(b), Texas Rules of Criminal Evidence. If the attorney representing the State intends to introduce an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence, notice of that intent is reasonable only if the notice includes the date on which and the county in which the alleged crime or bad act occured and the name of the alleged victim of the crime or bad act."

Defendant herein specifically requests the Court under Article 37.07, Sec. 3(g), Texas Code of Criminal Procedure, and Rule 404(b), Texas Rules of Criminal Evidence, to order the State to give notice of its intention to introduce such evidence, if any, with specific crime(s) or bad act(s) set forth, giving the date on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act, and any punishment received for same, at least thirty (30) days prior to the trial on the merits of this case. This information is necessary to preserve Defendant's right to effective assistance of counsel and his right to a fair trial, guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 10 and 19 of the Texas Constitution, and Articles 1.04, 1.05, and 1.051(a) of the Texas Code of Criminal Procedure.

**Wherefore, premises considered,** Defendant requests this Honorable Court grant this Motion directing the Prosecuting Attorney to provide Defendant and his Counsel the information

requested herein, and further grant Defendant any and all such relief to which he may be entitled.

Respectfully Submitted,

**John Gilmore**
622 South Tancahua
Corpus Christi, Texas 78401
(361) 882-4378; Fax: (361) 882-3635
STATE BAR # 07958500; ADM # 18181

## CERTIFICATE OF SERVICE

As Attorney of Record for Defendant, I do hereby Certify that a true and correct copy of the above and foregoing document was this date provided to the Attorney for the State.

**John Gilmore**

## CAUSE NO. A-08-5080-4CR
\* \* \* \* \* \* \* \* \* \* \*
## THE STATE OF TEXAS VS. CHADRICK PATE
\* \* \* \* \* \* \* \* \* \* \*
## IN THE 36th DISTRICT COURT OF
## ARANSAS COUNTY, TEXAS

## MOTION TO PROHIBIT STATE FROM ATTEMPTING TO INTRODUCE STATEMENTS ALLEGEDLY MADE BY THE DEFENDANT WITHOUT PRIOR HEARING ON ADMISSIBILITY

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES the Defendant, **Chadrick Pate,** by and through his Attorney of Record, **John Gilmore,** in the above entitled and numbered cause and respectfully moves the Court to instruct the Prosecuting Attorney not to mention or refer to, directly or indirectly, in the presence of the jury and not to attempt to introduce into evidence any statements allegedly made by Defendant to or in the presence of any law enforcement official(s) and/or agents, whether written or oral, without first requesting a hearing outside the presence of the jury to determine the admissibility of said statements, and for same would show unto the Court the following:

### I.

At the time of various conversations with certain law enforcement official(s) and /or agents, Defendant was either under arrest or deprived substantially of his freedom.

### II.

To require Defendant to object to the admissibility of any such statements in the presence of the jury would be prejudicial and detrimental to his rights, if it was subsequently determined that the statements were inadmissible.

### III.

This request is based on the Fifth, Sixth and Fourteenth Amendments to the United States

FILED

_22_ day of _July_ 20 _08_
at_ _10: 16_ o'clock _a_ M

Pam Heard, District Clerk
Dist. Court, Aransas Co., Texas
By _____ Deputy

21

Constitution, Article I, Sections 10 and 19 of the Texas Constitution, and Articles 1.04, 1.05, 1.051(a), 38.21, 38.22, and 38.23 of the Texas Code of Criminal Procedure.

**WHEREFORE, PREMISES CONSIDERED,** Defendant respectfully prays that this Motion be, in all things, granted.

Respectfully Submitted,

**John Gilmore**
622 South Tancahua
Corpus Christi, Texas 78401
(361) 882-4378; Fax: (361) 882-3635
STATE BAR # 07958500; ADM # 18181

## CERTIFICATE OF SERVICE

As Attorney of Record for Defendant, I do hereby Certify that a true and correct copy of the above and foregoing document was this date provided to the Attorney for the State.

**John Gilmore**

22

## CAUSE NO.  A-08-5080-4CR

\* \* \* \* \* \* \* \* \* \*

## THE STATE OF TEXAS VS. CHADRICK PATE

\* \* \* \* \* \* \* \* \* \*

## IN THE 36th DISTRICT COURT OF
## ARANSAS COUNTY, TEXAS

### MOTION FOR DISCOVERY, PRODUCTION AND
### INSPECTION OF EVIDENCE

**To the Honorable Judge of Said Court:**

Now comes the Defendant, **Chadrick Pate**, in the above entitled and numbered cause, by and through his Attorney of Record, **John Gilmore**, and would make this Motion for Discovery, Production and Inspection of Evidence pursuant to Article 39.14, Texas Code of Criminal Procedure, and in support thereof, would show as follows:

### I.

### STATEMENTS

The Defendant moves the Court to order the Prosecution to produce and permit the inspection of, and copying or photographing of, the following designated items:

1. All confessions, admissions, statements or comments, in writing, signed by the Defendant, in connection with this offense, or any factually related offense.

Granted: _____✓_____

Denied: _____

2. All confessions, admissions, statements or comments, oral in nature and set down or otherwise preserved under Article 38.22 of the Texas Code of Criminal Procedure, made by the Defendant in connection with this cause, or any factually related offense.

FILED

_23_ day of ___July___ 20_08_

at ___10:16___ o'clock _a_ M

Pam Heard, District Clerk
Dist. Court, Aransas Co., Texas
By _____ Deputy

23

Granted: ✔

Denied: _____

3. All oral, written and recorded statements of the Defendant, and any memoranda of such statements made to any investigating officer, law enforcement agency or third party, which is in the possession of the Prosecution, or any agent thereof.

Granted: ✔

Denied: _____

4. All statements of a nature as would be arguably admissible as a "res gestae" statement, spontaneous statement, or other utterance which the Prosecution intends to introduce in its case in chief, either during the guilt/innocence stage, or during the punishment stage.

Granted: ✔

Denied: _____

5. All handwritten or typed notes made by any law enforcement officers, agents or representatives, or any third parties who may be called by the Prosecution, which contain any reference to or content of any oral statements uttered by the Defendant and recorded therein, which may be used either in the case in chief, or as rebuttal evidence, or as impeachment of the Defendant's evidence.

Granted: ✔

Denied: _____

6. Any statements, written or oral, by the Defendant or any co-Defendant or third party, which the State intends to introduce or which reasonably may be expected to introduce to show the existence of any conspiracy or joint conduct, including the date of such statement, the time and place of such statement, and the method by which such statement contributes to or implicates

24

the Defendant in such conspiracy or demonstrates culpability as a party to the alleged offense.

Granted: __✓__

Denied: _____

## REPORTS, STATEMENTS AND RECORDS

7. All hand-written, typed or otherwise recorded notes of police officers who investigated or participated in the preparation of this case for trial. *Scope Work product*

Granted: __✓__

Denied: _____

8. The names of all suspects who were interrogated and/or arrested in conjunction with the investigation of the above and foregoing cause, or the facts which give rise to the above and foregoing cause, including addresses, phone numbers and physical description of the suspects.

Granted: __✓__

Denied: _____

9. Offense reports, police reports, arrest records, crime scene investigation reports or records or reports of any third parties, by way of written memoranda, letters, notes or transcriptions involving the alleged facts of the offense, the crime scene or any location which may have a bearing on any issue of the case.

Granted: __✓__

Denied: _____

## OBJECTS AND TANGIBLE THINGS

Any and all objects and/or tangible property alleged by the State to have been taken or used by the Defendant or any co-conspirator during the course of the offense with which the Defendant is charged, including but not limited to the following:

25

10. All weapons alleged by the State to have been used by the Defendant, any co-Defendant or co-conspirator, or any decedent. *by appointment*

Granted: ✓

Denied: _____

11. All articles of clothing allegedly belonging to the Defendant, the victim or any decedent. *by appointment*

Granted: ✓

Denied: _____

12. All contraband drugs, controlled substances and/or paraphernalia which was seized as a result of the investigation of this cause, in order to permit the Defendant to have an opportunity to examine the same and to have an expert examine, test, and inspect the same. *if any*

Granted: ✓

Denied: _____

13. All documents, papers, books, letters, accounts, objects, or tangible things which are in the possession of the Prosecution, its agent or representative, or any third party subject to the control or guidance of the Prosecution as a result of the investigation of the Defendant, which are material and relevant to the case involving the Defendant, either in the guilt/innocence stage or the punishment stage.

Granted: ✓

Denied: _____

14. Any written waiver alleged by the State to have been signed by the Defendant involving the Defendant's right to counsel, the right to remain silent, or the right to be free from search and seizure.

26

Granted: ✓

Denied: _____

15. Any search warrant or arrest warrant and supporting affidavits thereof used by law enforcement officers to enter the Defendant's residence, vehicle or any secured premises or item subject to the control of the Defendant, or which is charged to the Defendant under any theory of possession, ownership or control.

Granted: ✓

Denied: _____

16. Any and all stenographic or telephonic recordings or transcriptions of any electronic eavesdropping, wiretapping, surveillance or other means of obtaining undercover communications in the possession of the Prosecution or any agents or representatives thereof, including any tests, enhancements, or analysis of such recordings, in order to properly allow the Defendant to test the validity of such matters.

Granted: ✓

Denied: _____

## PHOTOGRAPHS

17. All photographs, drawings, charts, diagrams or sketches made by the Prosecution or any agent, representative, or officer of the State of Texas, the United States, or any third party cooperating with the Prosecution, of the crime scene, or any relevant and material aspect of the case in chief, either in the guilt/innocence stage or punishment.

Granted: ✓

Denied: _____

18. Any photographs of any decedent, victim or third party having relevance to the case

in question.

Granted: ✔

Denied: _____

19. Any photographic negatives which are in the possession of the State, but which are not to be used by the State during the trial of its case in chief.

Granted: _____

Denied: _____

20. All photographs of the Defendant which were used by the State during the investigation of the case, or any other photographs which were used in conjunction with the investigation of the case for purposes of identification of the Defendant or any co-Defendant or co-conspirator.

Granted: ✔

Denied: _____

## RESULTS OF TESTS

21.    All fingerprints, palm prints, foot prints, shoe, tire or other prints made by any means which are related to the case at bar, and alleged to have some relation to the Defendant, co- Defendants or co-conspirators or shall be used by the State in trial on the merits of this case.

Granted: ✔

Denied: _____

22.    All test results of any type, including but not limited to field sobriety tests, as same relate to the sobriety or insobriety of the Defendant herein.

Granted: _____

Denied: _____

*28*

23.     All reports of scientific tests, experiments or comparisons, and all reports of any experts who conducted such tests, experiments or comparisons, together with the name and address of such experts, including but not limited to weapons, bullets, shots, waddings, cartridge cases, tool marks, blood, breath, hair, threads, drugs, or controlled substances.

Granted: _____✓_____

Denied: _____

24.     All autopsy reports based on an examination of any decedent and/or medical records of the alleged victim.

Granted: _____✓_____

Denied: _____

25.     Any medical or psychiatric reports relating to the present case, whether of the Defendant or any witness or victim.

Granted: _____✓_____

Denied: _____

26.     Any evidence of insanity, incompetency or incapacity of the Defendant, the victim or any third party or a witness having some relation to the present case.

Granted: _____✓_____

Denied: _____

## IDENTIFICATION EVIDENCE

27.     All photographs made of the Defendant as a part of any line-up, including photographs of any other persons included in the line-up procedure.

Granted: _____✓_____

Denied: _____

29

28.    The form used by law enforcement authorities to identify participants in the line-up which included the Defendant, including any information available on any other participants in said line-up.

Granted: ✓

Denied: _____

29.    A description of any identification procedures utilized by law enforcement officers or agents of the State, including the names and addresses of any participants in such identification process.

Granted: ✓

Denied: _____

## PRIOR CRIMINAL RECORD

30.    The prior criminal record of the following persons: *in camera*

a. The Defendant

Granted: ✓

Denied: _____

b. Each co-Defendant

Granted: ✓

Denied: _____

c. Each co-conspirator

Granted: ✓

Denied: _____

d. Any decedent

Granted: ✓

Denied: _____

30

e. Any victim or complaining witness

Granted: _____✓_____

Denied: _____

f. All State's witnesses   *Except Law Enforcment*

Granted: _____✓_____

Denied: _____

## II.

In support of the foregoing, Defendant would show the Court that the production of all of the above evidence is necessary to the effective assistance of counsel. Such matters are in the possession or under the control of the Prosecution, and are relevant, material and necessary to the Defense. The items are not privileged and denial of the same would work a denial of a fair and impartial trial to Defendant. Absent such discovery, the Defendant's rights under Article 39.14, Texas Code of Criminal Procedure, Article I, Sections 9, 10 and 19 of the Texas Constitution, and the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States will be violated, to the irreparable injury of Defendant. See also Articles 1.04, 1.05, 1.051 and 1.06, Texas Code of Criminal Procedure, and Brady v. Maryland, 373 U.S. 83 (1963).

**Wherefore, premises considered,** the Defendant respectfully prays that this Honorable Court grant this Motion for Discovery, Inspection, Production and Inspection of Evidence in all things, or in the alternative, that this Court will set this matter down for hearing, and that after

31

such hearing, that the Court grant such discovery in all things.

Respectfully Submitted,

**JOHN GILMORE**
622 South Tancahua
Corpus Christi, Texas 78401
(361) 882-4378; Fax: (361) 882-3635
STATE BAR # 07958500; ADM # 18181

## CERTIFICATE OF SERVICE

· As Attorney of Record for Defendant, I do hereby Certify that a true and correct copy of the above and foregoing document was this date provided to the Attorney for the State.

**JOHN GILMORE**

# CAUSE NO. A-08-5080-4CR

\* \* \* \* \* \* \* \* \* \* \*

## THE STATE OF TEXAS VS. CHADRICK PATE

\* \* \* \* \* \* \* \* \* \* \*

## IN THE 36th DISTRICT COURT OF
## ARNANSAS COUNTY, TEXAS

### O R D E R

BE IT REMEMBERED, that on the _____ day of _____, 2008, came on to be considered the above and foregoing Rule 404(b) Request for Notice of Intent to Offer Extraneous Conduct by Defendant. After consideration of the same, it is the opinion of the Court that Defendant's Motion be:

(X) GRANTED.

( ) DENIED, to which ruling the Defendant excepts.

( ) SET FOR HEARING ON THE _____ day of _____,

2008, at _____ o'clock _____.

SIGNED: 7/24/08

_____
Judge Presiding

33

# CAUSE NO.  A-08-5058-4CR

\* \* \* \* \* \* \* \* \* \*

## THE STATE OF TEXAS VS. CHADRICK PATE

\* \* \* \* \* \* \* \* \* \*

## IN THE 36th DISTRICT COURT OF
## ARANSAS COUNTY, TEXAS

## O R D E R

BE IT REMEMBERED that the foregoing Motion to Reveal the Deal was presented to the Court on the _24_ day of ___July___ , 2008, and it is therefore, **ORDERED** that the Motion is hereby **GRANTED/DENIED.**

**DONE AND ENTERED** this the _24_ day of ___July___ 2008.

___Janna Whatley___
JUDGE PRESIDING

35

CAUSE NO.  A-08-5058-4CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | 36th JUDICIAL DISTRICT |
| CHADRICK PATE | * | ARANSAS COUNTY, TEXAS |

### MOTION OF DEFENDANT CHADRICK PATE FOR SEVERANCE OF DEFENDANTS

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES the Defendant, Chadrick Pate, by and through his attorney John Gilmore, and respectfully moves this Court for an order severing the offenses charged against this Defendant in the indictment herein from the offenses charged the co-defendants and for a separate trial thereon, on the grounds that this Defendant is by the joinder herein and for good cause would respectfully show unto the Court as follows:

I.

Defendant believes that there are previous admissible against the co-defendants in this case.

II.

Further, we believe that there will be conflicts in the defenses of this Defendant and the co-defendants which will be prejudicial to Defendant if they are tried together.

III.

A joint trial of Defendant and his co-defendants poses a security risk to Defendant and to trial participants and spectators.

**WHEREFORE,** Defendant respectfully prays that this Honorable Court sever him from the co-defendant indicted herein and order a separate trial of the charges against him from the offenses charged the co-defendants and for such other and further relief as this Honorable Court may deem just and proper.

FILED
31 day ti _____ 20 08
at _____ o'clock __ P. M
Pam Heard District Clerk
D__ Court __ __ Co., Texas

36

Respectfully submitted,

JOHN GILMORE
622 S. Tancahua/ P. O. Box 276
Corpus Christi, Texas 78403
(361) 882-4378/phone
(361) 882-3635/fax
ATTORNEY FOR DEFENDANT
BAR NO. 07958500

## CERTIFICATE OF SERVICE

I, John Gilmore, do hereby certify that a true and correct copy of the foregoing Motion of Defendant Chadrick Pate for Severance of Defendants has been served on Aransas County District Attorney's Office, Nueces County Courthouse, 301 N. Live Oak Street, Rockport, Texas on this the 31st day of July, 2008.

JOHN GILMORE

37

5080-4

CAUSE NO. A-08-5058-4CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| vs. | * | 36TH JUDICIAL DISTRICT |
| CHADRICK PATE | * | ARANSAS COUNTY, TEXAS |

## MOTION FOR CONTINUANCE

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES the Defendant, Chadrick Pate, by and through his attorney of record, John Gilmore, and moves the Court to continue the t Jury Trial, which is set for Monday, August 4, 2008. In support of such motion would show the Court as follows:

I.

The Defendant's attorney was in Trial in San Patricio County, Texas, in case styled: The State of Texas vs. Richard Cuellar, Cause No. S-07-3457-1CR and needs more time to prepare for Trial in the above-referenced case; therefore, Defendant's attorney ask the Court to re-set the Trial to a later date.

II.

This motion for continuance and is not made for delay. Defense Counsel requests this continuance in order to preserve Defendant's constitutional rights to effective assistance of counsel, due process and due course of law under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Article I, Sections 10, 13 and 19 of the Texas Constitution, and Articles 1.04, 1.05 and 1.051 of the Texas Code of Criminal Procedure.

WHEREFORE, PREMISES CONSIDERED, Defendant moves the Court, pursuant to the authority of Article 29.03, Texas Code of Criminal Procedure, to continue the Pretrial and Jury Trial in this cause until a future date.

FILED
31 day of _____ 20__
at _____ o'clock ___ M.
Pam Heard District Clerk
Dist. Court, Aransas County, Texas
By _____

38

Respectfully Submitted,


JOHN GILMORE
622 S. Tancahua/P. O. Box 276
Corpus Christi, Texas 78401
(361) 882-4378   FAX (361) 882-3635
ATTORNEY FOR DEFENDANT
STATE BAR #07958500

*39*

**STATE OF TEXAS**                    *

**COUNTY OF ARANSAS**            *

BEFORE ME, the undersigned authority, on this day personally appeared John Gilmore and after being by me first duly sworn deposed on his oath and said:

"My name is John Gilmore. I am the attorney in Cause No. A-08-5058-4CR presently pending in the 36th District Court of San Patricio County, Texas. I have read the foregoing Motion for Continuance to which this affidavit is attached and which is to be filed in the aforementioned cause. All of the facts and allegations contained in said motion are true and correct to the best of my knowledge and belief."

_____
JOHN GILMORE

SUBSCRIBED AND SWORN TO before me by the said John Gilmore on this the 31st day of July, 2008.

_____
NOTARY PUBLIC, STATE OF TEXAS

DEANNA MICHELLE KING
Notary Public
STATE OF TEXAS
My Comm. Exp. 11-12-2010

CAUSE NO. A-08-5058-4CR

| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| --- | --- | --- |
| vs. | * | 36TH JUDICIAL DISTRICT |
| CHADRICK PATE | * | ARANSAS COUNTY, TEXAS |

## CERTIFICATE OF SERVICE

I, John Gilmore, do hereby certify that a true and correct copy of the foregoing Motion for Continuance has been served on the Office of the District Attorney, Aransas County Courthouse, 301 N. Live Oak Street, Rockport, Texas 78382 on this the 31st day of July, 2008.

_____
JOHN GILMORE

41

CAUSE NO. A-08-5058-4CR

| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
|---|---|---|
| VS. | * | 36TH JUDICIAL DISTRICT |
| CHADRICK PATE | * | SAN PATRICIO COUNTY, TEXAS |

## ORDER

Defendant's Motion for Continuance, having been presented to the Court, the same is

hereby **GRANTED/DENIED.**

SIGNED this _____ 31 _____ day of _____ July _____, 2008.

_____Janna Whatly_____

JUDGE PRESIDING

## ORDER

Defendant's Motion for Continuance having been **GRANTED**, the same is hereby re-set

for Announcement on _____ day of _____, 2008 and the Jury Trial on the _____

day of _____, 2008  at _____ o'clock, _____.m.

SIGNED this _____ day of _____, 2008.

_____
**JUDGE PRESIDING**

42

Docket shows granted but NO order written for granted

Cause No. A-08-5080-4-CR

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| VS. | § | ARANSAS COUNTY, TEXAS |
| CHADRICK B. PATE | § | 36TH JUDICIAL DISTRICT |

## STATE'S MOTION FOR CONTINUANCE

Now comes the State, by and through her District Attorney, and asks this Honorable Court to continue this cause. In support of this Motion, the State would show as follows:

1. This case is set for jury trial on September 29, 2008.

2. The State seeks this motion for continuance due to information received in further investigation in this cause indicating the location of the weapon used in the murder of Aaron Watson. A D.P.S. dive team assembled by Ranger Oscar Rivera were able to locate and recover a revolver from a local bay matching the description of the weapon used in the commission of the charged offenses. The recovered revolver has been submitted to the D.P.S. Crime laboratory in McAllen for a series of forensic tests. Other evidence recovered in this cause have also been submitted to the D.P.S. laboratory in Austin and Corpus Christi for fingerprint and DNA testing of which the results are still pending.

3. Ranger Oscar Rivera, an investigator in this case and a material and necessary witness for the State, has recently undergone surgery and is not available to testify until November.

25 Sept 08

Camille

EX-25

43

4.     This request is not made for the purpose of delay, but that justice be more effectively served.

WHEREFORE, PREMISES CONSIDERED, the State prays that this Honorable Court grant this motion for a continuance.

Respectfully Submitted,

_____
Assistant District Attorney

## CERTIFICATE OF SERVICE

I, Marcelino Rodriguez, Assistant District Attorney for Aransas County, do hereby certify that a copy of the Motion For Continuance was delivered to defense counsel by hand delivery, on this the 25th day of September, 2008.

_____
Assistant District Attorney

44

CAUSE NO. A-08-5058-4CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | 36th JUDICIAL DISTRICT |
| CHADRICK PATE | * | ARANSAS COUNTY, TEXAS |

## ORDER

**BE IT REMEMBERED,** that on the _____25th_____ day of _____Sept_____, 2008, came on to be considered and above and foregoing Motion of Defendant Chadrick Pate for Severance of Defendants;

After consideration of the same, it is the opinion of the Court that Defendant's Motion be

**GRANTED/~~DENIED~~.**

**SIGNED** this _____25th_____ day of _____Sept_____, 2008.

_____
JUDGE PRESIDING

45

CAUSE NO. A-08-5058-4CR

| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | 36th JUDICIAL DISTRICT |
| CHADRICK PATE | * | ARANSAS COUNTY, TEXAS |

## MOTION TO DISMISS

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES the Defendant, Chadrick Pate, by and through his attorney John Gilmore, and respectfully moves this Court for an order dismissing the offenses charged against this Defendant in the indictment herein and for good cause would respectfully show unto the Court as follows:

I.

Defendant is confined in the Aransas County Jail. During Hurricane Ike, defendant and other inmates at the jail were evacuated to other facilities. Defendant was forced to leave his property behind, at the Aransas County Jail. Included with the property were approximately 30 pages of handwritten notes, which were confidential communications to defendant's attorney, regarding his case. When defendant returned to the Aransas County Jail, his property and the confidential writings were not returned to him. All other inmates had their property returned to them. Defendant believes the confidential communications were intentionally removed from his possession and are being reviewed and used by investigating law enforcement officers, to assist in the prosecution of defendant's case.

II.

Defendant is charged with the offense of murder, under the law of parties. The primary evidence of defendant's culpability in the case, comes from co-defendants. Defendant's confidential writings outlines his entire defense to the case and possession and review of these materials by law enforcement investigators severely hampers his ability to defend himself in this cause.

FILED
16 day of _____ 20___
at _____ 10:50 _____ o'clock ___ M
Pam Heard, District Clerk
Dist. Court, Aransas Co., Texas
By _____ Deputy

III.

Effective representation of counsel requires that a criminal defendant be permitted to confer in private with his attorney. Intrusion into the private attorney-client communications violates defendant's right to effective representation and due process of law guaranteed by the Fourteenth Amendment to the United States Constitution. These legal materials contained confidential information protected by the attorney–client privilege and law enforcement inspection of these materials violates defendant's right to effective assistance of counsel guaranteed him by the Sixth Amendment to the United States Constitution and article I, section 10 of the Texas Constitution.

**WHEREFORE**, Defendant, Chadrick Pate, respectfully prays that this Honorable Court enter an order dismissing this prosecution, with prejudice, and for such other and further relief as this Honorable Court may deem just and proper.

Respectfully submitted,

JOHN GILMORE
622 S. Tancahua/ P. O. Box 276
Corpus Christi, Texas 78403
(361) 882-4378/phone
(361) 882-3635/fax
ATTORNEY FOR DEFENDANT
BAR NO. 07958500

47

CAUSE NO. A-08-5080-4-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| VS. | § | 36TH JUDICIAL DISTRICT |
| CHADERICK B. PATE | § | NUECES COUNTY, TEXAS |

## DEFENDANT'S MOTION IN LIMINE

NOW COMES **Chadrick B.Pate** the Defendant in the above entitled and numbered cause and requests the Court to instruct the Prosecuting Attorney, his assistants, or any of the State's witnesses in this cause, not to allude to, refer to, or in any way bring before the jury, whether as a panel, or jury selected to try this cause, during any stage of this proceeding, any of the following, and would show the Court that to allow such testimony would be prejudicial to the rights of the Defendant in this cause.

This Defendant would urge the Court to instruct the Prosecuting Attorney not to refer to or allude to any of the following without first approaching the bench and making known to the Court and the attorneys for the Defendant outside the presence and hearing of the jury that he intends to offer such proof, thus permitting the jury to be retired and the evidence and objections heard, and the Court to rule on the admissibility of such evidence before it is placed before the jury, thus preventing prejudicial error no subsequent instruction could cure. The Defendant prays this Honorable Court preserve his rights under the Fifth and Fourteenth Amendments to the United States Constitution, Article I, Sections 10 and 19 of the Texas Constitution, and Articles 1.04 and 1.05 of the Texas Code of Criminal Procedure, and hereby requests this instruction concerning the following evidence:

1. Any alleged violations of the law, which have not resulted in a final conviction.

CAUSE NO.A-08-5080-2-CR & A-08-5080-4-CR

| | |
|---|---|
| STATE OF TEXAS | IN THE DISTRICT COURT |
| VS. | 36TH    JUDICIAL DISTRICT |
| CHRISTOPHER JOSEPH HALL<br>CHADRICK B. PATE | ARANSAS COUNTY, TEXAS |

JURY NOTE: _____1_____

Request:

1) all ballistic evidence exhibits

2) Statement of mr. Tanton

3) Statement of mr. Underwood

4) Statement of mr. Ray

_____
PRESIDING JUROR

12  Feb  OP
7:30    P

COURT'S ANSWER

MEMBERS OF THE JURY: _____

As to 1) - It is being sent to you - exhibit 59
As to 2), 3) + 4) the statements of Mr. Tanton,
Mr. Underwood + Mr Ray were not admitted into
evidence and cannot be sent in to you.

_____
PRESIDING JUDGE

59

#3

Cause No. A-08-5080-4-CR

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
|---|---|---|
| | § | ARANSAS COUNTY, TEXAS |
| CHADRICK B. PATE | § | 36TH JUDICIAL DISTRICT |

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

The defendant, CHADRICK B. PATE, stands charged by indictment with the offenses of COUNTS 1 MURDER, alleged to have been committed on or about January 4, 2008 in Aransas County, Texas; and COUNT 2 AGGRAVATED ASSAULT, alleged to have been committed on or about January 4, 2008, in Aransas County, Texas. The defendant is also alleged to have committed the offense of Aggravated Assault in Count 2 while ENGAGING IN ORGANIZED CRIMINAL ACTIVITY. The defendant has pleaded not guilty to each offense you are instructed that the law applicable to this case is as follows:

### COUNT ONE

1.

Our law provides that a person commits murder if he intentionally or knowingly causes the death of an individual.

60

### 2.

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

A person acts knowingly, or with knowledge, with respect to a result of his *conduct when he is aware that his conduct is reasonably certain to cause the result.*

A "deadly weapon" means a firearm

"Individual" means a human being.

### 3.

7.02 (a)(2)

SEC 7.01

Our laws provide that a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

Criminal Responsibility for conduct of another

7.02

(a) A person is criminally responsible for an offense committed by the conduct of another if, (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to a crime.

as a party criminally rev penilty each element must be proved

Penal Code Title 2 Chap 7

not in the Statute con

### 4.

Now, if you find from the evidence beyond a reasonable doubt that on or about January 4, 2008, in Aransas County, Texas, the defendant, CHADRICK B.

61

PATE, acting alone or together with Michael Jason Underwood, Christopher Joseph Hall, Anthony Lee Ray, and Kevin Ray Tanton, did then and there intentionally or knowingly, cause the death of an individual, namely, Aaron Watson by shooting the said Aaron Watson with a firearm, then you will find the defendant guilty of Murder.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of murder as alleged in Count One

If you have found the defendant guilty of Count 1 do not proceed to Count Two of Aggravated Assault.

## COUNT TWO

5.

Our law provides that a person commits an aggravated assault if the person intentionally, knowingly, or recklessly causes serious bodily injury to another.

6.

A "deadly weapon" means a firearm.

62

The term "serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

### 7.

A person acts intentionally, or with intent, when it is his conscious objective or desire to cause the result.

A person acts knowingly or with knowledge, when he is aware that his conduct is reasonably certain to cause the result.

A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

### 8.

Our laws provide that a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another

63

for which he is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to a crime.

## 9.

A person commits an offense of Engaging in Organized Criminal Activity if, as a criminal prison gang, he commits Aggravated Assault.

## 10.

"Criminal prison gang" means three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities.

## 11.

It is no defense to prosecution for the offense of Engaging in Organized Criminal Activity that:

(1) one or more members of the combination are not criminally responsible

for the object offense;

(2) one or more members of the combination have been acquitted, have not been prosecuted or convicted, have been convicted of a different offense, or are immune from prosecution;

(3) a person has been charged with, acquitted, or convicted of said offense; or,

(4) once the initial combination of three or more persons is formed, there is a change in the number or identify of persons in the combination as long as two or more persons remain in the combination and are involved in a continuing course of conduct constituting an offense of Engaging in Organized Criminal Activity.


## LIMITING INSTRUCTIONS

You are instructed that if there is any evidence before you in the case regarding the existence of a criminal prison gang, the defendant's membership in a criminal street gang, and/or the criminal street gang's commission of criminal activities, such evidence, if any, was admitted for the limited purpose of aiding you, if it does aid you, in determining the issues of the defendant's guilt or innocence of engaging in organized criminal activity, and for no other. This evidence, if any, can only be considered by you after you have determined the defendant is in fact guilty of one or more of the offenses charged. You may consider this evidence for that

65

purpose, and no other. To find the defendant guilty of Engaging in Organized Criminal Activity, each element of the crime must be proven beyond a reasonable doubt.

You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the one for which he is now on trial, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the motive or identity of the defendant, and for no other purpose.

## 12.

Now, if you find from the evidence beyond a reasonable doubt that on or about January 4, 2008, in Aransas County, Texas, the defendant, CHADRICK B. PATE, acting alone or together with Michael Jason Underwood, Christopher Joseph Hall, Anthony Lee Ray, and Kevin Ray Tanton, did then and there intentionally, knowingly, or recklessly, cause serious bodily injury to Aaron Watson by shooting the said Aaron Watson with a Handgun, the same being a firearm. You will find the defendant guilty of Aggravated Assault as alleged in Count Two

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of Aggravated

Assault as alleged in Count Two

If you have found the defendant guilty of Aggravated Assault in Count 2, *answer the following special issue — otherwise, do not answer this special issue.*

## SPECIAL ISSUE

*see June 20, 2007*

Do you find from the evidence beyond a reasonable doubt that on or about *January 4, 2008* in Aransas County, Texas, the defendant, CHADRICK B. PATE, when he committed the Aggravated Assault alleged in Count 2, was acting as a member of a criminal prison gang? Answer "Yes" or "No."

### 13.

You are instructed that an accomplice as the term is herein after used means *any person connected with the crime charged, as a party thereto, and includes all* person who are connected with the crime, as such parties, by unlawful act or omission on their part transpiring either before or during the time of the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible or by both. Mere presence alone, however, will not constitute one a party to an offense.

The witnesses Michael Jason Underwood, Anthony Lee Ray, and Kevin Ray Tanton *are accomplices. If an offense was committed, you cannot convict the* defendant upon accomplice testimony unless you first believe that the testimony is

67

true and shows the defendant is guilty as charged and then you cannot convict the defendant upon said testimony, unless you further believe that there is other testimony in the case, outside the evidence of the said witnesses Michael Jason Underwood, Anthony Lee Ray, and Kevin Ray Tanton tending to connect the defendant with the offense committed, if you find that an offense was committed, and the corroboration is not sufficient it merely shows the commission of the offense but it must also tend to connect the defendant with its commission, and then from all the evidence you must believe beyond a reasonable doubt that the defendant is guilty of the offense charged against him.

### 14.

*Our law provides that a defendant may testify in his own behalf if he elects* to do so. This, however, is a privilege accorded a defendant, and in the event he elects not to testify, that fact cannot be taken as a circumstance against him. In this case, the defendant has elected not to testify, and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against the defendant.

A grand jury indictment is the means whereby a defendant is brought to trial in a felony prosecution. It is not evidence of guilt nor can it be considered by you in passing upon the question of guilt of the defendant. The burden of proof in all

criminal cases rests upon the State throughout the trial and never shifts to the defendant.

All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that he has been arrested, confined, or indicted for, or otherwise charged with the offense gives rise to no inference of guilt at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and, if it fails to do so, you must acquit the defendant.

It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him and say by your verdict "Not Guilty."

You are the exclusive judges of the facts proved, of the credibility of the

69

witnesses, and the weight to be given their testimony, but you must be governed by the law you shall receive in these written instructions.

*After you retire to the jury room, you should select one of your members as* your Presiding Juror. It is his or her duty to preside at your deliberations, vote with you, and, when you have unanimously agreed upon a verdict, to certify to *your verdict by using the appropriate form attached hereto and signing the same as* the Presiding Juror.

During your deliberations in this case, you must not consider, discuss, nor *relate any matters not in evidence before you.* You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

*No one has any authority to communicate with you except the officer who* has you in charge. After you have retired, you may communicate with this Court in writing through this officer. Any communication relative to the cause must be written, prepared and signed by the Presiding Juror and shall be submitted to the Court through this officer. Do not attempt to talk to the officer who has you in charge, or the attorneys, or the Court, or anyone else concerning any questions you may have.

Your sole duty at this time is to determine the guilt or innocence of the defendant under the indictment in this cause and restrict your deliberations solely

70

to the issue of guilt or innocence of the defendant.

Following the arguments of counsel, you will retire to consider your verdict.

Janna White
~~Judge Presiding~~
36th Judicial District Court
San Patricio County, Texas

Date/time: 2/12/09
5 pm

12  5:45 Feb 09
P
Connik

71

Cause No. A-08-5080-2- CR

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | ARANSAS COUNTY, TEXAS |
| CHADRICK B. PATE | § | 36TH JUDICIAL DISTRICT |

## VERDICT FORMS

### COUNT ONE

We, the Jury, find the Defendant, CHADRICK B. PATE, GUILTY of MURDER, as alleged in the indictment.

_____
PRESIDING JUROR

**OR**

We, the Jury, find the Defendant, CHADRICK B. PATE, NOT GUILTY of MURDER.


_____
PRESIDING JUROR



**If you find the Defendant not guilty of Murder as alleged in Count One, then proceed to Count Two.**

72

Cause No. A-08-5080-4- CR

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | ARANSAS COUNTY, TEXAS |
| CHADRICK BLAKE PATE | § | 36TH JUDICIAL DISTRICT |

**VERDICT FORMS**

COUNT TWO

USE ONLY ONE FORM:

We, the Jury, find the Defendant, CHADRICK B. PATE, GUILTY of AGGRAVATED ASSAULT, as alleged in the indictment.

_____
PRESIDING JUROR

**SPECIAL ISSUE** (Answer only if you have found the defendant guilty of this count)

Did the Defendant, CHADRICK B. PATE, commit said offense as a member of a criminal prison gang? (answer "Yes" or "No")

ANSWER: _____

We, the Jury, find the Defendant, CHADRICK B. PATE, NOT GUILTY of COUNT TWO.

_____
PRESIDING JUROR

73

CAUSE NO.A-08-5080-2-CR & A-08-5080-4-CR

STATE OF TEXAS                          IN THE DISTRICT COURT

VS.                                     36TH        JUDICIAL DISTRICT

CHRISTOPHER JOSEPH HALL                 ARANSAS COUNTY, TEXAS
CHADRICK B. PATE
                        JURY NOTE: ___1___

(1) Prior Conviction Records of Both
Mr. Pate and Mr. Hall
(2) Does the victim receive any portion
of any fine.

13  10.88 Feb. 09                       _____
                                        PRESIDING JUROR

                        COURT'S ANSWER

MEMBERS OF THE JURY: _____
    (1)  O.K
    (2)  No.

                                        _____
                                        PRESIDING JUDGE

Cause No. A-08-5080-4-CR

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| vs. | § | ARANSAS COUNTY, TEXAS |
| CHADRICK B. PATE | § | 36TH JUDICIAL DISTRICT |

**PUNISHMENT CHARGE**

LADIES AND GENTLEMEN OF THE JURY:

1.

By your verdict returned in this case, you have found the defendant guilty of the offense of Murder as charged in the indictment. It is now necessary that the jury assess and fix punishment for this offense.

You are instructed that a defendant adjudged guilty of the offense of Murder as alleged in the indictment shall be punished by confinement in the Institutional Division of the Texas Department of Criminal Justice for a period of not less than five (5) years nor more than ninety-nine (99) years or life, and the jury in its discretion, may, if it chooses, assess a fine in any amount not to exceed $10,000, in addition to confinement in the Institutional Division. Therefore, you shall assess the punishment of the defendant at a term of years of not less than five (5) nor more than ninety-nine (99) years or life, and you may assess a fine of up to $10,000.

2.

Under the law a defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time

earned by the prisoner. It is also possible that the length of time for which a defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable to this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual calendar time served, without consideration of any good conduct time, equals one-half of the period of incarceration imposed or thirty years, whichever is less. If the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if the defendant is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

3.

The State has introduced evidence of extraneous crimes or bad acts other than the one charged in the indictment in this case. This evidence was admitted only for the purpose of assisting you, if it does, in determining the proper punishment for the offense for which you have found the defendant guilty. You cannot consider the testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other acts, if any were committed.

76

4.

Our law provides that a defendant may testify in his own behalf if he elects to do so. This, however, is a privilege accorded a defendant, and in the event he elects not to testify, that fact cannot be taken as a circumstance against him. In this case, the defendant has elected not to testify, and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against the defendant.

You are further instructed that in fixing the defendant's punishment in these counts, which you will show in your verdict, you may take into consideration all the facts shown by the evidence admitted before you in the full trial of this case, and the law as submitted to you in this charge.

Under the instructions herein given, it will not be proper for you, in determining the penalty to be assessed, to fix the same by lot, chance, any system of averages or any other method than by a full, fair and free exercise of the opinion of the individual jurors under the evidence before you.

During your deliberations in this case, you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor mention any personal knowledge or information may have about any fact or person connected with this case which is not shown by the evidence.

You are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given the testimony but the law of the case you must receive from the Court as contained in these instructions, and be governed thereby. You must disregard any comment or statement made by the Court during the trial or in these instructions which may seem to indicate an opinion with respect to any fact, item of evidence or verdict to be reached

77

in this case. No such indication was intended.

After argument of counsel, you will retire to the jury room and proceed with your deliberations. After you have reached a unanimous verdict, the presiding juror will certify thereto by filling in the appropriate forms attached to this charge and signing his or her name as foreperson. The forms are not intended to suggest to you what your verdict should be.

If the Jury wishes to communicate with the Court, they shall notify the bailiff. Any communication relative to the case must be written, prepared by the presiding juror and shall be submitted to the Court through the bailiff.

Respectfully submitted,

_____Janne White,_____
Judge Presiding
36th Judicial District Court
Aransas County, Texas

Date/time: ___2/13/09___
c 9: 50pm

13    10:10 Feb 09
A
Camille

78

Cause No. A-08-5080-4-CR

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
|---|---|---|
| v. | § | ARANSAS COUNTY, TEXAS |
| CHADRICK B. PATE | § | 36TH JUDICIAL DISTRICT |

## Verdict Form

We, the Jury, assess punishment at _____99_____ (Any term of years not less than 5 nor more than 99 years or life), confinement in the Institutional Division of the Texas Department of Criminal Justice and a fine of $ _____10,000_____ (from nothing to $10,000).

_Ronald N. Gore_
Presiding Juror

13
12:45
09
P

79

NO. A08-50804-CR

THE STATE OF TEXAS

IN THE 36th DISTRICT COURT

VS.

OF

Chadrick B. Pate

Aransas County

## TRIAL COURT'S CERTIFICATION OF DEFENDANT'S RIGHT OF APPEAL

_____ I, Judge of the Trial Court, Certify this criminal case:

__X__ is not a plea-bargain case, and the defendant has the right of appeal. (or)

_____ is a plea-bargain case, but matters were raised by written motion filed and ruled on before trail and not withdrawn or waived, and the defendant has the right of appeal. (or)

_____ is a plea-bargain case, but the trial court has given permission to appeal, and the defendant has the right of appeal. (or)

_____ is a plea-bargain case, and the defendant has NO right of appeal. (or)

_____ the defendant has waived the right of appeal.

_Janna Whatly_                    2/13/05
JUDGE                             Date

I have received a copy of this certification. I have also been informed of my rights concerning any appeal of this criminal case, including any right to file a *pro se* petition for discretionary review pursuant to Rule 68 of the Texas Rules of Appellate Procedure. I have been admonished that my attorney must mail a copy of the court of appeals's judgment and opinion to my last known address and that I have only 30 days in which to file a *pro se* petition for discretionary review in the court of appeals. TEX. R. APP. P. 68.2 I acknowledge that, if I wish to appeal this case and if I am entitled to do so, it is my duty to inform my appellate attorney, by written communication, of any change in the address at which I am currently living or any change in my current prison unit. I understand that, because of appellate deadlines, if I fail to timely inform my appellate attorney of any change in address, I may lose the opportunity to file a *pro se* petition for discretionary review.

_____          _____
Defendant                          Attorney for Defendant
Address:_____          SBN: _____

_____          Address:_____

Telephone: _____          Telephone: _____

                                   Fax No.: _____

*" A Defendant in a criminal case has the right of appeal under these rules. The trial court shall enter a certification of the defendant's right to appeal in every case in which it enters a judgement of guilt or other appealable order. In a plea bargain case - that is in which a defendant's plea of guilty or nolo contendere and the punishment did not exceed the punishment recommended by the prosecutor and agreed to by the defendant - a defendant may appeal only: (A) those matter that were raised by written motion filed and ruled on before trial, or (B) after getting the trial court's permission to appeal." TEXAS RULE OF APPELLATE PROCEDURE 25.2(a)(2).

District Clerk/Frm5.5/denfendant right to appeal

Cause No. A-08-5080-4-CR

| THE STATE OF TEXAS | )( | IN THE DISTRICT COURT |
| | )( | |
| VS. | )( | 36th DISTRICT COURT |
| Chadrick B. Pate | )( | |
| | )( | ARANSAS COUNTY, TEXAS |

INMATE:_____TDCJ No._____

## ORDER TO WITHHOLD

GREETINGS:

The above named defendant currently in the custody of the Texas Department of Criminal Justice Correctional Institutions Division has incurred court fees and costs in the 36th District Court of Aransas County, Texas as above entitled and represented in the certified Judgment attached hereto in the amount of $ 265 00 +u

THE COURT ORDERS that payment be made out of the inmate's trust fund account as follows:

Pay an initial amount equal to the lesser of:

(1)          20% of the preceding six months' deposits in the inmate's trust account; or
(2)          The total amount of court fees and costs.

In each month following the month in which the initial payment is made, the inmate shall pay an amount equal to the lesser of:

(1)          10% of that month's deposits to the trust account; or
(2)          the total amount of court fees and costs that remain unpaid.

Payments shall continue until the total amount of court fees and costs are paid, or the inmate is released from confinement. On Receipt of this Order, the department's Inmate Trust Fund Supervisor shall withdraw the funds from the account of the inmate, hold same in a separate account, and forward said funds monthly to Pam Heard, District Clerk of Aransas County at 301 N. Live Oak St., Rockport, Tx. 78382.

Defendant was admonished by the Court of garnishment of inmate's Trust Account with the above stated terms and conditions.

THE COURT ENTERS THIS ORDER pursuant to Section 501.014(f)(5), Texas Government Code, on this the 13 day of February, 20 09

_____
Judge Presiding

Defendant hereby acknowledges notice and receipt of this order.

_____

Copies to:    TDCJ
              Defendant

81

Judge Whatly,                           02-18-09

     My name is Chadrick Blake Pate
and I would like to appeal my
Case with # 1-08-5080-4-CR.
I do not have the funds to
retain my own Lawyer, I have
been locked up almost a year
and have ran out of money.
Can you please appoint me a Lawyer
Thank You for your time."

                    Respectfully,

                    Chad Pate

FILED

25 day of Feb 20 09
at 12:37 o'clock p M
Pam Heard, District Clerk
Dist. Court, Aransas Co., Texas
By _____ Deputy

82

02/26/2009 THU 11:47 FAX 3617379215 aransas county jail                                    ☑001/005

The following is to be filled out and attached to all REQUEST FOR

COURT APPOINTED ATTORNEYS by the Magistrate or someone under

his/her direction and submitted to the designated Coordinator as set forth in

the District wide or County plan on file.

DEFENDANT'S NAME: _Chadrick B. Pate_

DATE OF BIRTH: _3-26-76_

SOCIAL SECURITY NO. _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_

DRIVER'S LICENSE NO: _16716877_

TRN NUMBER: _____

CHARGES PENDING: DISTRICT COURT

_Appeal_

CHARGES PENDING: COUNTY COURT

DISTRICT OR COUNTY COURT CAUSE NUMBERS, IF KNOWN

_A-08-5080-4-CR_

INTERPRETER REQUIRED? (YES OR NO) _No_

LANGUAGE REQUIRED: _English_

FILED

_26_ day of _Feb_ 20 _09_

at _11:47_ o'clock _p_ M

Pam Heard, District Clerk

Dist. Court, Aransas Co., Texas

By _____ Deputy

83

**AFFIDAVIT OF INDIGENCE**
**AND**
**REQUEST FOR COURT APPOINTED COUNSEL**
**FELONY AND MISDEMEANOR**

IMPORTANT: This form tells the Court that you need an attorney to represent you your pending charge(s), but do not have the money to hire an attorney. If you qualify under law, a Judge will appoint an attorney to represent you in your case. IF YOU DO NOT FIL OUT THE FOLLOWING FORM COMPLETELY AND PROVIDE ALL REQUEST INFORMATION, IT MAY LEAD TO A DELAY IN PROVIDING YOU WITH A CO APPOINTED ATTORNEY, EVEN IF YOU QUALIFY UNDER THE LAW. Please rea carefully and fill in ALL requested information.

NAME: Chadrick Blake Parte

ADDRESS: Street or Box Number 301 N. Live Oak

City: Rockport                          Phone No.

State: T.V.         Zip: 78382

Do you work? Y/N  N    Where?

If you work, how much money do you make?_____/Week_____/Month

If you are married, does your wife work?____N____(yes or no)

How much money does your wife make?_____/Week_____/Month

Are you or any member of your family receiving Social Security benefits of any kind? Y/N N

What amount of Social Security Benefits (total) are received by all persons in the household? O /Month

Does any member of the household receive any other payments such as AFDC, RETIREMENT, UNEMPLOYMENT Or FOOD STAMPS? Y/N N

What is the total amount of salary or any other type of benefits that is received by all persons residing in the household from all sources? $ O (Monthly)

Do you have a Checking Account or Savings Account? Y/N N

How much money do you have in the bank in all accounts? $ O

84

Do you own your own home? Y/N __N__

How much per month do you pay in Rent or a House Payment? $__0__

List all persons currently residing with you:

NAME                                              AGE        RELATIONSHIP

_____

_____

_____

_____

_____

Do you pay the following monthly bills and if so, indicate the amount:

Electric/Gas $_____        Water $_____        Telephone $_____

Automobile $_____          Insurance $_____      Gasoline $_____

Credit Cards $_____

Do you pay child support and if so, how much? Y/N __N__ $_____

List any other debts that you pay on a regular basis:

_____

_____

_____

List all amounts owed to Banks, Credit Unions or other lending institutions:

_____

_____

_____

_____

85

What is the value of personal property (cars, boats, rare collections, furniture as examples) if you own? _0_

Do you own any stocks bonds or other securities? Y/N _N_

    If yes, state the total value: $_____

Have you posted BAIL/BOND? Y/N _N_

If yes, did you hire a Bondsman? Y/N _____

If you hired a Bondsman, how much have you paid on your bond? $_____

How much do you owe the Bondsman? $_____

*I certify the above financial affidavit to be correct and further certify that I have been advised of my right to representation by counsel in the trial of the charges pending against me and that I am without means to employ counsel of my own choosing and hereby request the court to appoint counsel for me.*

_____
Defendant's Signature

Before me the undersigned Notary Public, on this _26th_ day of _Feb_, 200_9_ personally appeared the above named defendant who subscribed the foregoing instrument, and after having been duly sworn, stated upon his/her oath that the foregoing statement is true and correct.

JIMMY H. TEAGUE
Notary Public
STATE OF TEXAS
My Comm. Exp. 01-31-2012

Notary Public for the State of Texas

86

CAUSE NO. A-08-5080-4-CR

OFFENSE: APPEAL

TO: CHADRICK B. PATE,            IN THE DISTRICT COURT
Defendant

36TH JUDICIAL DISTRICT

ARANSAS COUNTY

## ORDER APPOINTING COUNSEL

On this day came to be heard the sworn Affidavit of Indigence and the Court having determined that the defendant is not represented by counsel and that said defendant does not have sufficient money or other property to employ counsel, and has requested appointed counsel in charges pending before this court, the attorney listed below is appointed to represent the said defendant on pending charges in accordance with the Texas Fair Defense Act and the County Plan on file.

| | |
|---|---|
| Name | TERRY COLLINS |
| Address | 1701 PERCIVAL |
| | ROCKPORT, TX 78382 |
| Phone No. | 361-729-9520 |

Date: February 26, 2009

_____
Court Designee

_____
Judge Presiding

*81*

CAUSE NO. A-08-5080-4-CR

| THE STATE OF TEXAS | IN THE DISTRICT COURT OF |
|---|---|
| VS. | ARANSAS COUNTY, TEXAS |
| CHADRICK B. PATE | 36TH JUDICIAL DISTRICT |

## NOTICE OF APPEAL

On this 25TH day of February, 2009, the defendant in the above styled cause hereby excepts to the judgment of the court in said cause and gives notice of appeal.

DEFENDANT:   CHADRICK B. PATE

PLEA:        NOT GUILTY

| ATTORNEY FOR THE STATE<br>(Please list district attorney rather than assistant) | ATTORNEY FOR THE APPELLANT<br>(If appellant is proceeding pro se, please list both his/her name and address and the name and address of the attorney at trial.) |
|---|---|
| Patrick Flanigan<br>State Bar No. 07109600<br>P.O. Box 1393<br>Sinton, TX 78387<br>Phone No. 361-634-6220 | Terry Collins<br>State Bar No. 04619000<br>1701 Percival<br>Rockport, TX 78382<br>Phone No. 361-729-9520 |

APPOINTED __x__ RETAINED ____

DATE OF SENTENCING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . February 13, 2009

MOTION FOR NEW TRIAL FILED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . No

NOTICE OF APPEAL FILED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . February 25, 2009

AMENDED NOTICE OF APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . No

NAME OF COURT REPORTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Lisa Riley, Sylvia Trevino, Sharon Anderson

DEFENDANT INCARCERATED? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Yes

AMOUNT OF BOND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . None

OFFENSE:      MURDER

PUNISHMENT ASSESSED:      We the Jury, assess punishment at 99 years confinement in the Institutional
Division of the Texas Department of Criminal Justice and a fine of $10,000.

Please attach copies of notice of appeal, motion for new trial, and Certification of Right to Appeal, if any.

*CMRR# 7007 2680 0003 0957 6622*

*88*

Cause No. A-08-5080-4-CR (Count One)TRN 914 665 6553

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 36TH JUDICIAL |
| v. | § | DISTRICT COURT OF |
| CHADRICK B. PATE, | § | ARANSAS COUNTY, TEXAS |
| DEFENDANT | | |

SID: TX05581316

## JUDGMENT OF CONVICTION BY JURY;
## SENTENCE BY JURY TO Institutional Division, TDCJ

| | |
|---|---|
| DATE OF JUDGMENT: | February 13, 2009 |
| JUDGE PRESIDING: | Janna K. Whatley |
| ATTORNEY FOR THE STATE: | Patrick L. Flanigan |
| ATTORNEY FOR THE DEFENDANT: | John Gilmore |
| OFFENSE: | Murder |
| STATUTE FOR OFFENSE: | Section 19.02, Penal Code |
| DEGREE OF OFFENSE: | First Degree Felony |
| APPLICABLE PUNISHMENT RANGE (including enhancements, if any): | First Degree 5-99 yrs or life/max $10,000 fine |
| DATE OF OFFENSE: | January 4, 2008 |
| CHARGING INSTRUMENT: | Indictment |
| PLEA TO OFFENSE: | Not Guilty |
| PLEA TO ENHANCEMENT PARAGRAPH(S): | Not Applicable |
| VERDICT FOR OFFENSE: | Guilty |
| FINDING ON ENHANCEMENT: | Not Applicable |
| AFFIRMATIVE FINDING ON DEADLY WEAPON: | Yes-firearm used or exhibited |
| OTHER AFFIRMATIVE SPECIAL FINDINGS: | Applicable, See Below |
| DATE SENTENCE IMPOSED: | February 13, 2009 |
| PUNISHMENT AND PLACE OF CONFINEMENT: | Ninety Nine (99) years in the Institutional Division-TDCJ, and a $ 10,000.00 fine |
| TIME CREDITED TO SENTENCE: | Two Hundred Eighty Five (285) days |
| COURT COSTS: | $265.00 |
| TOTAL AMOUNT OF RESTITUTION: | $-0- |
| NAME AND ADDRESS FOR RESTITUTION: | |

The **Sex Offender Registration Requirements** under Chapter 62, CCP, **do not apply** to the Defendant. The age of the victim at the time of the offense was **not applicable.**

This sentence shall run **concurrently unless otherwise specified.**

FILED

_30_ day of _Mar_ 20 _09_
at _4:00_ o'clock _p_ M

Pam Heard, District Clerk
Dist. Court, Aransas Co., Texas
By _____ Deputy

DS4: Judgment of Conviction by Court; Sentence By Jury, Cause No. A-08-5080-4-CR; Page 1 of 4 Pages

89

On the date stated above, the above numbered and entitled cause was regularly reached and called for trial, and the State appeared by the attorney stated above, and the Defendant and the Defendant's attorney, as stated above, were also present. Thereupon both sides announced ready for trial, and the Defendant pleaded **not guilty** and a jury, to wit: **RONALD GORE**, and eleven others, was duly selected, impaneled and sworn. Having heard the evidence submitted and having been duly charged by the Court, the jury retired to consider their verdict. Afterward, being brought into open court by the proper officer, the Defendant, the Defendant's attorney, and the State's attorney being present, and being asked if the jury had agreed upon a verdict, the jury answered it had and returned to the Court a verdict, which was read aloud, received by the Court, and is now entered upon the Minutes of the Court as follows:

**"We, the Jury, find the Defendant, CHADRICK B. PATE, GUILTY of MURDER, as alleged in the indictment."**

Thereupon, the Defendant having previously elected to have the punishment assessed by the jury, pleaded to the enhancement paragraphs, if any, as stated above, and the jury was called back into the box and heard evidence related to the question of punishment. Thereafter, the jury retired to consider such question and, after having deliberated, the jury was brought back into open court by the proper officer, the Defendant, the Defendant's attorney, and the State's attorney being present, and being asked if the jury had agreed upon a verdict, the jury answered it had and returned to the Court a verdict, which was read aloud, received by the Court, and is now entered upon the Minutes of the Court as follows:

**"We, the Jury, assess punishment at Ninety Nine (99) years confinement in the Institutional Division of the Texas Department of Criminal Justice and a Fine of $10,000.00."**

A presentence investigation report **was not required or done.**

And thereupon the Court asked the Defendant whether the Defendant had anything to say why said sentence should not be pronounced upon said Defendant, and the Defendant answered nothing in bar thereof. Whereupon the Court proceeded to pronounce sentence upon said Defendant as stated above.

It is therefore ORDERED, ADJUDGED and DECREED by the Court that the defendant is guilty of the offense stated above, the punishment is fixed as stated above, and the State of Texas do have and recover of said defendant all court costs in this prosecution expended, for which execution will issue.

It is ORDERED by the Court that the Defendant be taken by the authorized agent of the State of Texas or by the Sheriff of this county and be safely conveyed and delivered to the **Director, Institutional Division-TDCJ**, there to be confined in the manner and for the period aforesaid, and the said defendant is hereby remanded to the custody of the Sheriff of this county until such time as the Sheriff can obey the directions of this sentence.

The defendant is given credit as stated above on this sentence for the time spent in county jail. The Defendant also is ordered to pay restitution to the person(s) named above in the amount specified above.

90

**Furthermore, the following special findings or orders apply:**

Deadly Weapon:  Pursuant to article 42.12, Section 3g, Code of Criminal Procedure & HB156 (77R) the court affirmatively finds that the Defendant used or exhibited a deadly weapon, namely, a firearm, during the commission of a felony offense or during immediate flight therefrom or was a party to the offense and knew that a deadly weapon would be used or exhibited.

In the interest of justice, the State has determined not to proceed with Count Two contained in this indictment, and said Count is hereby dismissed.

Cause No. A-08-5080-4-CR;  The State of Texas vs. Chadrick B. Pate;  In the 36th Judicial District of Aransas County, Texas; Count Two – **Aggravated Assault, Engaging in Organized Criminal Activity**

DS4: Judgment of Conviction by Court; Sentence By Jury, Cause No. A-08-5080-4-CR; Page 3 of 4 Pages

91

Pronounced in open court on the ___13__ day of ___February___, 20_09_.

Signed on the ___13__ day of ___February___, 20_09_.

___Janna Chase___
Judge Presiding

**Defendant's right thumbprint**

92

## ATTACHMENT "A"

Cause No. A-08-5080-4-CR

| THE STATE OF TEXAS | | IN THE DISTRICT COURT OF |
|---|---|---|
| ·VS | — | ARANSAS COUNTY |
| CHADRICK B. PATE | | 36TH JUDICIAL DISTRICT |

### JAIL CREDIT SUMMARY

| DATE | REASON FOR CUSTODY | TIME CREDITED |
|---|---|---|
| 05-05-08 through 02-13-09 | May 5, 2008: Arrested in Travis County in this cause. May 7, 2008: Booked into the Aransas County Jail for the offense of Murder and remained in custody. February 13, 2009: Convicted and sentenced to ninety-nine (99) years confinement in the Institutional Division of the Texas Department of Criminal Justice. | 285 days |

Total Credit                                                                285 days

Judgment Total Credit

Additional Credit for Time Served due
the Defendant

Attach. A
03-98

93

# CRIMINAL DOCKET

CASE NO. A-08-5080-4-CR

Case 4:13-cv-00709 Document 5-14 Filed in TXSD on 05/17/13 Page 35 of 38

| NUMBER OF CASE | STYLE OF CASE | ATTORNEYS | OFFENSE | DATE OF FILING | | |
|---|---|---|---|---|---|---|
| | | | | Month | Day | Year |
| A-08-5080-4-CR | STATE OF TEXAS vs. | Patrick Flanigan STATE | Murder 19.02 1st degree | 6 | 24 | 08 |
| | Chadrick D. Pate | John Gilmore (Ret.) | Agg Assault/Eng in Org Crim Activity | Information, Index or Indictment | | |
| | | DEFENDENT | 1st degree | Fee Book | | |
| | | | | Vol. | | Page |

| DATE OF ORDERS | | | Was Stenographer Used _____ ORDERS OF COURT | Minute Book | | WITNESSES |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Vol. | Page | |
| 6 | 25 | 08 | Capias issued, Dfy in Custody | | | |
| 6 | 27 | 08 | Waiver of Arraignment | | | |
| 7 | 10 | 08 | Case Set PT 7-24-08 Ann 731-08 JT 84-08 | | | |
| 7 | 24 | 08 | Disc. Ruled on — | | | WR. |
| 7 | 31 | 07 | M/F/C Granted 9/25/08 e 1:30pm Ann 9/29/08 e 9am JT | | | |
| 9 | 25 | 2008 | Sx Motion to Cont Granted Re set to Nov. 3, 2008 for JT — Ann. Oct 3, 2008 PT Oct. 23, 2008 @ 9ᵃᵐ | | | (ST) |
| 10 | 23 | 2008 | Case called for PTC. Defense has filed motion to dismiss Indictment based upon missing documents for Df lab's call. Eo. Shows def lab had a discovery packet & had written notes on it which were placed into a bag during evacuation for fl | | | L. Riley |

**STATE OF TEXAS**

VS.    No. _08-5080-4_

| DATE OF ORDERS | | | ORDERS OF COURT CONTINUED | Minute Book | | PROCESS |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Vol. | Page | |
| | | | for Hurricane Ike. His bag was returned to him. Def lab Q's where his notes, lee b, who has the & alleges interfere w/ 6th amendmt. Jail's explanation is we "lost ½ dozen total bags & ½ dozen lost bags for the 100 prisoners transported to Crystal City during evacuation. Motion ___ ___ on this tri. | | | |
| 10 | 30 | 08 | Dx - Motion for Cont - Reset @9:00am  JT set to 1/5/09 @9:00am - Arr to 12/22/08 @9:00am | | | L. Riley |
| 12 | 22 | 2008 | Reset to JT Feb 9, 2009 & Arr @ Feb. 5, 2009 | | | |
| 2 | 5 | 09 | All R - | | | |
| 2 | 9 | 09 | All R - Shuffle request by Co Draft - VD begins @ 12:15 - 3:10 - Dx arraigned & plead Not Guilty to Ct 1 & Ct 2. Opening by Sx - Dx 2 + 4 Reserve - Jury released 5pm to return 9am | | | 8π |
| 2 | 10 | 09 | Testimony resumed @ 9:15 - break @ 10:30 - resume @ 10:50 + lunch break @ 12 - Jury brought in 2pm (Out of jury presence hearing held in A 08-5080-2(K from 1pm - 2pm) - Bwe 3:11 - 3:28 - recess for day @ 5:30 - Ct reviewed + disclosed criminal history. | | | 8π |
| 2 | 11 | 09 | Hearing on admissibility of J Leal's gang report - ruling made on record Testimony began @ 9:10 - 10:30am - Bwch - 10:45 - Lunch break 12:15 Ct reviewed criminal histories - disclosed 7 Jones & Doty - | | 12:15 | 8π |

# CRIMINAL DOCKET

Case 4:13-cv-00709 Document 5-14 Filed in TXSD on 05/17/13 Page 37 of 38

| NUMBER OF CASE | STYLE OF CASE | ATTORNEYS | OFFENSE | DATE OF FILING | | |
|---|---|---|---|---|---|---|
| | | | | Month | Day | Year |
| A 08-50804 | STATE OF TEXAS vs. | Patrick Flanigan  STATE | Murder | 6 | 24 | 08 |
| | Chadrick B. Pate | John Gilmore | | Information, Index or Indictment | | |
| | | | | Fee Book | | |
| | | DEFENDENT | | Vol. | | Page |

| DATE OF ORDERS | | | Was Stenographer Used _____ | ORDERS OF COURT | Minute Book | | WITNESSES |
|---|---|---|---|---|---|---|---|
| Month | Day | Year | | | Vol. | Page | |
| 2 | 11 | 09 | | Testimony resumed e 1:50 - 4:00 Object - resumed 4:12. Concluded f Day e 5p- | | | |
| 2 | 12 | 09 | | Testimony resumed e 9:10 - 10:15 Break - 10:36 - 12:25 lunch - 1:53 testimony resumed - Sx rests Δx̄ & Δx̄y e 2:43 - jury received f abudc 2:45 retired e 6:28 Verdict g Guilty as to Ct 1 e 8p- Jury t return e 10a- | | | |
| 2 | 13 | 09 | | Jury Brought in e 10:00 · Sx made opening - all rested - Charge 11:08 - Chazy previously agreed pun d read e 10:05 - Followed by 10:11am - Jury retired t deliberate 10:32am - 12:40p Jury Polled - Verdict e 99 yrs, IDTDCJ - $10,000 f r̃ - Dx sentenced according t verdict - Right to Appeal given- | | | 8A |
| 2 | 25 | 09 | | Notice of Appeal filed | | | |

The State of Texas          )
County of Aransas          (


I, PAM HEARD, Clerk of the District Court of Aransas County, Texas do hereby certify that the documents contained in this record to which this certification is attached are all of the documents specified by Texas Rule of Appellate Procedure 34.5(a) and all other documents timely requested by a party to this proceeding under Texas Rule of Appellate Procedure 34.5(b)

GIVEN UNDER MY HAND AND SEAL at my office in Aransas County, Texas this _1st_ day of ___April___, 2009.


_____

PAM HEARD
DISTRICT CLERK


BY:_____, Deputy

97

RECORD EXHIBIT # 2

RR VOL 1 OF 9 MASTER INDEX

1309-112-cr

# REPORTER'S RECORD

## VOLUME 1 OF 9 VOLUMES

### Trial Court Cause Number A-08-5080-4-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT OF |
| VS. | * | ARANSAS COUNTY, TEXAS |
| CHADRICK B. PATE | * | 36TH JUDICIAL DISTRICT |

------------------------------------------------

*MASTER INDEX*

------------------------------------------------

## ORIGINAL

DELIVERED
JUN 1 0 2009
13th COURT OF APPEALS

**FILED**
IN THE 13TH COURT OF APPEALS
CORPUS CHRISTI

JUN 1 0 2009

DORIAN E. RAMIREZ, CLERK
BY_____

# T A B L E   O F   C O N T E N T S

VOLUME 1:   Master Index

VOLUME 2:   Announcement (9-25-08)

VOLUME 3:   Pretrial Hearing -- Motion to Dismiss (10-23-08)

VOLUME 4:   Jury Trial -- Voir Dire Proceedings (2-9-09)

VOLUME 5:   Jury Trial -- Guilt/Innocence (2-9-09)

VOLUME 6:   Jury Trial -- Guilt/Innocence (2-10-09)

VOLUME 7:   Jury Trial -- Guilt/Innocence (2-11-09)

VOLUME 8:   Jury Trial -- Guilt/Innocence (2-12-09)

VOLUME 9:   Jury Trial -- Punishment-Sentencing (2-13-09)
                         Trial Exhibits
                         -o0o-

RECORD EXHIBIT # 3

RR VOL 2 OF 9
9/25/08

**EXHIBIT # 3**

**RR VOL 2 OF 9**

**9/25/08**

13-09-112-cr                    1

R E P O R T E R' S   R E C O R D

VOLUME 2 OF 9

TRIAL COURT CAUSE NO. A-08-5080-4-CR

THE STATE OF TEXAS          )  IN THE DISTRICT COURT OF
                            )
VS.                         )  ARANSAS COUNTY, TEXAS
                            )
CHADRICK PATE               )  36TH JUDICIAL DISTRICT

*******************************************************
                    ANNOUNCEMENT

*******************************************************
A P P E A R A N C E S

ATTORNEY FOR THE STATE:

     MR. MARCELINO RODRIGUEZ
     Assistant District Attorney
     P.O. Box 1393
     Sinton, Tx  78387
     (361) 364-6220
     Fax No. (361) 364-9490
     SBN:  00797336

ATTORNEY FOR THE DEFENDANT:
     MR. JOHN GILMORE
     Attorney at Law
     622 S. Tancahua
     Corpus Christi, Tx  78401
     (361) 882-4378
     SBN:  07958500

DELIVERED

JUN 1 0 2009

13th COURT OF APPEALS

FILED
IN THE 13TH COURT OF APPEALS
CORPUS CHRISTI

JUN 1 0 2009

DORIAN E. RAMIREZ, CLERK

BY_____

     On the 25th day of September, 2008, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Michael E. Welborn, Judge presiding, in Rockport, Aransas County, Texas:

     Proceedings reported by Shorthand Method. ORIGINAL

THE COURT: Mr. Gilmore, how are you today?

MR. GILMORE: I'm doing just fine, Judge.

THE COURT: You're here today -- Let's see. You're on State versus Chadrick B. Pate. And what do we got going on, Counsel? What are your announcements in that case? State has filed a motions for continuance, I believe?

MS. RODRIGUEZ: That's correct.

MR. GILMORE: We don't oppose it, Judge. We're going to -- Mr. Pate -- during the hurricane, Mr. Pate was taking extensive attorney/client notes prior to the hurricane. When they were evacuated, he was instructed to put his notes in plastic garbage bags and when he got back from the evacuation, his notes were thrown out. Got that from Ricky McLester, Chief Deputy.

THE COURT: Threw all the plastic bags out?

MR. GILMORE: No. Just two people. Everybody got their stuff back except for two people. So all of his discovery is gone and all of his attorney/client notes are gone.

THE COURT: So he's not opposing a continuance because he needs to get back to square one?

MR. GILMORE: Yeah.

THE COURT: All right.

MR. GILMORE: I heard that you reset Ms. Cochran-May's case to November the 3rd.

THE COURT: Yes, sir.

MR. GILMORE: Which may be feasible, but I have a federal jury trial set then and those things in Judge Head's court, those things are known to fold. And last time I talked to my client, he wanted to go to trial.

THE COURT: All right. Well then what I'll do is go ahead and set that on November 3rd, making a note subject to your availability.

MR. GILMORE: Probably need -- We also need a decision -- I have a motion to sever, along with Ms. Cochran-May and she's going to need a decision on that, too. There's going to be maybe a new attorney on that case.

THE COURT: That's what I'm waiting to find out. That's why I wanted to know, because I'm going to have to get a new attorney, going to need to get one pretty quick and that new attorney is going to want a new -- We'll need a pre-trial to decide. Basically three of these cases are going to be severed out anyway.

MR. GILMORE: We got a shooter and we got my guy that wasn't there.

THE COURT: He wasn't there.

MR. GILMORE: He wasn't there. I know what they're saying, but --

THE COURT: You ain't going to figure out how they're going to get there. That's the reason they call it an

allegation.  All right.  We are going to give you the same thing.  We will have a pre-trial set on that for about the 3rd so we can look at severance at that time if see where we're at.  And make a note that that's subject to your federal court.

(END OF PROCEEDINGS.)

THE STATE OF TEXAS )

COUNTY OF ARANSAS   )

I, SYLVIA D. TREVINO, Official Court Reporter in and for the 36th Judicial District, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers, and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is 31²⁵ and was paid/will be paid by Aransas,

WITNESS MY OFFICIAL HAND this the 23rd day of April, 2009.

SYLVIA D. TREVINO, CSR 2733
Expiration Date:  12/31/08
Official Court Reporter,
36th Judicial District
P.O. Box 700
Sinton, Texas  78387
(361)  364-9321

RECORD EXHIBIT # 4

RR VOL 3 OF 9

10/23/08

Hearing
Re: Loss of
Paperwork +
Hurricane Ike

# REPORTERS RECORD

# VOLUME 3 OF 9

## THE STATE OF TEXAS
## VS.
## CHADRICK B PATE

REPORTER'S RECORD
VOLUME  3  OF  9  VOLUMES
TRIAL COURT CAUSE NO.  A-08-5080-4CR

THE STATE OF TEXAS          ) IN THE DISTRICT COURT
                            )
vs.                         ) ARANSAS COUNTY, TEXAS
                            )
CHADRICK B. PATE            )
                            ) 36TH JUDICIAL DISTRICT

————————————————————————————

MOTION TO DISMISS

————————————————————————————

COPY

On the **23rd day of October**, 2008, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Joel B. Johnson, Judge Presiding, held in Rockport, Aransas County, Texas.

Proceedings reported by computerized stenotype machine.

LISA TUCKER RILEY, CSR, RPR

APPEARANCES


**MR. MARCELINO RODRIGUEZ**
SBOT NO. 00797336
Assistant District Attorney
P.O. Box 1393
Sinton, Texas   78387
Telephone:   361-364-6220
*Attorney for the State*



**MR. JOHN S. GILMORE, JR.**
SBOT NO. 07958500
Attorney at Law
622 S. Tancahua
Corpus Christi, Texas   78401
Telephone:   361-882-4378
*Attorney for the Defendant*

**MOTION TO DISMISS**

**10-23-08**

                                   **PAGE VOL.**

**DEFENDANT'S EVIDENCE**

| | Direct | Cross | V.Dire |
|---|---|---|---|
| Chadrick B. Pate | | | |
|    By Mr. Gilmore | 5 v1 | | |
|    By Mr. Rodriguez | | 14 v1 | |

**STATE'S EVIDENCE**

| | Direct | Cross | V.Dire |
|---|---|---|---|
| Bryant Olson | | | |
|    By Mr. Rodriguez | 17 v1 | | |
|    By Mr. Gilmore | | 24 v1 | |

Defense's Argument .............................31    1

State's Argument ..............................32    1

Court's Ruling ................................33    1

Reporter's Certificate ........................35    1

**ALPHABETICAL INDEX OF WITNESSES**

|  | Direct | Cross | V.Dire |
|---|---|---|---|
| Olson, Bryant | 17 v1 | 24 v1 | |
| Pate, Chadrick B. | 5 v1 | 14 v1 | |

**P R O C E E D I N G S**

*(Defendant present)*

*THE COURT:* This is the Chadrick Pate case, Cause No. 08-5080-4CR.

Mr. Gilmore, you have a motion that needs a hearing?

*MR. GILMORE:* It's a motion to dismiss, Judge, a rather unique situation I have never encountered it before. It's a motion to dismiss for violation of due process and for violation of effective assistance of counsel.

*THE COURT:* All right. You may proceed.

*MR. GILMORE:* I'm going to call my client for the limited purpose of addressing the issues in this motion, Judge.

*THE COURT:* All right.

Mr. Pate.

*(Defendant sworn)*

*THE COURT:* You may be seated.

*MR. GILMORE:* May I proceed, Judge?

*THE COURT:* You may.

**CHADRICK B. PATE,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. GILMORE:

Q. Would you state your name for the Court, please.

A.    Chadrick Blake Pate.

Q.    And, Mr. Pate, are you the defendant in Cause No. 08-CR-5080-4 in this court?

A.    Yes, I am.

Q.    How long have you been in custody on this case?

A.    About six months.

Q.    Okay.  Do you recall the date that you were arrested?

A.    I believe it was April 5th.

Q.    Okay.  Of 2008?

A.    Yes, sir.

Q.    And you're charged with the offense of murder?

A.    Yes, sir.

Q.    In a two-count indictment?

A.    Yes, sir.

Q.    And without going into too much detail, you're not charged with being the actual person who murdered this victim. You're charged under the law of parties; is that right?

A.    Yes, sir.

Q.    As being somebody who was a party to the offense --

A.    Yes, sir.

Q.    -- is that right?

        And basically the evidence against you in this case deals with codefendant testimony and circumstantial evidence; is that correct?

A.    Yes, sir.

Q.    During the course of your confinement at the Aransas County jail your mother employed me to represent you; is that correct?

A.    Yes, sir.

Q.    And as part of my job I gave you the discovery packet in this case; is that right?

A.    Yes, sir.

Q.    And I'm holding up in front of me right now my copy of the discovery packet which you'll agree with me appears to be over an inch thick.  Is that reasonable?

A    Yes, sir.

Q.    Okay.  And is this basically what you had in your possession?

A.    Yes, sir.

Q.    And during our discussions I had asked you to thoroughly review the discovery packet and to make notes to assist me in the preparation of your defense, did I not?

A.    Yes, sir.

Q.    Okay.  And did you do that?

A.    Yes, sir.

Q.    How long did it take you to thoroughly go through all of the statements, the investigative reports and the other discovery matters and make notes on it?  How long did it take you to do that?

A.    About three months.

LISA TUCKER RILEY, CSR, RPR

Q. Three months?

A. Yes, sir.

Q. And you were very thorough doing that, were you not?

A. Yes, sir.

Q. Did you make notes on the actual discovery materials itself?

A. Yes. I highlighted some stuff.

Q. And made notes in the margin?

A. Yes, sir.

Q. You did you also have individually handwritten notes about your defense; is that right?

A. Yes, sir.

Q. And how many pages do you think you had of individually handwritten --

A. Thirty-two.

Q. Thirty-two?

A. Yes, sir.

Q. And those all dealt with the core of your defense in this case; is that right?

A. Yes, sir.

Q. And those notes were directed to me so that I could help you prepare -- or you could help me prepare for the defense of your case; is that right?

A. Yes, sir.

Q. I assume you recall Hurricane Ike.

A.   Yes, sir.

Q.   Do you recall when hurricane Ike was out in the gulf?

A.   It was before the 10th because we left on the 10th.

Q.   Okay.  What happened to the inmates at the Aransas County jail as a result of Hurricane Ike?

A.   They transferred us to Crystal City I believe it was.

Q.   Was the whole jail population transferred there or just part of it?  Do you know?

A.   The whole jail.

Q.   By the way, just for the Court's information you're in seg; is that right?

A.   Yes, sir.

Q.   So you have your own cell.  You don't mix with other inmates; is that right?

A.   Yes, sir.

Q.   Okay.  Do you recall what date you were evacuated from the Aransas County jail?

A.   Yes, sir.

Q.   What day was that?

A.   I believe it was the 10th of September.

Q.   And prior to your evacuation did you have these 32 pages of handwritten notes and the discovery packet with you?

A.   Yes, sir.  I just finished everything about two days before that.

Q.   Okay.  Did you request to bring that with you so that

A.   Yes, sir.

Q.   Do you recall when hurricane Ike was out in the gulf?

A.   It was before the 10th because we left on the 10th.

Q.   Okay.   What happened to the inmates at the Aransas County jail as a result of Hurricane Ike?

A.   They transferred us to Crystal City I believe it was.

Q.   Was the whole jail population transferred there or just part of it?   Do you know?

A.   The whole jail.

Q.   By the way, just for the Court's information you're in seg; is that right?

A.   Yes, sir.

Q.   So you have your own cell.   You don't mix with other inmates; is that right?

A.   Yes, sir.

Q.   Okay.   Do you recall what date you were evacuated from the Aransas County jail?

A.   Yes, sir.

Q.   What day was that?

A.   I believe it was the 10th of September.

Q.   And prior to your evacuation did you have these 32 pages of handwritten notes and the discovery packet with you?

A.   Yes, sir.   I just finished everything about two days before that.

Q.   Okay.   Did you request to bring that with you so that

you could maintain security over the privileged information in there?

A.    Yes, sir.

Q.    Okay.  And what were you told regarding your ability to keep that?

A.    They said I couldn't take anything but what I was wearing.

Q.    Okay.  What were you required to do with the information that you had prepared?

A.    They gave us a bag with our cell number, our name and it said *property* on it and told us to put everything in the bag.

Q.    Okay.  And particular they gave you a bag?

A.    Yes, sir.

Q.    You know that they gave it to every inmate at the jail, but you in particular had a bag; is that right?

A.    Yes, sir.

Q.    And can you describe the bag?

A.    It was a big white trash bag.

Q.    Okay.  And how was your name affixed to that bag?

A.    It had been in a black marker.

Q.    Okay.  And it had your name and it had your cell number?

A.    My cell number and it said *property* on it.

Q.    And what did you put in the bag?

A.     Everything.  My whole motion for discovery, basically my whole defense, all my commissary, I mean, hygiene, stuff like that.

Q.     Okay.  And what did you do with it?

A.     I set it on top of my bunk.  That is where they asked me to set it.

Q.     Did you tie it in a knot, or did you --

A.     I tied it in a knot.

Q.     Okay.  And set it on top of your bunk?

A.     Yes, sir.

Q.     Is that something you were required to do?

A.     Yeah.  They told me to set it on top of my bunk.

Q.     And then you were evacuated?

A.     Yes, sir.

Q.     During the evacuation process when you were being moved from the jail did you see any officers that were involved in the investigation of your case?

A.     I saw two of them.

Q.     Who was that?

A.     Gutierrez and Reddick.

Q.     What is the last one?

A.     Reddick.

Q.     Reddick, okay.

       And where were they in relation to your property?

A. Well, they were standing outside the jail with shotguns.

Q. So they were helping with the evacuation?

A. Yeah, they were helping.

Q. When you were placed in the vehicle that took you to Crystal Falls -- is that where you went?

A. Crystal City.

Q. -- Crystal City, when you were placed in there was any mention made of your property?

A. Yeah. The officer that was transporting me said that my stuff was being put in a bag, and I told him, I said that couldn't be my stuff because they made me leave it in my cell.

Q. Okay. Somebody said that your stuff was being put in a bag, but --

A. It wasn't. I looked. It was a box of somebody else's stuff I believe.

Q. Okay. You didn't have a box?

A. No.

Q. Okay. But there are boxes that are available?

A. Yeah. They sell them in commissary.

Q. And you didn't have one of those boxes?

A. No, sir.

Q. Okay. When did you return from Crystal City?

A. The 16th of September.

Q. Okay. And when you returned did you return to the

same cell?

A.    Yes, sir.

Q.    Okay.  Did you receive your property back?  And in particular, did you receive your attorney/client notes and your discovery packet back?

A.    No, sir.

Q.    Did you make inquiry about that?

A.    Yes, sir.

Q.    What were you told?

A.    They said that they were going to have to go look for it, and they never could find it.

Q.    Do you have knowledge of whether or not anybody -- any other inmate lost any property?

A.    Not to my knowledge.  I asked around, and they said nobody else had lost their property.

Q.    So you were the only one that lost their property?

A.    Yes, sir.

Q.    Now, for the Court's information, these garbage bags, are these the standard garbage bags that they use in the day-to-day operation of the jail?

A.    No, sir.

Q.    What distinguishes these garbage bags from other garbage bags?

A.    Well, the garbage bags that we use in seg are clear garbage bags.  You can see right through them, and the garbage

bag that they gave me was a solid white one to put my property in.

Q.   And it had your name on it?

A.   Yes, sir.

Q.   Did you -- to this day have you received your discovery packet back?

A.   No, sir.

Q.   And being aware that everybody but yourself received the discovery -- their property back, are you concerned that this may have been intercepted by law enforcement?

A.   Yes, sir.

Q.   And that law enforcement may be using the information that you wrote to me in preparation to prosecute you?

A.   Yes, sir.

Q.   Okay.  Other than that that's all the information you have; is that right?

A.   Yes, sir.

Q.   Okay.

MR. GILMORE:  All right.  Judge, I'll pass the witness on this issue.

MR. RODRIGUEZ:  May I proceed, your Honor?

THE COURT:  You may.

**CROSS-EXAMINATION**

BY MR. RODRIGUEZ:

Q.   Mr. Pate, these notes that were generated, you were

the one that generated the notes?

A.    Yes, sir.

Q.    They came from you?

A.    Yes, sir.

Q.    And the discovery packet that you had, that was the discovery packet that your attorney gave you?

A.    Yes, sir.

Q.    Okay.  You stated the property that was taken along with the property was the commissary stuff, shaving equipment, stuff like that?

A.    Yes, sir.

Q.    Did the jail reimburse you for all of that?

A.    Some of the stuff they did; not all of it.

Q.    When did you tell your -- well, put it this way:

When did your attorney become aware of these notes?

A.    Right away.

Q.    What do you mean right away?

A.    I don't understand the question.

Q.    When did you tell your attorney about these missing notes?

A.    When did I tell him?  As soon as I got back.

Q.    Prior to you being evacuated to Crystal City when was the last time you saw your attorney?

A.    Last time I saw him?  I believe it was a week before

that.

Q. Were your notes about completed at that time?

A. At that time, no.

Q. When did you start writing these notes?

A. About two-and-a-half months before that.

Q. Had you turned over any notes to your attorney prior to that?

A. No, sir.

Q. Why not?

A. Because I wasn't finished with everything yet.

Q. So you never turned over one note to your attorney?

A. No, sir.

Q. Despite three months of work you never turned one note over?

A. No, sir. I told him after I finish it is when I would give it to him.

Q. When did it come to your attention that you were going to be evacuated to Crystal City?

A. That day.

Q. So the very day you were hauled out of the jail you were told to put your stuff in a bag?

A. Yes, sir.

Q. Did you attempt to call your attorney on that day to tell him about your notes?

A. I couldn't get a phone.

Q.    You couldn't get a phone?

A.    They said we were being transported.  The phones were turned off.

MR. RODRIGUEZ:  I will pass.

MR. GILMORE:  I don't have any further questions, Judge.

THE COURT:  You may step down.

Your next witness, Mr. Gilmore?

MR. GILMORE:  That's all we have on the issue, Judge.

THE COURT:  Mr. Rodriguez?

MR. RODRIGUEZ:  Call Lieutenant Olson.

(Witness sworn)

THE COURT:  Thank you.

MR. RODRIGUEZ:  May I proceed, your Honor?

THE COURT:  You may.

**BRYANT OLSON,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. RODRIGUEZ:**

Q.    What is your position, sir?

A.    I'm operation manager for the jail.

Q.    And how long have you had that position?

A.    Approximately two-and-a-half months.

Q.    Did you take over from Ms. Kutach?

A.    Yes, sir.

Q.    So back around September the 10th of this year you were the operations manager?

A.    I was the operation manager, yes.

Q.    About that time, September the 10th, what was the jail population?  Do you recall?

A.    We had about 160 in the jail.  We let all of the misdemeanor and traffic fines out, and with the approval of the Judge, of course, and I believe we transported a little over a hundred personnel to Crystal City.

Q.    Was that a pretty big job?

A.    It's a large job.

Q.    When did you start the evacuation?

A.    We started the evacuation the day before.  We had to arrange for all the transportation, all the officers to be on call, all the deputies and what have you to be there for security.

Q.    Okay.  Just to be clear, when did the evacuation take place?

A.    I believe it was on the 10th.

Q.    When did you inform the inmates of the evacuation?

A.    Excuse me.  They were told I believe that day, okay, that they were leaving.

Q.    Okay.  And what were they told to do?

A.    They were told to pack all of their stuff in a

garbage bag, okay, and place their name upon the bag.  And they could not take anything with them because the other facilities or the transportation doesn't have enough room to take all of their personal belongings with them.

Q.    So more of a logistical consideration?

A.    Right.

Q.    Did you become aware of Mr. Pate's complaint regarding his property?

A.    Yes, sir.

Q.    And when did you become aware of that complaint?

A.    Ever -- I believe it was a couple days after we returned.

Q.    It was a couple of days?

A.    Yeah.

Q.    Did you look into what happened to Mr. Pate's property?

A.    Yes, sir, we did.

Q.    Now, was Mr. Pate the only person that lost property?

A.    No, sir, he was not.

Q.    How many other people are you aware of?

A.    I believe that we had about a half dozen lost everything that they had, and there was probably a dozen that lost individual items.

Q.    Looking into the matter involving Mr. Pate's property what do you believe occurred?

A. When we found out that this property along with some others was missing we went back. Because there was a sergeant in charge of the details that were cleaning the jail when we moved the inmates out it always has been in the past that we bring the crews in to clean the jail. We brought power washers in to clean all the cells, okay, the walls, and the showers and the bunks.

What we can ascertain as far as a couple of them went was because he was in a small cell, they set the property bag outside of the cell, okay, when they were power washing his cell, and the crew that was doing the clean up picked it up as garbage and hauled it out because -- because it is no place in the facility.

Q. The people that were doing the clean up, were they part of the jail?

A. Yes. They were officers from the jail. Yes. Yes. We pulled out all of their bedding, all of their -- everything, their extra uniforms, towels. Everything that was in the cell we pulled out and washed or sanitized.

Q. So you believe this property was just thrown away as garbage?

A. I believe it was thrown away as garbage, yes, sir.

Q. Did you try to reimburse Mr. Pate for some of those lost items.

A. Almost everybody that lost their items, other than

their personal letters and books and things like that, which you can't replace, okay, we replaced almost all of their commissary, their hygiene product, their underwear, their socks, T-shirts, their sweatpants, sweatshirts, whatever item they were missing the jail replaced. Doesn't mean we have got one hundred percent but we tried.

Q. Now, being in the jail are you separate from the investigative, I guess, department?

A. Yes, sir.

Q. Do you have any contact with them?

A. Basically only when they bring inmates in or they come over for interviews. Other than that I say hi to them, okay, but I don't see them on a daily basis.

Q. So there is no communication other than --

A. No.

Q. Basically when the inmates were told that they had to bag up their property, what was going to happen with these bags? What was the plan?

A. All the bags would normally be put on their bunk. Okay? In the big cell they were put -- all of them was put on a table and then the officers come in and put them on a bunk -- one bunk so they can strip everything else out of the cell so they could come in and power wash. Okay. Basically in the big cells none of the bags left the cells.

What happened was in the small cells because

they are so small you can't leave the bag in there while you're doing -- the power washer is going on. They were set outside the door.

Q. So these were the only ones that were set outside?

A. Yes. And the garbage bags are the garbage bags that the jail used. They are not the one they have in the cell, okay, which is a small bag. The ones we gave them was large white bags. It goes in the larger garbage cans that are all over the jail because a lot of them have commissary that would fill up a store.

Q. So there was a lot of trash thrown away; is that correct?

A. Uh-huh.

Q. A lot of cells were cleaned out?

A. Lots of trash.

Q. So that a lot of things were thrown out that day?

A. There were lots of things that were thrown out.

Q. So basically if he didn't put it in a bag what happened to it?

A. If they put it in a bag in --

Q. If they didn't put it in that bag.

A. If they didn't put it in the bag, okay, it was something personal like a personal Bible, okay, it was set aside, okay. But basically what was left over was, you name it, torn up uniforms, torn up towels, torn up cups, the list

goes on, okay, commissary wrappers, empty potato chip bags. We filled up a whole dumpster with trash, okay, and then we still had -- the sallyport had trash; had to wait for them to come back and to fill it up again of just nothing -- personal stuff; just items that they discarded.

Q.    So basically how would you respond to the claim that Mr. Pate's property was taken for the purpose of law enforcement to intrude on his rights?

A.    I'm sorry, sir.  Okay.  We go through three or 4,000 people over there.  None of the officers have time, okay, nor I doubt if any of them are interested in what his case is. Probably half of them don't even know what he is there for. Okay?  We try not to pay attention to what most of the charges are because some of them would drive us up a wall.  Okay?

Over the ten years I have been here, okay, we have never shared that I know of, okay, out of the facility any personal legal mail of any kind.  Okay?

Now, mail that goes to the US postal service, okay, state law allows us to go through incoming/outgoing if we have a security reason.  We do sometimes share that with DEA, the sheriff, with DA's office sometimes, okay?  But as far as their legal mail, no.  There are strict guidelines and rules.  And the officers sometimes open legal mail, okay, accidentally when they are going through five or 600 letters, okay, but it doesn't happen very often.

But we're basically -- none of us interested in what their cases are, okay, or anything on that order. Too many other things during the day to do.

MR. RODRIGUEZ: Pass the witness.

MR. GILMORE: May I proceed, Judge?

THE COURT: You may.

**CROSS-EXAMINATION**

**BY MR. GILMORE:**

Q. When you became aware that there was going to be an evacuation did you take measures to ensure the people -- inmates' personal property was kept in a secure place and --

A. It was kept in their cell, sir.

Q. So it would not be disposed of?

A. Yes, sir. But I can't help if it was taken outside.

Q. I'm just -- need to ask you what measures you took.

Did your staff write the inmates' names and their cell numbers on the bags?

A. Most of the inmates wrote their own names.

Q. Okay. So you don't know how Mr. Pate's got on there?

A. No.

Q. Okay. But everybody had their name written on their bags?

A. They were told they had to be on their bag.

Q. Okay. And the garbage bags from Mr. Pate's cell, are they the same garbage bags as the one you gave him? Are they

the same type of garbage bag?

A.    No.   The ones that the cells get are small clear bags.

Q.    Okay.   Let me just show you this --

A.    Yes.

Q.    -- what I have right here.   I'll mark this as Defendant's Exhibit 1.   I'm going to show you what I'm handing you -- I have marked as Defendant's Exhibit No. 1.   Can you identify that?

A.    Yes.   That's one of the cell garbage bags.

Q.    And just for the Court's information, this is a small -- goes in a small receptacle; is that correct?

A.    Uh-huh.

Q.    And it's basically see-through?

A.    Yes.   That's the ones that the six cells have.   The big cells have big garbage bags.

Q.    The garbage bags that you provided Mr. Pate and the other inmates to put their personal belongings in are different from that because they are bigger?

A.    They are just larger.   The large cells have large garbage bags which are white.

Q.    So they are bigger like a 30-gallon?

A.    Yes, sir, 30-gallon.

Q.    And they are also not clear?

A.    They are not clear.

Q. They are transparent or translucent, right?

A. Right.

Q. And everybody had their name on the outside?

A. Yes, sir. They were supposed to have their name on it.

Q. The people who went in and cleaned the cells are employees of the jail; is that right?

A. Yes, they are, sir.

Q. So they are familiar with the type of trash bags that come out of the different types of cells?

A. Yes, sir.

Q. The seg cells have that like the Defendant's Exhibit No. 1. The other ones have the bigger ones, right?

A. Yes, sir.

Q. And Mr. Pate, there is no disputing that he was in a seg cell?

A. No disputing, no.

Q. So the bigger not transparent or translucent garbage bag would not have been typically coming from his cell; is that right?

A. No, sir.

Q. And especially not one with his name on it?

A. No, sir.

Q. Okay. And did you instruct the personnel from the jail who were doing the clean up to make sure that they

watched out for people's personal property?

A.   Many times, sir.

Q.   Okay.   It was important for you to preserve because some people have items that are irreplaceable?

A.   That's right, sir.

Q.   All right.   But somehow during this clean-up process they threw away Mr. Pate's bag?

A.   That is true.

Q.   Okay.   Are there security cameras set up in that jail?

A.   Yes, sir.

Q.   Okay.   And are those security cameras functioning?

A.   Yes, they do, sir.

Q.   Did they show the hallways outside of the seg cells?

A.   Yes, they do, sir.

Q.   Okay.   Do you recall being asked by Chief Deputy McLester about Mr. Chad's -- Chad Pate's bag being missing and his property?

A.   Yes, because we discussed it.

Q.   Okay.   And he talked to you as a result of a phone call from me.   Are you aware of that?

A.   No.

Q.   But he did come over and ask you about what happened to his property; is that right?

A.   I have had several people come and talk to me about

his property, yes.

Q. At any point did you go to the videotape? I assume there is videotape.

A. Yes, sir. We have gone back. We looked, okay, but you have to understand the cameras in the jail, all right, are motion sensitive. Okay? They take approximately ten to 15 seconds after a motion starts -- start. They take another 15, 20 seconds, and if this -- if you walk out of range they stop.

Q. Okay.

A. And so you can see, for instance, someone walk up to something, but if they stop the camera stops and then if they did something in the next 10 or 15 seconds, okay, and they could be completely out of your site.

Q. Okay. Well, what I'm asking did you make an effort to see to check --

A. Yes, sir. We could not find where it disappeared.

Q. I'm sorry. I have to finish asking the question.

A. Yes, sir.

Q. Did you make an effort to check the camera that was -- particularly that was trained on the hall outside of Mr. Pate's cell during the time of the evacuation and clean up? Did you make the -- did you make an effort to find out what happened to his property and who disposed of it?

A. Yes. We made a great effort to find Mr. Pate's property. Because if anybody approached that bag, that is a

motion, and it would have triggered the camera, yes, sir, but there was a lot more garbage bags than that one just in the hallway.

Q.   I'm just asking did you check to make sure that you couldn't determine who moved that bag?

A.   Yes, sir, we did.

Q.   Okay.  And you were not able to --

A.   Were not capable of doing it.

Q.   Chief Deputy McLester talked to you within a week of the evacuation, did he not, about --

A.   Yes, sir.

Q.   -- about Mr. Pate?

A.   It was a week.

Q.   Do you have any idea why he reported back to me that only one other person lost their property that Mr. Pate --

A.   Because at that moment that is all there was.  Okay?  I still have -- as of this day, this morning, which I can show you the paper work, people saying that they have lost this article, this article, all the way back to the hurricane.

Q.   All right.  I'm going to hand you this packet right here.

A.   Yes, sir.

Q.   How much do you say that weighs?

A.   A couple of pounds.

Q.   Okay.  Is that the kind of garbage that usually comes

out of cells?

A.    A lot of it.

Q.    Material packed like this?

A.    A lot of them, paper work.

Q.    And you don't think that a jailer who picked up a packet at least this heavy, probably heavier because it had more stuff in it, with Mr. Pate's name on it would have snapped to the fact?

A.    They probably never noticed, sir, it had Mr. Pate's name.  They were supposed to have but they did not.

Q.    Did you talk to the people who cleaned out his cell?

A.    I hollered at the people that cleaned out his cell.

Q.    Who cleaned out his cell?

A.    It could have been anybody of 30 people that were down there working at a lower level.

Q.    So you don't know in particular?

A.    Any specific officer, no.

Q.    Okay.

         MR. GILMORE:  Okay.  That is all I have, Judge.

         MR. RODRIGUEZ:  No further questions, your Honor.

         THE COURT:  You may step down.

         THE WITNESS:  Thank you, sir.

         THE COURT:  Anything else, Mr. Rodriguez?

         MR. RODRIGUEZ:  No, your Honor.

THE COURT: Anything else, Mr. Gilmore?

MR. GILMORE: That's all I have, Judge.

THE COURT: What is your request?

MR. GILMORE: Well, Judge, you know, I have talked to Mr. Flanigan about this right after this -- it happened. I talked to the chief deputy about it. I have also brought it up to Judge Welborn that this happened, but I felt that it was necessary to do something officially and make a complaint about this because during the trial of this case it may become evident that these materials were being used against my client.

At this point I don't have any direct evidence that these materials are being used against my client or have been reviewed by law enforcement which I think is probably what I'm going to be required to show to get the relief that I'm seeking, but somewhere during the course of this trial it may become evident that these materials are being used and not -- and I'm not pointing fingers at the district attorney's office. I don't believe they would do this knowingly, but some law enforcement personnel who have access to these materials know what Mr. Pate's defense is right now and are probably -- and if they do have possession of this and if reviewed it are actively working to combat the defense, and it may become evident during the trial.

But if they did do this intentionally, Judge,

it's a violation of attorney/client privilege. It's a violation of his right to effective assistance of counsel, and it's a violation of his due process rights.

You know, I would like the relief that I requested in my motion, Judge, which is to dismiss with prejudice. I'm not expecting it, but that is what I would like, and I may renew this motion again during the trial if the Court denies the motion at this time.

*THE COURT:* Mr. Rodriguez?

*MR. RODRIGUEZ:* Basically the removal of the property, if in fact there were notes there, only take Mr. Pate's word what was in that bag, it was done. It was an accident. It wasn't intentionally done. It wasn't maliciously done. There is no evidence to show that it was.

We ask that the motion to dismiss be denied, your Honor.

*THE COURT:* Well, Mr. Gilmore, for what it's worth, I'm somewhat familiar with the efficiency with which the jail in Aransas County works, and unfortunately the circumstances I hear today are a par for the course for at least the last year and a half.

However, you're correct that if there is ever any proof introduced to this Court or any other court that sits in this district that those documents have come into the possession of some law enforcement agency or there is ever any

direct evidence that these documents were intentionally destroyed or taken away from your client there will be immediate relief for you and immediate bad news for someone else.

MR. GILMORE: Yes, sir.

THE COURT: Your motion is denied at this time.

MR. GILMORE: Yes, your Honor.

Just for scheduling, Judge, I know you're getting ready to take a recess, but I think we're set for --

THE COURT: November the 3rd.

MR. GILMORE: -- November the 3rd. And I talked to Mr. Rodriguez. I'm not sure that they have got everything ready that they need to have done, Judge.

MR. RODRIGUEZ: We're still waiting on some reports by a dive team that collected the weapon, your Honor, and we're getting further evaluation done on the handgun that was collected from the dive team. It's a matter of doing a report. The testing has already been done.

MR. GILMORE: Are you going to be the trial Judge or --

THE COURT: Yes. Yes.

MR. GILMORE: Are you going to be here for docket call? My only problem going to trial -- or other than I don't have everything that they have got so far, but I have a federal case that may go to trial in Judge Head's court. My

client is kind of vacillating. He doesn't know what he is going to do yet, so I haven't filed a motion for continuance. I'll know next week what he is going to do, but I just like to inform the Court of that.

THE COURT: What are y'all ready to try on November the 3rd?

MR. RODRIGUEZ: An attempted capital murder/sexual assault/injury to a child.

THE COURT: And the lawyers are ready?

MR. FLANIGAN: I think the primary case would be the attempted capital murder. Mr. Wimberly, that is Mr. Teague is defending on this case.

THE COURT: All right. Mr. Teague, and you understand him to be ready?

MR. FLANIGAN: I believe he is going to be ready.

THE COURT: Well, I think I'm going to leave it to the judge who hears the announcement docket.

MR. GILMORE: Okay. Judge, that is fine. I just wanted to let y'all know we may have a problem.

THE COURT: I have been trying to get all of Mr. Pate's cases off the docket as quickly as I can, John. I have got one off that nobody wanted to try, and it would be my pleasure to take another one off the docket that nobody wants to try.

MR. GILMORE: Okay, Judge.

(End of proceedings)

\*   \*   \*   \*

**STATE OF TEXAS**

**COUNTY OF ARANSAS**

I, **LISA TUCKER RILEY**, Official Deputy Court Reporter in and for the 156th District Court of Aransas, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $163.00 and will be paid in full by Aransas County.

WITNESS MY OFFICIAL HAND on this, the 11th day of March, 2009.

**LISA TUCKER RILEY, CSR, RPR**
Texas CSR #3895
Official Deputy Court Reporter
P.O. Box 700
Sinton, Texas 78387
Telephone: 361-364-9320
Expiration: 12-31-2010

RECORD EXHIBIT # 5

RR VOL 4 OF 9

2/9/09

VOIR DIRE

13-09-112-cr

R E P O R T E R ' S   R E C O R D

VOLUME 4 OF 9 VOLUMES

Trial Court Cause Number A-08-5080-4-CR

THE STATE OF TEXAS   *   IN THE DISTRICT COURT OF

VS.   *   ARANSAS COUNTY, TEXAS

CHADRICK B. PATE   *   36TH JUDICIAL DISTRICT

---

*JURY TRIAL*
*Voir Dire Proceedings*

FILED
IN THE 13TH COURT OF APPEALS
CORPUS CHRISTI

---

A P P E A R A N C E S

JUN 10 2009

**COUNSEL FOR THE STATE:**
  **MR. MARCELINO RODRIGUEZ**
  **MS. RETHA CABLE**
  ASSISTANT DISTRICT ATTORNEY
  36th Judicial District
  San Patricio County Courthouse
  P. O. Box 1393
  Sinton, Texas   78387
  Tel:   361-364-6220
  Fax:   361-364-4978
  SBN:   24046959
     00785741

DORIAN E. RAMIREZ, CLERK
BY_____

DELIVERED
JUN 10 2009
13th COURT OF APPEALS

**COUNSEL FOR THE DEFENDANT:**
  **MR. JOHN S. GILMORE**
  ATTORNEY AT LAW
  P. O. Box 276
  622 South Tancahua
  Corpus Christi, Texas   78403
  Tel:   361-882-4378
  Fax:   361-882-3635
  SBN:   07958500

**ORIGINAL**

On the **9th** day of **February, 2009,** the following proceedings came on for trial in the above-entitled and numbered cause in said Court, **HONORABLE JANNA K. WHATLEY,** Judge Presiding, held in Rockport, Aransas County, Texas: Proceedings were reported by machine shorthand.

question?

THE COURT: You may.

VENIREPERSON ROCK: Can you help me understand exactly what first-degree murder is?

THE COURT: Well, we only have one type of murder in Texas, just so you know. It's unlike television. You're going to find a lot of things are unlike television.

Right now -- I mean, not right now, but in Texas, the definition of "murder," intentionally or knowingly cause the death of an individual. That's the definition of "murder" in Texas. All right? And we only have one degree of that. Does that help?

VENIREPERSON ROCK: I think so.

THE COURT: Okay. Now, there are different ways of intentionally and knowingly causing death I will tell you and that's up to the State to prove or the Defense to disprove. But that is the definition you have in Texas. All right?

Now, can everyone consider the range of five to ninety-nine years or life depending on the circumstances of the case?

And there's one thing I forgot to mention which is most important. I did not mention the name of the deceased. Deceased was a gentleman by the name of

sir?  Burden of proof?

**VENIREPERSON ROCK:**  Right.  I'm answering your question:  "Does anyone have a problem -- "

**MR. RODRIGUEZ:**  Okay.  Anyone else?

Thank you very much, sir.  Appreciate that. Now is the time to talk about that.

Anyone?  Anyone else, burden of proof? Going, going...

Okay.  All right.  Thank you very much, ladies and gentlemen.

Let's talk a little bit about the case, itself, at least the charge.  Count One -- two-count indictment.  One deals with murder and the other one deals with aggravated assault causing serious bodily injury. What's going to happen if you become a juror in this particular case is that sometime after the evidence is presented to you, and evidence is someone sitting over there and tell you what happened.  The verbal testimony is evidence.  Any video that might be presented is evidence. Any photograph is evidence.

But sooner or later, we're going to close the evidence.  And at that time you're going to be asked to make a decision.  What's going to happen is you're going to be getting a document called a "jury charge," basically just a document that tells you the law with

respect to this particular case. And you're going to be asked to deliberate on the facts; in other words, go back there, talk about what you heard and then come to some conclusion as to what the facts are, apply it to the law and come to a conclusion.

Now, the jury charge may contain certain things and we want to talk about some of that. May or may not, but I want to talk to you about some of these things. As far as murder is concerned is that the allegations in this particular case is that the defendant, acting alone or together, did, then and there, intentionally or knowingly cause the death of an individual -- namely, Aaron Watson -- by shooting the said Aaron Watson with a firearm.

Count Number Two talks about pretty much the same thing. The defendant, acting alone or together, did, then and there, intentionally or knowingly or recklessly cause serious bodily injury to Aaron Watson by shooting the said Aaron Watson with a handgun or a firearm. Now, "acting alone or together," what that basically talks about is the Law of Parties. What that simply means is that a person can be held responsible for the conduct of another. And one of the most common hypotheticals -- we use hypotheticals to explain things -- is that of the bank robbery. Everyone talks about the bank robbery as a

hypothetical.

You have three, four people, whatever the amount. They get together and they decide that they're going to rob a bank. And they meet and they talk about what's going to happen, who's going to do what. And they gather the things that they need, the weapons. They gather the vehicles. And they go out to the target, the bank. And some of them may get out and go into the bank to actually perform the robbery, itself. And because you don't have much time to get a cab or anything like that, you usually have someone outside in a car, engine running, waiting.

Now, even though you're outside with the engine running, the Law of Parties means you're just as responsible as the people inside committing the offense. If, with the intent to promote or assist in the commission of the offense, this person solicits, goes out there and gathers these people, encourages, directs or aids in the attempts or attempts to aid in the commission of the offense, they can be held liable as a party.

Anyone disagree with that?

Now, here's another thing that pertains to parties. If, for instance, your idea is to go in there and commit this robbery, and that's what everyone's thinking about; that's the intent. But something goes

wrong.  You're sitting out there in your car.  You're part of this.  You've conspired to do this.  You've planned to do this; you've encouraged, you've aided; you're there. But while your partners are in there committing the robbery, something bad happens.  Somebody gets scared or feels threatened by the bank guard and they decide to commit a murder, to use that weapon.  Someone dies inside. Under the Law of Parties, guess what?  You're sitting out there in that car waiting for them to come out.  You're not only responsible for the bank robbery, you're now also as a party responsible for the murder that took place inside.  So, you know, you knew, you were shown, you knew there was a possibility that could happen.  Guys go in. They're carrying a gun.  Things like that could possibly happen.  It happened.  You're just as guilty.

Anyone disagree with that?  Anyone?

**VENIREPERSON ELLIOTT:**  I think I do.

**MR. RODRIGUEZ:**  You're Mr....

**VENIREPERSON ELLIOTT:**  Thom Elliott.

**MR. RODRIGUEZ:**  Your name, again, sir?

**VENIREPERSON ELLIOTT:**  Thom Elliott.

**MR. RODRIGUEZ:**  Number Twelve.  Okay.  You wouldn't agree with that scenario?

**VENIREPERSON ELLIOTT:**  Not necessarily.

**MR. RODRIGUEZ:**  Okay.  So you feel that the

person that's out in that vehicle is not responsible for murder in the scenario I gave you. Okay. That's fine.

VENIREPERSON ELLIOTT: Yes.

MR. RODRIGUEZ: If you believe that, that's fine.

Let's start -- anyone on the first row disagree?

Second row? I got you. Mr...

VENIREPERSON COYM: Coym.

MR. RODRIGUEZ: You feel the same way?

VENIREPERSON COYM: I do.

MR. RODRIGUEZ: That's Number Eight.

MR. TURPIN: Judge, can I make a suggestion? When he has them like this -- it may help the stenographer, too; certainly help us -- to just have them stand up.

THE COURT: He's supposed to after the second row.

MR. TURPIN: Thank you.

MR. RODRIGUEZ: All right. How do you pronounce your name again, sir?

VENIREPERSON COYM: Coym.

MR. RODRIGUEZ: Coym.

VENIREPERSON COYM: Yes, sir.

MR. RODRIGUEZ: Okay. It's my own writing;

I'm sorry.

So we have Mr. Elliott and Mr. Coym.

Now, the Law of Parties I dictated to you, can you follow the law? You said that you feel that person shouldn't be responsible, but legally they would be. Can you put your feelings aside and follow the law? Like I said, we don't want to have this kind of, you know, problem. But I'm going to ask you can you follow the law.

**VENIREPERSON ELLIOTT:** I can't give a general statement. I can give a hypothetical statement.

**MR. RODRIGUEZ:** Well, I mean, that's the thing. And I said it's unfair because we can't go into the facts of the case and we ask you to make a specific unequivocal answer kind of, like, you know, if your wife goes on a trip somewhere and she gets on the plane and you say, "Honey, baby, will you be faithful to me while you're gone?"

She says, "Well, I don't know. You know, well, let me give you a hypothetical. Let me give you a hypothetical."

*(Laughter)*

**MR. RODRIGUEZ:** When you leave the airport, you want to feel either good or bad, not, ooh, you know. So I know it's not fair. I'm not trying to make light of it. But, really, we need to get an answer to the best of

your ability.

**VENIREPERSON ELLIOTT:** Since I can conceive of exceptions to that rule, I think probably the fair statement would be no, I could not agree to that.

**MR. RODRIGUEZ:** All right.

**VENIREPERSON ELLIOTT:** I know it may not be the perfect answer for you, but it's one you need.

**MR. RODRIGUEZ:** Same question to you, sir. Can you follow the law?

**VENIREPERSON COYM:** I don't think I can.

**MR. RODRIGUEZ:** The answer would be "yes" or --

**VENIREPERSON COYM:** I think in this particular case with the co-defendant, it's a very good question and I'm having a lot of trouble with it.

**MR. RODRIGUEZ:** And, again, I apologize. We can't give you more specifics than that.

**VENIREPERSON COYM:** I understand.

**MR. RODRIGUEZ:** But the answer is "no"? You cannot follow the law?

**VENIREPERSON COYM:** No, I can't.

**MR. RODRIGUEZ:** Okay. That's everyone on the second row.

Anyone on the first row change their mind?

**VENIREPERSON BARRETT:** I feel the same way.

MR. RODRIGUEZ: You're Mr...

VENIREPERSON BARRETT: Ricky Barrett.

MR. RODRIGUEZ: Thank you, Mr. Barrett. Appreciate that.

Again, we don't want to have those conflicts back over there. I'm glad you're coming forward. That's what we want and only you can answer the question.

That takes care of, I think, the second row. Anyone else? No?

Okay. Third row, cannot follow the law as it pertains to parties.

VENIREPERSON SPRINGSTEAD: I'm having a real problem with the guy sitting in the car, driving the car, 'cause he has no idea what the man in the bank with the gun is thinking.

MR. RODRIGUEZ: Okay. Well --

VENIREPERSON SPRINGSTEAD: I couldn't give the man in the car ninety-nine years and give the other --

THE COURT: You have to stand up; I'm sorry, Mr...

Mr. Rodriguez, please get them to stand up. Thank you.

VENIREPERSON SPRINGSTEAD: I said I couldn't give the man in the car sitting outside ninety-nine years for murder when he had no real part other than driving the

car.

MR. RODRIGUEZ: Okay.

MR. GILMORE: Is that Mr. Springstead?

THE COURT: Get his name, please.

VENIREPERSON SPRINGSTEAD: Springstead.

THE COURT: Thank you.

VENIREPERSON SPRINGSTEAD: Number Twenty-Two.

MR. RODRIGUEZ: So I guess the answer if you could follow the law would be...

VENIREPERSON SPRINGSTEAD: No.

MR. RODRIGUEZ: Okay.

THE COURT: Well, Mr. Rodriguez has given y'all a hypothetical. The hypothetical you need to understand is not necessarily what the law is. Okay? And I see Mr. Elliott shaking his head. Mr. Springstead, if I wrote that down correctly, is stating with your hypothetical. But I need to make sure he can follow the law. Your hypothetical is one example of the law, Mr. Rodriguez. You need to make sure the jurors (sic) understand the difference.

MR. RODRIGUEZ: We're talking about the Law of Parties. I'm sorry we cannot go into any more depth as far as this particular case. But you're basically saying that you couldn't find someone guilty based on the Law of

63

Parties.

**VENIREPERSON SPRINGSTEAD:** Other than as being a party, yes.

**MR. RODRIGUEZ:** You're Mrs. Morgan?

**VENIREPERSON MORGAN:** Stephanie Morgan.

**MR. RODRIGUEZ:** I think we have you on another issue here.

**THE COURT:** Correct.

**VENIREPERSON MORGAN:** I wouldn't be able to either.

**MR. RODRIGUEZ:** Thank you, Ms. Morgan. Appreciate that.

Anyone else on Mrs. Morgan's row?

And, again, thank you very much. I know it's hard to answer these questions. Sometimes added information that you would need but unfortunately --

**THE COURT:** Let's move on. Anybody else on the left-hand side?

We got some jurors going to need a break, Mr. Rodriguez. I'm going to speed you up, please.

**MR. RODRIGUEZ:** Okay. Number Thirty-Four, Mrs...

**VENIREPERSON OUTTEN:** Outten.

**MR. RODRIGUEZ:** Outten.

**VENIREPERSON OUTTEN:** Correct.

**MR. RODRIGUEZ:** Can you follow --

**VENIREPERSON OUTTEN:** -- one intent was robbery and the other intent was murder and I could not convict the other one.

**MR. RODRIGUEZ:** So you cannot follow the Law of Parties.

**VENIREPERSON OUTTEN:** No.

**THE COURT:** You're going to have to -- all the jurors are getting facts, Mr. Rodriguez. This is not helping us, I don't think, in our selection process. You need to explain the Law of Parties again. You used an example to help the jurors, but they're coming back at you with specifics and that's not helping me.

**VENIREPERSON:** And my question -- I think it might help other people -- I need to go back to sentencing and we're given the guidelines. Is this jury going to be sentencing both defendants the same way or can they sentence them separately?

**THE COURT:** You'll have separate answers for each defendant.

**VENIREPERSON:** Thank you. I think that's helpful. Thank you.

**THE COURT:** If you get there with both defendants, that is.

**MR. RODRIGUEZ:** The way it works is that --

THE COURT: Mr. Rodriguez, just go to Law of Parties. Will you explain that again to them.

MR. RODRIGUEZ: Basically a person is held criminally responsible for an offense -- a person's held criminally responsible for the offense or the conduct of another if he acts to promote or assist in the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid in the commission of the offense. That's part of it. And the other part happens to be the fact that as a party you're also criminally responsible for whatever happens in the commission of the offense.

MR. GILMORE: I don't think that's exactly the law, Judge. I object to that.

THE COURT: I don't know what he's read. I'm sorry.

MR. RODRIGUEZ: -- if the offense was committed in the furtherance of the unlawful purpose and should have been anticipated. When I use the hypothetical we talked about planning and someone going into a bank carrying a weapon, a gun, and it could be anticipated that there could be a shooting because someone went in there with a gun. That's the hypothetical we talked about. It's not hypothetical pertaining to this particular case. We cannot talk about the facts in this particular case. All right? I don't know if that helps any.

All right.  Ma'am, you're saying you cannot follow the law as it pertains to parties?  Is that what your answer was?

**VENIREPERSON OUTTEN:**  That was my answer.

**MR. RODRIGUEZ:**  Okay.  Number Thirty-Four.

**THE COURT:**  I'm sorry; I couldn't hear her.

**MR. RODRIGUEZ:**  Number Thirty-Four.

**THE COURT:**  You best get them to stand up, Mr. Rodriguez, please.  I can't hear up here; I'm sorry.

**MR. RODRIGUEZ:**  Ma'am, please stand up.

**THE COURT:**  You answered with the facts specific, Ms. Outten.  You know, you're talking about burglary and something else and that's not what the law is.  Okay?  And Mr. Rodriguez has read it a few moments ago what he anticipates I'll be giving you as an instruction of the Court.  And basically, bottom line is, you know, it's not the innocent bystander.  Okay?  It's someone has to assist, promote -- I mean, he gave the definition of the other ones.  That's basically what the Law of Parties is and I think we got off a little bit on the other issue.

**VENIREPERSON OUTTEN:**  So my understanding, the man sitting in the car that his intent was to rob should be punished according to robbery and the man that pulls the trigger and murders should be punished according

to murder.

THE COURT: I don't get the two different charges, where that came into the scenario. I guess --

VENIREPERSON OUTTEN: What was your question to me?

THE COURT: Pardon?

VENIREPERSON OUTTEN: What is your question to me?

THE COURT: My question is can you follow the Law of the Parties. Basically --

VENIREPERSON OUTTEN: Yes, I can.

THE COURT: Okay.

MR. RODRIGUEZ: We got to Row Number Three.

Row Number Four, pertaining to Law of Parties.

Row Number Five.

Row Number Six.

Anyone over here cannot follow the Law of Parties?

Again, as far as what we're doing here, first thing and the only thing that concerns you if you sit as a juror is to determine, first off, if the defendants are guilty or not guilty of the offense charged. If the determination is guilty to one or the other or both, then you go into sentencing. And

sentencing is done individually based on whatever evidence is brought before you, the degree of their culpability. But right now, we're just talking about Law of Parties. I'm sorry we got off track there. Apologize for that. I guess you saw an inherent difference in the culpability and thought process. All right.

Okay. Earlier I asked about people unable to sit in judgment of others. I mentioned that. One thing I forgot to ask is whether the fact that you cannot sit in judgment, would that preclude you from being fair and impartial in this particular case or any case. So I'm going to ask the people that had answered they cannot sit in judgment of someone else, would that also mean you cannot be fair and impartial in this case. Those --

Ma'am? Cannot be fair and impartial?

**VENIREPERSON:** Yes, I cannot be fair and impartial.

**MR. RODRIGUEZ:** And the lady over here, said you cannot be fair and impartial?

**VENIREPERSON:** Cannot be fair and impartial.

**MR. RODRIGUEZ:** Okay. On this side.

**MR. GILMORE:** It would help to identify these people.

**THE COURT:** Let me go back over from the beginning. I had first one was Mr. Espinoza.

VENIREPERSON STECKLER: Huh-uh.

MR. GILMORE: Okay.

VENIREPERSON STECKLER: Did something wrong.

MR. GILMORE: And there's nothing wrong with you feeling like that. Okay? There's absolutely nothing wrong with you feeling that way. But you got to tell us. Okay? It just kind of slipped out of your -- I mean, people were asking these questions and you never raised your hand and then all of a sudden here it came. All right.

VENIREPERSON STECKLER: Doesn't mean I would judge them guilty, just means that something's going on.

MR. GILMORE: Okay. If that's the way you feel, there's nothing wrong with starting off that way. Okay? But if you don't tell us about it, then we don't know what to do.

So is there anybody here who feels the same way Mr. Steckler does, that they start off thinking they must have done something wrong; that *I'm not presuming* -- *I can't presume them innocent?* Raise your hands. I see a lot of heads shaking.

Okay. Ms. Cartwright.

VENIREPERSON FOSS: Mr. Gilmore.

MR. GILMORE: Yes.

VENIREPERSON FOSS: I asked you -- my name's

Tim Foss, Number Seventy-Two.

MR. GILMORE: Yes, sir.

VENIREPERSON FOSS: You said that y'all were not a team.

MR. GILMORE: We're not a team.

VENIREPERSON FOSS: Okay. I believe the Judge said these two gentlemen will be tried in the same case; is that correct?

MR. GILMORE: This is going to be one trial.

VENIREPERSON FOSS: One trial.

MR. GILMORE: One trial.

VENIREPERSON FOSS: But you're not a team.

MR. GILMORE: We're not a team.

VENIREPERSON FOSS: Okay, I guess.

MR. GILMORE: In other words, to be completely honest with you, I don't care what happens to Mr. Hall. Okay? My interests are for Mr. Pate. Okay?

VENIREPERSON FOSS: But you're doing it in the same trial.

MR. GILMORE: We're being forced to do it this way. Okay? All right?

VENIREPERSON FOSS: Thank you.

MR. GILMORE: We would rather not do it this way. Okay?

Yes, ma'am.

RECORD EXHIBIT # 6

RR VOL 5 OF 9

2/9/09

JURY TRIAL GUILT INNOCENCE

26

Page
13
Missing 11

The Rule
614

Pages
23456 Missing

Page 12
Line of Pants
Says

# REPORTERS RECORD

# VOLUME 5 OF 9

## THE STATE OF TEXAS
## VS.
## CHADRICK B PATE

# R E P O R T E R ' S   R E C O R D

## VOLUME _5_ OF _9_ VOLUMES

### Trial Court Cause Number A-08-5080-4-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT OF |
| | * | |
| VS. | * | ARANSAS COUNTY, TEXAS |
| | * | |
| CHADRICK B. PATE | * | 36TH JUDICIAL DISTRICT |

------------------------------------------------

*JURY TRIAL*
*Guilt/Innocence*

------------------------------------------------

## A P P E A R A N C E S

**COUNSEL FOR THE STATE:**
MR. MARCELINO RODRIGUEZ
MS. RETHA CABLE
ASSISTANT DISTRICT ATTORNEY
36th Judicial District
San Patricio County Courthouse
P. O. Box 1393
Sinton, Texas        78387
Tel:  361-364-6220
Fax:  361-364-4978
SBN:  24046959
      00785741

**COUNSEL FOR THE DEFENDANT:**
MR. JOHN S. GILMORE
ATTORNEY AT LAW
P. O. Box 276
622 South Tancahua
Corpus Christi, Texas        78403
Tel:  361-882-4378
Fax:  361-882-3635
SBN:  07958500

COPY

On the **9th** day of **February, 2009**, the following proceedings came on for trial in the above-entitled and numbered cause in said Court, **HONORABLE JANNA K. WHATLEY,** Judge Presiding, held in Rockport, Aransas County, Texas: Proceedings were reported by machine shorthand.

# C H R O N O L O G I C A L   I N D E X
## VOLUME 5

**JURY TRIAL -- GUILT/INNOCENCE PHASE**                                                    **PAGE**

(2-9-09)

Jury Seated, Sworn and Apprised of Trial Procedures....................... 2

Jury Instructed......................................................... 3

Defendants Arraigned.................................................... 7

Rule Invoked............................................................ 10

Opening Statements:

  By State.............................................................. 11

  Reserved By Defense................................................... 20

| *STATE EVIDENCE* | *Direct* | *Cross* | *Redirect* | *Recross* | *Voir Dire* |
|---|---|---|---|---|---|
| **MICHAEL HUFFMAN** | 21 | 39 | | | |
| **YVETTE GARCIA** | 34 | 50,52 | 54 | | |

CSR Certificate......................................................... 63

-oOo-

P R O C E E D I N G S

THE COURT: All right. Camille's going to call your name. As your name is called, if you'll please come have a seat in the jury box.

THE CLERK: Mark Hofstetter, Theresa Kjar, Sheila Williams, Herlinda Maldonado, Armando Naranjo, Robert Springstead, Sarah Gyarmathy, David John, Gerald Goodwin, Leland Trammell, Alifonsa Chavez, and Ronald Gore, and the two alternates will be Gayle Hancock and Justin Snead.

THE COURT: Ms. Hancock and Mr. Snead, y'all will be sitting out -- Doc will tell y'all, y'all have special spots. Y'all have to stay in the same spot. Everybody else can mess around, but my alternates get these two spots over here, guys. Y'all two can switch those two spots if you want to but -- I've just got to keep y'all in the corner sort of.

(The venire panel was discharged.)

THE COURT: All right, guys. I'm going to ask y'all to please stand and I'm going to swear you in. If you'll raise your right hands.

(The jury was duly sworn by the Court.)

THE COURT: All right. Ladies and gentlemen, you've got some instructions before you. I have to read those to you. I'm going to do that in just a

second once they shut the courtroom doors and get everybody situated. When I conclude this, the State will then formally read the charges out loud to the defendant and then we'll have opening statements.

The State will -- most likely they always make an opening statement. I assume they're going to. It's sort of an outline of what they anticipate the evidence is going to show you in this particular case. The Defense has options. They may choose to make an opening statement right after the State or they may choose to make one right before they present their evidence in the case. Again, I guess the best way to put it, like Mr. Gilmore said, they're not a team. So I'll be asking each one of the defense attorneys that question separately and they may do the same thing; they may not. All right? So you have to understand that. The reason the cases were -- are being tried together is the State anticipates having the same evidence and they're allowed to make that option because it is their choice. They're the one bringing the case to you. Okay?

*(The preliminary instructions were read to the jury.)*

THE COURT: All right, guys. There's a couple of other things.

Ms. Hancock, Mr. Sneed, y'all are alternates. Until the time the jury begins deliberations,

y'all are just like a regular juror, okay? The reason I put you outside, sort of out of my -- in my peripheral vision where I can see each one of you, unless you are substituted in for one of these individuals, you will not go in the jury room to deliberate on the charges or -- and if we have a guilty verdict, the punishment. But you're considered just like a juror and it's only for that particular reason you are sort of peripheral I would say. But otherwise, every rule I make, every ruling I do, is for y'all as well as for me; okay?

The other thing is if anybody wants to take notes you can, but I will tell you when you go in to deliberate, you will not be allowed to take your notes in there with you; okay? You have to rely upon your memory. I'm one of those, like I said to you earlier, I'm visual, so I take notes. That's how I remember. If I write it down, it goes in the brain; if I just see it, sometimes it just -- I don't know -- jumps around in the eyeballs or something. I don't know. So if you want to, you may; but I will tell you, when it's time to go deliberate, you'll have to leave your notes outside. Okay. That's the way Texas law is on that.

Jurors are not allowed to question witnesses or ask questions. You have to take what you get. So hopefully you get what you need. The only time I will ask

you, and I told one of my jurors earlier that had a hearing problem, if you can't hear, raise your hand. All right. And we'll try to get it repeated right then and there. But if you wait 'til later, there's a long, lengthy process about getting testimony read back and we don't want to have to go there, all right, if we can help it. If you can't hear, we can adjust these mikes a little bit. They're not the best, but they're a lot better than what we had before which was nothing.

The courtrooms are open. People may be coming and going. I will -- may limit that just depending on what's going on, you know. So -- but don't be disturbed if we don't look up. We have bailiffs and people who know the people in the courtroom that are around the doors 'cause some people will come looking for a judge to sign something. We had a lady came on Friday that was looking for the municipal court. Sat here for an hour -- I'm exaggerating; she didn't sit that long. But she was late getting -- 'cause she was in the wrong place. And we got done with everything else and I said, "Okay; I haven't called your name."

So that's why I have people stationed around my doors. They'll check to make sure they're not due in Judge Adams' courtroom. He has court the next two days. There's municipal court. We have two justice of the peace

court that's going on. So it gets a little confusing, so that's -- if I don't look up, that means I'm not worried. I've had jurors just stare at the person through that door thinking *oh, my gosh, no one's watching them.* That's why we have people to help us do that over here so that works.

How many of y'all have been on -- jurors before?

Okay. So I got four out of six -- five of y'all? Most of y'all know, the lawyers will remain seated unless they're standing, talking to you or to me. It's the way we do it in Texas. It's sort of -- I tell you the difference of television. Television, the lawyers get up and walk around and do all sorts of things. Well, we don't do that in Texas. I guess some courts may let you, but I don't. I'm the old, conservative, Baylor type of judge. That's what I learned, so I make everybody follow my rules. But I think we all do it.

But that's why they do that; all right? They will stand to address you or myself. If they want to come talk to a witness, the lawyers will ask and then they'll come up, show them something or demonstrate an item. They may do that.

Let me think; what else...

I guess that's it. Make sure you hear what you say, again, because it's very difficult to get the

court reporter to read back a record. It's not -- again, not like television.

All right. Anything else, guys? Other instructions?

**MS. CABLE:** No, Your Honor.

**THE COURT:** All right. Very good.

All right. Are we going to arraign the defendants separately? Is that how you want to do it or what do y'all think? You want to do it together?

**MS. CABLE:** You want me to read it twice or just read it once and have them enter their --

**THE COURT:** Y'all have any objection to just reading it once and led the individual pleas --

**MR. GILMORE:** I don't have any objection to that, Judge --

**THE COURT:** They are identical indictments; is that correct?

**MR. GILMORE:** They are.

**MR. TURPIN:** No objection.

**THE COURT:** All right. Gentlemen, if y'all will please stand while the State reads the charges to you out loud.

*(Defendants complied.)*

**MS. CABLE:** *In the name and by the authority of the state of Texas, Count One, comes now the grand*

jurors for the county of Aransas, State aforesaid, duly selected, organized, impaneled and sworn as such at the April term, A.D. 2008, of the 36th Judicial District Court in and for said county, a quorum thereof being present, upon their oaths present in and to said Court that Michael Jason Underwood, Christopher Joseph Hall, Anthony Lee Ray, Chadrick B. Pate and Kevin Ray Tanton, acting alone and together, on or about the 4th day of January A.D. 2008 and anterior to the presentment of this indictment, in the county and state aforesaid did, then and there, intentionally or knowingly cause the death of an individual -- namely, Aaron Watson -- by shooting the said Aaron Watson with a firearm.

Count Two; and the grand jurors aforesaid upon their oaths aforesaid do further present in and to said Court that Michael Jason Underwood, Christopher Joseph Hall, Anthony Lee Ray, Chadrick B. Pate and Kevin Ray Tanton, acting alone and together, on or about the 4th day of January A.D. 2008, anterior to the presentment of this indictment, in the county and state aforesaid did, then and there, intentionally, knowingly, or recklessly cause serious bodily injury to Aaron Watson by shooting the said Aaron Watson with a handgun, the same being a firearm.

And the defendants did, then and there,

*commit said offense with the intent to establish, maintain, or participate in a combination or in the profits of a combination who collaborated in carrying on said criminal activity.*

*Against the peace and dignity of the State,* signed by the foreman of the grand jury.

**THE COURT:** All right. Mr. Hall, how do you plead to the allegations contained in Count One of the State's indictment?

**DEFENDANT HALL:** Not guilty.

**THE COURT:** And as to Count Two?

**DEFENDANT HALL:** Not guilty, also.

**THE COURT:** Thank you.

Mr. Pate, how do you plead as to the allegations contained in Count One of the State's indictment?

**DEFENDANT PATE:** I'm not guilty.

**THE COURT:** And Count Two.

**DEFENDANT PATE:** I'm not guilty.

**THE COURT:** All right. Thank you.

And, ladies and gentlemen, the reason I'm going in a certain order, I'm going to go in the order that the State has named the defendants in the indictment. Mr. Hall's name was named first and Mr. Pate's name was named second. There's no method to my madness. I've got

to keep up with it and I thought it'd be easier for everybody if I just went by numerical order. So that's how we're going to do that.

All right. Mr. Turpin.

MR. TURPIN: Judge, we would invoke the rule at this time.

THE COURT: All right. Ladies and gentlemen --

We'll bring them in later I guess. If y'all will advise all the witnesses.

MS. CABLE: You want me to bring the ones in that are here now?

THE COURT: Not right now. Let's go ahead and do an opening. Just let them know the rule's been invoked.

MS. CABLE: Okay. I'll go let them know.

THE COURT: Okay. Thank you. We'll do it in a little bit.

All right. Ladies and gentlemen, there is a certain rule number and we sometimes -- lawyers forget it, so we've all decided it's called "the rule." And what "the rule" means for us is that that means you may not bring other witnesses into the courtroom to hear testimony of a certain witness. That way you get fair and unbiased testimony so no one says, "Well, I'm going to say the same

thing that guy did a minute ago." We don't do that. Neither party may do that during the case. And the lawyers -- the witnesses can't talk to anybody but the lawyers involved in the case. And so that's what that was just now.

All right. Mr. Rodriguez, State wish to make an opening?

MR. RODRIGUEZ: Yes, Your Honor.

THE COURT: All right.

MR. RODRIGUEZ: May it please the Court, Counsel.

BY MR. RODRIGUEZ:

Good afternoon, ladies and gentlemen. Ms. Cable just read the indictment and that indictment serves a good purpose. First off, it tells you about the elements of the offense that are charged and it also lets you know exactly what you're looking at as far as what the offenses are going to be.

Now, at this point in time, I'm going to talk to you a little bit about some of the witnesses you're going to be hearing from over the next couple of days. And to understand, we're going to try to get through this case as quickly as possible, but you have to understand it is a serious case so we're going to take the time that's necessary.

Now, we're going to begin basically by telling you a little bit about what happened the night of January the 4th, 2008. We're going to tell you that on or about that time, the address, 909 North Tenth Street in Fulton, Texas, Aransas County -- remember, we're talking about the elements -- on or about January 4th, 2008, in Aransas County. The allegations we have here is that the defendants, acting alone or together with other co-defendants -- acting alone or together, did, then and there, intentionally and knowingly cause the death of an individual, Aaron Watson, by shooting the said Aaron Watson with a firearm.

And, again, in Count Two we're alleging the law of parties; that on or about January 4th, 2008, in Aransas County, Texas, the defendants, acting alone or together, did, then and there, intentionally, knowingly, or recklessly cause serious bodily injury to Aaron Watson by shooting the said Aaron Watson with a handgun.

And it is further noted when we talked about this particular indictment that was read to you *and the defendants did, then and there, commit said offense with the intent to establish, maintain, participate in a combination or the profits of a combination collaborated and carried out said criminal activity.* Basically that they conspired with each other to commit this

They're going to testify that they were living there in a little trailer that's located on the property at 909 North Tenth Street. 909 Tenth Street (sic) is basically a house that belonged to a woman by the name of Jo Ann Budlong and there's a trailer on that property, actually a pull-out area. You'll see a photograph of that in the course of this trial.

They're going to tell you that they were living there at that trailer with their dad, Aaron Watson, and their mother, Tracy Lynn Watson. And they're also going to tell you that they know the defendant, Mr. Pate. And that Mr. Pate sometimes lived there. Also that Mr. Pate was also involved with Tracy Watson. They were boyfriend-girlfriend. They're also going to tell you that sometime along the line that Mr. Pate no longer started living there, that Ms. Watson, Tracy Watson, was getting back with her husband, Aaron Watson. These girls are also going to tell you about the fact that Mr. Pate had made some threats regarding Aaron Watson, that those threats included bringing his friends over to take care of him. You have to understand that these girls are 11 and 13 years old.

They're going to tell you that on the particular morning, very early morning, they were home. They're going to tell you they were home with their father and

there was no one else was there. Just them and their father, Aaron Watson. They're going to tell you that on that particular day, men entered their home. Jessica in particular, Jessica Watson, will tell you that she was going to leave that trailer to go right next door just a few feet to her grandmother's house to get some medicine that she normally takes on a regular basis. It was late, but she was going to go get it.

She's going to tell you that when she was at the door, these men came in, that one of them was armed with a gun and one was armed with a bat. She's going to tell you that these men came in. She got scared. She ran back to her room. She stopped before she got to her room, looked to see what was happening, and these men had circled her father. Her father was laying in his bed and they were there. The bed the father stayed at was right next to the door, the entryway. It was a very small trailer.

She's also going to say that she was shoved into her bedroom and the door was closed.

There's also going to be another little girl, Meghan Watson. She's going to testify that she was there. She was up and she was in her room. She's also going to tell you that Jessica was going to go get her medicine. She's going to say that some men came into her house, circled her father and one had a gun. She's going to tell you

that her sister was forced into the room, bedroom, and the door was locked. She's also going to tell you that, after a few minutes, they left out the back door of that trailer. Her little room has a little door that goes out as well. There's an external door that let's them go in and out of that room.

They went out that door. And when they managed to get out the door, they saw their father running and that there was some men chasing him. They're going to tell you that one of the men that was there was the defendant, Christopher Hall.

You're going to be hearing from the co-defendants. Each one's going to take the stand and, again, they're going to talk about what happened that night. They're going to talk about the fact that they -- and I'm talking about "they" being Mr. Underwood, Mr. Tanton and Mr. Ray. Mr. Underwood and Mr. Tanton are going to tell you that they are not from here, not from around here; that they know the defendant, Mr. Pate. They know him as "Sid." They're going to tell you that they were called by Sid to come down and take care of a problem that he had.

So those two men along with Christopher Hall come down from the Houston area and they drive down here. And they're going to tell you that when they got down here, they met with Mr. Pate along with another man by the name

of Ray. They met, they talked, and they discussed what they were going to do. They're going to tell you that they came down here at the request of Mr. Pate and they're going to tell you they were told that there was some people in this trailer that are holding Mr. Pate's wife and kids practically hostages. They were told the story by Mr. Pate.

They're going to tell you that, under that assumption, they went into that trailer. And they're going to tell you when they went into that trailer, they saw those two little girls. One of them will tell you that they took the little girls and put them in the back room. The other are going to tell you that, yeah, they assisted in the assaulting of Mr. Watson. But they're also going to tell you that one guy had a gun, a revolver, and that was Mr. Hall.

They're going to tell you that Mr. Hall shot Aaron Watson as he sat in his own bed; that after Mr. Watson was shot, he managed to get up and run. One is going to tell you that Mr. Hall chased him. They're basically all going to say that they ran from the trailer after the shot. They were expecting that the police would be called soon enough.

They're going to tell you that they finally, after the shooting, met up again in their vehicle. Underwood,

Tanton and Hall were all in one vehicle and that Mr. Ray was in another vehicle. But they're all going to tell you that Mr. Pate wasn't in the vehicle after the shooting. They're going to tell you that Mr. Pate, after meeting with them prior to the shooting and after showing them where to go and after telling them what they're supposed to be doing, leaves before the shooting. He doesn't enter the trailer. He takes off out into the woods.

So immediately after the shooting, after these other men meet up, Underwood, Tanton and Hall decide to head back to Houston. Ray's told to go back and find Pate. Ray says he didn't do that. He said he just goes back and gets on home. Ray's from here, this area.

The three men from Houston, Hall, Underwood and Tanton, then leave the area going over the Copano Bay Bridge. Hall's driving the vehicle. Tanton is in the front seat. As they start to go over the bridge, Tanton's going to tell you that Hall asked him to remove his sock. *You need to hold the sock open.* Bullets were placed in the sock. The handgun is then given to Mr. Tanton, and at some point over the bridge, he's told to throw the gun into the bay along with the bullets. And that's done. The gun is thrown overboard, thrown out the car into the bay.

They're going to tell you sometime later that they

found out that Mr. Watson died from the gunshot wound. You'll hear officers testify that around 6:30 that morning, Mr. Watson died of a gunshot wound to the abdomen. Died of internal bleeding. Mr. Tanton's going to tell you that he didn't know the man that died and he confesses to his part in it and he talks about what happened. Underwood's going to tell you that he wasn't aware the man had died, but he, too, then confesses and talks about his part and the other people that are involved. Same with Ray. They're going to testify they heard the man died and they talk about their roles, about their involvement in this shooting and death.

Tanton, as a matter of fact, takes the investigators to where he believed the gun was thrown. They described it as a thirty-eight revolver, some tape on the handle. Takes them out there to where he believed it was thrown. And even after months, finally a dive team is gathered. The dive team goes out there and, guess what? They find the weapon, thirty-eight caliber revolver.

The gun is taken to the lab in McAllen and cleaned up. But the firearms expert, Mr. Hitchcox, is going to tell you that the gun was in very poor condition to begin with. Being in salt water for that period of time didn't make it any better. It would be dangerous to try to fire it. So he would be unable to do any type of ballistics. That

would require firing the weapon. He's going to tell you, however, that he made a casting of the inside of the barrel. And with that casting and with the bullet that was removed from Mr. Watson, he looked at them. He's going to tell you, though he can't say it's a hundred percent match, it was very similar. Very similar.

Now, when the witnesses start coming forward, they'll be in much more detail than I just laid out. Consider the witnesses before you. And, again, most of the State's witnesses will tell you that they reached a plea agreement with the State regarding this.

I want to thank you very much, ladies and gentlemen, for your time and your attention. I'll talk to you again.

THE COURT: Mr. Turpin, would you like to make an opening statement at this time?

MR. TURPIN: Judge, I waive at this time or reserve opening.

THE COURT: Mr. Gilmore.

MR. GILMORE: I'm going to reserve, Judge.

THE COURT: All right. Very good.

All right. Mr. Rodriguez, if you'll call your first witness.

MR. RODRIGUEZ: I'll see if she's (sic) here, Your Honor. I'll call Huffman.

THE WITNESS: (Enters courtroom).

THE COURT: Come on up, please, sir, and I'll swear you in before you have a seat.

Raise your right hand, please, sir.

(The witness was sworn.)

THE COURT: Have a seat, please, sir.

THE WITNESS: Yes, ma'am.

THE COURT: For the jury and the record would you tell us your name, please, sir.

THE WITNESS: Michael Huffman.

THE COURT: All right. Mr. Rodriguez is going to begin with his questioning.

MR. RODRIGUEZ: My I proceed, Your Honor?

THE COURT: You may.

**MICHAEL HUFFMAN,**
having been first duly sworn, testified as follows:
**D I R E C T   E X A M I N A T I O N**

**BY MR. RODRIGUEZ:**

Q. Deputy Huffman, where do you work?

A. I'm a deputy sheriff with the Aransas County Sheriff's Office here in Rockport.

Q. And how long have you worked with the sheriff's office?

A. Four years.

Q. And back on January the 4th, 2008, were you on duty?

A. Yes, sir.

Q. And what shift were you working?

A. I was on the 6:00 p.m. to 6:00 a.m. shift.

Q. And what were your duties that particular day?

A. I was a patrol deputy.

Q. During that shift, were you called out to 909 North Tenth Street?

A. Yes, sir.

Q. And is that located in Fulton, Texas?

A. Yes, it is.

Q. Is that located in Aransas County, Texas?

A. Yes, sir.

Q. What was the nature of your call? Why did you get called out there?

A. I was in the jail booking in a subject that I had arrested on county warrants when I overheard communications dispatch Sergeant Harrison to a disturbance in progress. I checked clear from the jail and headed out to that location.

Q. And where exactly is that location?

A. 909 North Tenth Street, it's going to be --

Q. Using this courtroom as -- this courthouse as being a point of origin, where would you go? How far is it from here?

A. I can't give you an exact distance, but if you travel Business 35 north all the way to F.M. 3036 and then

past it, you're going to take a left on -- it's either Myrtle (ph) or Mesquite (ph) to Ninth Street, you know, take a right. You're going to be running parallel to Business 35 on Ninth Street. It intersects with what would be Lone Star Road (ph) which makes an S-curve then runs back out towards the south.

Q. About what time did you receive this dispatch?

A. It was around 2:23 in the morning.

Q. What did you see when you arrived there at the scene?

A. When I initially arrived on the scene, I observed a young female that was standing in the roadway. The roadway, itself, on North Ninth Street, it runs straight. When Ninth Street starts to take a left and turns into Lone Star Road, Ninth Street continues on and it's just a small dirt road that dead-ends. When I exited off the main pavement onto the dirt road, there was a young female that was standing -- would be to the left of my car.

Q. A young female.

A. Yes, sir.

Q. Did you identify her?

A. All I knew is that she was one of the daughters.

Q. You said she was standing in the roadway?

A. Yes, sir.

Q. What else did you observe?

**A.** She was very distraught. She was crying. She was real upset. She was screaming. When I exited the patrol unit, I asked her if she was okay and she couldn't tell me anything other than that, "My daddy's been shot."

And I asked here, "Where?" She pointed to where he was and I ran out to where he was found.

**Q.** And where exactly did you find him?

**A.** He was in the backyard of a residence. It would be number -- I believe it's 15 Sandra Drive. He was in the backyard. He was maybe twenty-five feet or so behind the house laying on his side.

**Q.** When you got to him, was there any emergency medical personnel there?

**A.** Not at that time, no.

**Q.** Anyone else there when you got there?

**A.** Officer Spencer Yarnall with the Rockport Police Department; he arrived on location at the same time I did. He and I approached the victim, Aaron Watson. And then a Sergeant Harrison; he arrived just a few seconds later.

**Q.** So the gentleman that was laying there was Aaron Watson?

**A.** Aaron Michael (ph) Watson.

**Q.** Was he conscious?

**A.** He was in and out of consciousness.

**Q.** Did you assess him to see what kind of injuries

he had?

A. I did. Sergeant Harrison and myself, we tried to talk to him. Like I say, he was in and out. He would make a few grumbles, but he really didn't say anything. We rolled him over onto his back and that's when I noticed he did have blood on his hands. The front part of his shirt near his naval on the left side had a little bit of blood on the outside of his shirt. Sergeant Harrison cut his shirt open and that's when we noticed he had a wound from a gunshot that was in his lower left abdomen and he also had one in his leg. I believe it was also in his left leg.

Q. Did you call E.M.S.?

A. Yes. They had already been dispatched to the scene. We were told prior to arrival that Mr. Watson had been shot. We had already called for E.M.S. at that time. They hadn't arrived on scene at that time.

Q. Was the fact that you were going onto a scene where a gunshot took place concern you in any way?

A. Yes, it did.

Q. In what way?

A. Well, we didn't know if the actors were still in the area. We had no idea if there was anybody in any of the houses. We didn't know if there was anybody hiding behind any houses. We had no idea. And for our safety

and the safety of the E.M.S. personnel, we wouldn't want anybody to be on scene but us until we made sure that there was no further danger to the victim, there was no further danger to law enforcement and none to E.M.S. personnel at that time.

Q. So what did you do with Mr. Watson?

A. When we called for E.M.S., we didn't have an exact arrival time for them because we didn't know there were still suspects in the area. We needed to make sure we had him in a secure location so the E.M.S. could come in and treat him. So we opted at that point in time with authorization from my supervisor, Sergeant Harrison, we moved Mr. Watson to my patrol unit. I put him in the back seat. Myself, Officer Yarnall and Sergeant Harrison, we all three lift him up, put him in the back seat. I took him out of the immediate area, drove him to or drove Aaron Watson to the Stripes Fulton convenience store which is at Cactus (ph) and Business 35 where we waited for E.M.S.

Q. You felt it wasn't safe to have him treated there at the scene?

A. No, it wasn't because we didn't know if -- maybe there was somebody still in the area that was watching and knew what we were doing that could possibly, you know, we didn't know if anybody was going to shoot at us or try to cause any more harm to the victim than was already done.

We didn't know.

Q. So he was taken to the Stripes Fulton convenience store?

A. Yes, sir, where we waited in the parking lot for E.M.S.

Q. Did E.M.S. arrive?

A. Yes, they did.

Q. Did he remain in your vehicle 'til E.M.S. arrived or how did that work?

A. He did. He was laying in the back seat of my car. They had the back door open and I was trying to talk to him. I did talk to him very briefly although he did tell me he was pain. I told him E.M.S. was coming; everything would be fine. He told me -- he kept telling me, he says, "I'm going to die; I'm going to die."

And I said, "Well, if you're going to die, you need to tell me who killed you." And he wouldn't tell me. We talked about that several times. And then, like I say --

MR. TURPIN: Your Honor, I'm going to object at this time as to the narrative and ask for question and answers.

THE COURT: Sustained.

Q. (BY MR. RODRIGUEZ) What -- did he tell you anything?

A. He just kept telling me, "I'm going to die."

Q.   Was he taken to the hospital with E.M.S.?

A.   He was removed from the patrol car, put on a stretcher.   He was placed in the ambulance where he was transported from there to the grassy parking lot area of the Paws and Taws Convention Center in Fulton where we waited for HALO-Flight.

Q.   So he was HALO-Flighted?

A.   Yes.

Q.   You know where he was taken?

A.   I believe he was taken to Spohn Memorial.

Q.   After he was removed from your vehicle and placed in the ambulance, what did you do?

A.   I remained with E.M.S. -- from the time I met them at the Stripes store until we got to Paws and Taws, I stayed on location there until he was taken out by HALO-Flight.   I returned back to the crime scene.

Q.   Did you ride in the ambulance or what?

A.   I followed in my patrol unit.

Q.   Anyone ride in the ambulance with him?

A.   Not that I'm aware of.

MR. RODRIGUEZ:  I'll pass the witness.

THE COURT:  Mr. Turpin.

MR. TURPIN:  Thank you, Judge.

-o0o-

## C R O S S - E X A M I N A T I O N

BY MR. TURPIN:

Q.    Officer Huffman?

A.    Yes, sir.

Q.    Good afternoon.  I represent Mr. Christopher Hall.  I'm going to ask you a few questions.

You said you didn't remember the name of the girl that you talked to?

A.    No, I don't remember.

Q.    She give you a synopsis of what had happened?

A.    She did.

Q.    You didn't write that in your report?

A.    Where it's contained in my report is what I was relayed to from communications.

Would you like for me to read what was in the report?

Q.    No, that's okay.  I'm just...

Okay.  Now, you also asked Watson if he knew who had shot him; correct?

A.    That is correct.

Q.    And, in fact, Mr. Watson would not answer you.

A.    He didn't answer me, no.

Q.    Was it because he couldn't or because he wouldn't?

A.    That I don't know.

Q.    You said he was in and out.  He was saying

things; right?

A. Yes, he was.

Q. Okay. Now, when y'all find him, you said you didn't have adequate time to secure the scene. You called in emergency medical technicians; right?

A. That's correct.

Q. How many officers did you have on the scene?

A. Myself, Spencer Yarnall with the Rockport Police Department and Sergeant Harrison.

Q. So you got three officers on the scene. The little girls are there with you or where have they gone?

A. There was one that was outside when I got there. After I had made contact with her and she told me where her father was, myself and Officer Yarnall went where he was at and then Sergeant Harrison arrived. If he talked to any one of those girls after that, I don't know what he talked to them about.

Q. So y'all placed Mr. Watson in your car?

A. Yes.

Q. And how did y'all do that?

A. We carried him. We picked him up.

Q. Did y'all make a stretcher for him?

A. No, sir. We didn't have time.

Q. Okay. Well, let me go back to that. You said you didn't have time and you felt the scene wasn't

secured. What was so unsecured about the scene? Why did y'all feel insecure? You have three officers there.

A. The dispatcher had told us there was between two and five male subjects on the scene. The daughter already told me her father had been shot. We have a male subject that's down. He's been shot twice. We don't know how many people are out there. We don't know what they're capable of. Evidently someone's capable of shooting the victim. Are they capable of shooting us as well or the E.M.S. personnel on scene?

Q. Okay. How did y'all get him to the car? Did y'all carry him or did you drag him?

A. We raised him up. Myself and Officer Yarnall both got on each side of him, put our hands underneath his arms, up underneath the pit of his arms, placed our hands on his back and we pulled him to the car so that we didn't have to mess with his abdominal area. When we get him to the car, we leave --

Q. So my question was *did you drag him,* and you're telling me halfway I guess; right?

A. Well, we dragged him.

Q. Okay. How far was that to your car?

A. Maybe thirty feet, forty feet.

Q. Now, at this time I think you've already stated you know he's got two wounds you can see for sure; right?

A.   Yes.

Q.   Abdomen and you thought leg, too.

A.   Yes.

Q.   And how did y'all place him in the car? Did you roll him in or how did y'all get him in?

A.   We had the back door open to the prisoner compartment. When we pulled him up to where the vehicle was, we had him sitting down on his rump. We had his back against the seat. Sergeant Harrison opened up the driver's side door at the back of the car to crawl through underneath --

*(Interruption by Court Reporter)*

A.   (TO MR. RODRIGUEZ) Sergeant Harrison crawled through from the driver's side. He reached down there and grabbed him underneath his arms and then we stayed -- myself and Yarnall stayed outside the vehicle and helped to lift him up and pull him into the vehicle at that time. He was on his back.

Q.   Okay. What did y'all do for the two wounds?

A.   We left them the way they were. There was not a lot of extensive bleeding.

Q.   In fact, Mr. Watson never would tell you who shot him; right?

A.   That's correct.

MR. TURPIN:   We pass.

MR. GILMORE: No questions.

THE COURT: All right. Thank you.

Further questions, Mr. Rodriguez?

MR. RODRIGUEZ: No, Your Honor.

THE COURT: All right. Officer Huffman, you may step down. The rule's been invoked, so please do not discuss the case with anyone until the conclusion of the trial except for the attorneys involved in the matter, please.

THE WITNESS: Yes, ma'am.

THE COURT: Thank you.

THE WITNESS: Thank you. (Exits courtroom.)

MR. RODRIGUEZ: May I have a moment, Your Honor?

THE WITNESS: (Enters courtroom and is sworn.)

THE COURT: That mike will swing closer to you, just do that. And I'm going to let you, for the record and the court reporter, will you please tell us your name.

THE WITNESS: Yvette Garcia.

THE COURT: Yvette? And is that with a "Y"?

THE WITNESS: With a "Y"; Y-V-E-T-T-E.

THE COURT: Thank you.

You may proceed.

Mr. Rodriguez is going to start.

**YVETTE GARCIA,**
having been first duly sworn, testified as follows:
**D I R E C T   E X A M I N A T I O N**

**BY MR. RODRIGUEZ:**

Q.   Ma'am, do you live at 13 Sandia Drive or Sandra Drive?

A.   Yes, sir, I do.

Q.   Is that in Fulton Texas?

A.   Fulton, Texas, yes.

Q.   And do you live there alone?

A.   No.  I live with my husband and my two other children or my two children.

Q.   And back on January the 4th, 2008, were you living at that address?

A.   Yes, sir, I was.

Q.   Now, while you were living there, was there some disturbance that woke you up around 1:45 or so in the morning?

A.   Yes, sir, there was.

Q.   What was the nature of the disturbance?

A.   The nature of the disturbance was I was awake.  I couldn't sleep that night.  I was watching T.V.  I turned off the T.V. probably about 12:30, 1:00 --

Q.   You need to slow down just a little bit.

A.   I turned off the T.V. about 12:30 or 1:00 and I

was laying in my bed and the dogs were barking just nonstop but kind of used to the dogs barking because there's so many dogs down the back alleyway. So anyway, the dogs are barking and I just laid there. Around 2:00, dogs were excessively barking and it was directly behind our rear lot. So when that took place, I was like --

THE COURT: Hang on one second; I got a juror needs to turn his phone off real quick for us.

All right.

Q. (BY MR. RODRIGUEZ) So basically around two o'clock?

A. Yeah, around two o'clock the dogs started excessively barking. And when that took place, I just, you know, I laid there and thinking, *oh gosh, okay, another night without sleeping with the dogs barking.*

So anyway, around -- a little after 2:00 I heard like... The dogs are really, really barking, but I heard, like, "No, stop, don't do that," and I'm thinking, *oh gosh, they're at it again.* And what I'm --

Q. What do you mean "at it again"?

A. Well, the whole week prior to this incident in the back, I had called the police a couple of times on that address because there was excessive fighting.

Q. What address was that?

A. 910 North Tenth Street or 912 North Tenth Street.

So I had called the police and had some encounters with the back neighbors there for a period of the week prior to. And I had made a couple of calls to law enforcement to come out. And that was the whole week during Christmas really.

Q. The week of Christmas?

A. Yeah, the week of Christmas.

Q. Okay.

A. So I was just laying there thinking, *okay, the guy's beating up that girl again and...*

Q. Don't go there.

Basically what happened is that there was a disturbance.

A. Well, there was a disturbance and I just laid there which I feel really bad for now because of the fact that, you know, I laid there for a good five minutes or a little bit more, maybe ten. And I was laying there just, you know, hearing this and all of a sudden --

Q. So, now, you were hearing something going on --

A. Yeah. I could hear screaming --

*(Interruption by Court Reporter)*

Q. (BY MR. RODRIGUEZ) You were saying, if I remember correct, you were saying about ten minutes you heard --

A. Yeah, about five -- it was really funny 'cause, you know, when you're laying in bed, time kind of just

goes and I looked at the clock and it was maybe about 2:10, 2:12 maybe because I know by the time I came back in after everything had happened, it was around maybe 2:30 by that point. So I'm -- it was after 2:00 when I heard the yelling and the screaming. And what woke me up was the oldest one, Jessica, with this really -- it was a terrible --

Q. Okay. Let's just back up a little bit.

Now, you live next door to 909 North Tenth Street?

A. Yeah. Say my house is right here and my lot is, like, right to the back of that chair that's there. And you have a little alleyway, little tiny -- I don't even consider it a road. And then you have their location. I wouldn't even call it a house. It's just this shack. And that's where it's at. I mean, you can see everything from my back two windows where I reside.

Q. And you said -- mentioned a girl by the name of Jessica.

A. Yeah. Jessica did this horrible scream.

Q. Okay. Hold on; back up a little bit. In that residence, does a girl by the name of Jessica Watson live there?

A. Yes. That's who I'm referring to; Jessica.

Q. And is there another girl by the name of Meghan Watson --

A.    Meghan, the little one, yes.

Q.    Those two girls live there.

A.    Yes.  At that time, yes.

Q.    Are you familiar with a person by the name of Tracy Watson?

A.    Yes, their mother.

Q.    And do you know a person by the name of Aaron Watson?

A.    I didn't know Aaron Watson to tell you the truth. And after talking to the girls 'cause they were at our house from, like, 2:30 'til, like, 7:30 that morning, you know, they had told me that the reason why their dad was there --

MR. GILMORE:  Your Honor, I object to any hearsay.

THE COURT:  Sustained.

Q.    (BY MR. RODRIGUEZ) Did you basically know Mr. Watson?

A.    Yeah, but -- I've seen him at the house, but I don't know him personally like I knew the others.

Q.    You don't socialize --

A.    No, but all the -- my kids had confrontations with the little ones.  You know, the kid neighborhood deal, so...

Q.    Do you know Chadrick B. Pate?

**A.** I know the name but as far as, you know, him personally, no, no.

**Q.** Don't know him personally.

**A.** No, sir, don't know him personally.

**Q.** Okay. Going back to when we were talking about you said around two o'clock the dogs were barking quite a bit and you laid in bed for about ten minutes?

**A.** I would say just close to about ten minutes.

**Q.** Now, you said the commotion was going on next door?

**A.** Directly behind my rear lot, my lot.

**Q.** Could you hear anything being said?

**A.** Yeah. When I got up, I got up and I moved my shades to the side and I saw Jessica outside the -- they have a porch light and I saw Jessica and that's when she was yelling, "Stop, no." And the scream was really, really -- it was bad. That's what made me jump up 'cause it was cold that night. Our A.C.s were off. There was nothing on. I mean, I could -- it was just a quiet night, you know. It wasn't quiet at night, but, you know, you can hear, you know, what was going on.

So I went over to my daughter's room, you know, which is -- well, we have a small house, and just kind of went over to my daughter's room and opened her curtains and that's when I saw Jessica and I saw her running and I saw

one man that was on the porch, but it was a second. And he didn't have very much hair and he just ran. So I ran back to my room, turned on the lights to my bedroom, turned on -- opened the shutters and started pounding on the window, "I'm coming."

Q. All right. You said you were able to go to your daughter's room and look out?

A. Yeah, yeah. I did before I made a decision to --

Q. Can you see the porch?

A. Yeah. Oh, yeah, you can see the porch from my house.

Q. The porch where Jessica and Meghan --

A. I only saw Jessie; I did not see Meghan.

Q. But that's the house where they lived --

A. Yes. Yes.

Q. And what exactly was Jessica screaming?

A. Jessica was screaming right at the porch. But what caught my attention is Jessica started coming towards my rear lot 'cause I don't have a fence in the back. She was coming towards my lot yelling, "Help; call the police; they're going to kill" -- I thought she said they're going to kill her.

Well, turns out when I went outside, it was her dad. And when I -- my husband jumped up and I told him, "He's going to kill her," because I was assuming that that man

was -- that was living with Tracy was going to hurt her.

So we got our shoes on. We ran outside the side door. I turned on my floodlight in the back and you can hear the scuffle. There was something going on out there. And my husband was -- Jessica was screaming. Meghan was -- I didn't know there was another girl there and --

Q. Let's slow down a little bit. Meghan was out there as well?

A. Yes. That's when Jessica told me, "Help; my little sister's out there trying to help my dad."

Q. Do you know the man that was living with Tracy at the time?

A. Well, he was a very slender man. The girls told me it was Chadrick Pate that was living with --

MR. GILMORE: Your Honor, that's hearsay again.

THE COURT: Sustained.

Q. (BY MR. RODRIGUEZ) Okay. So that night you spoke with Jessica and Meghan?

A. Oh, yeah.

Q. You said that Jessica was screaming.

A. Jessica was screaming, yes, sir.

Q. What about Meghan --

A. Meghan? My husband, when we ran out, everything was so -- it was just so chaotic because my girls were

awake and they were outside. You have Jessica screaming. My husband was trying to go out towards the back 'cause Jessica said, "They've got a gun to my dad's head; they're going to kill him."

I made a couple of calls to the sheriff's department over a period of time. I think maybe three or four. And... It just -- my husband was out in the back, but I knew there was people out there running. And he was trying to help and that is just the worst thing. I was pretty scared myself.

Q. So just basically you said when you looked out of the window, you saw someone running?

A. There was people running. Oh, yeah, there was people running. But it was dark because in that alleyway there is no light. The only ones that have light is ourselves. We have a floodlight.

Q. These people, could you tell if they were male, female?

A. That I could not, no, sir. I knew of Jessica and that one man that was in the porch just for a split second. But he was a bigger build. He wasn't skinny, so, you know, I couldn't tell you who it was. But I did -- I did see the running in the dark and the yelling and...

Q. You said you saw people running.

A. Yes. There was a couple which I'm going to

assume that that was the father and -- not Jessica; she was with me -- Meghan, maybe some of the other people, because it was so dark. You got to understand; it was really dark. But you can hear -- we had a bunch of leaves in the back -- the running, and it was, you know, it was -- our lot is so little -- I mean, you can even touch my neighbor's house. I mean, and it was my home, a neighbor's home and then the Wrights' (ph) home where he was resting. So they're very close. They're not huge lots; they're little lots. So you can hear a lot, but it was just dark.

Q. But you can tell there was more than one --

A. Oh, yeah, yeah. And when my husband took off running, I was yelling for him to come back 'cause I knew there was others out there. But...

Q. More than one person was running.

A. Yes.

Q. Let's go back. You said you looked out your daughter's window; you could see the porch where Jessica and Meghan lived.

A. Yes, sir.

Q. You said you saw a person out there?

A. Yes.

Q. A man.

A. A man.

Q.    Did you say you saw people running or heard them?

A.    I saw -- well, from the porch -- you have the porch and the light, so the light -- their porch light lets off a little light a little distance so you can see their car where they park it at night.  So that's where you could see people taking off running.  But like I said, that area in the back, that alleyway, they head off towards a darker area where just anything can happen at all times.  But they take off and they were running and --

Q.    Were they running from the house?

A.    They were running from the house, yes, sir, towards the alleyway.

Q.    And there was more than one person.

A.    Yes, sir.

Q.    Did you ever leave your house?

A.    Did I ever leave?  You mean -- I went outside when this was all taking place, yes, sir, and I was out there for a period of time.

Q.    Who were you out there with?

A.    I was with my husband, Todd, who had went to go look at the victim and he got Meghan back 'cause Meghan wasn't about to leave her dad's side.  He got Meghan back. I had Jessica.  I had my two daughters and I was trying to get everybody inside, but my husband was persistent on going back out.  He said, "Yvette, he's been shot on the

side. He's bleeding -- "

MR. TURPIN: Judge, I'm going to object to hearsay.

THE COURT: Just don't tell us anything anybody told you, please, ma'am. Thank you.

Q. (BY MR. RODRIGUEZ) So basically your husband went out to where this man was.

A. Yes, sir.

Q. What is your husband's name?

A. Todd Garcia.

Q. Did you see the victim?

A. My husband did; I did not. There was -- the Wrights had a big, grassy area --

MR. TURPIN: Judge, I'm going to object at this time to her describing what her husband did or didn't see, did or didn't do.

THE COURT: I agree. Overruled.

You may proceed.

Q. (BY MR. RODRIGUEZ) Describe the Wrights' property.

A. The Wrights' property is -- there's a little fencing, a little fence, and then you have maybe, like, a little bit of grass growing. And it was -- his body -- my husband -- where I saw my husband's shadow, he was kneeling over was right by their back window, the

neighbors' back window. And, I mean, I could tell you what my husband saw, but I wasn't there. I mean, he just --

Q. Basically you saw your husband leaning over.

A. Yeah. Yeah, he was leaning over. And I saw him because I had my floodlight on at that point. And I turned on my floodlight. When we ran outside to go help, I popped open -- we had open the floodlight that we have so we can look and see what was going on. And, you know, takes about a minute or two for that light to come on. But finally, when it shines, it shines.

Q. Your husband was over there leaning over. You're assuming it was Mr. Watson.

A. Yeah, because the little girl, Meghan, told me, "My dad's been shot. Help him."

Q. Now, what happened with Meghan and Jessica?

A. What happened with them?

Q. You were out there at this time. Anyone take them in?

A. I did. I was the one that took them in for, like, five hours or so. They were with me from the time of the incident 'til 7:30, 'til their mother was released the next morning and Mr. Beck and her came to get them. They were with me and my family.

Q. And you stated that the girls were pretty

distraught?

A.     Oh, gosh, yeah; very, very distraught along with all of us.  We couldn't believe what had just happened.  Actually I could, but I never assumed in my backyard.  But that house is just --

Q.     Anyway, going back to the girls, you said they were distraught and upset?

A.     Oh, yes.

Q.     And which one told you the dad got shot?

A.     Both of them.  But outside, Jessica was the one that said that someone had a gun to her dad and they were going to kill him.  Whenever my husband was bringing Meghan back, that's when I found out there was a second one.  Well, Jessica said, "Go help -- my sister's out there helping my dad."  And when my husband was walking back, he brought Meghan back.  And I really hadn't seen Meghan too, too much.  I was more familiar with Jessica.

Q.     Meghan was in the same kind of condition, emotional state?

A.     Oh, gosh, yeah.

Q.     You said the whole incident started around 1:45 --

A.     With the dogs barking down the alleyway, yes, sir.

Q.     And when did the police arrive?  Do you recall?

**A.** Oh, gosh. They must have got there -- I'm going to say about 2:25, 2:30 maybe just about. Because I know when I was back inside of course -- it had to be around 2:30 by the time we got back in, the girls were already inside in my home. And a county unit came in the back and a city unit came in the back and they told us just to get inside for our own safety.

**Q.** You said you were able to see somebody on the porch, a male.

**A.** Yes, sir.

**Q.** Did you recognize who that male was?

**A.** Like I said, he was of a bigger build, but, I mean, you're not -- I'm not going to be able to say, "Hey, it was such and such person." I mean...

**MR. RODRIGUEZ:** May I approach the witness, Your Honor?

**THE COURT:** You may.

**Q.** (BY MR. RODRIGUEZ) I'm going to hand you the statement you gave to Michael Brooks and ask you if that helps you with your memory regarding I asked you if you remember the man that was on the porch.

**A.** What's that?

**Q.** I'll ask you if you remember the man that was on the porch.

**A.** That describes pretty much what I saw; but, like

I said -- I mean, as far as pin-pointing who that person was, I couldn't do that.

Q. Did he look familiar to you at all?

A. Who? The man?

Q. The man on the porch.

A. To tell you the truth, he looked a little... The night -- the week of Christmas when I had called the police, there was known to me now -- I don't know if I can say this -- Chadrick Pate. The two girls and the mother were sitting on the porch. My girls were outside playing and they came in yelling that the dad was --

MR. RODRIGUEZ: May I approach?

Don't go into that.

May I approach, Your Honor?

THE COURT: You may.

Q. (BY MR. RODRIGUEZ) Do you know if a man named Chadrick B. Pate lived next door?

A. Yeah.

Q. Now... This man, Chadrick B. Pate, is he present in the courtroom today?

A. I would say "yes."

Q. Please point him out and describe something he's wearing --

A. I would say that's him right there.

Q. Which one?

**A.** I would say that's him because, to me -- of course, it's been a year -- Chadrick B. Pate was of a thinner build.

**Q.** The man there looks familiar to you.

**A.** Like I said, it's been a year. He could look -- I mean, I look different. I've gained twenty pounds, you know, honestly...

**Q.** Okay.

**A.** I mean...

**Q.** All right. The man on the porch.

**A.** Yes, sir.

**Q.** Have you ever seen him before?

**A.** That's what I was going to say. The way that he looked looked like a man I had seen out there when I first called -- when I called the police the week prior to. He was with Chadrick B. Pate. And he was just standing there doing nothing in defense of that family. But he did. It could have been. But like I said, I'm not...

**MR. RODRIGUEZ:** I'll pass.

**THE COURT:** Mr. Turpin.

**C R O S S - E X A M I N A T I O N**

**BY MR. TURPIN:**

**Q.** Did you hear any sounds other than what you said you heard?

**A.** Did I hear any other sounds? Just yelling.

Q. Did you hear a gun go off?

A. That I did not, no, sir.

Q. Did you see anybody with a gun?

A. No, I did not.

Q. Did you see anybody with a pipe?

A. No, sir, did not. I --

Q. Did you see anybody with a baseball bat?

A. No.

Q. You also said something about... You had the two girls with you for about four or five hours?

A. Yes, sir; that's correct.

Q. You waited until Tracy Watson was released? What do you mean by that?

A. What I mean by that is the girls were being taken care of by their dad because their mom and their grandma was in jail. So when --

Q. Hold on a minute.

A. That's why their dad was there taking care of them, because their mom and their grandma was in jail.

Q. Grandma is?

A. Jo Ann Budlong.

Q. Tracy Watson and the grandmother, Jo Ann Budlong, are in jail. Do you know where they're in jail at?

A. Whenever -- my concern was when the girls came over to the house that they were asking who was going to

take care of them because, you know, they told me about the mother and the grandmother and that their dad was -- had been shot, who was going to take care of them. So I asked one of the law enforcement officers and he said, "We're going to place a call to the Aransas County Jail" -- I believe that's what he told me, Aransas County Jail -- "and see if we can get them out." It took such a long time because I needed to go to work by 8:00 the next morning and she wasn't released 'til about 7:30, 7:40. And so that's why they were with me.

Q. Did they release both Tracy and Budlong?

A. No. They just released them to Tracy and that's all I knew who was released was Tracy. And Mr. Beck came in at the time, Austin (ph) Beck -- or not Austin, his dad, Mr. Beck, Detective Beck.

Q. So that ended your care of the kids at that point.

A. Oh, yeah. Yeah.

MR. TURPIN: I pass.

C R O S S - E X A M I N A T I O N

BY MR. GILMORE:

Q. You said that there was fighting over at the house the week...

A. It was during the week of Christmas.

Q. During the week of Christmas. Was it after

Christmas?

    A.    No, it was before Christmas.

    Q.    You said, like, two weeks.

    A.    No.  What went on January 4th, it was the week before prior to the new year.  So maybe it was.  I thought it was the week of Christmas 'cause we still had lights out.

    Q.    Could have been after Christmas --

    A.    You know, it could have been 'cause we had our lights and so did they and so did the whole neighborhood, so...

    Q.    So this fighting that you heard was probably after Christmas?

    A.    I don't...  You know what?  Probably, probably not, because of the fact that --

    Q.    "Probably, probably not"?

    A.    Well, you got to understand, it's been a year. It has been a year.

    Q.    Okay.

    A.    And...

    Q.    So you're not really sure.  It was sometime around --

    A.    Yeah, but I'm sure that Aransas County has the records when I called.

    Q.    Okay.

A.    All I know is they had been fighting for a long time.  Almost every night and during the day, too.

Q.    Okay.

MR. GILMORE:    That's all the questions I have.

**R E D I R E C T     E X A M I N A T I O N**

BY MR. RODRIGUEZ:

Q.    You called the police department because of the fighting that took place?

A.    The sheriff's department, yes.

Q.    Sheriff's department.

A.    Yes, sir.

Q.    You said earlier it was a week before Christmas or the week of --

A.    It was the week of Christmas.  Like I said, they had their lights on and we had our lights on, too.  But, you know, sometimes we don't take our lights down 'til after Christmas.  So, like I said, I called in -- I want to say it was the week of Christmas because I remember thinking, *those poor girls, what type of Christmas are they going to have,* you know.  But I remember that, thinking that to myself.

Q.    All right.  So it was around Christmas.

A.    I'm going to say that, yeah.

Q.    Do you have an idea who was involved in the

disturbance?

A. At the time that I called at that point?

Q. Yeah --

MR. GILMORE: Your Honor, unless she knows from personal knowledge, it's hearsay.

.A. (TO MR. RODRIGUEZ) It's going to be hearsay 'cause whenever I had the girls for several hours and they were talkative.

Q. No. I'm talking about the event which -- before Christmas.

A. You know, I asked the officer who it was and, of course, he didn't release any information to me.

Q. You weren't looking over there to see what was going on?

A. You could -- I could look over there, but, I mean --

Q. Okay.

A. She had so many different men.

Q. I understand.

MR. RODRIGUEZ: I'll pass.

THE COURT: Mr. Turpin.

MR. TURPIN: No further questions.

THE COURT: Mr. Gilmore.

MR. GILMORE: (Shaking head). Nope.

THE COURT: All right. Ms. Garcia, we have

something called "the rule" has been invoked which means you may not discuss this testimony you've made today whatsoever including at home with any of your family members or anyone. The only two parties you may visit with are the State's attorneys or any of the Defense Attorneys until the case is totally over which may be later in the week. The D.A. may request you to keep in touch with them or not. You may go home or go back to work.

THE WITNESS: Thank you. (Exits courtroom.)

THE COURT: All right. Counsel, will y'all approach, please.

*(Interruption by Court Reporter)*
*(An off-the-record discussion was had at the bench.)*

THE COURT: All right. Ladies and gentlemen, I'm going to ask you to please don't discuss the case with anyone during your break this evening. Again, if anybody asks, "I'm on a criminal trial and I'll talk to you about it later."

I'm going to ask you to be back here ready for testimony beginning at nine o'clock. Doc's going to show you where we're going to be assembling you over here at the J.P. One courtroom. It's where you'll be going in the mornings so you don't have to be out in the hallway worrying about the witnesses.

Camille normally has coffee ready. She'll

probably put it in there tomorrow because I think Judge Adams has a big docket, doesn't he, the next two days?

THE CLERK: Yes, I can put it in there.

THE COURT: All right. Okay. If you want to bring coffee or water, cokes, in the courtroom, I'm good with that. Just remember we may take an hour and a half before we take a break, so...

All right. Thank y'all.

Please rise for the jury.

*(The jury exited the courtroom.)*

THE COURT: Counsel, if you need anything of me, I want it done at 8:45. And I want to be sure the defendants are in here by 8:30 in the morning. And then the other guys they're telling me we're going to try to start them at 1:30, or 1:00 or 1:30. We'll have to sort of massage it.

MR. RODRIGUEZ: Actually, I guess I'll just get all the officers taken care of then.

THE COURT: Well, we'll just --

MR. RODRIGUEZ: It will be in the afternoon when we bring the other guys.

THE COURT: Well, we'll see. If things go fast, we'll be going back. We're thinking after lunch for Mr. Tanton and Ray and Underwood is what we're thinking.

All right, guys. Thank you very much. Do

y'all need to talk to your clients any?

MR. GILMORE: I do, Judge, but I also want to address an issue and I talked to Mr. Rodriguez about it. In the girls' statements, they talk about extraneous bad acts on my client's part and then they go into his reputation of being a criminal, and I just want them warned not to say that in front of the jury.

MR. RODRIGUEZ: I will tell them.

THE COURT: All right. Anything else, guys?

MR. TURPIN: Judge, I've got a concern that there may not be any way to remedy. I know we discussed it last week on how we were going to proceed as far as taking people to and from the restroom with the officers. And I just don't want it to make -- I mean, I know we have the officers here, but I just don't want it to seem to the jury that, you know, we have all these officers here and basically steps on the presumption of innocence by having them escort us every time we go back there.

THE COURT: Well, you're going to have to, Mr. Turpin. That's just part of it. In fact, this is better than any other counties most of them have. But y'all are more than welcome to walk with your client like you're consulting with them into the jury room. I've made arrangements and we moved the jury. But if you're concerned about it, walk with your client. Like I said,

we'll ask the officers to maintain some distance and make sure y'all have some confidentiality.

MR. TURPIN: That'll work, Judge.

MR. RODRIGUEZ: As far as the Four-Oh-Four-B, we talked about the incident happened on or about Christmas Day. We kind of alluded to it through the witnesses. The girls are going to talk about that. That that's when Mr. Pate was, according to them, arrested and removed from the house. I think that is relevant in this particular case.

MR. GILMORE: I don't have any problem with that.

MR. RODRIGUEZ: But as far as --

THE COURT: It's the other junk.

MR. RODRIGUEZ: -- aside from the general thing he talked about, I have no problem with that.

THE COURT: All right. Very good. If you think it's going to be -- just remind them to answer the questions asked. That may help.

MR. RODRIGUEZ: I'll do my best, Your Honor.

THE COURT: I understand that. Thanks.

MS. CABLE: May we be excused, Judge?

THE COURT: Yes, you may.

MR. RODRIGUEZ: One more thing, Your Honor.

THE COURT: Yes.

MR. RODRIGUEZ: We did invoke the rule in this particular case. There is one lady out there that has a husband or a boyfriend that keeps coming in and out. I don't know if they're discussing the case or not. I'd ask --

THE COURT: Who is it?

MR. RODRIGUEZ: Ms. Bardin (ph) and her, I guess, boyfriend that was in here.

MR. GILMORE: What about them? I didn't hear.

MR. RODRIGUEZ: Ms. Bardin has a boyfriend that keeps going in and out of here, so I don't know if they're discussing the case or not. I'd like them to be instructed not to if he's relaying information --

THE COURT: She out there still? Go get her and I'll swear her in.

MS. CABLE: I did advise her, but she was rather hostile towards me, so...

Excuse me, Mr. Gilmore?

MR. GILMORE: I can't imagine why. You're just prosecuting her son for murder.

THE WITNESS: (Enters courtroom.)

THE COURT: Hello, ma'am. I need you to come forward. I need to swear you in, please, ma'am.

THE WITNESS: (Complies).

THE COURT: I've messed your name up all day long. It is... Nema, N-E-M-A?

THE WITNESS: Nema Bardin.

THE COURT: If you'll raise your right hand, please, ma'am.

*(The potential witness was sworn.)*

THE COURT: Ms. Bardin, while y'all were outside, we did something called "the rule" was invoked which means you may not discuss the case with anyone whatsoever except for Mr. Turpin, Mr. Gilmore, or either the two attorneys' cases. I know you have a gentleman that's here with you that's been in and out. He's more than welcome to do that; but, if for some reason he's caught talking to you about the case, you will not be able to testify and I don't think you want that to happen.

THE WITNESS: Not a problem. And just for your edification, the woman in red, I have no idea who she is. I've just seen her over here with Mr. Rodriguez.

THE COURT: She's a state's attorney.

THE WITNESS: Okay. But she invoked the rule to me outside.

THE COURT: Very good. Well, I wanted to do it officially. She told me she had --

THE WITNESS: Appreciate that.

THE COURT: But I just thought it's better

we tell you right up front.

THE WITNESS: It's not a problem, Your Honor.

THE COURT: Like I said, if you're here to testify, I think you'll do fine.

THE WITNESS: Thank you.

THE COURT: All right, guys. Thank y'all.

Anything else, guys? Guys, girls, people.

Mr. Turpin, Mr. Gilmore, why don't y'all maybe turn the table a little bit.

Mr. Turpin, you're not talking loud enough.

MR. GILMORE: I was going to suggest turning the table tomorrow.

THE COURT: Okay. If y'all don't mind, that would be helpful because I kept looking at my jury and they were okay. But I'm thinking if you get tired tomorrow afternoon, you are not going to be heard because I know your voice goes as the day goes on, so...

*(There was a discussion off the record.)*

*(Evening recess)*

-o0o-

**CONTINUED IN NEXT VOLUME**

THE STATE OF TEXAS　　　　)(

COUNTY OF ARANSAS　　　　)(


　　　I, **SHARON D. ANDERSON**, Official Court Reporter in and for the 343rd Judicial District Court of Aransas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties and/or Court to be included in the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me on the designated dates.

　　　I further certify that the following exhibits in this Reporter's Record constitute true and complete duplicates of the original exhibits (excluding physical evidence), if any, offered/admitted by the respective parties into evidence during the proceedings in the aforementioned and numbered cause.

　　　I further certify that the total cost for the preparation of this Reporter's Record is $570.00 and will be paid by Aransas County.



**WITNESS MY OFFICIAL HAND** this the ___3rd___ day of ___June___, 20_09_.



**SHARON D. ANDERSON, CSR**
OFFICIAL COURT REPORTER
343rd Judicial District
P. O. Box 700
Sinton, Texas 78387
361-364-6202
361-364-6155 (FAX)
Cert. No.: 2650
Exp. Date: 12-31-10

RECORD EXHIBIT # 7

RR VOL 6 OF 9

2/10/09

JURY TRIAL GUILT INNOCENCE

# REPORTERS RECORD

# VOLUME 6 OF 9

## THE STATE OF TEXAS
## VS.
## CHADRICK B PATE

# R E P O R T E R ' S   R E C O R D

## VOLUME _6_ OF _9_ VOLUMES

### Trial Court Cause Number A-08-5080-4-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT OF |
| | * | |
| VS. | * | ARANSAS COUNTY, TEXAS |
| | * | |
| CHADRICK B. PATE | * | 36TH JUDICIAL DISTRICT |

------------------------------------------------

*JURY TRIAL*
*Guilt/Innocence*

------------------------------------------------

## A P P E A R A N C E S

**COUNSEL FOR THE STATE:**
 **MR. MARCELINO RODRIGUEZ**
 **MS. RETHA CABLE**
 ASSISTANT DISTRICT ATTORNEY
 36th Judicial District
 San Patricio County Courthouse
 P. O. Box 1393
 Sinton, Texas      78387
 Tel:  361-364-6220
 Fax:  361-364-4978
 SBN:  24046959
       00785741

**COUNSEL FOR THE DEFENDANT:**
 **MR. JOHN S. GILMORE**
 ATTORNEY AT LAW
 P. O. Box 276
 622 South Tancahua
 Corpus Christi, Texas     78403
 Tel:  361-882-4378
 Fax:  361-882-3635
 SBN:  07958500

COPY

     On the **10th** day of **February, 2009**, the following proceedings came on for trial in the above-entitled and numbered cause in said Court, **HONORABLE JANNA K. WHATLEY,** Judge Presiding, held in Rockport, Aransas County, Texas: Proceedings were reported by machine shorthand.

**MR. GILMORE:** Your Honor, I'm going to object. That's based on hearsay. Objection.

**MR. RODRIGUEZ:** It is a lead.

**THE COURT:** Why don't you rephrase your question.

Q. (BY MR. RODRIGUEZ) Based on the information received from Mr. Underwood, was Mr. Pate developed as a suspect in this case?

A. Yes, sir.

Q. Based on the information that you received in the statement given by Mr. Underwood, was Christopher Hall developed as a suspect?

A. Yes, sir.

Q. Now, there was another person that was looked at, person they refer to as "Dough Boy." Who was that?

A. Justin Padgett.

Q. And was he eliminated as a suspect based on that statement?

A. Yes, sir.

Q. Now, one of the suspects developed was a person by the name of Kevin Tanton? Is that correct?

A. Yes, sir.

Q. Did you have an opportunity to meet with Mr. Tanton?

A. Yes, sir.

A. Yes, sir.

Q. Now, prior to talking to him regarding the events that took place back on January the 4th, 2008, that led to the death of Mr. Watson, did you promise or did Mr. Leal promise anything to Mr. Tanton in exchange for his testimony or his statement?

A. No, sir.

Q. Do you know of any deal made between him and the district attorney's office?

A. No, sir, I don't.

Q. Now, you said there was some suspects that were developed during the course of the statement that was given to you by Mr. Underwood. The statements made by Mr. Tanton, did you develop any new suspects based on talking to Mr. Tanton?

MR. GILMORE: Your Honor, I would object again. This is based on hearsay and it violates Crawford and the Confrontation Clause. This is a way of trying to get around the hearsay rule. I object to it.

MR. RODRIGUEZ: Goes only to the fact that he developed any particular witnesses or suspects --

MR. GILMORE: Comes directly from what he was told, hearsay.

THE COURT: I'll sustain the objection.

Q. (BY MR. RODRIGUEZ) As to the content of the

Underwood -- let me trace it back. Let me go back to Tracy Watson? Is that correct?

A. Yes, sir.

Q. As a matter of fact, you were there with Baird?

A. Yes, sir.

Q. And you asked them or y'all asked her specifically if there was anybody that Aaron might have had problems with or owed money to; right?

A. Yes, sir.

Q. In fact, she gave you a name, didn't she?

A. Doughboy.

Q. Justin Padgett.

A. She said "Doughboy" at the time. She didn't know the name.

Q. That's who it was; right?

A. That's who it turned out to be, yes, sir.

Q. And she said that Aaron owed Padgett or Dough Boy money.

A. Yes, sir.

Q. Said that he owed him, I believe, four hundred dollars; right?

A. I couldn't recall how much he owed. Just remember owing money.

Q. Okay. You said earlier -- I think the State asked you about -- again about Padgett. And I believe it

was through Underwood's testimony to y'all that, in fact, after you went through with them that he determined that Padgett wasn't a suspect.

A. Yes, sir.

Q. Well, wasn't Padgett Dough Boy? Wasn't he, in fact, indicted?

A. Yes, sir.

MR. RODRIGUEZ: I'm going to object, Your Honor, as to hearsay. The indictment's part of the record, Your Honor.

THE COURT: Sustained.

MR. TURPIN: Okay.

Q. (BY MR. TURPIN) So he was charged; right?

A. Yes, sir. There was a warrant for him, yes, sir.

Q. In this case.

A. Yes, sir.

Q. In fact, there was also a photo lineup; correct?

A. Yes, sir.

Q. That had Mr. Padgett's picture on it?

A. Yes, sir.

Q. And, in fact, Jessica Watson looked at this photo lineup. Is that correct?

MR. RODRIGUEZ: Object to any type of hearsay.

THE COURT: Sustained.

**THE COURT:** Um-hm.

*(Counsel returned to counsel tables.)*

**THE COURT:** All right. Ladies and gentlemen, there's been an objection made as to basically the nonresponsive of the last question, I guess I'd say, and the response.

**MR. GILMORE:** Response to the question.

**THE COURT:** And the response. Any instruction -- I mean -- excuse me. Any answer that was just made by Mr. Tanton about any conduct on behalf of either defendant is going to be stricken from the record and you will not consider it whatsoever.

Additionally, the same instruction goes if Mr. Tanton says something Mr. Pate said, that cannot be used against Mr. Hall. Do you understand that? You have to only use it against the individual that was making the statement. Okay?

Thank you.

All right. You may proceed.

Q. (BY MS. CABLE) Now, when you went outside, was there a conversation about what y'all were getting ready to do?

A. Correct.

Q. And who all was involved in that conversation? Who all was there when it took place?

A.    Mr. Pate was there.  Mr. Hall was there. Underwood was there.  Ray was there.

Q.    Could you tell who was running the show or giving the directions?

A.    At that time, Pate was telling Underwood and Hall about an easement, the woods that ran behind the victim's house, how to approach it without being seen.  You know, basically mapping out how we're going to get up there without a bunch of Aryan Brotherhood dudes seeing us before, you know, we can get in place basically.

Q.    And just so the jury understands, do the Aryan Circle and the Aryan Brotherhood get along?

A.    Years of animosity.

Q.    And so even though I guess they're both based on the White race, they don't like each other?

A.    Correct.

Q.    Now, after Pate, Chadrick Pate, the defendant, told you where you were going and gave you instructions, did he say anything about the kind of structure that was going to be on this location?

A.    Could you elaborate the question --

Q.    Was it, like, a house, a trailer, or where were y'all going?

A.    It was just a house.  They were talking about the house.  I mean, it wasn't really, you know, specified, so,

I mean, it was just "his house" is what he was saying.

Q.    And so Chadrick Pate was saying it was his house.

A.    Correct.

Q.    Was there any information given to you and your other members of the gang that who was going to be in this house?

A.    There was never any name.  It was just affiliation, Aryan Brotherhood.  That was all I knew. That was all that was told to me.  That's all I ever heard.

Q.    Was there any information given to you by Chadrick Pate about whether anybody was being hurt in that residence?

A.    I don't remember anybody being hurt.  I just remember it being said that, you know, that there was guys there selling dope out of the house and, you know, he couldn't get them to leave basically.  That was...

Q.    Was there an indication as to the number?  One or more than one?

A.    Yeah.  It went from four and five to five and six at one time, so, I mean...  Just Aryan Brotherhood guy and some of his -- said his friends, members, whatever you want to call them.

Q.    And did the defendant, Chadrick Pate, say that he lived at that house?

A. Correct.

Q. Now, how long would you say you were at that residence there where you had this meeting? How long were y'all there?

A. Two hours max.

Q. And when you left there, who was in the vehicle with you?

A. Mr. Hall, Mr. Underwood.

Q. And who was driving that vehicle?

A. Mr. Hall.

Q. Now, on that particular night, how was Mr. Underwood feeling?

A. Mr. Underwood had the flu. He was real nauseous, real sick. You could tell. You could see it all over him.

Q. Now, when y'all left the residence, who was the lead vehicle, yourself or the other --

A. No, the other vehicle.

Q. And do you know who was driving the other vehicle?

A. I'm pretty sure it was Anthony driving the vehicle.

Q. And that'd be Anthony Ray?

A. Correct; yes, ma'am.

Q. And who was with Anthony Ray?

A.    Sid.  Chad Pate.

Q.    And when y'all left there, do you know where you went?

A.    Like I said, I'm not from this area.  All I know is we were following a car and I can describe the area for you.

Q.    What kind of area was it?

A.    Kind of desolate.  I remember going up past, like, a can place that was on the right.  We went all the way to, like, this dead-end where there was a bunch of ponds and stuff around.  We came back and we parked in front of this wooded easement.

Q.    And which vehicle was leading the way over there?

A.    I'm assuming it was Ray's vehicle.

Q.    Who was with Ray?

A.    Pate was with Ray.

Q.    Now, when y'all headed over there, you said it was a couple of hours.  What time of day or night was it?

A.    It was midnightish at the time.

Q.    So was it daytime or dark?

A.    No.  It was dark.  It was midnight, around midnight.

Q.    When you went to this back easement, what happened when y'all got out of the vehicle?

A.    We parked.  We got out.  And Mr. Pate was telling

us how to go through the woods and that, you know, where basically -- where, you know, the house would be from that particular point where we were at. And where --

Q. Who led the way?

A. Mr. Pate.

Q. And --

A. I mean, we were...

Q. Go ahead.

A. We were, I mean, pretty much, you know -- you know, together, I mean, but he was, you know, leading the way, showing us how to get to -- the back way to the house.

Q. Were there any lights or anything out there to help y'all see?

A. Really not that I can -- not that I remember. It was really dark.

Q. On the way to this house where these Aryan Brothers were held up, did y'all stop along the way?

A. There was -- right before in eyesight of the little house, there was, like, a dilapidated shed. We held up behind there. And at that time, I guess Pate said he was going to, like, pull the phone lines I guess. And at that time, you know, it was pretty apparent that there wasn't going to be no six or seven Aryan Brotherhood guys there.

Q. As you approached, what made you think there weren't six or seven guys there?

A. No cars.

Q. Were there any lights or any noises --

A. There was lights on in the house, but, I mean, there wasn't really any noise at all, a T.V. maybe. At that point...

Q. As you approached -- as you approached, what was going through your mind?

A. Maybe I'm going to get out of here without getting shot at basically. I felt -- I felt that I had, you know, I felt -- I felt something wasn't right 'cause, I mean, you know, it didn't seem like the situation that I had been told. So, I mean, even -- I wasn't the only one that felt that way 'cause at that time Underwood turned back to Mr. Pate when we were behind that little shed and he asked him, you know, plain as day, "What do you want to see happen here? You know, what do you want us to do?" I mean --

Q. What did Pate say?

A. He said that he just wants this guy to leave. You know, he wants, you know, he don't want these guys back at his house.

Q. Did he indicate it was one guy or more than one guy at that time?

**A.** He was saying "guys." I mean... I mean, there was, you know, there was a guy in question. I didn't know his name or anything about him at the time. There was a guy in question, but, you know, his friends were part of the problem, you know.

**Q.** Were you aware -- were you made aware as part of the plan that there were going to be kids in that house?

**A.** Absolutely not. Absolutely not.

**Q.** Would that have played a part in your decision-making?

**A.** I'd have took a bullet myself for leaving the situation. You don't mess with kids. You don't put kids in that position. That's, you know, wrong.

**Q.** As you left that little shack and approached the trailer, describe for me what you saw.

**A.** What do you mean?

**Q.** What did the trailer look like?

**A.** It was -- looked like a cross between a camper trailer with a house add-on almost. I mean, it was, you know, really small, you know. The closer I got to it, the more I was thinking, you know, *I don't think six Aryan Brotherhood guys could even fit in this place.*

**Q.** And as you approached, did Mr. Pate indicate what he was going to do?

**A.** He said that he was going to pull the phone lines

before we even, you know -- he started acting really sketchy at this point. He said he was going to pull phone lines. And when we all took off to go to the house, he ran around the house and I didn't see him again really, I mean...

Q. As y'all approached the house, was anybody armed?

A. Yes.

Q. Who had a weapon?

A. Everybody had a weapon at that point whether it be, like, a stick-type piece of -- well, there was, like -- there was all kinds of rubble, like rubbish in front of the house, and everybody just kind of grabbed whatever was laying around.

Q. What sort of weapon did Mr. Hall have?

A. He had a pistol.

Q. And was that the same pistol he had from his --

A. From the trunk of the car.

MS. CABLE: Your Honor, may I approach the witness?

THE COURT: You may.

Q. (BY MS. CABLE) I'm going to show you what's been marked as State's Exhibit Number 23 and ask you if you can identify the contents of this for me.

A. Looks identical to the gun. I'm positive that's it.

Q. And who had this weapon that night on January 4th, 2008?

A. Mr. Hall.

Q. And is that Mr. Hall the defendant you've identified here today?

A. Correct.

Q. And as yourself, Underwood, Anthony Ray, Chadrick Pate and Hall approached the residence, what -- how did Hall have the weapon? What was he doing with it?

A. He, like, had it tucked to his side right here.

Q. And you said everybody had a weapon.

A. Correct.

Q. Does that mean you had a weapon?

A. Correct.

Q. What kind of weapon did you have?

A. Some little piece of, like, pipe thing I found in the trash can right in front of the house.

Q. And did Underwood have a weapon?

A. I'm pretty sure he did. I can't remember exactly what it was. I'm not going to sit here and say what it was because I can't remember. But, I mean, I'm pretty sure. I mean, it was a year ago. But, I mean, we all grabbed something before we actually went in the home because we're thinking, you know, there's still -- even though there's no cars, there's still a possibility of a

bunch of guys being in there and they could have been armed.

Q. And did you see whether Chadrick Pate picked up anything?

A. No, I don't think -- I couldn't say he did. Like I said, by the time we were actually standing in front of the door, I didn't see him anymore.

Q. So as you approached the door, Chadrick Pate ran off.

A. Correct.

Q. Said he was going to go cut the phone lines.

A. Correct, which I thought was odd because, if that was my house, you know, I would definitely want the guy to see me that I was running off.

Q. So who was left as you approached the house then?

A. Me, Hall, Underwood and Spooky Ray.

Q. Ray's nickname is Spooky?

A. Correct.

Q. And as you approached the house, what happened?

A. Right as we -- I guess we're standing, you know, kind of, I guess, reluctant to actually to go in or whatever. The door opened up and there was a female standing in front of the door.

Q. Could you describe what the female looked like?

A. I really can't.

Q. And as you see the female inside the door, what's her reaction when she sees y'all?

A. Just kind of, like, shocked, stunned, you know what I mean? And then she could see that, you know, that there was weapons involved. She made a little scream and ran back into the house. And from there, everything happened really fast.

Q. So as she runs back in the house, what did you do?

A. We all -- we all went through the doors, you know, really quick. Hall told me and Underwood to make sure there wasn't nobody in the back. And as we're going back there, there's, you know, there's screaming -- there's these girls in there, young girl screaming, "Please don't hurt me, please don't hurt me."

Underwood and I both said, you know, "Nobody's going to hurt you." Shut the door on them.

Q. And then where did you and Underwood go?

A. We went back to the little front of the, you know, by the door where there's, like, a bed/couch pull-out type thing.

Q. Was there anybody in that room as y'all went in besides the girl?

A. There was a man laying on the bed.

Q. Just one man?

**A.** Yeah, just one man.

**Q.** And when you came back from the girls, what was Hall and Ray doing? What were they doing?

**A.** They were standing over the guy. Hall had the gun pointed at him, like, towards his face. I'm wanting to say like in a pistol whip type motion. I don't know if he actually hit him with the gun, but he was, you know...

**Q.** Did you feel like Hall was threatening him with the gun?

**A.** Definitely.

**Q.** The guy that was on the bed, was he fighting y'all at that time?

**A.** Yeah, he was definitely trying to squirm away, trying to get, you know, trying -- I mean, he was -- looked to me like he was trying to reach up for the gun to get it pointed, and he was saying, "Please, I got kids."

**Q.** And did Ray do anything?

**A.** He was hitting him.

**Q.** What was he hitting him with?

**A.** Whatever he had in his hands, stick, pole type object thing. I'm not even sure exactly what it was.

**Q.** And did you see where Ray hit him?

**A.** I mean, he was -- he was standing, like, you know, I don't know how to actually, I mean, he was, like -- Hall was on this side and he was on this side and

I was coming up towards the middle.

Q. Were they closer to the top of the bed where this guy's head was?

A. Actually, Hall was towards that side and Ray was towards the other. But by this time, he had done spun around to, you know, like, to face off, you know, so...

Q. And the guy that y'all made contact with, could you describe him? Was he a big guy, little guy?

A. Seemed tall. Maybe not really big in build, but he seemed tall, kind of wiry guy.

Q. Did this guy that y'all you went into his house, did he have a weapon?

A. Not that I could see.

Q. Did you ever hit the guy?

A. Yeah. Yes, ma'am, I did. I hit him towards, like, he was -- when he was crawling away, like, when we first went, you know, back towards, you know, I hit him when he was crawling away.

Q. Where did you hit him?

A. Leg-ish, thigh-ish-type area.

Q. And did you see him get shot?

A. Yes, I did.

Q. And who shot him?

A. Hall shot him. Mr. Hall shot him.

Q. Can you show the jury how that happened?

A. As the guy was, like, turning to face off and squirming away, like, trying -- he was, like, trying to get up to get out the door I guess. Hall -- I mean, Hall shot him. I mean, actually didn't see the shot, but, you know, he had the gun in his hand. I mean, I had just come back from the back side with Underwood and Underwood's standing right behind me and, you know, the shot. And then I see the guy get up and, I mean, I could actually see the wound, the puncture. I mean, it was, like, above his -- on his side right here kind of up, like, waist area.

Q. And when you saw that wound, who had the gun in his hand?

A. Hall had the gun.

Q. And that's the defendant in this case --

A. Correct.

Q. -- Mr. Hall. And when the guy gets shot, what does he do?

A. He bolts straight out the door.

Q. And as he ran out the door, did you ever see Hall fire at him again?

A. No.

Q. Did you ever see him try to fire at him again?

A. He had -- I mean, he was running behind him, but, you know, I can't say he tried to fire at him again or

Please don't discuss the case with anyone.

*(The jury exited the courtroom after which there was a discussion off the record.)*

THE COURT: Okay. Go ahead.

MR. GILMORE: There were some folks sitting out in the audience over here. I believe it's --

THE COURT: Where?

MR. GILMORE: Right over here. I believe it was Mr. Watson's family.

THE COURT: Mr. Who?

MR. GILMORE: Watson.

MS. CABLE: His mother and his grandmother. It's his mother. They're here with the little girls. They're custodians.

MR. GILMORE: But anyway, one of the people sitting behind the Watsons, his mother and father, said -- pointed over to my client and said, "He's in jail. I know he's in jail because I can see his leg brace." And it was said where the jury could hear it. And I just want them instructed not to be making statements in front of the jury.

THE COURT: I don't want anybody -- anybody that's involved with the witness or whatever does not need to be making any comments whatsoever about the case while they're sitting in the courtroom.

And you'll please advise them.

Mr. Rodriguez --

MS. CABLE: I don't know who was talking. Who said that?

THE BAILIFF: That's the C.P.S. girl.

MS. CABLE: Okay, 'cause it wasn't our witnesses. It wasn't anybody I have control over. We'll make the instruction and, for the record, I didn't hear them make any comment.

THE COURT: Is that Ms. Abbott? She's on the witness list.

THE CLERK: Stephanie?

THE COURT: Yeah. She's on the witness list. If that was her; I don't know --

THE CLERK: I think that's her name.

THE COURT: Well, y'all's witness ain't going to get to be in the courtroom.

MS. CABLE: Not our witness anymore, Your Honor.

MR. RODRIGUEZ: She was basically having custody of the children, so that's why she was on the list. They were actually placed with somebody else on a permanent basis.

MS. CABLE: I don't think we're planning on calling her.

MR. RODRIGUEZ: We weren't planning on

calling her, Your Honor.

THE COURT: You're going to have to check with them, guys, at the door.

THE BAILIFF: Yes, ma'am.

THE COURT: Would be C.P.S.

Off the record, Sharon.

*(There was a discussion off the record.)*

THE COURT: Just for the record, gentlemen, I have reviewed -- got to me late -- but Mr. Fanton's criminal history. I've reviewed Mr. Leal's -- no, no. Who is this?

MR. RODRIGUEZ: Underwood.

THE COURT: I'm sorry; Ray's. There's... one felony conviction it looks like. Is that what y'all saw?

MR. RODRIGUEZ: On?

THE COURT: Mr. Ray. It's a conviction for some sort of drugs. Four-Eighty-One-Point-One-One-Five-P. I don't know if that's the cocaine charge or not; I don't know. Less than a gram on him.

I'm just now reviewing Underwood's. (Examining document/s). He's got a felony theft, Mr. Underwood does, guys.

MR. GILMORE: Who's that?

THE COURT: Mr. Underwood has a felony

**THE STATE OF TEXAS** }{

**COUNTY OF ARANSAS** }{

I, **SHARON D. ANDERSON,** Official Court Reporter in and for the 343rd Judicial District Court of Aransas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties and/or Court to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me on the designated dates.

**WITNESS MY OFFICIAL HAND** this the 3rd day of June, 20 09.

SHARON D. ANDERSON, CSR
OFFICIAL COURT REPORTER
343rd Judicial District
P. O. Box 700
Sinton, Texas 78387
361-364-6202
Cert. No.: 2650
Exp. Date: 12-31-10

RECORD EXHIBIT # 8

RR VOL 7 OF 9

2/11/09

JURY TRIAL GUILT INNOCENCE

# REPORTERS RECORD

# VOLUME 7 OF 9

## THE STATE OF TEXAS
## VS.
## CHADRICK B PATE

*Objection to dropping gang stuff on them day of trial when proper discovery was made*

# R E P O R T E R ' S   R E C O R D

## VOLUME 7 OF 9 VOLUMES

### Trial Court Cause Number A-08-5080-4-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT OF |
| | * | |
| VS. | * | ARANSAS COUNTY, TEXAS |
| | * | |
| CHADRICK B. PATE | * | 36TH JUDICIAL DISTRICT |

------------------------------------------------

*JURY TRIAL*
*Guilt/Innocence*

------------------------------------------------

## A P P E A R A N C E S

**COUNSEL FOR THE STATE:**
    MR. MARCELINO RODRIGUEZ
    MS. RETHA CABLE
    ASSISTANT DISTRICT ATTORNEY
    36th Judicial District
    San Patricio County Courthouse
    P. O. Box 1393
    Sinton, Texas      78387
    Tel:  361-364-6220
    Fax:  361-364-4978
    SBN:  24046959
          00785741

**COUNSEL FOR THE DEFENDANT:**
    MR. JOHN S. GILMORE
    ATTORNEY AT LAW
    P. O. Box 276
    622 South Tancahua
    Corpus Christi, Texas      78403
    Tel:  361-882-4378
    Fax:  361-882-3635
    SBN:  07958500

COPY

     On the **11th** day of **February, 2009,** the following proceedings came on for trial in the above-entitled and numbered cause in said Court, **HONORABLE JANNA K. WHATLEY,** Judge Presiding, held in Rockport, Aransas County, Texas: Proceedings were reported by machine shorthand.

knew about Underwood and he said "no," so I'm going to ask if he made the statement, Judge.

THE COURT: Not how you do it.

MS. CABLE: He needs to ask him if he can -- if seeing his statement would help refresh his memory and give him an opportunity to do that before he can read the statement into the record.

MR. GILMORE: Okay.

Q. (BY MR. GILMORE) Obviously seeing the statement might help you refresh your recollection since you don't remember.

THE COURT: We need a response, Mr. Tanton.

Q. (BY MR. GILMORE) You need to answer. Do you need to read this?

A. I guess, yes, sir.

Q. Then read this right here.

A. (Complies). Yes, but that was -- that was after, you know, that had happened. That was a discussion after it had happened.

Q. Okay. Before you went to the trailer, you did not know that Underwood had been there previously?

A. I knew he had been there, but I didn't know anything about girls there. I didn't know anything about kids there.

Q. So when you say that you were told by your major

A.    Yes, ma'am.

         MS. CABLE:    Your Honor, may I publish State's Exhibit Number 36, 37 and 38 to the jury?

         THE COURT:    Yes.

         MS. CABLE:    (Tendering document/s).

Q.    (BY MS. CABLE) Now, when you got to that house with the lightning bolts, how were you feeling at that time?

A.    Sick.

Q.    What kind of symptoms were you having?

A.    Just real bad cough and fever.

Q.    So did you go anywhere to try and get some medication?

A.    Yes, ma'am.

Q.    And who took you?

A.    Ray.

Q.    And did y'all go in your car or his car?

A.    His car.

Q.    And do you know where you went?

A.    To a stop-and-go by Wal-Mart.

Q.    And what did you go in and get?

A.    Some Theraflu.

Q.    When you left to go to the stop-and-go to get some Theraflu, who stayed back at that house with the SS?

A.    Tanton, Mr. Hall and Mr. Pate.

Q.   Was there anybody else there at that house --

A.   There was some girls inside.

Q.   When you got back to that house there, were there any discussions about what was going to happen next?

A.   No.  I just -- I don't remember exactly what was said.

Q.   Do you recall if anyone was given directions or not?

A.   Just how we were going to go up on the house. That's about it.

Q.   Who was doing that?

A.   Mr. Pate.

Q.   Do you remember what directions he gave you?

A.   No, ma'am.  I didn't remember at the time.

Q.   And after Mr. Pate gave you the directions to go to the house, did you know what you were supposed to do at the house?

A.   It wasn't clear.  I mean, at that time it wasn't clear.

Q.   Did you know how many people were supposed to be there?

A.   He said "a few."

Q.   And who's "he"?

A.   Mr. Pate.

Q.   Did he say if these -- a few people if they had

A. People were probably asleep or something.

Q. Did it look like there were a bunch of Aryan Brotherhood there?

A. No, ma'am.

Q. And was that your understanding, there was supposed to be?

A. Yes, ma'am.

Q. And so what was going through your mind as y'all stopped behind that shed?

A. That this whole trip was bullshit. Excuse my language.

Q. That's all right. And so did you ask Pate anything at that time?

A. What he wanted done.

Q. So who was giving directions out there that night?

A. Pretty much Mr. Pate.

Q. And what did Mr. Pate say he wanted done?

A. Said he wanted the dude there ran off.

Q. Said "the dude"?

A. Uh-huh.

Q. Did he ever give you a name?

A. No, ma'am.

Q. At this time, did you see whether Mr. Hall had his gun?

Vol 7 of 9.

A. I didn't see it at that time, no.

Q. Did you have a weapon?

A. No, ma'am.

Q. Did anybody else have a weapon that you saw?

A. Not that I was paying attention, no, ma'am.

Q. As y'all approached the trailer, what happened?

A. I walked up to the trailer.

Q. Why did you do that?

A. I was going to open the door.

Q. And did you open the door?

A. No. I started to open the door, but a little girl opened the door.

Q. And where was Mr. Pate at that time?

A. He walked around the other side of the house I think to pull the phone lines or something.

Q. And where was Mr. Tanton at that time?

A. They were all behind me. I don't know for sure.

Q. So you were the first one up to the door.

A. Yes, ma'am.

Q. You said that Mr. Pate went to go pull some phone lines?

A. Yes, ma'am.

Q. Did you see where he went from there?

A. He went to the side of the house, not the trailer, and did something. Then he started walking,

like, towards the woods.

Q. Did he stay with y'all?

A. No, ma'am.

Q. So he didn't come back to that location.

A. No, ma'am.

Q. Was that part of his plan?

A. I have no idea.

Q. Were you aware he was going to leave?

A. No, ma'am.

Q. Whose idea was it for y'all to be out there that night?

A. His.

Q. Who's "his"?

A. Mr. Pate's.

Q. As you and, I guess now there's four guys, you and three other guys approached the front of the trailer, can you tell whether anybody's armed at that time?

A. No, ma'am.

Q. Did you know whether Mr. Hall had his weapon at the time?

A. I knew he had it, but, no.

Q. Did you see anybody else pick up any other weapons?

A. Not that I remember.

Q. Did you pick up a weapon?

A. My mother's.

Q. And what kind of vehicle was that?

A. A red Ford Focus.

Q. And who was driving that vehicle?

A. Me.

Q. And where -- and who was with you?

A. Chad Pate.

Q. Where was he in the vehicle?

A. Passenger side.

Q. And did there come a time on that night of January 4th -- January the 4th, 2008, that you had an occasion to meet up with Underwood, Hall and Mr. Tanton?

A. Yes, ma'am.

Q. And where did that first take place?

A. Well, Chad had my cell phone and he received a call from him saying, "Well, hey, you know, we're in Rockport. Where do we meet you at?"

And we found out they were going down that highway, and I told Chad, "Well, let's meet them at the end of the street."

And so we went down to the end of the street and, when we asked them, "Well, hey, do you see us?"

"Yeah, we see you."

So they turned down where we were parked and we led them back to the house.

Q.   Do you know who Mr. Pate talked to on your cell phone?

A.   I believe it was Chris.

Q.   Is that Chris Hall, the defendant?

A.   Yes, ma'am.

Q.   And when you first saw the vehicle that Hall, Underwood and Tanton were in, could you tell who was driving that vehicle?

A.   I can't remember.

Q.   And when you all left, I guess, the side of the road and met up with them, where did you go?

A.   Well, we went back to that house on...

Q.   Sawyer Lane?

A.   Sawyer Lane.

MS. CABLE:   Your Honor, may I approach the witness?

THE COURT:   You may.

Q.   (BY MS. CABLE) I'm going to show you what's been marked as State's Exhibit Number 36, 37 and 38 and ask you if you recognize these for me.

A.   Yes, ma'am.

Q.   And is that the house that you went to on Sawyer Lane that night?

A.   Yes, ma'am.

Q.   And I believe on the shed in State's Exhibit

Number 37 there appears to be something on that shed. Could you tell me what that is?

A.    Those are SS lightning bolts.

Q.    And does that mean anything to you?

A.    Yes, ma'am.  That's...  With a circle around it, that's kind of, like, an Aryan Circle patch.

Q.    Okay.  When you got back to that house there on Sawyer Lane, did you have occasion to learn where you were going and what y'all were getting ready to do?

A.    Yes, ma'am.  Well, we had hung out there a little bit and then we went outside and...

Q.    Did Mr. Pate tell y'all where you were going?

A.    Yes, ma'am.  He told us we were going back to that trailer that we had gone to before and he was just telling us, "Hey, we're going to go run these dudes off," you know.

Q.    Going to go run what?

A.    "Run these guys off."

Q.    At that point, were you expecting violence?

A.    Well...  Yes, ma'am.

Q.    Now, did Mr. Pate give directions on how to get to that house while y'all were there?

A.    Yes, ma'am.

Q.    What did he say?

A.    Well, we just jumped in the car and he just told

me, you know, "Turn here, turn here."  And then the other guys were following us.

Q.    And can you describe for the jury the area where this trailer was located?

A.    Well, I'm not too familiar with the area there, but I know we parked on the side of the road somewhere and we went through these woods, under this barbed wire fence through these woods and there's, like -- it's kind of a woody area like grass and there's other trailers here and there or houses or whatever they were, but...

Q.    Do you know -- was it a short distance or a long distance from the road to where the trailer was?

A.    Short.

Q.    Was it well-lit?

A.    No.

Q.    Was it daytime or nighttime?

A.    Nighttime.

Q.    Do you know what time of night it was?

A.    Somewhere around 2:00 in the morning, 3:00 in the morning or somewhere around there.

Q.    Now, when you all got out of the vehicle, who led the way up to the trailer?

A.    Chad.

Q.    Okay.  And that's Chad Pate, the defendant?

A.    Yes, ma'am.

**Q.** And as y'all approached the trailer, did y'all stop anywhere along the way?

**A.** Yes, ma'am. We stopped behind this little shed thing I guess to see, like, how we were going to approach the trailer.

**Q.** Was there ever any discussion about what was going to happen at that point?

**A.** Well, Chad was saying -- he said, "Well, I don't want them to see that it's me," you know.

So he kind of started to trying to back out and, you know, we were just kind of thinking, like, *Well, are we going to storm up in there? Are we going to knock on the door and call them out? You know, how's this going to go,* you know.

And Chad said, "Well, Spooky, you know, you go around back and cut the phone lines," and, like, well, I don't really know what to look for.

And Chris Hall told him, "Man, you live here. You go back around there."

So he went back around there and did whatever and...

**Q.** What did y'all do as Chad Pate went around to cut the phone line?

**A.** Well, from there we just kind of winged it, you know. We just kind of snuck up there and just walked in.

**Q.** When you got to the residence, can you describe

what it looked like as far as did it look like anybody was there?

A. Well, we saw lights on, so we figured somebody was there, and we heard, like, voices, like a T.V. And so we knew people were there.

Q. When Mr. Pate went around the building to cut the phone lines, did you see where he went from there?

A. Yes, ma'am. He ran through this grassy field, looked like he was limping, and he went into the woods.

Q. Did you see him again after that?

A. No.

Q. As -- so I guess who's left is you, Tanton, Underwood and Hall?

A. Yes, ma'am.

Q. So what happened at that point?

A. Well, we went into the trailer and there's a little girl --

Q. Let me back you up.

A. Okay.

Q. How did y'all get in the trailer?

A. Well, we all kind of, like, snuck up to the door, and I'm not sure if Underwood pulled the door open or if, I mean, or if the little girl -- the little girl was right there at the door. She might have pushed the door open. The door came open and we just walked in.

Q. What was the reaction of the little girl when y'all walked in?

A. She didn't look scared. She looked surprised like, you know, and she was, like, "Oh, hi, Underwood."

And, well, then, when she saw, you know, we were just kind of, like, walking in there and I guess menacingly, they kind of started freaking out.

Q. What happened to her? Where did she go?

A. Well, I'm not sure if it was Underwood -- by then I was already on one side of the bed and Chris Hall was on the other and I didn't see exactly who it was. It was Underwood or Tanton that took the two little girls into another room and I guess to keep them out of danger, you know. And then it was just me and Chris Hall and whoever else. But he was, like, off over there, so I couldn't really see who it was.

Q. So you couldn't tell whether it was Underwood or Tanton.

A. No.

Q. When you went in the residence, where did you go first?

A. I went around on the other side of the bed, like, I guess the side furtherest from the door.

Q. Did you see somebody in that room?

A. Yes, ma'am.

Q. Did you know that person?

A. No.

Q. And where did Christopher Hall go?

A. He went on the other side of the bed and sat down on the bed with him.

Q. And when was the first time you saw that Christopher Hall had a gun?

A. When he sat down on the bed with him.

Q. Can you show the ladies and gentlemen of the jury what he was doing with the gun?

A. He just sat down next to him and had the gun pointed at him and was saying, like, "Well, what's your name, dude," you know.

Q. Did y'all know the name of the person you were looking for?

A. By then, yes.

Q. Who had told you the name of the person?

A. Chad.

Q. Is that the defendant, Chad Pate?

A. Yes, ma'am.

Q. And what name did he give you?

A. Aaron.

Q. And so what did Chris Hall say when he sat down on the bed with this man?

A. Just, "What's your name," you know. Just kept

asking him what his name was.

Q. What was this man's reaction when y'all came in?

A. He was just saying, like, you know, "Whoa, I don't know you guys. What are you guys doing in my house," you know. And, "Whoa, hey, let's talk about this," you know.

Q. Did the man on the bed have a weapon that you saw?

A. No.

Q. And did you have a weapon?

A. No.

Q. Could you tell whether Underwood had a weapon?

A. I didn't see him with one.

Q. And could you tell whether Tanton had a weapon?

A. I didn't see him with one.

Q. So what happened when you and Hall were sitting on the bed with Aaron Watson?

A. Well, I wasn't sitting on the bed; I was standing. But he kept asking, you know, "What's your name?"

And I asked him, you know, "What's your name, dude," you know.

And, well, he wouldn't give up his name, and Chris Hall -- he didn't hit him with the gun; he just tapped him on the head with the gun and was, like, "Come on, dude;

what's your name?"

And, well, I got impatient and I punched him in the face and I --

Q. With your hand?

A. With my hand.

Q. Was it an open hand or a closed fist?

A. Closed.

Q. And how many times did you hit him in the face?

A. Two or three times.

Q. And was it all in the front of the face?

A. No. In the front of the face and in the back of the head.

Q. And then what happened?

A. Then, well, Chris puts a gun to him. It looked to me like he put it under his leg at the time. I thought he had put it under his leg. I guess not. But, anyway, he puts the gun up to him and he puts a pillow on it and then, you know, "pop," you know, "bang," you know. Didn't really sound that loud but...

Q. What was Aaron's reaction when you heard the pop?

A. Well, he didn't -- he acted like he didn't even get shot. He just went, "Ah, ah," and jumped up, and then there was just mass chaos.

Q. What happened? What did he do?

A. Well, he jumped up and he started, you know,

going towards the door and he was intercepted by everybody else and he's getting beat up and I'm looking for a way, you know, everybody's just clumped up at the door and Aaron Watson's trying to get out and there's this horrible little dog and he jumps up on the bed and he starts biting me and so...

Anyway, Aaron Watson makes it out the door and then everybody else just kind of funnels out the door and then I go out the door.

Q. So who was the first person out the door?

A. Aaron Watson.

Q. And could you tell where he went?

A. No. He vanished.

Q. Okay. And when you went out the door, where were you going?

A. I was running. I went down this grassy field and I wasn't even sure if that was the direction of, you know, where I was -- where I'd parked, you know. But I was running down this grassy -- it wasn't a field; it was like a -- I don't know what you would call that -- like a grassy road, and back to the vehicle.

Q. Did you see where Mr. Underwood went?

A. He was right behind me.

Q. And what about Mr. Tanton?

A. I figured he was right behind me.

Q.   What about Mr. Hall?

A.   I figured he was right behind me, too.

Q.   When you got back to the vehicles, did you see him again?

A.   Yeah, we were all there.

Q.   And did Mr. Hall have the weapon with him?

A.   I didn't see him with it, but I figured he did.

Q.   And what did y'all do at that time?

A.   Well, Chad had disappeared, so I was the only one in the vehicle that I was in and, well, they had took off over the bridge and I didn't know they were going, but... I guess I just kind of followed them and I'm not sure why. But I followed them over the bridge going towards Holiday Beach.

And we stopped as soon as we got over the bridge and, well, Chris Hall got out of the car and came up to me and say, "Hey, man, where's Chad?"

I was, like, "Well, I mean, he's gone, dude," you know.

And he was, like, "Oh, man, we were supposed to stay together." And he said they had got rid of the gun and he said, "Well, you know, there's going to be cops but, you know, go back and look for Chad, you know, and if you can't find him, well, just, you know, just look for him once and split, you know." And so --

Q. Did you do that?

A. No. No. I just went straight home.

Q. Now, you said that Mr. Hall, and that's the defendant in this case, told you he got rid of the gun?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes, ma'am.

Q. Did you actually see him do that or he just told you that?

A. He just told me that. I didn't see him do it.

Q. Did he tell you where he got rid of it?

A. He just said, "We got rid of the gun."

Q. At that point did you know that there had been a shooting?

A. I knew that the gun had discharged. I didn't think he was hit. I mean, just the way he just got up and just ran like that, you know, perfectly capable. You wouldn't think he got shot. I didn't see any blood or anything like that. So, no, I didn't think he was shot, but I knew that the gun had been discharged.

Q. When you exited that trailer, could you tell whether Mr. Hall did anything else with the weapon?

A. He didn't do anything else with the gun as far as I know.

Q. You didn't see him do anything.

**A.** No.

**Q.** After that meeting there on the side of the road with Hall and Underwood and Tanton, did you ever see them again?

**A.** No.

**Q.** Do you know who Ace is?

**A.** Yes, ma'am.

**Q.** What position does he hold in the Aryan Circle?

**A.** Director of the state.

**Q.** And would that be a high position or a low position?

**A.** High position.

**Q.** Is there anybody else higher in the state than Ace?

**A.** I wouldn't know what rank that is, but I think one other person.

**Q.** Did you see Ace on January 4th, 2008?

**A.** No.

**Q.** Was he out at that trailer when Mr. Watson was shot?

**A.** No.

**Q.** And what about Mr. Scott or Scott, the major? Was he out there that night?

**A.** No.

**Q.** What about Mr. Padgett? Was he out there at the

trailer that night?

A.    No.

Q.    Do you know how the Aryan Circle feels about you testifying here today?

A.    Not -- not very good about it.  I don't think they're too happy with it.

Q.    Why's that?

A.    Well, because I'm testifying against someone.

Q.    And is that a good thing or a bad thing in the Aryan Circle?

A.    A bad thing.

Q.    And are there penalties for testifying in criminal cases?

A.    Yes, ma'am.

Q.    Do you know what those penalties could be?

A.    You get x'd out.

Q.    And what would that mean?

A.    That would mean you get beaten up and kicked out of the gang.

Q.    Are you still in the gang?

A.    No, ma'am.

Q.    Now, I believe you used to have some tattoos on your arm and your leg which you've changed since then.

A.    Yes, ma'am.

Q.    What did you used to have on your arm?

A.    Lightning bolts.

Q.    Is that the same lightning bolts that are the symbol for Aryan Circle?

A.    They don't have the circle around them, but they're lightning bolts.

Q.    And did those signify anything?

A.    (Nodding head).  I guess that I was a member of an Aryan gang.

Q.    Was there any particular reason why you covered it up or changed it?

A.    Because I don't want to affiliate myself with anything like that anymore.

Q.    Why not?

A.    Well, because I never really believed in it, in hating another race or anything like that, and -- plus I'd never really known too much about A.C.  But the more I learned, now that I've learned more, you know, they're not really what they say they're about and I don't really want to represent anything like that.

Q.    I believe you also had on your leg or inside your leg a swastika?

A.    Yes, ma'am.

Q.    Did you change that as well?

A.    Yes, ma'am.

Q.    And why did you do that?

A.   Same reason.

Q.   Did you do that after the shooting?

A.   Yes, ma'am.

Q.   So do you consider yourself a member of the Aryan Circle today?

A.   No, ma'am.

Q.   Have you ever heard of a group call the Aryan Brotherhood?

A.   Yes, ma'am.

Q.   Do you know what their relationship is with the Aryan Circle?

A.   I'm not too read up on the history.  But from what I can gather, the Aryan Circle branched off of the Aryan Brotherhood I think.

Q.   Do they like each other or not?

A.   They're rivals.

Q.   Now, do you remember back when you talked to the police about your involvement in this case?

A.   (Nodding head.)   Yes, ma'am.

Q.   You remember when you did that?

A.   I was in the jail I think and I'm not too sure what the date was but --

Q.   You remember the month?

A.   I think it was July, August.

Q.   2008?

**A.** Yes, ma'am.

**Q.** And at that time when you gave your statement to the police about your involvement, did you have a plea bargain agreement between yourself and the State of Texas for your involvement in this case?

**A.** No.

**Q.** Did you give that statement freely and voluntarily?

**A.** Yes, ma'am.

**Q.** Did anybody try to get you to make those things up and put them in your statement?

**A.** No.

**Q.** Did Scott ever tell you what to say?

**A.** No.

**Q.** What about Ace?

**A.** No.

**Q.** Underwood?

**A.** No.

**Q.** Tanton?

**A.** No.

**Q.** Or Mr. Hall?

**A.** No.

**Q.** Since that time when you gave your statement, have you made an agreement with the State to resolve your criminal charges from January 4th, 2008?

A. Yes, ma'am.

Q. And what did you plead "guilty" to?

A. Aggravated assault and organized crime.

Q. And do you know what you're looking at?

A. Five to fifteen.

Q. And do you know who's going to make that decision what your punishment is?

A. I believe the judge.

Q. At this point, do you have any agreement with the State as to what your exact sentence will be?

A. No.

Q. That trailer that you, Mr. Underwood, Mr. Hall, Mr. Tanton and Mr. Pate went to on January 4th, 2008, had you been to that trailer previously?

A. Yes, ma'am.

Q. And who lived there at that time when you had been there before?

A. Chad Pate and Tracy Watson I think.

Q. And do you know how many times you went there before that day?

A. Just once.

Q. Was that the occasion when Mr. Underwood and Mr. Hall were here previously?

A. Yes, ma'am.

MS. CABLE: Pass.

THE WITNESS: I'm sorry?

MS. CABLE: I'm passing you to the defense counsel. Sorry.

THE WITNESS: Oh. Okay.

MR. TURPIN: May I proceed, Judge?

THE COURT: You may.

### C R O S S - E X A M I N A T I O N

**BY MR. TURPIN:**

Q. Good afternoon, Mr. Ray. My name is Stan Turpin. I'm representing Mr. Hall. Like to ask you a few questions.

First of all, when you went into this house where you participated in this assault of Mr. Watson, what were you carrying? Did you have anything on you --

A. No, sir. Sir?

Q. Did you have anything in your hands or you used your hands on him or what?

A. I used my hands.

Q. Okay. And there was a wallet missing from Mr. Watson. You took the wallet?

A. No.

Q. After Hall -- supposedly you said -- let's see; Hall and Underwood, when they were leaving the scene, you met with them and supposedly you were supposed to go back and look for Pate?

A. Yes, sir.

Q. And you didn't go look for Pate.

A. No.

Q. You went back to Rockport.

A. I went back home. Yes, sir.

Q. But you didn't have the wallet.

A. I didn't have the wallet.

Q. How often do you communicate with Mr. Scott?

A. I'm sorry?

Q. How often do you communicate with Scott?

A. Not often.

Q. But you do communicate with him.

A. Yes, sir.

Q. Of course you realize he's high up in the upper echelons of this Aryan Circle; right?

A. Yes, sir.

Q. How often do you communicate with Ace?

A. Not often, but I do communicate with him, or I did.

Q. And he's also high-up echelon in this Aryan Circle; is that correct?

A. Yes, sir.

Q. How often do you communicate with Justin Padgett, Doughboy?

A. Never. I have never met him before and I don't

really even know the guy.

Q. So you do or don't know him.

A. I'm sorry?

Q. You do or do not know him.

A. I know him now, but not -- I mean, not well enough to say -- I mean, we don't hang out all the time. We're acquainted.

Q. Just an acquaintance?

A. Yes, sir.

Q. Okay. This night, January 4th, 2008, you were smoking speed; right?

A. Yes, sir.

Q. Going into the house for the assault, January 4th, 2008, first one in the door was Underwood.

A. Yes, sir.

Q. Any way to miss Underwood?

A. I'm sorry?

Q. Is there any way to miss Underwood?

A. To miss Underwood?

Q. Yes.

A. You mean like --

Q. If somebody's looking for him, could you miss him or not?

A. No, you wouldn't miss Scott.

Q. Why is that?

A. He's a pretty big fellow.

Q. You said that you went in with Tanton and Underwood went to help the little girls?

A. One of them took the girls into the other room.

Q. So two girls are there. Mr. Watson is there. Who else is there when y'all go in?

A. Well, I saw an adult female, but I've been told that there was no adult female there. But I'm pretty sure I saw an adult there, female.

Q. All right. When were you told there was not an adult female there?

A. Well, I had heard from the district attorney that the two little girls said that --

Q. I'm not asking for hearsay from two little girls; I'm just asking you when did you find out.

A. I guess just recently, just, like, I guess Friday.

Q. Not today?

A. No.

Q. Last Friday?

A. Yes, sir.

Q. All right. You also have psychological issues.

A. Yes, sir.

Q. What are they?

A. Schizophrenia, Bipolar Disorder, depression and

stuff like that.

Q. When were you diagnosed with these?

A. When I was, say, 18, 19.

Q. How old are you now again?

A. 22.

MR. TURPIN: Pass.

C R O S S - E X A M I N A T I O N

BY MR. GILMORE:

Q. Mr. Ray, you hired --

MR. GILMORE: Is it okay, Judge?

THE COURT: Please.

Q. (BY MR. GILMORE) You or somebody in your family hired a lawyer to represent you?

A. Yes, sir.

Q. Did your lawyer go over the case with you that the State had against you?

A. (Nodding head). Yes, sir.

Q. Give you copies of the reports?

A. No, I didn't get the discovery.

Q. He didn't give you any of the discovery?

A. No, sir.

Q. Did he talk to you about what the law enforcement officers had gathered regarding your involvement in the case?

A. Not a whole lot, but I had heard they found a bat

with my scent on it.

Q.   Okay.  All right.  So the lawyer told you that?

A.   No.  The investigators told me that and then I talked about it with my attorney.

Q.   Okay.  So the investigator talked to you before you got a lawyer?  Is that it?

A.   Yes, sir.

Q.   But you didn't really give a statement to the investigators until after you got a lawyer; is that right?

A.   Right.

Q.   Did the lawyer go over the case against you?  Did he talk to you about what all the witnesses were saying about your involvement in the case?

A.   Vaguely.  He didn't go into detail.  He just -- he just said...  He just said my story was different -- I mean, what everybody else was saying was basically -- what Tanton and Underwood had said was basically what I had said.

Q.   So -- okay.  When did he tell you this?

A.   I'm not sure what the date was.

Q.   Well -- okay.  You went and talked to the law enforcement people, the investigators, on August the 12th of 2008.

A.   Okay.

Q.   Okay?  Now, did he tell you that your story was

different from everybody else's or the same as everybody else's before you went to talk to them or after?

A. No. He just basically told me what everybody else had said.

Q. Okay. So when you went in to talk to the investigator, did you already know what everybody else had said?

A. Not detail. I mean, I knew they had said, you know, basically what I had said just now.

Q. Okay. All right. Let me ask you about -- you said when you were talking to the investigators that there was a lady and two little girls there.

A. Right.

Q. That's what you told the investigators?

A. Uh-huh.

Q. You have to say "yes" or "no."

A. Yes.

Q. Okay. And which assistant district attorney told you that you were wrong? Which one of these two?

A. I believe it was the lady.

Q. Okay. She told you that you were wrong?

A. Yes, that the little girls had said that it was just them.

Q. Okay. So when you testified -- when she was asking you questions, you didn't talk about the lady.

**A.** I mentioned the lady, but, you know, she didn't seem to know anything about it.

**Q.** Were there any other things that she told you about your story that was different that you shouldn't talk about?

**A.** No.

**Q.** Let me ask you about the wallet.

**A.** Okay.

**Q.** Okay. You know where the wallet was found; right?

**A.** No, I'm not sure.

**Q.** You're not sure?

**A.** I don't know.

**Q.** Do you recall talking to the investigators about the wallet?

**A.** They'd asked me about a wallet, but I didn't know anything about it.

**Q.** Okay. Do you recall talking to the investigators and telling them that you knew about the wallet?

**A.** No, I didn't -- I had heard from somebody that the wallet was taken, but I didn't see anybody take the wallet from him that night.

**Q.** So before you talked to the investigators, you knew that the wallet had been found.

**A.** I didn't know that investigators found the

wallet. I had heard that somebody took his wallet. I didn't know that was true. That could have been just a rumor.

Q. You heard that on the streets.

A. Right.

Q. Okay. Now, this location where this incident took place is in Fulton; right?

A. Right.

Q. And it's North Fulton. It's kind of like the northern part of Fulton?

A. Right.

Q. If the wallet was found closer to Rockport, that would be south of the location where the incident took place; right?

A. Right.

Q. Now, you said that Mr. Pate took off running before the entry into the trailer; right?

A. Right.

Q. And then when you guys left, everybody went north.

A. Right.

Q. Okay. And you're the only one that came back south that went into that trailer. You're the only one that came back south again to go home; right?

A. Right.

Q. And if the wallet was found south of the location, who would have been the only one in that trailer that could have taken the wallet?

MS. CABLE: Your Honor, I'm going to object. That's speculation. There's no way this witness can know what everyone else did after they left each other.

THE COURT: Don't ask speculative questions.

Q. (BY MR. GILMORE) You took the wallet, didn't you?

A. Nope.

Q. Okay. But if the wallet was found south of the location, then --

MS. CABLE: Again, Judge, I'm going to object to that; speculation. He said he didn't do it. Asked and answered.

MR. GILMORE: Okay. Okay.

Q. (BY MR. GILMORE) All the calls that were made to the Aryan Circle guys in Houston were made on your cell phone.

A. Right.

Q. And you're claiming that Chad used your phone and made all those calls.

A. Yes, sir.

Q. And then after this incident happened and Chad took off, you didn't see him again that night.

A. No.

Q. But you made calls to the Aryan Circle guys after the incident; right?

A. After the incident, yes, sir.

Q. Okay. I mean, you got -- there's no way out of this because they got your cell phone records; right? So they know you made phone calls to these people.

A. Right.

Q. Did you make calls to Ziggy? To Chris Hall?

A. Yes, sir.

Q. And did you make calls to Scott?

A. Yes, sir.

Q. What about Ace?

A. Yes, sir.

Q. Okay. But you didn't make the calls to bring these guys down.

A. No.

Q. It just happened to be on your cell phone.

A. Yes, sir.

Q. This Aryan Circle -- I mean, you said you joined because you were going into SAFP and... I don't know if the jury knows; "SAFP" is Substance Abuse Felony Punishment Facility.

A. Yes.

Q. And that's for drug rehabilitation; right?

A. Right.

Q. Apparently it didn't work too well for you; right?

A. Well, that night, that had been the first time I had done drugs in a long time and, I mean, I turned it down once, but then, I mean, just -- it just being there, you know, I just said, "Well, all right. Let me have it," you know.

Q. You were actually smoking it, weren't you?

A. Right.

Q. And you got these drugs from Justin Padgett.

A. Chad did.

Q. You went over with Chad to get these drugs from Justin Padgett; right?

A. Right.

Q. Were you actually in Justin Padgett's trailer?

A. Yes.

Q. So you saw Justin Padgett deliver the methamphetamine.

A. No. I was off on the other side of my trailer -- I mean his trailer, minding my own business.

Q. Okay. You weren't watching.

A. No, I was not watching.

Q. But you know it came from there; right?

A. Right.

Q. So you joined the Aryan Circle for protection.

And did you maintain your membership after you got out of SAFP?

A. I was just a prospect. I was never a full-fledged member.

Q. Do y'all have regular meetings or something? Is it like -- is it like a club or something, you know, where you have regular meetings and discuss things?

A. Yes. There's no specific location where they meet, but it's wherever it happens to be --

Q. Where have you met with the Aryan Circle for meetings?

A. In Corpus, in Rockport and that's it.

Q. Okay. And at the Rockport meetings, who was there?

A. Me... It's a pretty small chapter. Me and Shane Evans and Matthew Chips (ph) and, at the time, that was it.

Q. Okay. What about Justin Padgett?

A. He never attended.

Q. He never went to the meetings?

A. No.

Q. He was A.C. though; right?

A. As far as I knew.

Q. And what about Chad Pate?

A. Chad Pate never attended any meetings.

Q.    Okay.  Now, when you go to these meeting, do they tell you who, you know, who's your boss?

A.    Yes.

Q.    Did anybody at those meetings ever tell you that Chad Pate was your boss?

A.    No.

Q.    Okay.  And as a prospect, you would know who your superiors were, wouldn't you?

A.    You would know, yeah.

Q.    'Cause you know who the director of the state is; right?

A.    Right.

Q.    And you know who the major is in Houston; right?

A.    Yeah, because I'm told that.

Q.    But nobody ever told you that Chad Pate was a ranking member of A.C.; right?

A.    Yeah, sure.  Chad told me that.

Q.    Yeah.  But other than that, did anybody ever tell you that?

A.    No.

Q.    What's the purpose of being in A.C. if you're not in prison?

A.    I don't know.  I didn't really know a whole lot about the organization at the time.

Q.    What kind of things were you asked to do for

A.C.?

A. Well... Beat people up.

Q. Beat people up. That was your job?

A. Well, I mean, basically whatever it is you were asked to do, I mean, you know.

Q. Did Chad Pate ever ask you to beat anybody up besides this guy?

A. J.R.

Q. J.R. Okay. Let's talk about J.R.

A. Okay.

Q. You said that that night, the night that this happened to Aaron Watson, that Chad Pate had to tell you how to get to the trailer.

A. Right.

Q. Okay. Now, the first time in November when Mr. Hall and Mr. Underwood came down, they met you at the end of Copano Bay Bridge.

A. Right.

Q. And you were by yourself; right?

A. I was with a girl, but, I mean, yeah.

Q. And you took them to Mr. Pate's -- the trailer, the trailer that y'all went to that night; right?

A. Right.

Q. So you already knew your way there.

A. Yeah, but this time, we'd gone through some woods

and it was dark. I mean, we didn't take backroads and go straight there; we went through some woods like commando style.

Q. Okay. So Mr. Pate had to tell you how to do that?

A. Yeah.

Q. And let me ask -- I don't want you to say what the district attorney told you or what anybody else told you. You think there was a woman there that night; right?

A. Right.

Q. And had you met Tracy before?

A. Once briefly.

Q. You think Tracy was there that night, don't you?

A. That's who I thought it was.

Q. Before y'all went into the trailer that night -- well, let me back up to November. What did y'all do in November? What was the deal in November?

A. November when Chris Hall and Underwood came down?

Q. Yeah. What was the deal back then?

A. Well, that's when we were supposed to go fight with J.R. and his buddies and --

Q. "J.R. and his buddies." It wasn't just J.R.?

A. No.

Q. And what did J.R. supposedly do?

A. Sexually assault his girlfriend.

Q.   Okay.   And Chad told you that?

A.   Yes.

Q.   Okay.   And Chad's the one that called everybody down.

A.   Right.

Q.   When y'all got together and met, what did y'all do?

A.   We just drove around.  And I guess -- I don't know why -- I was in the tailgate and I was kind of wondering what we were doing, but --

Q.   Did you know who J.R. was?

A.   No.

Q.   Never heard of him before?

A.   Huh-uh.

Q.   You have to say "yes" or "no"; sorry.

A.   No.   Sorry.

Q.   Did you go to J.R.'s house?

A.   No.

Q.   You weren't with them when they went to J.R.'s house?

A.   If they went to J.R.'s house, I didn't know that that was his house.  I was in the back in the tailgate and they were talking in the cab.  I didn't hear anything.

Q.   Okay.   So you were -- is this an open-bed pickup truck?

A. Right. Tailgate, yeah, open bed.

Q. So you were sitting in the back.

A. Right.

Q. You don't recall going by a house and stopping at the house?

A. We didn't stop at the house.

Q. So all y'all did was drive around.

A. Right.

Q. And this all occurred in one day?

A. Right.

Q. There's been previous testimony that they spent the night there at Chad's trailer, at the house by Chad's trailer. Did it happen the day before they spent the night or the day after they spent the night?

A. Day after.

Q. The day after. So you led them to the trailer. They spend the night and then y'all go looking for this guy.

A. Right.

Q. Can't find him anywhere, and then they just left; right?

A. Right.

Q. And you saw them leave.

A. Right.

Q. Where was Chad when they left?

A. Chad? He was with them.

Q. Did you assist them in stealing the jet ski?

A. No. They'd dropped me off already.

Q. But you know about the jet ski being stolen.

A. I didn't know it was stolen. I didn't know anything about a jet ski until I was told. Well, I wasn't even told. I looked at a statement and seen that it -- yeah.

Q. Do you know why Chad Pate would have had his arm cut that day?

A. I didn't know he had his arm cut.

Q. Okay. He was with you all day and Mr. Hall and Mr. Underwood, but you didn't see him get his arm cut.

A. No.

Q. And you didn't have anything to do with him getting his arm cut.

A. No.

Q. Now, before y'all went in -- we're going to jump ahead to January the 4th, the morning of January the 4th. What was your understanding of what y'all were going to do before you went into the trailer?

A. We were supposed to go in there and run off all these guys that were supposed to be in there, all these A.B. dudes.

Q. Were you there during the planning?

A.    Chad?   He was with them.

Q.    Did you assist them in stealing the jet ski?

A.    No.   They'd dropped me off already.

Q.    But you know about the jet ski being stolen.

A.    I didn't know it was stolen.   I didn't know anything about a jet ski until I was told.   Well, I wasn't even told.   I looked at a statement and seen that it -- yeah.

Q.    Do you know why Chad Pate would have had his arm cut that day?

A.    I didn't know he had his arm cut.

Q.    Okay.   He was with you all day and Mr. Hall and Mr. Underwood, but you didn't see him get his arm cut.

A.    No.

Q.    And you didn't have anything to do with him getting his arm cut.

A.    No.

Q.    Now, before y'all went in -- we're going to jump ahead to January the 4th, the morning of January the 4th. What was your understanding of what y'all were going to do before you went into the trailer?

A.    We were supposed to go in there and run off all these guys that were supposed to be in there, all these A.B. dudes.

Q.    Were you there during the planning?

A. Yes.

Q. Did anybody say anything about shooting anybody?

A. No.

Q. Did anybody say anything about beating people?

A. Nobody specifically said, "Beat these dudes up," but -- well, what was said, "We're going to go right these -- we're going to go run these dudes off and, if they want to fight, well, you know, what's up, you know."

Q. As far as you know, nobody went into that place -- before you went in and as you were going in, you didn't realize that anybody was armed; right?

A. Right.

Q. Even with bats or clubs.

A. Right.

Q. You didn't have a bat or a club, did you?

A. No.

Q. And as far as you know, nobody else had one.

A. Right.

Q. Okay. And the gun was never pulled and shown as far as you know in front of Mr. Pate.

A. Right.

Q. So -- and he never talked about shooting anybody, did he?

A. No.

Q. So you went in there and Mr. Hall hit the guy in

the head. You start hitting him --.

A. He didn't hit him in the head. He just tapped him on the head to get his attention.

Q. Okay. Just tapped him a little bit with a gun on the head?

A. Well, not like, you know, just, like, "Hey, come on, dude," you know, like, "Tell me your name."

Q. "Tell me your name"?

A. Yeah. It wasn't like -- he didn't really smack him with it.

Q. And then he got a pillow and he put it over the gun, like, covering the gun and shot him?

A. Right.

Q. I mean, like, here's the front of the gun and here's the pillow. He put the gun up against the pillow and shoot him through the pillow?

A. No.

Q. Put the pillow on top of the gun?

A. Right.

Q. And that was a conscious effort on his part. He picked up the pillow, stuck it on top of the gun and shot him.

A. Yes.

Q. And is this while everybody -- while everybody was beating him?

A.    No.   This was just while I was beating him.

Q.    While you were beating him.   Do you recall telling the investigators that you and Mr. Pate went out a day or two before this incident at the trailer and scouted the place out?

A.    Yes, sir, but I think -- see, I wasn't really sure of the dates.   So I guess I just said, you know, a day or two before.   That was the time that we went -- that Underwood and them came down I think.

Q.    Okay.   Well, you talked about driving by there and scouting the place out.   You didn't talk about stopping and going inside the trailer.   You talked about...

A.    We probably did, yeah.   It was a long time ago. I don't know; I can't remember.

Q.    Well, in August you told them a couple of days before this incident you and Mr. Pate went over and scouted out the place.

A.    So I guess I did.

Q.    And you know that that's impossible; right?

A.    I don't.

Q.    You know that Mr. Pate was in jail the day before this happened and the week before this happened, don't you?

A.    Okay.

Q. You know that, though, don't you?

A. I didn't -- I didn't -- yeah. Yeah, I did know that.

Q. Because the investigators told you that you were wrong and they also told you you were wrong about Tracy being there, too.

A. Okay.

Q. And so you tailored your story to meet whatever they're telling you; right?

A. Right.

Q. You also told them that you left the A.C. because they were going to set you up.

A. Yeah.

Q. Is that right? So the A.C. does things like that; right?

A. Yes.

Q. You did -- you do something wrong?

A. It's all confusing to me because I was being set up for something I got told to do, you know, so -- so --

Q. What was that?

A. What we were asked to do, to go do this, and apparently... I was never really sure as to why, but from what I could gather, yeah, that's what it was, you know, bringing heat, you know, on everybody.

Q. So there's loyalty within the A.C. until they get

mad at you and x you out; is that right?

A. Right.

Q. So if you're x'd out, everything is -- everything goes; right? Including being beaten up; right?

A. Right.

Q. Being shot? Is that right?

A. Right.

Q. And also filing or testifying falsely against ex A.C. members; right?

A. No. You're not supposed to testify at all, ever.

Q. Okay. And if they did tell you to do it, you sure aren't going to tell us they told you to do it; right?

A. I don't guess I would.

Q. Probably wouldn't; right?

MR. GILMORE: Okay. That's all the questions I have.

R E D I R E C T   E X A M I N A T I O N

BY MS. CABLE:

Q. Did anybody tell you to testify falsely here?

A. No.

Q. And are you being truthful to this jury to the best of your ability?

A. Yes, ma'am.

Q. Did I ever tell you to lie?

A.    No, ma'am.

Q.    Did I tell you to try and tell the truth to the best of your ability?

A.    Yes, ma'am.

Q.    And this happened about a year ago?

A.    (Nodding head).  Yes, ma'am.

Q.    Do you remember everything as perfectly now as you did then?

A.    (Nodding head).  Yes, ma'am.

Q.    Are you sure that Mr. Hall was there with you that night?

A.    Yes, ma'am.

Q.    Are you sure that Mr. Pate was there directing y'all to go to that trailer?

A.    Yes, ma'am.

Q.    Was Mr. Pate aware that y'all were there to do violence?

A.    Yes, ma'am.

Q.    Now, the Defense Attorney asked you, "Who did Justin Pate (sic) give the meth to the night of January 4th, 2008?"  Who was that?

A.    Chad Pate.

Q.    When was the last time you communicated with Mr. Scott or Major Scott?

A.    That was maybe, like, a week or so after

January 4th.

Q. Was it -- did you and he ever discuss your speaking with the police?

A. Yes. I mean, he didn't come right out and say, "Don't speak with the police," but he just said, you know, "Hey, what's going on with that," you know, "What happened," you know.

I said, "Well, it's all a dead issue pretty much down here."

And he said, "Well, make sure it stays that way."

Q. Was that a threat from Mr. Scott regarding your involvement in the case?

A. I felt so.

Q. Now, you have a nickname of "Spooky"?

A. Yes, ma'am.

Q. Can you tell the ladies and gentlemen of the jury how you got that nickname?

A. I'm very paranoid. Anytime somebody is talking amongst themselves, I immediately think they're speaking about me. And I always think everybody's out to get me. And so one day, my associates said, "You know, you're kind of a spooky dude, so that's what we're going to call you."

Q. Did you really know Justin Padgett prior to January 4th, 2008?

A. I'd only heard of him, but I'd never met him or,

you know, I'd heard the name, but I'd never met him or anything like that.

Q. After leaving his house and Mr. Pate got drugs from Mr. Padgett, did you see him again that night?

A. I don't think so, no.

Q. Was he at the trailer with you?

A. No, ma'am.

Q. When was the last time you spoke with Ace?

A. About maybe, like, a few weeks, something like that, you know. Not long, but after January 4th, maybe like a month after.

Q. Did he in any way give you permission to testify here today?

A. No.

Q. Do you know how you're going to be viewed when you go to prison as a snitch?

A. Well, yeah, yeah. I guess everybody's going to be mad at me.

Q. And how does that make you feel?

A. Nervous. Targeted.

Q. When Underwood and Hall came down in December of 2007, were they armed with firearms?

A. They didn't have the firearms on them. There's -- in the back of the red truck, there's this little toolbox deal and that's where two firearms were.

But they didn't have any guns on them.

Q. But they did have weapons with them.

A. Right.

Q. You were aware of that?

A. Yes, ma'am.

Q. Was Mr. Pate aware of those weapons on that occasion as well?

A. I believe so, yes.

MS. CABLE: Pass the witness.

R E C R O S S - E X A M I N A T I O N

BY MR. TURPIN:

Q. Mr. Ray, after these statements were made August 12th, 2008, by you, did you assault somebody here at the jail for an A.C. member named Chips?

A. Yes, sir.

Q. What did you do to him?

A. I hit him once.

Q. You hit him?

A. Yes, sir.

Q. So you're still active with the A.C.

A. I wasn't doing it as an act of Aryan Circle, I mean... I mean, pretty much what I had heard was --

Q. I'm not asking what you heard; I'm just saying you hit this guy.

A. I did it so I wouldn't get any, you know, so I

wouldn't get beat up, you know, basically, 'cause they were talking about it.

Q. You told me you assaulted somebody for A.C. This is after the statements were made.

A. Who told you that?

Q. That's what I'm asking.

A. No. I didn't do anything for A.C.

Q. This guy named Chips?

A. Yeah.

Q. You don't know that he's A.C.?

A. I know that he's A.C.

Q. All right.

MR. TURPIN: I pass.

**R E C R O S S - E X A M I N A T I O N**

**BY MR. GILMORE:**

Q. I didn't know about that. So Chips is A.C. and he asked you to hit somebody for him?

A. Yes.

Q. And this happened after you gave this statement?

A. Right.

Q. But it wasn't an Aryan Circle hit. It was just somebody that you knew in the Aryan Circle asked you to hit somebody.

A. Well, I was pressured into doing it. I didn't want to do it.

Q.    In November when Mr. Hall and Mr. Underwood came down, did y'all go to Mr. Padgett's place?

A.    Yes.

Q.    Okay.  What did you go there for?

A.    We just went there just to meet Justin Padgett.

Q.    You're going to be sentenced for pleading "guilty" to this crime; is that right?

A.    Right.

Q.    In your mind, do you think that you're guilty of this -- of shooting Mr. Aaron Watson?

A.    I'm not being sentenced for that.

Q.    Yes, you are.

MS. CABLE: Your Honor, I'm going to object to relevance in his mind what he's guilty of to this proceeding.

THE COURT:  I'll allow the questioning, but I think you need to rephrase your question.

Q.    (BY MR. GILMORE) You pleaded "guilty" to intentionally, knowingly and recklessly causing bodily injury to Aaron Watson by shooting him.  Do you think you're guilty of that?

A.    No.  I didn't shoot the guy.

Q.    And you didn't know before you went in the trailer that he was going to be shot, did you?

A.    No.

Q.    Okay.  You're going to be sentenced anywhere from five to fifteen years; is that right?

A.    Right.

Q.    And Judge Welborn is going to sentence you; is that right?

A.    I didn't know that, but, yeah.

Q.    I think that's what Ms. Cable asked you.  Judge Welborn is going to sentence you.

A.    Okay.  Yeah.

Q.    So Judge Whatley's not going to sentence you.

A.    Right.

Q.    So the only way that Judge Welborn is going to know about what you've done here is if he talks to Judge Whatley or a prosecutor comes in and makes a recommendation for you; is that right?

A.    Right.

Q.    And the Prosecution, you assume they're going to make a recommendation based on how you perform in court?

MS. CABLE: Your Honor, I'm going to object.  That calls for speculation and assumption --

MR. GILMORE:  I don't have any more questions, Judge.

THE COURT:  Anything else?

MS. CABLE:  Yes.

-o0o-

# R E D I R E C T   E X A M I N A T I O N

**BY MS. CABLE:**

**Q.** Were you -- are you still a member of A.C.?

**A.** No, ma'am.

**Q.** Why were you involved in this assault with Mr. Chips?

**A.** I'm sorry; repeat that.

**Q.** Why were you involved in the assault with Mr. Chips in the jail?

**A.** Well, because he had asked me to do that and, well, at first, I told him "no." I told him "no," you know.

And we went to Crystal City and I had heard from another inmate, you know, "Hey, man, if you don't do that dude, they're going to get you, dude." So I mean... I mean, I know it's kind of weird, you know. You don't really even know the dude or anything, but you don't have to beat them up. Just swing on them, you know, and, you know. So I did.

**Q.** Did anybody tell you to testify here differently than the truth?

**A.** No.

**Q.** Does that assault have anything to do with your testimony here today?

**A.** No.

Q. And has my office, myself, Mr. Rodriguez, the district attorney, ever told you that we're going to make a specific recommendation based on anything?

A. No.

MS. CABLE: Pass the witness.

MR. TURPIN: Did you pass?

MS. CABLE: I passed.

**R E C R O S S - E X A M I N A T I O N**

BY MR. TURPIN:

Q. Your attorney was Ray Martinez (ph); right?

A. Right.

Q. Of course, they can't talk to you. Only your attorney can talk to you; right?

A. Right.

Q. So your attorney obviously told you what the deal was going to be before you came in here and testified.

A. Okay.

Q. Right?

A. Right.

MR. TURPIN: I pass.

**R E C R O S S - E X A M I N A T I O N**

BY MR. GILMORE:

Q. Did you know Ace's phone number before January of 2008?

A. I had it in my cell phone.

Q.    Did you have it in your speed dial?

A.    Previous calls, yeah, I guess speed dial, yeah.

Q.    Did you know Scott's number before January 2008?

A.    Same thing.

Q.    What about Ziggy?

A.    Yeah.

Q.    You had his number, too.  How about Mr. Underwood?

A.    Underwood?  I didn't even know he had a phone. No.

Q.    Okay.  So you had these numbers available to you before January of 2008.

A.    Right.

Q.    Did you have them before November of 2007?

A.    No.

Q.    When did you get them?

A.    Well, I got them from -- oh, well, I had the numbers for Ace and Scott but not for Chris Hall.  But for Ace and Scott, I had received those from...  Well, the one from Scott I believe I got from Chad, but the one from Ace, I had that.  I'd always had that.

Q.    Okay.  Did you ever write those numbers down and give them to anybody?

A.    Yes.

Q.    And who did you give them to?

A.    Chad.

Q.    So you wrote those numbers down -- even though Chad already supposedly had these numbers, you wrote them down and gave them to Chad.

A.    Ace did not -- I mean Chad did not have Ace's number.  As a matter of fact, I didn't write -- I don't think I wrote down Scott's number and gave it to Chad.  I think that was my number that I wrote down along with Ace's number and gave to Chad.

Q.    When did you write these numbers down and give them to Chad?

A.    I was working at Alby's Seafood.  I guess that was in November or September.

Q.    Before Mr. Hall and Mr. Underwood came down?

A.    Yes.

Q.    Okay.  And did you give them to Chad for Chad or did you give them to Chad for Mr. Watson?

A.    I gave them to Chad for Chad.  I didn't even know anything about Watson or anything like that.

Q.    Okay.  You never met Mr. Watson before?

A.    No.

Q.    When Chad was working there, did you ever see Mr. Watson there with Chad?

A.    Not that I know of, no.

Q.    You never -- you never met Mr. Watson at Alby's

THE STATE OF TEXAS    }{

COUNTY OF ARANSAS    }{


I, **SHARON D. ANDERSON**, Official Court Reporter in and for the 343rd Judicial District Court of Aransas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties and/or Court to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me on the designated dates.


**WITNESS MY OFFICIAL HAND** this the 3rd day of _____, 20 09.


SHARON D. ANDERSON, CSR
OFFICIAL COURT REPORTER
343rd Judicial District
P. O. Box 700
Sinton, Texas 78387
361-364-6202
Cert. No.: 2650
Exp. Date: 12-31-10

Vol 7 of 9

RECORD EXHIBIT # 9

RR VOL 8  OF 9

2/12/09

JURY TRIAL GUILT INNOCENCE

page 176
(Just says charge of
the Court was read)

missing page 77/81

# REPORTERS RECORD

# VOLUME 8 OF 9

## THE STATE OF TEXAS
## VS.
## CHADRICK B PATE

Page 70 line 25
~ 71 line 1

167 entire page
168 line 1-10

7

# R E P O R T E R ' S    R E C O R D

## VOLUME _8_ OF _9_ VOLUMES

### Trial Court Cause Number A-08-5080-4-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT OF |
| | * | |
| VS. | * | ARANSAS COUNTY, TEXAS |
| | * | |
| CHADRICK B. PATE | * | 36TH JUDICIAL DISTRICT |

------------------------------------------------

*JURY TRIAL*
*Guilt/Innocence*

------------------------------------------------

## A P P E A R A N C E S

**COUNSEL FOR THE STATE:**
   **MR. MARCELINO RODRIGUEZ**
   **MS. RETHA CABLE**
   ASSISTANT DISTRICT ATTORNEY
   36th Judicial District
   San Patricio County Courthouse
   P. O. Box 1393
   Sinton, Texas      78387
   Tel:  361-364-6220
   Fax:  361-364-4978
   SBN:  24046959
         00785741

**COUNSEL FOR THE DEFENDANT:**
   **MR. JOHN S. GILMORE**
   ATTORNEY AT LAW
   P. O. Box 276
   622 South Tancahua
   Corpus Christi, Texas      78403
   Tel:  361-882-4378
   Fax:  361-882-3635
   SBN:  07958500

COPY

On the **12th** day of **February, 2009,** the following proceedings came on for trial in the above-entitled and numbered cause in said Court, **HONORABLE JANNA K. WHATLEY,** Judge Presiding, held in Rockport, Aransas County, Texas: Proceedings were reported by machine shorthand.

is updated.

Q. And specifically, the number of cards that noted that Mr. Hall was a known gang member of Aryan Circle.

A. Mr. Hall's been documented four times.

Q. Now, did you also have an occasion to determine whether the defendant, Chadrick Pate, is a member --

MR. GILMORE: May we approach the bench, Judge?

THE COURT: You may.

*(The following discussion was had at the bench.)*

MR. GILMORE: I thought we already had a ruling on this. I objected earlier and the Court ruled that that was not admissible.

MS. CABLE: No. It ruled that it was admissible but just that their findings as far as the hearsay statements are inadmissible. But his determination is admissible.

THE COURT: I didn't say she couldn't bring it in; it's just --

MR. GILMORE: -- all based on hearsay, Judge.

THE COURT: That's the law, Mr. Gilmore. I can't help it. That's the code.

MR. GILMORE: Well, I can certainly object to it, Judge.

THE COURT: You certainly can.

**MR. GILMORE:** I'm going to object to it.

**THE COURT:** Okay. Very good. You may.

*(Counsel returned to counsel tables.)*

**Q.** (BY MS. CABLE) Again, were you asked to look at and determine whether the defendant, Chadrick Pate, was a member of *Aryan Circle?*

**MR. GILMORE:** Judge, I object to any testimony regarding my client, Chadrick Pate.

**THE COURT:** You may have a running bill on that. Your objection's overruled.

**Q.** (BY MS. CABLE) Again, did you -- were you asked to do that?

**A.** Yes, I was.

**Q.** And did you use those same criteria set out by the attorney general's decision in this case?

**A.** Yes, I did.

**Q.** And did you use the same cards' notation as you did in Mr. Hall?

**A.** Yes, I did.

**Q.** And how many cards noted that -- did you have in Mr. Pate's conclusion?

**A.** Five.

**Q.** What was your determination as an expert in gangs in this region as to whether Mr. Pate is a member of a gang?

MR. GILMORE: We rest, Judge.

THE COURT: How are we coming?

MS. CABLE: It's almost done. Printing it out.

MR. GILMORE: Can we talk about what we want?

THE COURT: All right. Ladies and gentlemen of the jury, you want to keep looking at those for a minute, you have all the evidence you're going to be seeing in the case. That's been submitted to you now. We are currently working on the jury charge to get the case charged to you. It may take us a little while to get that done because, to be real truthful, the State has the slowest printer in the United States of America. I don't have a printer at all so I got to be careful why I complain. But everytime I'm over here, it spits out one page, about two pages per five minutes. That's all I can tell you. They don't have a good printer.

MS. CABLE: Well, we brought that from San Pat.

THE COURT: So, I don't know. Like I said, we wait for it to print all the time. But once we get it finalized, we'll be ready to go. I've got a copy machine that'll make the copies.

So if y'all want to look at those for a

couple of minutes, when they all get done, let me know. Then I will release y'all to go take a break. It may be an hour; it may be twenty minutes; we do not know. This is the unknown break time for y'all; okay? I'll let y'all know in just a couple of minutes. Just remain seated if you don't mind.

(Pause)

THE COURT: Okay. Y'all want to take a break, we'll keep you informed. Again, don't discuss anything.

(The jury exited the courtroom and a recess was taken.)

THE COURT: All right! Do y'all have any objections to the charges as presented?

MR. RODRIGUEZ: None by the State, Your Honor.

MR. GILMORE: I don't have any objections for Mr. Pate, Judge.

THE COURT: Mr. Turpin.

MR. TURPIN: No objections.

THE COURT: Okay.

MR. GILMORE: Just to let you know, the wrong case number's on mine.

THE COURT: Okay.

All right. Doc, bring them in.

(The jury entered the courtroom.)

**THE COURT:** All right. Ladies and gentlemen, what's going to happen now, I'm going to read you the charge of the Court. You will have two originals, one for the Defendant Hall and one for the Defendant Pate. What we have agreed or everybody said I could do is I'm just going to read one of the charges. So I'll say "Pate" or "Hall" but noting that you're going to have to answer two originals; all right? Does that make sense to everybody?

Y'all don't want me to read this twice, do y'all?

Didn't think so. All right. I'll start.

*(The charge of the Court was read to the jury.)*

**THE COURT:** You have two verdict forms. Count One: *We, the jury, find the defendant, Christopher Joseph Hall or Chadrick B. Pate, guilty of murder as alleged in the indictment.* There's a signature blank. Or: *We, the jury, find the defendant not guilty of murder,* and, again, there's a signature blank. If you find the defendant not guilty of murder as alleged in Count One, then you proceed to Count Two; otherwise, you don't go to Count Two.

Count Two, you only use one of three forms: *We, the jury, find the defendant guilty of aggravated assault as alleged in the indictment,* and if you do find

that, then you move to special issue. Answer only if you found the defendant guilty of this count. *Did the defendant commit said offense as a member of a criminal prison gang*, and you answer "yes" or "no." And then lastly or: *We, the jury, find the defendant, Christopher Joseph Hall or Chadrick B. Pate, not guilty of Count Two.*

All right. Who's starting?

**MS. CABLE:** Judge, for the State I'll be making closing. State would waive my opening and reserve full time to close.

**THE COURT:** Mr. Turpin.

**MR. TURPIN:** Please the Court, please the State. Approach?

**BY MR. TURPIN:**

Ladies and gentlemen, good afternoon. I'm going to be speaking fast, so bear with me.

First of all, go back through and review the charge, please, limine instructions. Main thing I want to hit on is the Fifth Amendment. Our clients don't have to testify, don't have to put on any evidence. We didn't put on evidence. You're instructed you cannot hold that against them for any reason whatsoever. I understand that's a hard thing to do. What I'm asking you to do is put blinders on and to look simply at the evidence that you have. Okay?

like the organizations that your neighbors and friends belong to, but that's not proof of murder.

Thank you.

MR. TURPIN: Thank you, Judge.

MR. GILMORE: Your Honor, counsel.

**BY MR. GILMORE:**

I don't know if you guys are like me; you'd probably rather be home eating dinner. That's where I'd rather be right now.

Let me make it clear to you. Y'all are going to get a copy of this charge the Judge read to you to take back with you. I was listening to her read it and I was watching you guys and this is very complicated. This is complicated even for somebody who's been practicing law for thirty years as I have. So you have to read this and really understand it because this is the law that applies to the offense that Mr. Pate's charged with. And I told y'all at first during voir dire, Mr. Pate did not want to be tried with Mr. Hall. These cases are to be considered separately by the jury. We were forced into this trial together. Mr. Pate does not want to be sitting at that table with Mr. Hall. Our position is that Chad Pate was not there that night and did not do this, did not have anything to do with this. That's our position.

But I have to look at the other side. See; I don't

have the luxury of listening to Ms. Cable argue first and then counteract her argument. So I have to anticipate what she's going to say. But I'll tell you that the State called twenty witnesses. That's my count. Twenty witnesses. And of those witnesses, seventeen of them had absolutely no evidence what Chad Pate did on the early morning hours of January the 4th, 2008. Seventeen of those witnesses ranging from police officers to Tracy Watson and the kids to this gang expert to the dog expert, all those -- not one of those people have any evidence at all as to what Chad Pate did in the early morning hours of January the 4th.

Now, I will tell you that there are two people they could have called to show that Chad was associated with these people that committed this crime, two people that they could and should have called if these people -- if these people truly existed and if Chad was really there: The two girls at the house on Sawyer Lane, you know, where they showed you the barn with the SS and the circle around it. Why didn't they call them to say, "Yeah, Chad was there"? The only people that say that Chad was there -- they call seventeen witnesses that didn't have any information about what Chad Pate did on the early morning hours of the 4th of January -- were three people. Three people were the only people that testified as to what Chad

THE STATE OF TEXAS }{

COUNTY OF ARANSAS }{

I, **SHARON D. ANDERSON**, Official Court Reporter in and for the 343rd Judicial District Court of Aransas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties and/or Court to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me on the designated dates.

**WITNESS MY OFFICIAL HAND** this the 3rd day of June, 20 09.

SHARON D. ANDERSON, CSR
OFFICIAL COURT REPORTER
343rd Judicial District
P. O. Box 700
Sinton, Texas 78387
361-364-6202
Cert. No.: 2650
Exp. Date: 12-31-10

Vol 7 of 9